# **<u>Exhibit J</u>**

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3

    ---------------------------x
4                                :
    UNITED STATES OF AMERICA      :
5                                :
    v.                            :
6                                :    USAO No. 23 Cr. 307
                                 :
7   SHVARTSMAN et al.,            :
                                 :
8                                :
    ---------------------------X
9

10

11

12

13

                         Recorded Conversation
14

15

16

17                  Date:  July 27, 2023
                    Time:
18                  Session ID:
                    Participants:  CS
19                                 Michael Shvartsman
                                   Michael Park
20

21

22

                    (U/I) - UNINTELLIGIBLE
23                  (PH)  - PHONETIC SPELLING

24

25

```
 1   [PHONE RINGING]
 2   CS:          Hi Mike.
 3   PARK:        Hey, Steven.  How are you?
 4   CS:          Yeah, I'm good, thanks.  Good, thanks, and
 5                you?
 6   PARK:        Yes, I'm here with -- Michael is here as
 7                well.
 8   CS:          Hi, Michael.  How are you?
 9   SHVARTSMAN:  Good Steven, where are you?  You on
10                vacation?
11   CS:          Well, I'm on a bit of business and I'm going
12                to wrap the week and purely a bit of rest
13                and recuperation.  So.
14   SHVARTSMAN:  Right, well, enjoy yourself.  Good luck in
15                your business.
16   CS:          Yeah.  Cheers, thanks.  It's repeat
17                business, so.  So, yeah, it's pretty
18                relaxed.  Booked full on until tomorrow, so
19                lunch time.
20   SHVARTSMAN:  Okay, cool.
21   CS:          So, I'm pleased to have got in touch.  I
22                don't know if you spoke to Eric.  I said
23                I've been wanting to give you a call, but
24                I've obviously, for obvious reasons not.
25                And I was at the point where I was going to
```

| 1  |             | -- if I hadn't heard I was going to head |
|----|-------------|------------------------------------------|
| 2  |             | over next week.  So, this is perfect timing, |
| 3  |             | really. |
| 4  | SHVARTSMAN: | All right. |
| 5  | PARK:       | Yes, so we've put together a list of assets, |
| 6  |             | we got them over to John, he's come back to |
| 7  |             | me with some of that stuff.  Michael has |
| 8  |             | some questions about kind of the operation |
| 9  |             | and ownership of the Belize entities.  You |
| 10 |             | know, once we get everything transferred |
| 11 |             | into the Belize entities. |
| 12 | CS:         | Yes. |
| 13 | SHVARTSMAN: | So, right now they're from -- they're going |
| 14 |             | to Hong Kong, right?  And they're going to |
| 15 |             | UK and then they're going to Belize?  Is |
| 16 |             | that the, is that the process?  Or what's |
| 17 |             | the process? |
| 18 | CS:         | Yeah, yeah.  That's the full Singapore with |
| 19 |             | a double dip as we call it with having the |
| 20 |             | UK thrown in there just to give it that |
| 21 |             | added cleanliness and polishing off.  Do you |
| 22 |             | know what I mean? |
| 23 | SHVARTSMAN: | Yeah. |
| 24 | CS:         | Bearing in mind -- and this is purely up to |
| 25 |             | you guys, bearing in mind, you know, your |

```
 1                    situation, Michael, it may be appropriate
 2                    that we inject something that's sort of
 3                    already in being, if you like, so we push it
 4                    through another entity that pre-dates your
 5                    meetings with the SEC -- your arrest with
 6                    the SEC basically, for obvious reasons it's
 7                    completely up to you, won't cost any more,
 8                    but we can facilitate that.  The only
 9                    problem would be we would need an extra
10                    person from your side who would control --
11                    if you remember when we, when we discussed
12                    the full Singapore, I pointed out to you and
13                    -- on every move of your assets in order to
14                    give you the comfort that you need and you
15                    deserve.  And you can have somebody
16                    nominated by yourself to control that
17                    entity.  So, for example, if we just run
18                    with the full Singapore as it is, when your
19                    assets move from the current situation, we
20                    move them into Hong Kong.  That Hong Kong
21                    company will be set up with a person you
22                    nominate to control it.  So, you've got
23                    that, you've got that comfort zone.  And
24                    then when we move to the UK, we've got the
25                    same situation and ultimately whoever the
```

4

```
 1                      (U/I) is going to be over there controlling

 2                      it is, you know, obviously we need those

 3                      details in advance.  If you could provide us

 4                      with those in advance, that would be -- we

 5                      can -- we can --

 6  SHVARTSMAN:         All right, so how many people, how many

 7                      people do you need?

 8  CS:                 Well, if we run with the full Singapore, as

 9                      we agreed and we said, with the Hong Kong,

10                      UK, and Belize, that's three.  If we go for

11                      something additional where, you know, I can,

12                      I can, I can put something together where

13                      we've got something where the entity was set

14                      up maybe a year ago or whatever.  So, it

15                      doesn't look like we're moving your assets

16                      through something that's -- after the horse

17                      has bolted.  Do you get it?

18  SHVARTSMAN:         Yeah.

19  CS:                 And we would need, we would need an extra

20                      person.

21  SHVARTSMAN:         But why?  Isn't that just a replacement for

22                      either the Hong Kong or the UK?

23  CS:                 No.  We wanted to go through Hong Kong

24                      because that really cleans up your assets,

25                      Michael.  It really puts them out of reach
```

```
 1                        of the U.S. government because, you know,

 2                        it's China, basically.

 3   SHVARTSMAN:    Yeah.

 4   CS:            That is the big washing machine, if you

 5                        like, where they go into a deep wash.  When

 6                        they come out, they go to the UK and to

 7                        their, to their end -- to the end of the

 8                        journey in Belize where you want them.  So

 9                        yeah, we need to do Hong Kong, and that's --

10                        we're ready to go.  Ultimately, we've just

11                        been waiting for these -- excuse me -- these

12                        details as who you want on the

13                        intermediaries and just, you know, some

14                        specifics about the assets.  Because again

15                        in terms of seeing the specific assets,

16                        there may be something that, you know, we

17                        may need to separate or whatever.  You know,

18                        you can advise us on that, but obviously we

19                        need to look at it and say, well, maybe we

20                        need to put this in, you know, in a

21                        subsidiary of one of the, one of the

22                        cleaning companies, you know, to take it

23                        out.  So, for -- I'm trying to think what

24                        you've got.  Your vessel, for example, your

25                        boat, we can maybe separate out that totally
```

```
 1                      and put it -- strip it out of the -- when it

 2                      gets to Hong Kong, strip it out, and then

 3                      put it into a subsidiary report.  It doesn't

 4                      matter.  It will be controlled by your

 5                      nominated, your nominated person.

 6   SHVARTSMAN:        All right.  Okay.  So, you need four names.

 7                      Now, can they be citizens -- can they be,

 8                      like, Canadian citizens?  Ukrainian

 9                      citizens?  Like where -- what can they be?

10   CS:                Yep.  Yep.  Ideally, we don't -- obviously,

11                      we don't want a U.S. citizen for obvious

12                      reasons.

13   SHVARTSMAN:        Yep.

14   CS:                Ukrainian --

15   SHVARTSMAN:        And we don't want, and we don't want

16                      Russianers -- Russians, okay?

17   CS:                No, no, no.  No Russians.  Definitely not.

18                      Basically, we want anybody who's got a clean

19                      bill of health, so to speak, that is not

20                      going to bring any questions.  We want it to

21                      go as smoothly as possible.  So Canadian, no

22                      issues whatsoever.  Ukrainian --

23   SHVARTSMAN:        All right.

24   CS:                Where's the Ukrainian based?

25   SHVARTSMAN:        I don't know.  In Ukraine?
```

```
 1   PARK:            Not in Crimea.

 2   SHVARTSMAN:      Not in Crimea, no.  Like in Odesa.

 3   CS:              Yeah, yeah.  Let me have a think about that

 4                    one, Michael.  But potentially yes,

 5                    potentially, yes.

 6   SHVARTSMAN:      Yeah, think about it.  That's an important

 7                    one, because I've got, you know, some people

 8                    there I can use.

 9   PARK:            And I think the ultimate -- you know,

10                    obviously the asset is kind of ultimately in

11                    Belize, so Michael you know one of the big

12                    concerns is he appoints a third party to

13                    control the Belize entity, be the manager of

14                    the LLC or whatever it is, what are his

15                    protections in the ownership and operation?

16                    Kind of like the protector role he has for

17                    the trust.

18   CS:              Well, you've got that role and what it will

19                    be, it will be structured so that if there

20                    are -- if any issues arise, the assets will

21                    be poached directly back into -- they'll be

22                    liquidated, so the -- passed back to the

23                    beneficiaries.  So, it will be written up.

24                    So, it's absolutely watertight, and we'll

25                    give you a draft before we do it.
```

```
 1  SHVARTSMAN:    All right.

 2  CS:            But you, you know -- we will --

 3  SHVARTSMAN:    Let me ask a question --

 4  CS:            We'll give --

 5  SHVARTSMAN:    So, who is the beneficial owner of the

 6                 Belize entity?

 7  CS:            Whoever you want to be.

 8  SHVARTSMAN:    Got it.

 9  CS:            At the end of the day, Michael, as we

10                 discussed, just want to give you the maximum

11                 protection that you can possibly have, and

12                 particularly in the situation that you're in

13                 now.  Yeah, the person who you put in there

14                 you need to trust clearly, obviously, with

15                 any of -- in any step of the way.  But we've

16                 got control -- you've got control through

17                 those people, and it will be --

18  SHVARTSMAN:    Yeah, I got it.

19  CS:            Yeah, yeah.

20  SHVARTSMAN:    So ultimately the assets are going to end up

21                 in Brazil.  So, that's really -- not Belize

22                 -- or Belize.  That's really where I need to

23                 impart the person that I really trust.

24                 Because that -- other than that, I mean,

25                 they're just pops (PH).
```

```
 1   PARK:           Yeah, it's paper assets, so.

 2   SHVARTSMAN:     Yeah.

 3   CS:             Yeah.

 4   SHVARTSMAN:     Right, Steve?

 5   CS:             Yeah, yeah.  Absolutely.  What we need is --

 6                   for you is, what is key as you've just

 7                   pointed out, Michael, the trust factor is

 8                   there, but equally it will be so well neatly

 9                   tidy -- tied up.  Yeah.  Belize will be the

10                   -- where the control -- we can have

11                   subsidiaries wherever you want them or

12                   whether we agree.  As we move down the line,

13                   I think what we should do is if you can, you

14                   can have a think about Belize, Michael, and

15                   let's crack on with the, with the first

16                   obviously, Hong Kong or if we go with the

17                   first move, which --

18   SHVARTSMAN:     All right, I --

19   CS:             -- we tell -- which -- what I would say if

20                   we do that, we'd probably use UK but it's a

21                   paper exercise.  It would all be done as we

22                   said with promissory notes, blah, blah,

23                   blah.  You know.  So, yeah.  If you want, if

24                   you want to do that, that's your choice.

25                   But it would have been remiss of me not to,
```

| | | |
|---|---|---|
| 1 | | not to mention it, because what we don't |
| 2 | | want is for the SEC coming to me and saying, |
| 3 | | well, this was a fraudulent transfer because |
| 4 | | it was just a case of moving after the horse |
| 5 | | has bolted.  Well, no, it wasn't.  This |
| 6 | | company was set up.  This was all done, and |
| 7 | | we'll backdate.  So, some things you can't. |
| 8 | SHVARTSMAN: | All right. |
| 9 | CS: | But leave it -- |
| 10 | SHVARTSMAN: | Okay, so just do me a favor.  Find out if |
| 11 | | you're okay with a Ukrainian that don't live |
| 12 | | in Crimea obviously, they'll live in like |
| 13 | | Odesa or in Kyiv, if that's okay for you. |
| 14 | | And then I will give you -- as soon as you |
| 15 | | tell me that, within 24 hours I'll give you |
| 16 | | a couple of names for the first couple hops |
| 17 | | and then I've got some -- I know who I'm |
| 18 | | going to use already for the Belize. |
| 19 | CS: | Okay.  Okay.  You know already who you going |
| 20 | | to do -- use for the Belize? |
| 21 | SHVARTSMAN: | Yeah. |
| 22 | CS: | Okay.  Well, and by the time we get to that, |
| 23 | | aren't you in Miami anyway, Michael?  So, |
| 24 | | I'll probably get those details off your |
| 25 | | face to face. |

```
 1   SHVARTSMAN:    Okay.
 2   CS:            And, yeah, by the time we've done, by the
 3                  time we've done the -- did you, did you say
 4                  you wanted to do the UK's company first?
 5                  The back dated one.
 6   SHVARTSMAN:    Yeah.  I mean I don't know if it's first or
 7                  second or whatever but --
 8   CS:            Well, we'll have -- we want it to be first
 9                  because the Hong Kong will be settled.
10   SHVARTSMAN:    Yeah, yeah.  I got it.
11   CS:            Got it, yeah.
12   SHVARTSMAN:    I got it.  Okay, yeah.  So, that's, so,
13                  that's fine.  So, we can go to UK, Hong Kong
14                  and then what?  And then Belize?
15   CS:            Back -- probably back to the UK, as we said,
16                  for the double dip within the full
17                  Singapore.  And then it will go to Belize
18                  after that.
19   SHVARTSMAN:    Okay.  No problem.
20   CS:            So, you'll be, you'll be absolutely
21                  watertight then, Michael.
22   SHVARTSMAN:    Okay.
23   PARK:          And then John sent me an email today, you
24                  know, talking about the assets but also
25                  mentioned that you're coming here, and
```

SDNY_04_00020339

```
1                         you'll have a face to face and that you
2                         would normally set up a couple of passwords.
3    CS:                  Yeah.
4    PARK:                Which only you and him that will know that -
5                         -
6    [OVERLAPPING VOICES]
7    CS:                  Well, it'll be me.  Myself, Michael might so
8                         that --
9    PARK:                -- under duress or not.
10   CS:                  Sorry, say that again?
11   PARK:                One for I'm okay, one for under duress.
12   SHVARTSMAN:          Got it.
13   PARK:                So, he knows what actions to take.
14   SHVARTSMAN:          Okay.
15   PARK:                And that way nobody else knows it but you.
16                        And that's going to be your additional level
17                        of control over the guy in Belize.
18   SHVARTSMAN:          All right.
19   CS:                  Absolutely.
20   SHVARTSMAN:          Well, the guy in Belize -- but the guy in
21                        Belize is my guy.
22   CS:                  Yeah.
23   PARK:                Yes.  But you still don't want him doing
24                        something that you don't want him to do.
25   SHVARTSMAN:          Yeah, of course.  Okay.
```

```
 1   CS:           Because at the end of the day, Michael, I'm
 2                 your trustee, so I -- what -- it's me, it's
 3                 important you and I know so that we have a,
 4                 we have a password for what -- well talk
 5                 about when we see, we see each other.
 6   SHVARTSMAN:   Yeah, it's fine.
 7   CS:           It's --
 8   SHVARTSMAN:   Okay.
 9   CS:           It's two together, so to speak.  So.
10   SHVARTSMAN:   But wait a second, if you're the trustee on
11                 the Belize Corp, so then --
12   PARK:         No, he's the trustee.  The Belize Corp is
13                 going to be only controlled by -- but
14                 there's -- you know, when you set it up
15                 there will be additional powers that you can
16                 remove -- you can have that person removed
17                 for certain situations.  And what if he
18                 becomes under duress?
19   SHVARTSMAN:   Yeah.
20   PARK:         Right?
21   SHVARTSMAN:   This is where Steve comes in?
22   CS:           Yeah.
23   PARK:         And that -- so you can put somebody else in
24                 there that isn't that person and protect the
25                 asset.
```

```
 1   SHVARTSMAN:    Is that how it works, Steve?
 2   CS:            Yeah.  It's a bang on, as they say in the
 3                  UK.  Mike.  You got it.  You got it
 4                  absolutely right.  Yeah.  It will be
 5                  designed so that no matter what happens
 6                  within the -- that person who's controlling
 7                  that LLC will only be able to act upon
 8                  Michael's, you know, authorization if you
 9                  like.  So yeah, it will be inbuilt.  For me,
10                  yeah, if you want me to pay something -- if
11                  something's moving, you want me to pay,
12                  that's when you give me these words, the two
13                  different words.  One is which will be the
14                  normal to do it.  The other will be the
15                  duress, as Mike just explained.  If you --
16   SHVARTSMAN:    Got it.
17   CS:            So -- and if I get that one, I won't do it.
18                  I won't sanction it.  So.
19   SHVARTSMAN:    Okay.
20   CS:            But yeah, we'll have a good old chat.  We'll
21                  get the first bit done and then meet face to
22                  face for that.  I'm just trying to think of
23                  anything else.  Have you -- sorry, have you
24                  -- I keep talking, I'm sorry.  I've been
25                  waiting for this conversation for what, two
```

```
 1                       weeks?  Because I've been wanting to crack
 2                       on and get it, get it done because I'm
 3                       conscious -- we need to get your assets to a
 4                       place of -- you know, that's safe.  Clearly,
 5                       you're not in a good situation at the
 6                       moment.
 7   SHVARTSMAN:         All right.  Okay.  So, I'll see you next
 8                       week, but yeah, hit me back on the Ukrainian
 9                       question, and then we will get that done.
10   CS:                 Yeah.  So, just so I've got it clear in my
11                       mind, so you're going to use possibly two
12                       Ukraine?
13   SHVARTSMAN:         Yeah.  And then probably a Canadian for the
14                       Belize, most -- mostly -- either a Canadian
15                       or a -- I'm thinking like a Bulgarian
16                       potentially for the Belize.
17   PARK:               You need a total of four.
18   SHVARTSMAN:         Yeah, I know.
19   PARK:               Okay.
20   CS:                 Yeah.  So, two Ukrainians, a Canadian, and a
21                       Bulgarian?
22   SHVARTSMAN:         Yeah, or maybe even a couple Canadians.  So,
23                       we'll see.
24   CS:                 Okay, well, we can firm that once I've come
25                       back to you with the, with the Ukrainian --
```

| | | |
|---|---|---|
| 1 | SHVARTSMAN: | Ukrainian, yeah. |
| 2 | CS: | Yeah. |
| 3 | SHVARTSMAN: | Okay.  So, when do you think you'll be able |
| 4 | | to come back on that? |
| 5 | CS: | Well, I'll make some calls now and -- do you |
| 6 | | want me to call you, or do you want me to |
| 7 | | just text and say -- |
| 8 | SHVARTSMAN: | Call Mike, call Mike, or message Mike, and |
| 9 | | he'll tell me. |
| 10 | CS: | Yeah.  Okay.  Okay. |
| 11 | SHVARTSMAN: | Okay? |
| 12 | CS: | Yeah. |
| 13 | SHVARTSMAN: | All right, Steve. |
| 14 | CS: | Just before you go, I'm just trying to think |
| 15 | | if I've got any other questions while I've |
| 16 | | got you Michael, and Mike.  Yeah.  Once we, |
| 17 | | once we get going with this -- once you give |
| 18 | | us the relevant details of the beneficiaries |
| 19 | | -- the controlling beneficiaries, if we need |
| 20 | | to know, is there any specific details of an |
| 21 | | asset that you may -- we may need to |
| 22 | | separate out?  You don't have to answer that |
| 23 | | now.  Maybe that's -- anything linked to the |
| 24 | | SEC that we need to be aware -- |
| 25 | SHVARTSMAN: | In all, in all honesty, all of these assets |

```
 1                      have nothing to do with that matter.
 2  CS:                 Good.
 3  SHVARTSMAN:         I'm actually not --
 4  CS:                 Good.
 5  SHVARTSMAN:         I'm actually not at all worried about the
 6                      SEC and going after any of these assets
 7                      because, you know, the purported, the
 8                      purported crime, the funds from that didn't
 9                      buy any of these assets or invested in any
10                      assets.  I'm actually not worried about that
11                      at all.
12  CS:                 Good, good, good.  I know we've talked about
13                      that in the past, but I've got to make sure
14                      I won't be doing my job correctly if I
15                      wasn't --
16  SHVARTSMAN:         Yeah, no, I appreciate, I appreciate it.
17                      But yeah.
18  CS:                 Yeah.
19  SHVARTSMAN:         But it's kind of -- one's got nothing to do
20                      with the other.
21  CS:                 Oh, and in terms of the property, real
22                      estate.  Is it suitably leveraged, or does
23                      it need any anything else?  This is just
24                      something to think about.
25  PARK:               I mean, I don't think we have anything on
```

```
 1                          the (U/I) stuff but on the --

 2   SHVARTSMAN:    Mortgages you mean?

 3   PARK:          Yeah.

 4   SHVARTSMAN:    Yeah, there's a mortgage for 2 million on

 5                  Rocket.  Yeah, so one of the properties has

 6                  a mortgage for $2 million.  The other

 7                  property has nothing, but those are -- you

 8                  know, and those are owned by the trust right

 9                  now.

10   CS:            Yeah.

11   SHVARTSMAN:    Right.  So, yeah, I mean, we can transfer

12                  that stuff too.  But the mortgage is going

13                  to be a problem.  How do you deal with that?

14   CS:            Well, we can, we can create something.

15   SHVARTSMAN:    No, because there's a mortgage on the

16                  property right now for 2 million bucks.

17   CS:            And what's the value?

18   SHVARTSMAN:    The value is at around 6 million.

19   CS:            Okay.  So, there's potentially 4 million at

20                  risk.  Yeah, we --

21   SHVARTSMAN:    Yeah, potential.

22   CS:            Leave that with me and before we do any

23                  movements, we will, we will --

24   SHVARTSMAN:    Not really a risk because, the -- like I

25                  said, the money had nothing to do with this
```

SDNY_04_00020346

```
1                        transaction that they're -- that we're

2                        having a problem about right now.

3    CS:                 Yeah, yeah.

4    SHVARTSMAN:         That was used to acquire that.  It was

5                        acquired before this even happened.

6    CS:                 Yeah.

7    SHVARTSMAN:         Around the same time, maybe even.  Yeah, so

8                        I don't see it being a problem, to be honest

9                        with you.  I think we should just leave it

10                       to the trust and that's it.

11   PARK:               We can move it; we can move it with

12                       everything else on paper.

13   CS:                 Okay.  Okay.  Well, if you're comfortable

14                       with it, I just want to make 100 percent

15                       sure that you're happy, because I don't want

16                       you coming back to me and saying, Steve, you

17                       should have told me about this.  So.

18   SHVARTSMAN:         Yeah, but I mean, how -- but how do we --

19                       how do you transfer it?

20   CS:                 We wouldn't transfer it because it just

21                       wouldn't, it just wouldn't look, or as you

22                       guys say, hang right.  We would just have to

23                       look to provide some paperwork to show that

24                       the property is leveraged outside of the

25                       U.S.
```

```
 1   SHVARTSMAN:    Got it.
 2   PARK:          Because right now, I mean.  The way it is,
 3                  it's basically under a notice trust.
 4   SHVARTSMAN:    Right.
 5   CS:            Yeah.  Yeah.  But too, you know, that will
 6                  be a matter for you.  But it's sitting in
 7                  the -- yeah.  It's sitting in the U.S. that
 8                  will be an easy picking, you know, at the
 9                  end of the day Nevus (PH) (U/I) is never
10                  going to, it's never going to -- worst case
11                  scenario, I'm going to stay out of the U.S.
12                  It's going to be difficult for me to get
13                  ahold of.  You know, it's not the first time
14                  I've done this, so, yeah.  Yeah, don't even
15                  worry about it.  If I have a light bulb
16                  moment and it comes on, I will -- we can, we
17                  can revisit it.  But if you, if you decide
18                  for (U/I) braces you want me to get some
19                  paperwork in place, just let me know.  But
20                  it's a paper exercise.
21   SHVARTSMAN:    Yeah.  All right.  Sounds good.  So, I gotta
22                  say, let me ask a question.  So now that
23                  we've got -- okay, so, question, we've got
24                  bank accounts, for example, under the trust
25                  right now, and under the subs.
```

```
 1   PARK:         Yeah.

 2   SHVARTSMAN:   And I'm the signer -- I'm not the signer

 3                 anymore, Cassanna's (PH) the signer, right?

 4   CS:           Yeah.

 5   SHVARTSMAN:   Which is fucked up because she's not even a

 6                 trustee, but whatever.  So, but now this is

 7                 not -- who's the trustee for this stuff now?

 8                 Because the stuff is in Nevis, now.

 9   CS:           Yeah.  The truth, well, I'm your trustee.

10                 So basically, where are the, where are the

11                 accounts held?  I think you might have told

12                 me this before.  Are they held in --

13   SHVARTSMAN:   In the U.S., in the U.S.

14   CS:           Okay.  And are they linked to operating

15                 companies or businesses?

16   SHVARTSMAN:   I mean, one account just got some money

17                 sitting in it for a rainy-day fund.

18   CS:           Yeah.

19   SHVARTSMAN:   And then, and then the other accounts, you

20                 know, borrow funds from one of our other

21                 companies and then, you know, kind of dole

22                 it out accordingly.

23   CS:           Yeah.  So, with that -- yeah, in terms yeah

24                 -- it sits within -- but it's within the

25                 U.S.
```

```
 1   SHVARTSMAN:     Yeah.

 2   CS:             You know, anything directly in the U.S.

 3                   that's operating, it's going to hold a

 4                   value, by the sounds of things, a

 5                   significant value.  We could -- again, we

 6                   could create something where it -- we would

 7                   leverage the company or companies so that

 8                   this -- we provide, we provide you with the

 9                   debt.  So, if -- worst case scenario, and I

10                   know we've had the conversation.  If the SEC

11                   come looking, they're going to -- there's 20

12                   million in -- figuratively speaking.  And

13                   unfortunately, the company is leveraged to

14                   25 or 22, whatever.

15   SHVARTSMAN:     Yeah.

16   CS:             Yeah.  Do you see what I mean?

17   PARK:           Yeah.  I --

18   SHVARTSMAN:     Yeah, yeah, I understand.  Okay, we'll talk

19                   about when you're here, about that stuff.

20   CS:             Yeah.  Yeah.

21   SHVARTSMAN:     All right, all right.  Tell me about the

22                   Ukrainian stuff and then we'll go from

23                   there.

24   CS:             I will -- I'll make some calls now so we

25                   can, we can get going.  But I'm really
```

```
 1                      pleased to hear your tones and I'm really --
 2                      I really want to get this moving and get it
 3                      to the place where we need to get it to.
 4   PARK:              Yeah.
 5   SHVARTSMAN:        All right.  Thanks, Steven.  Appreciate it.
 6                      Enjoy your weekend.
 7   CS:                No problem.  You too, take care.  And I'll
 8                      get back to you as I say, and I'll let you
 9                      know when I'm coming.
10   SHVARTSMAN:        Thank you.
11   PARK:              Great.  Thanks Steven.
12   SHVARTSMAN:        Thank you.
13   CS:                Okay, cheers Mike, cheers Michael.  Bye.
14                      Bye.
15   SHVARTSMAN:        Bye-bye.
16   CS:                Yeah, the time is Thursday.  Sorry, the time
17                      is 1635, that's 4:35 Central European time
18                      on Thursday, the 27th of July 2023.  That
19                      was an incoming call from Mike Park on
20                      WhatsApp from his normal number, the only
21                      number I have for him.  And Mike -- Michael
22                      Shvartsman was on.  The conversations were
23                      pretty -- quite -- very self-explanatory,
24                      really.  We talked about laundering his
25                      assets through what I've called the
```

1          Singapore -- full Singapore structure, and I

2          suggested an added bit of value to him, if

3          you like, or an added bonus that we can

4          provide a corporation that pre-dates his

5          arrest.  So, no fingers could be pointed by

6          the SEC or any other law enforcement

7          organization looking to recover assets from

8          him, and clearly laundering Michael's assets

9          into a place of safety where they're out of

10         reach.  I referred to cleaning and

11         polishing.  Michael knows what I'm talking

12         about, I'm talking about laundering.  He

13         clearly understands, as does Mike.  He asked

14         some pertinent questions because clearly, we

15         talked about the individuals who were going

16         to control the companies to give him the

17         comfort that they've got the majority

18         control, so that I or anybody linked to me

19         can't run away with his assets and his prop

20         top (PH) I suggested potentially a couple of

21         Ukrainians, two Ukrainians, a Canadian, a

22         Bulgarian national to each.  And be provided

23         to be put in these places of control of the

24         individual corporations, which would be, as

25         Michael said, four in total.  The new one,

1    possibly a UK entity whereby these assets

2    are laundered through that entity.  And the

3    entity clearly would have been set up a year

4    ago, as I mentioned, maybe more, which

5    clearly, he likes.  And then it would just

6    go through the structure of the full

7    Singapore that I've already mentioned and

8    discussed at length with him, which is going

9    from the new UK through the, through the

10    Hong Kong into the UK, and then moving onto

11    Belize where he'll have control through an

12    individual of his choice who he trusts, and

13    his assets will be fully cleaned, which is

14    clearly what he wants.  On that basis, I've

15    -- before I go off, I've arranged to meet

16    face to face to discuss passwords for the

17    protocols regarding the instructions Michael

18    was liable to give me, or likely to give me,

19    regarding payments and movements of assets

20    and funds.  And we've agreed to meet in

21    Miami, and we can discuss a few more details

22    regarding the structure.  So, time's moved

23    on a little bit now, it's 1639 Central

24    European time, that's 4:39 p.m.  And I'm

25    going to switch it off.

1    [END OF RECORDING]

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SDNY_04_00020354