UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

MICHAEL SHVARTSMAN, et al.,

Defendants.

23 Cr. 307 (LJL)

**GOVERNMENT'S OMNIBUS MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Elizabeth Hanft
Daniel G. Nessim
Matthew R. Shahabian
Assistant United States Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND .............................................................................................................. 2

   I. The Insider Trading Scheme ................................................................................. 2

   II. Procedural History .............................................................................................. 3

ARGUMENT ................................................................................................................... 3

   I. Criminal Prohibitions Against Insider Trading Are Constitutional ...................... 3

      A. Prohibitions Against Insider Trading Do Not Violate Article I ........................ 3

      B. Prohibitions Against Insider Trading Do Not Violate the Due Process Clause ................ 8

   II. The Court Should Deny the Defendants' Motion Alleging
      Purported Grand Jury Impropriety ...................................................................... 10

      A. Relevant Facts .............................................................................................. 10

      B. Applicable Law ............................................................................................. 13

      C. Discussion .................................................................................................... 15

   III. The Court Should Deny the Defendants' Motion for a Bill of Particulars ......................... 18

   IV. The Court Should Deny Michael Shvartsman's Motion to Suppress
      Without a Hearing .......................................................................................... 22

      A. Relevant Facts .............................................................................................. 23

      B. Applicable Law and Ethical Rules ............................................................... 25

      C. Discussion .................................................................................................... 27

   V. The Court Should Deny Garelick's Motion to Suppress the Fruits of the
      Searches of His iPhone and Electronic Accounts ............................................. 31

      A. Relevant Facts .............................................................................................. 32

      B. Applicable Law ............................................................................................. 34

      C. Discussion .................................................................................................... 37

   VI. The Court Should Adopt the Government's Proposed Schedule for
      Pretrial Disclosures ........................................................................................ 49

CONCLUSION ............................................................................................................... 51

# TABLE OF AUTHORITIES

*Bank of Nova Scotia v. United States*,
    487 U.S. 250 (1988) ........................................................................ 14

*Blockburger v. United States*,
    284 U.S. 299 (1932) ........................................................................ 25

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994) .......................................................................... 5

*Charlotte E. v. Safir*,
    156 F.3d 340 (2d Cir. 1998) ............................................................ 36

*Colorado v. Connelly*,
    479 U.S. 157 (1986) ........................................................................ 36

*Colorado v. Spring*,
    479 U.S. 564 (1987) ........................................................................ 41

*Commonwealth v. Jones*,
    117 N.E.3d 702 (Mass. 2019) .......................................................... 35

*Connally v. Gen. Constr. Co.*,
    269 U.S. 385 (1926) .......................................................................... 8

*Dirks v. SEC*,
    463 U.S. 646 (1983) .......................................................................... 6

*Edwards v. Arizona*,
    451 U.S. 477 (1981) ........................................................................ 44

*Fisher v. United States*,
    425 U.S. 391 (1976) ........................................................................ 34

*Grievance Committee v. Simels*,
    48 F.3d 640 (2d Cir. 1995) ........................................................ 26, 28

*Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*,
    542 U.S. 177 (2004) ........................................................................ 34

*Illinois v. Perkins*,
    496 U.S. 292 (1990) ........................................................................ 41

*In re Amgen Inc.*, No.,
    10 Mc. 249, 2011 WL 2442047 (E.D.N.Y. Apr 6, 2011) ...................... 27

*In re Grand Jury Subpoena Duces Tecum Dated Mar. 25*,
    *2011*, 670 F.3d 1335 (11th Cir. 2012) ............................................ 35

*In re Order Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued by this Court*,
    No. 15 Mc. 1892 (JO), 2015 WL 5920207(E.D.N.Y. Oct. 9, 2015) ...... 35

*In re Terrorist Bombings of U.S. Embassies in East Africa*,
    552 F.3d ...................................................................................... 36

*Johnson v. Zerbst*,
    304 U.S. 458 (1938) ........................................................................ 24

*Kirby v. Illinois*,
    406 U.S. 682 (1972) ........................................................................ 24

*Kolender v. Lawson*,
    461 U.S. 352 (1983) .......................................................................... 8

*Loving v. United States*,
  517 U.S. 748 (1996) ............................................................................................. 6
*Maine v. Moulton*,
  474 U.S. 159 (1985) ...................................................................................... 25, 27
*Marbury v. Madison*,
  5 U.S. 137 (1803) ................................................................................................. 6
*Massiah v. United States*,
  377 U.S. 201 (1964) ........................................................................................... 25
*Maynard v. Cartwright*,
  486 U.S. 356 (1988) ......................................................................................... 8, 9
*McNeil v. Wisconsin*,
  501 U.S. 171 (1991) ...................................................................................... 25, 26
*Moran v. Burbine*,
  475 U.S. 412 (1986) ........................................................................................... 41
*Oregon v. Elstad*,
  470 U.S. 298 (1985) ...................................................................................... 36, 43
*Parsad v. Greiner*,
  337 F.3d 175 (2d Cir. 2003) .............................................................................. 39
*People v. Sneed*,
  2023 IL 127968 (Ill. 2023) ................................................................................ 35
*Pinto-Thomaz*,
  352 F. Supp. 3d .................................................................................................. 44
*Salman v. United States*,
  580 U.S. 39 (2016) ...................................................................................... 5, 6, 9
*Scott v. Illinois*,
  440 U.S. 367 (1979) ........................................................................................... 24
*State v. Valdez*,
  No. 20210175, 2023 WL 8635197 (Utah Dec. 14, 2023) .................................. 35
*Texas v. Cobb*,
  532 U.S. 162 (2001) ...................................................................................... 25, 27
*United States v. Anderson*,
  929 F.2d 96 (2d Cir. 1991) ................................................................................ 41
*United States v. Apple MacPro Computer*,
  851 F.3d 238 (3d Cir. 2017) .............................................................................. 35
*United States v. Avenatti*,
  432 F. Supp. 3d 354 (S.D.N.Y. 2020) ................................................................. 9
*United States v. Awadallah*, 349 F.3d,
  349 F.3d 42 (2d Cir. 2003) ................................................................................ 46
*United States v. Bari*,
  750 F.2d 1169 (2d Cir. 1984) ............................................................................ 16
*United States v. Bellomo*,
  263 F. Supp. 2d 561 (E.D.N.Y. 2003) ............................................................... 20
*United States v. Bin Laden*,
  92 F. Supp. 2d 225 (S.D.N.Y. 2000) .................................................................. 21
*United States v. Binday*,
  804 F.3d 558 (2d Cir. 2015) .............................................................................. 30

*United States v. Blaszczak,*
  141 S. Ct. 1040 (2021)................................................................................................. 5

*United States v. Blaszczak,*
  947 F.3d 19 (2d Cir. 2019)........................................................................................... 4

*United States v. Blondet,*
  No. 16 Cr. 387 (JMF), 2019 WL 5690711 (S.D.N.Y. Nov. 4, 2019)........................... 50

*United States v. Bortnovsky,*
  820 F.2d 572 (2d Cir. 1987)......................................................................................... 18

*United States v. Brito,*
  907 F.2d 392 (2d Cir. 1990)................................................................................... 13, 14

*United States v. Caming,*
  968 F.2d 232 (2d Cir. 1992)................................................................................... 30, 47

*United States v. Chestman,*
  947 F.2d 551 (2d Cir. 1991)........................................................................................... 6

*United States v. Connolly,*
  No. 16 Cr. 370 (CM), 2019 WL 2120022 (S.D.N.Y. May 2, 2019)............................. 16

*United States v. Contorinis,* No.,
  09 Cr. 1083 (RJS), Dkt. 49 (S.D.N.Y. 2010).............................................................. 21

*United States v. Coppa,*
  267 F.3d 132 (2d Cir. 2001)......................................................................................... 50

*United States v. Corbin,*
  729 F. Supp. 2d 607 (S.D.N.Y. 2010)........................................................................... 6

*United States v. D'Amico,*
  734 F. Supp. 2d 321 (S.D.N.Y. 2010)......................................................................... 19

*United States v. DeFilippo,*
  No. 17 Cr. 585 (WHP), 2018 WL 740727 (S.D.N.Y. Jan. 31, 2018)......................... 46

*United States v. DeVillio,*
  983 F.2d 1185 (2d Cir. 1993)............................................................................. 25, 26, 27

*United States v. Dixon,*
  409 U.S. 688 (1993)...................................................................................................... 25

*United States v. Duvall,*
  537 F.2d 15 (2d Cir. 1976)........................................................................................... 41

*United States v. Eldair,*
  No. 20 Cr. 243 (LDH), 2023 WL 4373551 & n.5 (E.D.N.Y. July 6, 2023).............. 35

*United States v. Falkowitz,*
  214 F. Supp. 2d 365 (S.D.N.Y. 2002).......................................................................... 50

*United States v. Feola,*
  651 F. Supp. 1068 (S.D.N.Y. 1987)............................................................................. 20

*United States v. Filippi,*
  No. 12 Cr. 604 (RA), 2013 WL 208919 (S.D.N.Y. Jan. 16, 2013) ........................... 49

*United States v. FNU LNU,*
  653 F.3d 144 (2d Cir. 2011).................................................................................. 39, 42

*United States v. Gilkeson,*
  431 F. Supp. 2d 270 (N.D.N.Y. 2006).......................................................................... 44

*United States v. Grant,*
  No. 07 Cr. 1119 (CM), 2008 WL 2971781 (S.D.N.Y. Aug. 1, 2008) ......................... 44

*United States v. Grimaud*,
  220 U.S. 506 (1911) ............................................................................ 6, 7

*United States v. Halloran*,
  821 F.3d 321 (2d Cir. 2016) ...................................................................... 8

*United States v. Hammad*,
  858 F.2d 834 (2d Cir. 1988) ...................................................... 26, 27, 29, 30

*United States v. Haygood*,
  157 F. App'x 448 (2d Cir. 2005) .............................................................. 44

*United States v. Hoskins*,
  73 F. Supp. 3d 154 (D. Conn. 2014) ........................................................... 9

*United States v. Howard*,
  216 F.3d 1074 (Table), 2000 WL 772405 (2d Cir. June 15, 2000) ................... 15, 17

*United States v. Hubbell*,
  530 U.S. 27 (2000) ............................................................................ 34

*United States v. Irving*,
  No. 03 Cr. 633 (LAK), 2003 WL 22127913 (S.D.N.Y. Sept. 15, 2003) ................. 40

*United States v. Jones*,
  164 F.3d 620 (2d Cir. 1998) ............................................................... 14, 17

*United States v. Kaiser*,
  609 F.3d 556 (2d Cir. 2010) .................................................................. 10

*United States v. Lanier*,
  520 U.S. 259 (1997) ............................................................................ 8

*United States v. Leung*,
  40 F.3d 577 (2d Cir. 1994) .................................................................... 13

*United States v. Lombardozzi*,
  491 F.3d 61 (2d Cir. 2007) ................................................................ 14, 17

*United States v. Mahabub*,
  No. 13 Cr. 908 (AJN), 2014 WL 4243657 (S.D.N.Y. Aug. 26, 2014) .................. 20

*United States v. Mahaffy*,
  446 F. Supp. 2d 115 (E.D.N.Y. 2006) ......................................................... 19

*United States v. Martin*,
  426 F.3d 68 (2d Cir. 2005) .................................................................... 47

*United States v. Martinez*,
  992 F. Supp. 2d 322 (S.D.N.Y. 2014) .......................................................... 30

*United States v. Masullo*,
  489 F.2d 217 (2d Cir. 1973) .................................................................. 28

*United States v. McCoy*,
  407 F. App'x 514 (2d Cir. 2010) .............................................................. 44

*United States v. McKee*,
  192 F.3d 535 (7th Cir. 1999) ................................................................. 42

*United States v. Mechanik*,
  475 U.S. 66 (1986) ............................................................................ 13

*United States v. Mejia*
  No. 11 Cr. 1032 (PAE), 2013 WL 3212299 (S.D.N.Y. June 26, 2013) ................. 14

*United States v. Melvin*,
  143 F. Supp. 3d 1354 (N.D. Ga. 2015) ......................................................... 9

v

*United States v. Mendonca*,
  88 F.4th 144 (2d Cir. 2023) .................................................................... 41

*United States v. Milani*,
  739 F. Supp. 216 (S.D.N.Y. 1990) ........................................................... 8

*United States v. Mills*,
  412 F.3d 325 (2d Cir. 2005) .................................................................... 25

*United States v. Mitchell*,
  76 M.J. 413 (C.A.A.F. 2017) .................................................................. 45

*United States v. Mitchell*,
  966 F.2d 92 (2d Cir. 1992) ............................................................... 39, 41

*United States v. Mitlof*,
  165 F. Supp. 2d 558 (S.D.N.Y. 2001) ...................................................... 19

*United States v. Moten*,
  582 F.2d 654 (2d Cir. 1978) .................................................................... 13

*United States v. Motz*,
  652 F. Supp. 2d 284 (E.D.N.Y. 2009) ........................................................ 9

*United States v. Murgio*,
  209 F. Supp. 3d 698 (S.D.N.Y. 2016) ...................................................... 18

*United States v. Nacchio*,
  No. 05 Cr. 545 (EWN), 2006 WL 2475282 (D. Colo. Aug. 25, 2006) ................. 21

*United States v. Nieves*,
  No. 19 Cr. 354 (JSR), 2021 WL 1240472 (S.D.N.Y. Apr. 1, 2021) ................... 47

*United States v. Noble*,
  No. 07 Cr. 284 (RJS), 2008 WL 140966 (S.D.N.Y. Jan. 11, 2008) .................. 30

*United States v. Nouri*,
  611 F. Supp. 2d 380 (S.D.N.Y. 2009) ...................................................... 27

*United States v. O'Hagan*,
  521 U.S. 642 (1997) ............................................................... 4, 6, 9, 10

*United States v. Ojeikere*,
  299 F. Supp. 2d 254 (S.D.N.Y. 2004) ...................................................... 49

*United States v. Okwumabua*,
  828 F.2d 950 (2d Cir. 1987) .................................................................... 41

*United States v. Oladokun*,
  No. 15 Cr. 559 (BMC), 2016 WL 4033166 (E.D.N.Y. July 27, 2016) ........... 40, 41

*United States v. Oloyede*,
  933 F.3d 302 (4th Cir. 2019) .................................................................. 44

*United States v. Ordaz-Gallardo*,
  520 F. Supp. 2d 516 (S.D.N.Y. 2007) ...................................................... 13

*United States v. Parnas*,
  No. 19 Cr. 725 (JPO), 2021 WL 2981567 (S.D.N.Y. July 14, 2021) ................ 50

*United States v. Patane*,
  542 U.S. 630 (2004) ............................................................................ 43

*United States v. Pena*,
  961 F.2d 333 (2d Cir. 1992) .................................................................... 30

*United States v. Plaza*,
  826 F. App'x 60 (2d Cir. 2020) .............................................................. 16

*United States v. Proctor & Gamble Co.*,
   356 U.S. 677 (1958)............................................................................................ 13

*United States v. R. Enterprises, Inc.*,
   498 U.S. 292 (1991)............................................................................................ 13

*United States v. Rajaratnam*,
   719 F.3d 139 (2d Cir. 2013)............................................................................... 46

*United States v. Rajaratnam*,
   No. 09 Cr. 1184 (RJH), 2010 WL 2788168 (S.D.N.Y. July 13, 2010) .................. 21

*United States v. Rittweger*,
   259 F. Supp. 2d 275 (S.D.N.Y. 2003)................................................................ 18

*United States v. Rodriguez*,
   No. 95 Cr.  (HB), 1996 WL 479441 (S.D.N.Y. Aug. 22, 1996)............................. 15

*United States v. Rybicki*,
   354 F.3d 124 (2d Cir. 2003).................................................................................. 8

*United States v. Salameh*,
   142 F.3d 88 (2d Cir. 1998)................................................................................. 47

*United States v. Samsonov*,
   No. 07 Cr. 1198 (CM), 2009 WL 176721 (S.D.N.Y. Jan 23, 2009)....................... 20

*United States v. Sharma*,
   No. 18 Cr. 340 (LGS), 2019 WL 3802223 (S.D.N.Y. Aug. 13, 2019) ................. 44

*United States v. Siddiqui*,
   699 F.3d 690 (2d Cir. 2012).............................................................................. 39

*United States v. Smith*,
   643 F.2d 942 (2d Cir. 1981).............................................................................. 40

*United States v. Smith*,
   No. 22 Cr. 352 (JSR), 2023 WL 8611259 (S.D.N.Y. Dec. 13, 2023) ........................ 34, 35, 37

*United States v. Stewart*, No.,
   15 Cr. 287 (LTS), Dkt. 64 (S.D.N.Y. 2016) ...................................................... 22

*United States v. Torres*,
   901 F.2d 205 (2d Cir. 1990)......................................................................... 13, 18

*United States v. Trippe*,
   171 F. Supp. 2d 230 (S.D.N.Y. 2001)................................................................ 20

*United States v. Tsai*,
   282 F.3d 690 (9th Cir. 2002) ............................................................................ 40

*United States v. Tuzman*,
   301 F. Supp. 3d 430 (S.D.N.Y. 2017)................................................................ 20

*United States v. Verdugo*,
   617 F.3d 565 (2d Cir. 2010).............................................................................. 38

*United States v. Walsh*,
   194 F.3d 37 (2d Cir. 1999)................................................................................ 18

*United States v. Wey*,
   15 Cr. 611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) ......................... 20

*United States v. Williams*,
   504 U.S. 36 (1992)........................................................................................ 14, 15

*United States v. Wilson*,
   914 F. Supp. 2d 550 (S.D.N.Y. 2012)................................................................ 44

*Vega v. Tekoh*,
   142 S. Ct. 2095 (2022) ............................................................................................................ 43

## PRELIMINARY STATEMENT

Defendants Michael Shvartsman, Gerald Shvartsman, and Bruce Garelick are charged in Indictment 23 Cr. 307 (LJL) (the "Indictment") with conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 and nine counts of substantive securities fraud—eight counts in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b5, and 18 U.S.C. § 2; and one count in violation of 18 U.S.C. §§ 1348 and 2. The charges arise from the defendants' participation in an insider trading scheme involving securities of the special purpose acquisition corporation ("SPAC") Digital World Acquisition Corporation ("DWAC").

All three defendants have filed pretrial motions. (Dkt. 45 ("Garelick Mem."), 50 ("G. Shvartsman Mem."), 56 ("M. Shvartsman Mem.").) The defendants move to dismiss the indictment on constitutional grounds, asserting that criminal prohibitions against insider trading violate Article I and are unconstitutionally vague. The defendants further move to dismiss the indictment based on purported misrepresentations to the grand jury (and, in the alternative, for disclosure of grand jury materials). The defendants also move for a bill of particulars and to set their preferred schedule for pretrial disclosures.

In addition, Michael Shvartsman asserts that his Sixth Amendment rights were violated and seeks the suppression of the fruits of that supposed violation. Garelick argues that his Fifth Amendment right against self-incrimination was violated when he provided his cellphone passcode to Customs and Border Protection ("CBP") officers and seeks the suppression of the fruits of that supposed violation. Both Shvartsman and Garelick seek a hearing in connection with their suppression motions.

For the reasons set forth below, the defendants' motions should be denied in their entirety without a hearing.

1

## BACKGROUND

### I.     The Insider Trading Scheme

As alleged in the Indictment, the defendants together made more than $22 million in illegal profits by trading in securities of DWAC based on insider information that the SPAC was going to take public a media company owned by former U.S. President Donald J. Trump. (Indictment ¶ 1.) In or about June 2021, the defendants were personally solicited to invest in DWAC by the chief executive officer ("the CEO") of DWAC. (*Id.* ¶ 7.) During that initial pitch meeting and subsequent solicitation calls with the CEO, the defendants were told that Trump Media and Technology Group ("Trump Media") had become a likely merger target for DWAC, and that Trump Media had already executed a confidential letter of intent with another SPAC managed by the CEO, Benessere. (*Id.* ¶ 8.)

All three defendants signed confidentiality agreements prohibiting the use of the information they received from DWAC or Benessere for any purpose other than considering whether to invest directly in DWAC or Benessere. (*Id.*) The defendants agreed to invest hundreds of thousands of dollars in DWAC, and made a condition of their investment that Garelick, who was the chief investment officer of Michael Shvartsman's venture capital firm, Rocket One Capital LLC ("Rocket One"), be named to the board of directors of DWAC. (*Id.* ¶¶ 7, 9.) As a DWAC director, Garelick was further bound by a code of ethics that prohibited his misuse of confidential information he learned in his role as a director, including for insider trading. (*Id.* ¶ 9.)

Through his position as a member of the board, Garelick received updates on DWAC's merger negotiations with Trump Media. The defendants used Garelick's access to this material, nonpublic information to purchase additional DWAC securities on the open market from counterparties who did not have advance knowledge of DWAC's plans. (*Id.* ¶¶ 11-12.) The

defendants timely purchased these securities before the public announcement of the DWAC-Trump Media merger on October 20, 2021. (*Id.* ¶ 14.) In addition, the defendants further violated their duties of confidentiality to DWAC and Benessere by disclosing this material nonpublic information to friends, business associates, and employees. (*Id.* ¶ 13.) In particular, Michael Shvartsman tipped his neighbor, friend, and a business associate ("Associate-1"); Garelick further tipped that same Associate-1 and friend; and Gerald Shvartsman tipped two of his employees, all of whom engaged in their own profitable trades based on this inside information. (*Id.* ¶ 13.)

In total, Michael Shvartsman purchased approximately two million DWAC warrants at the end of September and beginning of October 2021, (*id.* ¶ 20), which he sold for a profit of approximately $18 million. Gerald Shvartsman purchased approximately 400,000 DWAC warrants in mid-October 2021, (*id.*), which he sold for a profit of approximately $4 million. Garelick purchased approximately 4,020 units of DWAC in September 2021, (*id.*), which he sold for a profit of approximately $49,702.

## II. Procedural History

A grand jury sitting in this District returned the Indictment against the defendants on June 26, 2023. (Dkt. 1.) The defendants were arrested on June 29, 2023, presented before magistrate judges in the districts of their arrests, and released on bail. Trial is scheduled to commence on April 15, 2023.

## ARGUMENT

## I. Criminal Prohibitions Against Insider Trading Are Constitutional

### A. Prohibitions Against Insider Trading Do Not Violate Article I

The defendants argue that the Indictment should be dismissed pursuant to "Article I and/or the due process clause of the Constitution." That argument flies in the face of decades of statutory and case law and is meritless.

3

As noted, the Indictment charges the defendants with Title 15 securities fraud and Title 18 securities fraud (as well as a conspiracy with those objects). The prohibition on insider trading under those statutes is well established from the text of the statutes, from the case law, and even from the legislative record the defendants ask this Court to consider. The defendants confuse a policy argument for a legal one, but under the law, as enacted by Congress and as interpreted by the courts, insider trading is illegal and the relevant statutes are constitutional.

First, the prohibition on insider trading does not violate Article I. Despite Shvartsman's say-so ("No statute defines and prohibits insider trading," *see* M. Shvartsman Mem. 7), the prohibition is drawn directly from the relevant statutes' texts. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), proscribes the use of a deceptive device or contrivance in contravention of rules prescribed by the SEC in connection with the purchase or sale of securities. The SEC has in turn promulgated Rule 10b-5, 17 C.F.R. § 240.10b-5. That Rule provides that it is unlawful to "employ any device, scheme, or artifice to defraud . . . or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(a), (c). And Title 18, United States Code, Section 1348 makes it unlawful to "execute, or attempt[] to execute, a scheme or artifice . . . to defraud any person in connection with . . . any security." Insider trading is a deceptive device and/or a "device, scheme, or artifice to defraud." *United States v. O'Hagan*, 521 U.S. 642, 652 (1997) (under the classical theory of insider trading liability, "[t]rading on such information qualifies as a 'deceptive device' under § 10(b)"; under the misappropriation theory, "a person commits fraud 'in connection with' a securities transaction, and thereby violates § 10(b) and Rule 10b-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information"); *United*

4

*States v. Blaszczak*, 947 F.3d 19, 35 (2d Cir. 2019) (in Sections 78j(b) and 1348, "the term 'defraud' encompasses the so-called 'embezzlement' or 'misappropriation' theory of fraud"), vacated on other grounds by *United States v. Blaszczak*, 141 S. Ct. 1040 (2021); *see also Salman v. United States*, 580 U.S. 39, 41 (2016) ("Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b-5 prohibit undisclosed trading on inside corporate information by individuals who are under a duty of trust and confidence that prohibits them from secretly using such information for their personal advantage. . . . These persons also may not tip inside information to others for trading. The tippee acquires the tipper's duty to disclose or abstain from trading if the tippee knows the information was disclosed in breach of the tipper's duty, and the tippee may commit securities fraud by trading in disregard of that knowledge."); *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 172-73 (1994) (noting that Congress did not create a private cause of action under §10(b), but that "the text of the statute controls" regarding the scope of conduct § 10(b) prohibits).

Section 240.10b-5-1 makes that prohibition even clearer, explaining that "[t]he manipulative or deceptive device[s] or contrivance[s] prohibited by [15 U.S.C. § 78j] and [Rule 10b-5] thereunder include, among other things, the purchase or sale of a security of any issuer, on the basis of material nonpublic information about that security or issuer, in breach of a duty of trust or confidence that is owed, directly, indirectly, or derivatively, to the issuer of that security or the shareholders of that issuer, or to any other person who is the source of the material nonpublic information." 17 C.F.R. § 240.10b5-1.

Decades of case law have also clearly established that these antifraud statutes prohibit insider trading. Courts have consistently so held, despite variations among courts and scholars in explaining the motivating principles and policy interests behind the prohibition itself. And while

courts may have disagreed about the *scope* of the prohibition—as in the case of nearly every criminal statute—they have been crystal clear not only that insider trading is prohibited, but also about which statutes prohibit it. *See, e.g.*, *Salman*, 580 U.S. at 41-42 ("Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b-5 prohibit undisclosed trading on inside corporate information by individuals who are under a duty of trust and confidence that prohibits them from secretly using such information for their personal advantage. Individuals under this duty may face criminal and civil liability for trading on inside information (unless they make appropriate disclosures ahead of time). These persons also may not tip inside information to others for trading. The tippee acquires the tipper's duty to disclose or abstain from trading if the tippee knows the information was disclosed in breach of the tipper's duty, and the tippee may commit securities fraud by trading in disregard of that knowledge."); *O'Hagan*, 521 U.S. at 652; *Dirks v. SEC*, 463 U.S. 646, 653 (1983); *United States v. Chestman*, 947 F.2d 551, 564-67 (2d Cir. 1991); *United States v. Corbin*, 729 F. Supp. 2d 607, 612 (S.D.N.Y. 2010).

While "Congress, not the courts, has the exclusive power to define federal crimes," (Shvartsman Mem. 6), "[i]t is emphatically the province and duty of the [courts] to say what the law is," as "[t]hose who apply the rule to particular cases, must of necessity expound and interpret that rule," *Marbury v. Madison*, 5 U.S. 137, 177 (1803). And the Supreme Court has blessed Congress's delegation of rulemaking authority to the SEC. *O'Hagan*, 521 U.S. at 667; *see also Loving v. United States*, 517 U.S. 748, 768 (1996) (The Supreme Court has "upheld delegations whereby the Executive or an independent agency defines by regulation what conduct will be criminal, so long as Congress makes the violation of regulations a criminal offense and fixes the

punishment, and the regulations 'confin[e] themselves within the field covered by the statute.'" (quoting *United States v. Grimaud*, 220 U.S. 506, 518 (1911))).

Congress, for its part, aware of the long line of case law prohibiting insider trading under existing statutes, has not chosen to enact more specific legislation. Shvartsman cherry-picks certain commentary from a few members of Congress to argue that Congress has "acknowledged [its] obligation" to pass a law prohibiting insider trading. (M. Shvartsman Mem. 9.) To the contrary, the Congressional Record that Shvartsman asks this Court to consider is replete with the opposite acknowledgment—that prohibitions on insider trading law already exist. *See, e.g.*, 167 Cong. Rec. H2460 (daily ed. May 18, 2021) ("To be explicitly clear, [the proposed Insider Trading Prohibition Act's] intent is to codify, and neither expand nor contract, insider trading law as it is currently understood and interpreted by the Federal courts. Again, there should not be a single cause of action available under this law that would not otherwise be available to Federal prosecutors or SEC enforcement attorneys under the already existing securities laws"); 166 Cong. Rec. H9272 (daily ed. Dec. 5, 2019) (proposed Insider Trading Prohibition Act "codifies existing case law" and intends to "reflect existing insider trading case law"; noting that "[c]urrent law prohibits trading on material insider information in breach of a fiduciary duty under the antifraud provisions of the Federal securities law. . . . the [SEC and DOJ] regularly use their authority by bringing insider trading cases against bad actors who violate our insider trading laws"); *id.* at H9274 ("We currently have . . . the greatest clarity on insider trading that we have ever had in this Nation"). Congress's failure to pass a *new* insider trading statute should not be equated with its failure to carry out its Article I duties, or its disapproval of the manner in which the case law interpreting statutes that were indeed duly enacted by Congress has developed.

Whether Congress should or should not enact a new insider trading law is not before this Court. Congress has enacted statutes that prohibit insider trading, and the courts have interpreted those statutes. The relevant prohibitions do not violate Article I.

B.  Prohibitions Against Insider Trading Do Not Violate the Due Process Clause

Second, the laws prohibiting insider trading do not violate the Due Process clause. A statute must "define [a] criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "[T]he vagueness doctrine bars enforcement of 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.'" *United States v. Lanier*, 520 U.S. 259, 266 (1997) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). The void-for-vagueness doctrine asks "whether [a] statute, either standing alone *or as construed*, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Halloran*, 821 F.3d 321, 338 (2d Cir. 2016) (emphasis added).

Because vagueness challenges are "as applied," courts "must await conclusion of the trial" to determine whether a statute is unconstitutionally vague in a particular case. *United States v. Milani*, 739 F. Supp. 216, 218 (S.D.N.Y. 1990). As the Supreme Court has explained, "[o]bjections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988); *see also United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003) ("Panel opinions of this Court have repeatedly held that when, as in the case before us, the interpretation of a statute does not implicate First Amendment rights, it is assessed for

vagueness only 'as applied,' i.e., in light of the specific facts of the case at hand and not with regard to the statute's facial validity." (internal quotation marks and citation omitted)).

The defendants here do not explain how the prohibitions on insider trading are void for vagueness as applied to their conduct specifically, or why they would not have understood that their conduct was prohibited by the charged statutes. In any event, any effort to do so would be premature. A void-for-vagueness challenge like this one is inherently fact-specific and cannot be decided without a developed record. *Maynard*, 486 U.S. at 361. Accordingly, the law requires as-applied void-for-vagueness challenges to be raised after trial. *See United States v. Avenatti*, 432 F. Supp. 3d 354, 366 (S.D.N.Y. 2020); *United States v. Hoskins*, 73 F. Supp. 3d 154, 166-67 (D. Conn. 2014).

Such a challenge would clearly fail, in any event. In *Salman*, the Supreme Court unanimously held that the established principle for determining tippee liability for insider trading—the aspect of insider trading liability most in dispute among lower courts—was not unconstitutionally vague. 580 U.S. at 51 ("We reject Salman's argument that *Dirks*' gift-giving standard is unconstitutionally vague as applied to this case. . . . At most, Salman shows that in some factual circumstances assessing liability for gift-giving will be difficult. That alone cannot render 'shapeless' a federal criminal prohibition."). Honed over decades, the body of existing case law defines insider trading with amply sufficient "definiteness." Courts have also rejected vagueness challenges to Section 1348 specifically. *See United States v. Melvin*, 143 F. Supp. 3d 1354, 1371-73 (N.D. Ga. 2015) (18 U.S.C. § 1348 is not void for vagueness; its elements are straightforward, even as applied to insider trading, and it does not create a "trap for the unwary"); *United States v. Motz*, 652 F. Supp. 2d 284, 295 (E.D.N.Y. 2009) (holding same with regard to Section 1348 in the context of a "cherry-picking" scheme).

9

Finally, as to the Title 15 counts, the Government must show that the defendants acted "willfully," cutting against any argument that the statute as applied to the defendants is so vague as to prevent them from understanding what conduct is prohibited. 15 U.S.C. § 78ff(a); *O'Hagan*, 521 U.S. at 665-66. The "requirement of the presence of culpable intent as a necessary element of the offense does much to destroy any force in the argument that application of the statute . . . is unjust." *Id.* at 666 (internal quotation marks and citation omitted). In order to be convicted, the defendants must have known they were committing a wrongful act. *Id.*; *United States v. Kaiser*, 609 F.3d 556, 568 (2d Cir. 2010). The statutes are not void for vagueness, generally or as applied to the defendants.

## II. The Court Should Deny the Defendants' Motion Alleging Purported Grand Jury Impropriety

The defendants move to dismiss the indictment, or, in the alternative, inspect grand jury materials, due to purported prosecutorial misconduct before the grand jury in presenting a single text message out of context. (M. Shvartsman Mem. 27-31.) The motion should be denied. There was no prosecutorial misconduct before the grand jury, intentional, reckless, or otherwise, and the error the defendants rely on was immaterial to the grand jury's probable cause determination.

### A.  Relevant Facts

As discussed further below in connection with defendant Bruce Garelick's motion to suppress, law enforcement searched Garelick's iPhone on two separate occasions. The first search took place on New Year's Eve 2021, when Garelick landed at JFK Airport and FBI agents, pursuant to a search warrant, covertly searched Garelick's phone while Garelick underwent a secondary inspection by CBP officers. Due to time constraints, technical difficulties, and the desire to not alert Garelick to the fact that he was under criminal investigation, the returns from that review were limited to a manual review of Garelick's iPhone, i.e., an FBI agent ("Agent-1")

manually took pictures of responsive data on Garelick's device. Those pictures included the following (cropped) photo of a portion of a text message chain between Garelick and Michael Shvartsman:



Relevant here, the top of the visible portion of the text chain includes the end of a message from Garelick to Shvartsman that says "intelligence to share with you."

Subsequently, in June 2022, law enforcement seized Garelick's phone from his home in Rhode Island and searched it, again pursuant to a warrant. This time, law enforcement was able to obtain a forensic extraction of the entire device, and performed a responsiveness review on that extraction. In the full extraction, the context of the above-described text from Garelick is as follows: "I spoke to Steve at Altmore (guy that was supposed to be on the zoom at 10am). Have some good intelligence to share with you." (Park Decl., Ex. O.)

In describing the insider trading scheme, the Indictment discusses in painstaking detail how: (1) the defendants learned the material nonpublic information that DWAC was targeting Trump Media; (2) Garelick was named to the DWAC Board as a condition of the defendants' investment in DWAC; and (3) Garelick improperly provided updates to others on the status of the

DWAC-Trump negotiations based on confidential information he learned as a board member. For example, the Indictment alleges that, on September 8, 2021, Garelick told Michael Shvartsman's business associate that the DWAC Trump Media merger was expected to occur within six to ten weeks, and that Shvartsman intended to purchase a quarter million dollars in additional DWAC securities on the open market over the next month. (Indictment ¶ 13(b).) Less than two weeks later, on September 20, 2021, Garelick texted Shvartsman that he (Garelick) would be attending a DWAC board meeting the next day and recommended "starting to buy" more DWAC stock. (*Id.* ¶ 12(a).)

Three days later, on September 23, 2021, Garelick learned during a DWAC board meeting that Trump Media had entered into a letter of intent with DWAC. (*Id.* ¶ 12(b).) Garelick did two things with that information. First, that same day, he illegally purchased DWAC shares on the open market. *Id.* Second, as alleged in the Indictment, Garelick had "several conversations" with Michael Shvartsman, which culminated in Shvartsman purchasing two million DWAC warrants beginning on October 1, 2021. (*Id.* ¶ 12(b).) Relying on the manual review screenshot version of the Garelick phone search, the Indictment quotes the "intelligence to share with you" text as an "instance" of Shvartsman and Garelick's communications during this one-week time period. (*Id.*)

In reviewing the discovery materials for this case post-indictment, the Government realized that the full version of the text messages extracted during the *second* Garelick phone search added additional context to the "intelligence to share with you" text that was missing from the initial search screenshot. This led the Government to include in its response to the defendants' discovery letters that, the "text messages surrounding the September 24, 2021 text message from Garelick to Michael Shvartsman where Garelick states he has 'intelligence to share with' Shvartsman, (Indictment ¶ 12(b)), suggest that Garelick's statement may refer to a conversation that Garelick

had with 'Steve at Altmore,' and may not have been in reference to information regarding DWAC." (Dkt. 57 ("Park Decl."), Ex. P at 4 (citing December 2021 search screenshot and June 2022 search full spreadsheet of texts identified as responsive to warrant).)

B.  Applicable Law

Grand jury proceedings are presumed to be valid, *see United States v. Mechanik*, 475 U.S. 66, 75 (1986) (O'Connor, J., concurring), and should presumptively remain secret, *see United States v. Proctor & Gamble Co.*, 356 U.S. 677, 682 (1958). A court "may" authorize disclosure "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). However, "[t]o obtain disclosure of grand jury materials, a defendant must demonstrate a 'particularized need' for the materials." *United States v. Ordaz-Gallardo*, 520 F. Supp. 2d 516, 519 (S.D.N.Y. 2007) (quoting *United States v. Moten*, 582 F.2d 654, 662 (2d Cir. 1978)). Courts in this Circuit have long held that "[a] review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct." *United States v. Torres*, 901 F.2d 205, 233 (2d Cir. 1990), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010); *see also United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994) ("A review of grand jury minutes should not be permitted without concrete allegations of Government misconduct."); *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 301 (1991) (noting that grand jury proceedings are "accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process."). Thus, to obtain review of the grand jury minutes, a court must make specific factual allegations of government misconduct sufficiently severe that if the allegations were borne out by the grand jury minutes, the indictment should be dismissed.

A district court, pursuant to its general "supervisory power," "may dismiss an indictment for prosecutorial misconduct if the grand jury was misled or misinformed . . . ." *United States v. Brito*, 907 F.2d 392, 394 (2d Cir. 1990) (holding dismissal inappropriate for Government's use of agent with no knowledge of the case to testify as sole witness relaying on hearsay). But because "the social costs of dismissing an indictment because of an imperfect grand jury proceeding are simply too high to accept when the defendant has been convicted after a full and fair trial and no harm has been done," *id.*, courts in the Circuit require a showing that the prosecutor's conduct amounts to "a knowing or reckless misleading of the grand jury as to an essential fact." *United States v. Lombardozzi*, 491 F.3d 61, 79 (2d Cir. 2007).

"[T]he mere fact that evidence presented to the grand jury was unreliable, misleading, or inaccurate, is not sufficient to require dismissal of an indictment." *Id.* (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 260-61 (1988)). To the contrary, a district court's supervisory power to dismiss an indictment is limited to "where [] misconduct amounts to a violation of one of those few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions." *United States v. Williams*, 504 U.S. 36, 46 (1992). "That power does not permit dismissal on the ground that the evidence presented to the grand jury was unreliable, even if the allegation is that the prosecutor's presentation was incomplete or misleading." *United States v. Jones*, 164 F.3d 620 (Table), 1998 WL 708952, at *2 (2d Cir. 1998) (citing *Williams*, 504 U.S. at 54).

Following *Nova Scotia*, courts in this Circuit have repeatedly explained that unintentional evidentiary errors in the grand jury do not constitute misconduct. In *United States v. Mejia*, the prosecution mistakenly informed the grand jury that several defendants were over 18 years old, and thus death eligible, when in fact they were not. No. 11 Cr. 1032 (PAE), 2013 WL 3212299, at

*2 (S.D.N.Y. June 26, 2013). Judge Engelmayer explained that even such a serious evidentiary mistake could not warrant dismissal, because errors do not constitute misconduct. *Id.* at *3. Similarly, the defendant alleged the presentation of "totally incorrect and totally misleading" testimony to the grand jury in *United States v. Rodriguez*, No. 95 Cr. 754 (HB), 1996 WL 479441, at *1 (S.D.N.Y. Aug. 22, 1996). Judge Baer assumed the testimony was false, but found the court "lack[ed] the power to dismiss the indictment" absent evidence that the testimony "was perjurious or that the prosecutor knowingly introduced it as false testimony." *Id.* at *2. As the Second Circuit has explained: "A district court cannot dismiss an indictment because the prosecution presented unreliable, misleading, or incomplete evidence to the grand jury." *United States v. Howard*, 216 F.3d 1074 (Table), 2000 WL 772405, at *3 (2d Cir. June 15, 2000) (citing *Williams*, 504 U.S. at 54).

## C. Discussion

The defendants argue that the grand jury was misled because the grand jurors were presented with one text message from Garelick that, out of context, appeared to be about DWAC, but, in context, was not. Accepting that as true, without violating grand jury secrecy, that allegation does not come close to making out a claim for the relief the defendants seek of dismissal or piercing grand jury secrecy.

First, the defendants cannot seriously claim that this was anything other than a simple mistake; it was not intentional misconduct or anything approaching recklessness. Because of the circumstances of the searches of Garelick's iPhone—first, a time-limited, manual border search; second, a thorough forensic examination—there, unusually, existed two versions of the relevant text in this case, one of which lacked the additional context provided by the other. Any failure to recognize the context of the December 2021 search screenshot and rely on it rather than the June

15

2022 forensic extraction review, for purposes of assembling the evidence to present to the grand jury a year later, in June 2023, was entirely innocent and unintentional. The Government voluntarily disclosed the error promptly upon discovery. There is no risk that the petit jury will be misled as to the full context of this text message. On those facts, there is no misconduct that warrants dismissal or piercing grand jury secrecy. *See United States v. Bari*, 750 F.2d 1169, 1176 (2d Cir. 1984) ("[W]e see no reason whatsoever to dismiss an indictment because of a breakdown in communication among the prosecutors which denied the grand jury evidence going at best to credibility and which the convicting petit jury heard in detail."); *accord United States v. Plaza*, 826 F. App'x 60, 62 (2d Cir. 2020).

Second, nothing about this mistake creates an error as to an "essential fact" such that dismissal is required. The purported error relates to a single text message sent by Garelick to Michael Shvartsman. Even in the context of how that factual allegation is cited in the Indictment, that text message is used merely as an "instance" of the "several" conversations that Garelick and Michael Shvartsman had in the week that (i) Garelick learned that Trump Media had entered into a letter of intent with DWAC; (ii) Garelick illegally purchased DWAC shares on the open market in violation of his duties as a DWAC director; and (iii) Shvartsman purchased two million DWAC warrants on the open market. (Indictment ¶ 12(b).) More generally, as the fifteen-page speaking Indictment makes clear, the grand jury was presented with copious amounts of evidence that the defendants: (1) learned on a continuing basis material nonpublic information about the DWAC-Trump merger negotiations; (2) illegally traded on the open market while in possession of that information; and (3) tipped others about their inside information, which those tippees also used to engage in profitable, illegal trades. (*See, e.g.*, *id.* ¶ 13(d) (Gerald Shvartsman told employee on October 19, 2021 that the Trump-DWAC merger had been approved and would be announced in

the next two weeks).) This single text message is not an "essential fact" supporting the charges against the defendants. *See, e.g.*, *United States v. Connolly*, No. 16 Cr. 370 (CM), 2019 WL 2120022, at *5 (S.D.N.Y. May 2, 2019) (misidentifying trade as part of defendant's book did not require dismissal where error was in good faith and did not go to an essential fact).

Asking this Court to dismiss the indictment because one text message on one day was presented to the grand jury out of context is exactly the kind of remedy the Supreme Court and the Second Circuit have made clear is improper. *See Jones*, 164 F.3d 620, at *2 ("A defendant's complaint that a government agent gave the grand jury misleading testimony—including an inaccurate summary of evidence—is in essence a challenge to the reliability or competence of the evidence and, absent other prosecutorial misconduct, will not support dismissal of an indictment."). The defendants cite no case authorizing the remedies they seek on facts remotely close to these. For example, in *Lombardozzi*, the case agent testified that a loan sharking victim was in fear of his safety due to an interaction he had with the defendant, as opposed to a general fear of his safety due to engaging in loan sharking. 491 F.3d at 79-80. The Second Circuit denied the motion to dismiss, finding that the discrepancy was minor and not the product of misconduct, as it was nothing more than the agent's "simple inability to remember accurately all of the details of a conversation," and, in any event, the error was harmless because the case was submitted to the petit jury with all facts known. *Id.*

Similarly, in *Jones*, "apparently misleading testimony was presented to the grand jury by a government law enforcement agent as to the physical descriptions given by witnesses, the attempts to have witnesses identify [the defendant], and the number of fingerprints matching those of [the defendant]." 164 F.3d 20, at *2. Notwithstanding those errors, the Court affirmed the denial of the motion to dismiss, finding more than adequate probable cause even without the errors, and

17

harmlessness given the petit jury's trial verdict. *Id.*; *accord Howard*, 216 F.3d 1074, at *3 (holding officer's inconsistent testimony between grand jury and trial not sufficient to show misconduct warranting dismissal). Given that there is no remotely plausible claim for relief, the defendants' motion to dismiss, motion to inspect the grand jury materials, and request for an evidentiary hearing should all be denied.

### III. The Court Should Deny the Defendants' Motion for a Bill of Particulars

The defendants seek to compel the Government to produce a bill of particulars specifying all co-conspirators and tippees, the material nonpublic information, and the relevant trades. (Garelick Mem. 17-22; M. Shvartsman Mem. 31-35.) This motion should be denied as "an impermissible attempt to compel the Government to provide the evidentiary details of its case." *United States v. Rittweger*, 259 F. Supp. 2d 275, 292-93 (S.D.N.Y. 2003).

A bill of particulars is required "only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999). That is not the case here. The fifteen-page speaking Indictment, as supplemented by the searchable Rule 16 discovery and additional voluntary disclosures made by the Government, provides the defendants with more than enough notice. *See United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (court should consider the text of the Indictment, as well as discovery and other information supplied to the defendant).

A bill of particulars is not required to identify all co-conspirators and tippees. The Indictment itself identifies three charged conspirators and identifies many other anonymized conspirators. As Garelick concedes, the Government has also unmasked the anonymized conspirators in the Indictment. (Dkt. 48 ("Shapiro Decl."), Ex. 11.) More is not required. *See, e.g.*, *United States v. Torres*, 901 F.2d 205, 233-34 (2d Cir. 1990) (upholding district court's denial of

a bill of particulars where the defendant had requested, in part, "the identity of those other persons 'known and unknown' as alleged in . . . the indictment"), *abrogated on other grounds by United States v. Marcus* 628 F.3d 36 (2d Cir. 2010); *United States v. Murgio*, 209 F. Supp. 3d 698, 721 (S.D.N.Y. 2016) ("courts in this circuit frequently exercise their discretion to deny requests to identify co-conspirators through a bill of particulars" (citing *United States v. Mahaffy*, 446 F. Supp. 2d 115, 120 (E.D.N.Y. 2006))).

Similarly, no bill of particulars is required to identify the material nonpublic information. The Indictment itself alleges that the defendants obtained and traded on material nonpublic information "about DWAC's plans to merge with Trump Media." (Indictment ¶ 3; *see also id.* ¶¶ 6, 8, 10, 11, 13(b).) The defendants, however, seek the substance of material nonpublic information and the date it was shared. But this type of "wheres, whens and with whoms" are precisely the details that courts have deemed "beyond the scope of a bill of particulars." *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001). Regardless, the Indictment does specify this information, including the narrow timeframes of the relevant trades—September and October 2021 (Indictment ¶¶ 11-14, 20), the nature of the information—DWAC's plans to merge with Trump Media (*id.* ¶¶ 6, 8, 10, 11, 13(b)), and the sources of that information—obtained through the defendants' status as DWAC insiders (*id.* ¶¶ 8, 10-13).

There is also no basis to require particulars as to the trades at issue. The Indictment specifies particular trades and trading periods. (*Id.* ¶¶ 12, 13, 20.) And the Government has also conveyed that the unlawful trades are "the open market purchases that occurred after the IPO," all of which involved the securities of a single entity. (Shapiro Decl. Ex. 12.) These allegations and the discovery in this matter certainly provide the defendants with adequate notice.

While more information than has already been produced might be considered "helpful," the "ultimate test must be whether the information sought is necessary," *Mitlof*, 165 F. Supp. 2d at 569, and the allegations in the Indictment are more than sufficient to advise the defendants of the nature of the charged scheme, *see United States v. D'Amico*, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) ("'A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial.'"); *United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to . . . restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory.").

Courts in this District therefore routinely deny motions like the defendants'. *See, e.g.*, *United States v. Buyer*, No. 22 Cr. 297 (RMB), 2023 WL 1381970, at * 3 (S.D.N.Y. Jan. 31, 2023) (rejecting defendant's motion for bill of particulars, where indictment "clearly describe[d] the nature of the material nonpublic information at issue, and at what time and in what capacity [the defendant] acquired" the information before trading, even where indictment did not specify the precise occasion on which the information was conveyed, or the exact contours of the information); *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *19 (S.D.N.Y. Jan. 18, 2017) (disclosure of "trade-level detail" was "the very type of evidentiary minutiae that is not appropriate in a bill of particulars"); *United States v. Tuzman*, 301 F. Supp. 3d 430, 452-53 (S.D.N.Y. 2017) (denying request for bill of particulars seeking "particularized trade information"); *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (stock fraud case where indictment was 15-pages long and substantial discovery had been provided).

There are good reasons why bills of particulars are warranted only where the allegations in an indictment, as supplemented by discovery and otherwise, are so general as to render it impossible to prepare a defense. Because a bill of particulars "confines the Government's proof to particulars furnished," it can "restrict unduly the Government's ability to present its case." *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987). "The [G]overnment's presentation of evidence at trial is limited to the particulars contained in the bill, so care must be taken not to overly restrict the government's proof while still protecting the defendant from unfair surprise." *United States v. Mahabub*, No. 13 Cr. 908 (AJN), 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26, 2014); *see also United States v. Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721, at *3 (S.D.N.Y. Jan 23, 2009) (bill of particulars "must not be misused . . . to foreclose the Government from using proof it may develop as the trial approaches").

This case is also unlike those few cases identified by the defendants where the district court ordered the Government to disclose certain particulars. (Garelick Mem. 20-21; M. Shvartsman Mem. 33-34.) Among other things, those cases involved indictments with significantly more charges and/or more trading activity to parse than that at issue here.[1] By contrast, the Indictment

---

[1] For example, in *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 WL 2788168, at *2 (S.D.N.Y. July 13, 2010), the charged conduct took place over six years and involved dozens of stocks and seven conspiracies; in *United States v. Contorinis*, No. 09 Cr. 1083 (RJS), Dkt. 49, slip op. at 1-2 (S.D.N.Y. May 5, 2010), the charges spanned a period of over two years where hundreds of trades in multiple stocks took place; and in *United States v. Nacchio*, No. 05 Cr. 545 (EWN), 2006 WL 2475282, at *6 (D. Colo. Aug. 25, 2006), the Indictment had forty-two counts and allegations of using material nonpublic information were not tied to any particular count.

As part of his motion, Garelick also cites *United States v. Bin Laden*, 92 F. Supp. 2d 225, 234-45 (S.D.N.Y. 2000), *aff'd sub nom In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93 (2d Cir. 2008), *see* (Garelick Mem. 22), implicitly comparing the defendants' run-of-the-mill insider trading scheme to the "vast, international terrorist network known as 'al Qaeda'." *Bin Laden*, 92 F. Supp. 2d at 228. This analogy crumbles under even modest scrutiny. Unlike *Bin Laden*—which involved allegations of a diverse array of criminal acts, "rang[ing] from detonating

here involves an approximately two-month timeframe, the securities of a single entity, and a single class of identified material nonpublic information. As Judge Swain explained in rejecting an argument like the defendants': "specificity as to the substance of tipping communications may sometimes be necessary in complex insider trading cases involving multiple alleged conspirators and communications, large numbers of companies and transactions and extended time periods . . . [but] no such challenge of complexity is presented here." *United States v. Stewart*, No. 15 Cr. 287 (LTS) (S.D.N.Y. 2016) (Dkt. 64 at 22). So too here. Because the details provided by the Government go beyond what the law requires, the defendants' motion for a bill of particulars should be denied.

## IV.   The Court Should Deny Michael Shvartsman's Motion to Suppress Without a Hearing

Michael Shvartsman moves to suppress statements he made to a confidential source about laundering the proceeds of his insider trading—both pre- and post-indictment—by, among other things, hiding his assets in an offshore trust. Shvartsman argues that these statements were improperly obtained in violation of his Sixth Amendment rights and that Government lawyers violated the relevant ethical rules in directing these investigative steps. He is wrong. The continuing investigation into Shvartsman's money laundering was appropriate and his rights were not violated.

---

explosives, to training Somali rebels, to transporting weapons, to establishing businesses, to lecturing on Islamic law, to writing letters, and to traveling, as overt acts in furtherance of the charged conspiracies," *id.* at 235—this case involves familiar acts of insider trading. Moreover, unlike *Bin Laden*—which involved allegations of "overt acts in furtherance of those conspiracies that occurred in Afghanistan, Pakistan, the Sudan, Somalia, Kenya, Tanzania, Malaysia, the Philippines, Yemen, the United Kingdom, Canada, California, Florida, Texas, and New York," *id.* at 234—the defendants—and many of the relevant witnesses—operated largely in Florida. For obvious reasons, this case hardly compares to the complex, five-continent terrorism conspiracy that necessitated a bill of particulars in *Bin Laden*.

A.  <u>Relevant Facts</u>

Independent of this Office's investigation into the defendants for insider trading, in or about December 2022, the Miami field office of Homeland Security Investigations ("HSI") and the U.S. Attorney's Office for the Southern District of Florida opened a money laundering investigation into Michael Shvartsman and other individuals. Shvartsman, through his attorneys and employees, sought the services of specialists in offshore trusts to move assets out of the United States. After HSI agents learned of Shvartsman's plans, which raised suspicions of, among other things, money laundering and sanctions evasion, in or about December 2022, the HSI agents were able to introduce Shvartsman to a confidential source ("the CS"). The CS was introduced as a person who could serve as the trustee of Shvartsman's desired trust. Although HSI made the CS available to engage with Shvartsman, it was Shvartsman who affirmatively reached out to the CS to begin discussions about establishing the offshore trusts. Following this contact, and acting at the direction of law enforcement, the CS recorded phone calls and meetings with Shvartsman and his associates and preserved electronic communications through email and encrypted Signal messages.

During one early meeting, for example, in March 2023, Shvartsman told the CS that he was seeking to obscure and hide his assets because of the "shit [that] happened with Trump," referring to his insider trading profits, and that he wanted to ensure that investigators could not trace his assets and get a court order to seize his assets. During that same meeting, Shvartsman also discussed his connections with a friend who owned a bank in Dominica that could be used to move millions of dollars offshore. Other participants in that meeting included Associate-1, Shvartsman's business associate (and insider trading tippee), and the general counsel for Rocket One ("GC-1").

On or about March 22, 2023, a Southern District of Florida grand jury subpoena was issued to a Florida entity, seeking information about wire transfers received from Rocket X Capital LLC.[2] (Park Decl., Ex. G.) The subpoena does not indicate the offenses under investigation. On or about April 13, 2023, Grant Smith left a voicemail for an Assistant U.S. Attorney in the Southern District of Florida ("AUSA-1"). In the voicemail, Smith identified himself as an attorney for Rocket X. (Dkt. 67 ("Shahabian Decl."), Ex. 1.) Smith and AUSA-1 later spoke by phone, during which AUSA-1 told Smith that he could not tell Smith anything about the S.D. Fla. investigation. AUSA-1 does not recall Smith telling him that Smith represented Shvartsman.

In or about January 2023, HSI and S.D. Fla. learned of this Office's separate investigation into Shvartsman for insider trading.

In or about April 2023, this Office agreed to absorb the HSI money laundering investigation into its case. On or about June 26, 2023, a grand jury sitting in this District returned the Indictment against the defendants, charging them with insider trading but not money laundering.

Subsequent to Shvartsman's arrest, Shvartsman continued to take steps to hide his assets from law enforcement. For example, he removed his name as a signatory from multiple business accounts that he and his business partners used both for his payment processing businesses and for the purpose of laundering the proceeds of his illegal insider trading proceeds. (*See* Park Decl., Ex. N ("Seizure Warrant") Aff. ¶ 29). Shvartsman and his business associates continued to reach out to the CS to take steps to set up the offshore trust that Shvartsman wanted to use to hide his assets until the Government executed the Seizure Warrant in or about November 2023 and seized

---

[2] Rocket X Capital LLC is another entity affiliated with Michael Shvartsman. (*See, e.g.*, Park Decl. ¶ 11 & Ex. L at 34-35 (Michael Park and Shvartsman discussing Rocket X with CS as part of offshore trust scheme)).

approximately $11 million from a bank account Shvartsman and his co-conspirators used to launder proceeds of the insider trading scheme.

   B.   <u>Applicable Law and Ethical Rules</u>

       *1.  The Sixth Amendment*

The Sixth Amendment provides a right to counsel in any case in which the defendant faces the possibility of imprisonment. *Scott v. Illinois*, 440 U.S. 367, 373-74 (1979); *Johnson v. Zerbst*, 304 U.S. 458, 462-63 (1938). The right to counsel attaches "at or after the initiation of adversary judicial criminal proceedings," whether by way of "indictment, information, or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 689 (1972). The defendant is entitled to this right until the close of these proceedings and any statements made in violation of that right may be suppressed. *Massiah v. United States*, 377 U.S. 201, 205-06 (1964).

The right to counsel protected by the Sixth Amendment is "offense specific" and therefore no constitutional violation arises from the questioning of a represented defendant with respect to criminal conduct for which the right to counsel has not attached. *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991); *United States v. DeVillio*, 983 F.2d 1185, 1190-92 (2d Cir. 1993) (undercover conversations between informant and represented defendants about additional robberies for which defendants had not been indicted did not violate *Massiah*). The *Blockburger* elements test applies when considering whether an offense is distinct for Sixth Amendment purposes. *See Texas v. Cobb*, 532 U.S. 162, 173 (2001). The test is thus "whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). Indeed, the Supreme Court has explicitly rejected the notion that the Sixth Amendment right to counsel extends to crimes "factually related" to a charged offense. *See Cobb*, 532 U.S. at 168 & n.1; *see*

*also United States v. Dixon*, 409 U.S. 688, 704 (1993); *United States v. Mills*, 412 F.3d 325, 329 & n.1 (2d Cir. 2005).

The Sixth Amendment does not prevent the Government from investigating individuals who have been charged with an offense. The Government has a valid interest in investigating new and additional crimes. "[T]o exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at the time, would unnecessarily frustrate the public's interest in the investigation of criminal activities." *Maine v. Moulton*, 474 U.S. 159, 179-80 (1985). Although incriminating statements pertaining to pending charges are inadmissible at trial on those charges regardless of whether the Government obtained the statements while investigating additional crimes, incriminating statements relating to crimes for which the Sixth Amendment has not attached are admissible. *See id.* at 180 & n.16; *see also McNeil*, 501 U.S. at 175-76; *DeVillio*, 983 F.2d at 1190-92.

### 2.  *Rules of Professional Conduct and* Hammad

Federal prosecutors are subject to State ethics rules that "govern[] attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State." 28 U.S.C. § 530B.

Rule 4.2(a) of the Rules of Professional Conduct, adopted by New York in 2009, governs relations between attorneys and adverse parties they know to be represented by counsel. The rule provides that a lawyer representing a client shall not: "communicate or cause another to communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the other

lawyer or is authorized to do so by law." Florida has adopted a similar rule, albeit without an "authorized by law" exception. Rule Regulating the Florida Bar 4-4.2.

In *United States v. Hammad*, 858 F.2d 834, 837 (2d Cir. 1988), the Second Circuit held that New York DR 7-104(A)(1), which is now Rule 4.2(a), applies to the conduct of a prosecutor in the pre-indictment, investigative phase of a case. The Circuit, however, urged "restraint in applying the rule to criminal investigations to avoid handcuffing law enforcement officers in their efforts to develop evidence." *Id.* at 838; *see also Grievance Committee v. Simels*, 48 F.3d 640, 650 (2d Cir. 1995) ("[T]he vague terms of DR 7-104(A)(1) should be construed narrowly in the interests of providing fair notice to those affected by the Rule and ensuring vigorous advocacy not only by defense counsel, but by prosecutors as well"). In *Hammad*, although the Second Circuit affirmed the district court's finding that the ethical rules had been violated, the Court reversed the district court's suppression order. *Hammad*, 858 F.2d at 842. As the defendant concedes, no court in this Circuit has suppressed evidence in light of a purported ethics violation since.

C.  Discussion

The CS's contacts with Shvartsman did not violate the Sixth Amendment. The Sixth Amendment is offense-specific and its protections do not even extend to factually related crimes that are distinct from a charged offense. *See Cobb*, 532 U.S. at 168 & n.1. On June 26, 2023, the grand jury returned Shvartsman's Indictment, and, on June 29, 2023, Shvartsman was arrested. His Sixth Amendment right to counsel attached with the return of the Indictment, but only as to the securities fraud charges contained in that instrument. The Government's investigation into

money laundering related to a distinct crime and was consistent with the Sixth Amendment's protections.[3]

The CS's contacts with Shvartsman were also consistent with applicable ethics rules. First, the Second Circuit has repeatedly deemed appropriate these exact sort of pre-indictment (as to money laundering) contacts, which fall under New York's "authorized by law" exception. *See Hammad*, 858 F.2d at 840 ("[T]he use of informants by government prosecutors in a preindictment, non-custodial situation . . . will generally fall within the 'authorized by law' exception to DR 7-104(A)(1) and therefore will not be subject to sanctions."); *DeVillio*, 983 F.2d at 1188-90 (no violation of DR 7-104 when cooperating accomplice tape-recorded conversations with defendants regarding, among other matters, a burglary in which they already had counsel appointed); *United States v. Nouri*, 611 F. Supp. 2d 380 (S.D.N.Y. 2009) (cooperators recorded communications with represented subject of SEC investigation); *In re Amgen Inc.*, No. 10 Mc. 249 (SLT) (JO), 2011 WL 2442047 (E.D.N.Y. Apr 6, 2011) ("*Hammad* remains binding precedent for the proposition that a prosecutor is authorized by law to engage in *covert* pre-indictment communications with the represented target of an investigation").

Second, the CS's contacts did not relate to the subject matter of Shvartsman's known representation. Rather, the CS's contacts related to Shvartsman's efforts to establish offshore entities to launder and conceal funds.

The Second Circuit has not yet decided the "precise scope" of the term "matter." *See Simels*, 48 F.3d 640 at 647, 650 & n.8. But as the ABA Committee on Ethics and Professional

---

[3] At trial, the Government will keep to the rule that incriminating statements pertaining to the pending charges are inadmissible at trial. *See Moulton*, 474 at 180 & n.16; *DeVillio*, 983 F.2d at 1190-92.

Responsibility has explained in connection with the ABA's analogous Model Rule 4.2, "the Rule contemplates that the matter is defined and specific, such that the communicating lawyer can be placed on notice of the subject of the representation." ABA Formal Op. 95-396, Section V. That a person retains a lawyer generally—or even with respect to related, but distinct conduct—is insufficient to trigger the Rule's prohibitions. *See id.* ("In order for the prohibition to apply, the subject matter of the representation needs to have crystallized between the client and the lawyer."); *see also* Rule Regulating the Florida Bar 4-4.2, cmt. ("This rule does not prohibit communication with a represented person . . . concerning matters outside the representation."). The Second Circuit concluded as much in *United States v. Masullo*, where questioning concerning drug trafficking sales distinct from ones in which Masullo had retained counsel was upheld as consistent with DR-7-104. *See* 489 F.2d 217, 223 (2d Cir. 1973) ("That Masullo had retained counsel in other past and current drug transactions is not necessarily indicative of his retention of them for the August 17th sale of speed."); *cf. Simels*, 48 F.3d at 650 (noting that the vague terms of the ethical rule should be "construed narrowly in the interests of providing fair notice to those affected by the Rule and ensuring vigorous advocacy not only by defense counsel, but by prosecutors as well").

As with the Sixth Amendment analysis, Shvartsman's efforts to engage in money laundering on an ongoing basis, which he discussed with the CS, are plainly distinct from Shvartsman's representation in his securities fraud matter. Nor does the April 2023 contact between S.D. Fla. and Smith suffice to create a "represented person" issue with respect to Shvartsman's money laundering scheme. Smith identified himself as representing Rocket X, not Shvartsman personally. (Shahabian Decl., Ex. 1.) And, even if Smith had identified himself as representing Shvartsman in relation to the subpoena, the subpoena's request for information related to historic money transfers is a different matter from Shvartsman's ongoing and forward-looking

efforts to launder money through newly established offshore entities. It would be impossible for Shvartsman to be represented with respect to money laundering conduct that was still ongoing into the future. *See* N.Y. Rules of Professional Conduct R. 1.2(d) ("A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is illegal or fraudulent, except that the lawyer may discuss the legal consequences of any proposed course of conduct with a client."); Rule Regulating Florida Bar 4-1.2(d) ("A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows or reasonably should know is criminal or fraudulent.").

Similarly, the presence of GC-1, who claimed to serve as both corporate counsel and personal counsel to Shvartsman, does not alter this analysis. First, GC-1 himself is a co-conspirator in Shvartsman's ongoing attempts to launder funds. And the Second Circuit has made clear that a criminal's retention of "house counsel to represent him in connection with ongoing fraud or criminal enterprise" is not an effective workaround of the authorized by law exception. *Hammad*, 858 F.2d at 839. Florida ethical rules (and analogues in every state) also prohibit GC-1 from representing Shvartsman in connection with ongoing money laundering crimes in which he is a participant. *See* Rule Regulating Florida Bar 4-1.2(d).

Shvartsman ignores that his interactions with the CS were related to a distinct and still uncharged investigation into money laundering. Those contacts were outside of the Sixth Amendment's attachment, a distinct matter for purposes of the ethical rules, and authorized by law. He nevertheless requests a hearing "so that the full details of [the Government's] conduct may be examined." (M. Shvartsman Mem. 26.) There is, however, no factual dispute that supports a hearing.

"A defendant is entitled to an evidentiary hearing on a motion to suppress only if the defendant establishes a contested issue of material fact." *United States v. Noble*, No. 07 Cr. 284

(RJS), 2008 WL 140966, at *1 (S.D.N.Y. Jan. 11, 2008) (citing *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992)). If the moving papers do not create a genuine dispute as to any material fact, the court can decide the matter on the factual record established by the papers. *See United States v. Caming*, 968 F.2d 232, 236 (2d Cir. 1992), *abrogated on other grounds by Peck v. United States*, 73 F.3d 1220 (1995); *United States v. Martinez*, 992 F. Supp. 2d 322, 325-26 (S.D.N.Y. 2014).

In *Hammad*, the district court held a hearing to determine the extent to which the prosecution was aware of the defendant's representation at the time of the challenged covert contacts. *See Hammad*, 858 F.3d at 836. By contrast, here, there is no dispute that the Government was aware that Shvartsman was represented. As described above, no evidentiary hearing is required to conclude that the CS contacts at issue here were consistent with the Constitution and ethical rules. *See United States v. Binday*, 804 F.3d 558, 595 (2d Cir. 2015) (upholding district court's denial of evidentiary hearing on *Hammad* motion where hearing "would have no effect on its ultimate decision").

## V.  The Court Should Deny Garelick's Motion to Suppress the Fruits of the Searches of His iPhone and Electronic Accounts

Bruce Garelick argues that the Government violated his Fifth Amendment right against self-incrimination when he voluntarily provided the passcode to his iPhone to CBP officers during a secondary border inspection at JFK Airport. (Garelick Mem. 2-17.) Garelick moves to suppress evidence recovered from his iPhone during that search, a subsequent search, and from searches of his Gmail and Apple accounts, on the basis that those searches are all fruits of the violation. He is wrong. Garelick's voluntary disclosure of the passcode for an iPhone that law enforcement already knew was his—and already had a warrant to search—was neither "compelled" nor "incriminating" in violation of his Fifth Amendment right against self-incrimination.

31

A.  Relevant Facts

In late December 2021, FBI agents investigating the defendants' insider trading learned that Garelick had traveled outside of the United States and was scheduled to return on December 31, 2023, landing at JFK Airport. On December 29, 2021, Eastern District of New York Magistrate Judge Marcia M. Henry issued a warrant authorizing law enforcement agents to seize and search Garelick's cellphone upon his arrival for evidence of, among other things, insider trading. (Shapiro Decl., Ex. 1 ("First Garelick Warrant").) The affidavit sworn to by an FBI agent ("Agent-2") in support of the First Garelick Warrant explained the probable cause for believing that Garelick had committed insider trading and that evidence of those crimes would be on his phone. (First Garelick Warrant Aff. ¶¶ 4-9.) The affidavit further explained how law enforcement knew Garelick used the specific device to be searched—an Apple iPhone 11 Pro Max bearing an IMEI number ending in 1839. (*Id.* ¶¶ 10-11.)

The First Garelick Warrant authorized law enforcement agents to compel Garelick to display certain physical biometric characteristics, such as a fingerprint or face recognition, to unlock his iPhone. (*Id.* at Attachment A.) The First Garelick Warrant Affidavit stated, however, that the Government was not seeking authority "to compel Garelick to provide a numeric passcode," (*id.* ¶ 16), and the Warrant's Attachment A thus included only authorization to compel Garelick to display biometrics under penalty of disobeying a court order.

On December 31, 2021, CBP officers pulled Garelick aside as he entered the United States from Mexico at JFK Airport. (*Id.* ¶ 10(a); Shapiro Decl., Ex. 2 (FBI 302)). During that secondary inspection, law enforcement agents seized Garelick's phone pursuant to the First Garelick Warrant. (Shapiro Decl., Ex. 2.) During the inspection, Garelick provided information about his travel into the country, his travel companion, and his employment, which included discussing Rocket One,

DWAC, Michael Shvartsman, and another deal, "Koji." (Shahabian Decl., Ex. 2 (CBP secondary inspection report).) Garelick also avers that the CBP officers asked for, and he provided, the passcode to his phone in order to unlock it. (Dkt. 49 ("Garelick Decl.") ¶¶ 10-11.)[4]

While the CBP officers performed the secondary inspection, FBI agents covertly executed the search warrant for Garelick's phone. The search was conducted in two parts. First, Agent-1 conducted what is known as a "manual" review of the phone, i.e., Agent-1 opened the iPhone and took pictures of the physical iPhone as he found evidence responsive to the terms of the Warrant. (Shapiro Decl., Ex. 2.) Second, an FBI forensic examiner ("Examiner-1") attempted to extract a forensic copy of the iPhone's contents for preservation and later review by law enforcement. To avoid alerting Garelick to the fact that he was under criminal investigation, and due to the attendant time constraints, law enforcement returned the iPhone to Garelick without obtaining a full forensic copy of the phone. (Shapiro Decl., Ex. 5 (the "Second Garelick Warrant"), Aff. ¶ 15.) Due to technical errors, the partial extraction Examiner-1 obtained was corrupted and unusable. (Shapiro Decl., Ex. 4 (FBI 302).) The secondary inspection lasted approximately an hour and fourteen minutes. (*See* Shahabian Decl., Ex. 2 (Inspection start time, 20:19 EST; end time, 21:33 EST).)

Six months later, on June 14, 2022, District of Rhode Island Magistrate Judge Patricia A. Sullivan issued a second warrant to again search Garelick's iPhone (the Second Garelick Warrant). The affidavit in support of that warrant, sworn to again by Agent-2, disclosed that law enforcement

---

[4] A CBP report states that Garelick "voluntarily presented his cell [phone] in the powered on and unlocked position," which means the agents may not have needed the passcode to access the already unlocked device. (Shahabian Decl., Ex. 3, at 2 (CBP Electronic Media Report).) Because, however, other evidence indicates the agents obtained Garelick's passcode (*see, e.g.*, Shapiro Decl., Ex. 4 (FBI 302) ("verified passcode")), and because the Court need not resolve this factual ambiguity to deny Garelick's motion, the Government will assume for purposes of this motion that Garelick provided his passcode to the CBP officers and that it was necessary to access his iPhone.

had previously obtained the First Garelick Warrant, (Second Garelick Warrant Aff. ¶ 14), and that law enforcement agents had conducted a manual review of that phone at JFK, but that (1) Garelick's WhatsApp account, which he was believed to have used in furtherance of his crimes, was not reviewable at that time; and (2) the phone was returned to Garelick without a forensic extraction, (*id.* ¶ 15). The warrant affidavit again sought authorization to compel physical biometrics from Garelick, and, in support of that biometrics request, stated that "the passcode or password that would unlock the device subject to search under this warrant is not currently known to law enforcement." (*Id.* ¶ 24(f).)

Agent-1 and Agent-2 executed the search warrant at Garelick's home in Rhode Island on or about June 15, 2022. (Shahabian Decl, Ex. 4 (FBI 302).) The agents asked Garelick preliminary questions about his involvement with DWAC, but terminated the interview after learning that Garelick was possibly represented by counsel for DWAC's board of directors. (*See id.*) The agents informed Garelick that they had a warrant to search his cellphone. One of the agents told Garelick that they knew his passcode from the JFK interview. (Garelick Decl. ¶ 19.) The agents then seized Garelick's phone and, subsequently, an FBI examiner obtained a forensic extraction of the phone.

B.  Applicable Law

The Fifth Amendment states that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "To qualify for the Fifth Amendment privilege, a communication must be [1] testimonial, [2] incriminating, and [3] compelled." *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 189 (2004); *accord United States v. Hubbell*, 530 U.S. 27, 34 (2000).

With respect to whether a communication is "testimonial," the Supreme Court has held that the Fifth Amendment privilege also includes the so-called "act of production" doctrine:

compliance with a law enforcement request, such as a subpoena for documents, can be "testimonial" if compliance tacitly concedes the existence of what law enforcement seeks and that the information is in the defendant's control. *Fisher v. United States*, 425 U.S. 391, 410 (1976). But under the "foregone conclusion" doctrine, the act of production doctrine requires suppression only if the implicit statement is *incriminating*; that is, if the act of production "adds little or nothing to the sum total of the Government's information," then production is not incriminating and there is no applicable privilege. *Id.* at 411.

While the Second Circuit has not yet addressed how these doctrines apply to a law enforcement demand for a phone passcode, Judge Rakoff addressed this issue last month and held that "if the Government can independently show the phone belonged to the defendant and that the defendant knew the passcode, the foregone conclusion doctrine applies, and the Fifth Amendment is not violated by the act of compelled decryption." *United States v. Smith*, No. 22 Cr. 352 (JSR), 2023 WL 8611259, at *3 (S.D.N.Y. Dec. 13, 2023). That is because "the act of physically unlocking a smartphone or providing the password does not communicate anything about what files exist on the phone, whether the files were created by the defendant, or whether the files are authentic. Rather, the testimonial significance of unlocking a cellphone or providing the password is the implied statement: 'I am the person who knows the password for this phone.'" *Id.*

Judge Rakoff's approach to when a phone passcode demand is "testimonial" and "incriminating" is consistent with the approaches taken by the Third Circuit, and by the highest courts of Massachusetts and Illinois. *See United States v. Apple MacPro Computer*, 851 F.3d 238, 248-49 (3d Cir. 2017); *People v. Sneed*, 2023 IL 127968 ¶ 104 (Ill. 2023); *Commonwealth v. Jones*, 117 N.E.3d 702, 711 (Mass. 2019); *accord* Orin S. Kerr, *Compelled Decryption and the Privilege Against Self-Incrimination*, 97 Tex. L. Rev. 767, 782-85 (2019). *But see State v. Valdez*, No.

20210175, 2023 WL 8635197, at *12, *13 (Utah Dec. 14, 2023) (holding that providing passcode is testimonial and foregone conclusion exception is inapplicable); *In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335, 1346 (11th Cir. 2012) (holding subpoena must describe location and existence of documents sought on device with "reasonable particularity"). Judge Rakoff's approach is also consistent with the approach taken by other district courts in this Circuit. *See, e.g.*, *United States v. Eldair*, No. 20 Cr. 243 (LDH), 2023 WL 4373551, at *6 & n.5 (E.D.N.Y. July 6, 2023) (holding that biometric compulsion to unlock phone is not testimonial, unlike a passcode demand, which "may have constituted a testimonial act"); *In re Order Requiring Apple, Inc. to Assist in the Execution of a Search Warrant Issued by this Court*, No. 15 Mc. 1892 (JO), 2015 WL 5920207, at *5 n.3 (E.D.N.Y. Oct. 9, 2015) ("The owner may arguably have a Fifth Amendment privilege to refuse to reveal the code . . . .").

Even if testimonial and incriminating, with respect to compulsion, "the Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony," and "[v]oluntary statements remain a proper element in law enforcement." *Oregon v. Elstad*, 470 U.S. 298, 304-07 (1985). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *accord Elstad*, 470 U.S. at 305 (noting that the Fifth Amendment is "not concerned . . . with moral and psychological pressures to confess emanating from sources other than official coercion"). Whether a statement is coerced is "determined by the totality of the circumstances," *Charlotte E. v. Safir*, 156 F.3d 340, 346-47 (2d Cir. 1998), including "the accused's characteristics," "the conditions of the interrogation," and "the conduct of the police," *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d at 213.

C.  Discussion

Garelick's motion to suppress fails both because his providing the passcode to his phone was not "incriminating" testimony and because he was not "compelled" to disclose it in violation of the Fifth Amendment. While the Second Circuit has not decided whether providing a passcode is "testimonial" under the Fifth Amendment, the Government will assume *arguendo* that it is, for the reasons described by Judge Rakoff in *Smith* and in *Pinto-Thomaz*. But that is only step one of the Fifth Amendment analysis. Garelick's motion ignores entirely the question of whether his providing the passcode to his phone was "incriminating" in violation of the Fifth Amendment.

It was not. As Judge Rakoff also explained in *Smith*, a passcode, such as "123456," is not incriminating on its face. It simply communicates a number. The only way a person disclosing a passcode can be considered incriminating is the *implicit* testimonial communication that disclosing the passcode communicates under the act-of-production privilege: I have access to the data in this phone because I know the passcode. But where, as here, "the Government can independently show the phone belonged to the defendant and that the defendant knew the passcode, the foregone conclusion doctrine applies, and the Fifth Amendment is not violated by the act of compelled decryption." *Smith*, 2023 WL 8611259, at *3.

Indeed, the case for the lack of incrimination here is even stronger than in *Smith* or in the typical border search case: here, law enforcement already had a *warrant* to search Garelick's cellphone before Garelick had even landed at JFK. Not only did law enforcement have a warrant to search whatever phones Garelick had on him, it had a warrant to search one specific iPhone that belonged to him. As the affidavit to the warrant explained, the Government had probable cause to believe that Garelick had only one cellphone—the Subject Device—which they knew was Garelick's based on records provided by Apple, AT&T, and Fidelity. (First Garelick Warrant Aff.

37

¶¶ 10-11.) The Government knew the details about the phone, including phone number, the IMEI number, i.e., the unique serial number for the phone, and the make and model, an Apple iPhone 11 Pro Max. When Garelick landed at JFK in possession of a single cellphone, an Apple iPhone 11 Pro Max, there was nothing else that law enforcement needed to know to confirm that the cellphone was his and that he knew the passcode. *Accord Smith*, 2023 WL 8611259, at *3 (holding Government knew the phone was the defendant's and that he knew the passcode because it was on the defendant's person when he was stopped at the airport, did not deny ownership of the phone, and used the phone in front of law enforcement agents).

Garelick makes no serious argument that disclosing his passcode under these circumstances was "incriminating." He does not and cannot cite a single case holding that a passcode disclosure in a similar context violated a defendant's right against self-incrimination. Instead, he argues that the Government has already *conceded* that providing a passcode is incriminating because the warrant application for Garelick's phone did not seek a court order to compel Garelick to disclose the passcode and listed passcodes, generally, as information responsive to the search warrant. (Garelick Mem. 6-7).

Garelick's argument is meritless. Whatever limitations a law enforcement agent places in his request for a search warrant, whether for prudential, practical, or other potential legal concerns, the warrant's scope is not a binding legal admission by the Government for future litigation. The Government sought a biometric provision to compel Garelick to provide a fingerprint ID or face ID scan to unlock his phone—the fact that the warrant specifically excluded authority to *compel* him under penalty of contempt of a court order to provide his passcode did not in any way limit the agents' ability to *ask* him for his passcode, nor was it a concession that a response to that question would necessarily be "incriminating" in violation of the Fifth Amendment. Similarly, the

fact that the Warrant authorized law enforcement to search the Phone generally for "evidence of passwords or other information needed to access the Subject Device," is not a concession that, on these facts and circumstances, law enforcement agents needed Garelick to provide the passcode to his iPhone to confirm that the phone was his and that he knew the passcode. Because Garelick can point to no incriminating statement he made in violation of the Fifth Amendment, his motion necessarily fails.

Even if he could show that he made an incriminating testimonial statement, his motion also fails because none of his statements were compelled in violation of the Fifth Amendment. The standard for compulsion under the Fifth Amendment is very high. The Second Circuit has repeatedly explained that a statement is generally not compelled when it "contain[ed] no traces of the brutality, psychological duress, threats, or unduly prolonged interrogation that courts have . . . found when they have concluded that statements were involuntarily made." *United States v. Verdugo*, 617 F.3d 565, 575-76 (2d Cir. 2010) (collecting cases).

That is not the case here. Garelick does not suggest that CBP officers used "brutality," "psychological duress" or "threats" to compel him to give up his passcode. Instead, Garelick's affidavit represents that the CBP officers asked him straightforward questions while he was unrestrained at a secondary screening location at JFK Airport. And while Garelick's attorneys argue that being detained for two hours was somehow coercive (Garelick Mem. 12; *but see* Shahabian Decl., Ex. 1 (1 hour, 14 minutes)), (1) Garelick's own declaration makes clear he was asked for his passcode approximately 30 minutes into the interview (Garelick Decl. ¶¶ 9-10), and, (2) in any event, the Second Circuit has found statements voluntary in far more coercive environments, *see, e.g.*, *United States v. Siddiqui*, 699 F.3d 690, 706 (2d Cir. 2012) (finding statements not coerced when defendant was questioned while detained, in restraints, and

hospitalized because "the defendant was lucid and police conduct was not overbearing"); *Parsad v. Greiner*, 337 F.3d 175, 184-85 (2d Cir. 2003) (finding statement not coerced when defendant was questioned, over the course of hours, in a police station and told the officers he did not want to discuss the crime).

Garelick nonetheless contends that his statements were compelled and therefore involuntary because the CBP officers "affirmatively misled him as to the true nature of their investigation." (Garelick Mem. 9-10 (citing *United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992)). But the only purported falsehood Garelick identifies is that the CBP officers told him in response to his questions about being pulled aside for a secondary inspection that the interview was "routine" and did not disclose that he was the subject of a criminal investigation.

The interview was, in fact, routine. Whether a border search is "routine" turns only on the objective circumstances of the interview, not whether there was a subjective criminal investigative motivation for the search. *See United States v. FNU LNU*, 653 F.3d 144, 152 n.7 (2d Cir. 2011); *United States v. Smith*, 643 F.2d 942 (2d Cir. 1981) (rejecting subjective test into motives of airport security personnel for searching a passenger after receiving a request from DEA agents). "Whether the customs agent or inspector initiates a search randomly or based on information acquired from an independent source (including other law enforcement officials) is immaterial in the border context." *United States v. Irving*, No. 03 Cr. 633 (LAK), 2003 WL 22127913, at *4 (S.D.N.Y. Sept. 15, 2003); *accord id.* ("Rather, "[t]he 'critical factor' in determining whether a border search is 'routine' is the 'degree of intrusiveness it poses." (quoting *United States v. Tsai*, 282 F.3d 690, 694 (9th Cir. 2002))).

Garelick points to nothing suggesting that the circumstances of this border inspection were non-routine or otherwise coercive. The inspection was conducted by CBP officers, not FBI agents.

It was done in a secondary inspection room at JFK Airport. While Garelick asserts the officers were armed, none of them drew their weapons, and he was not restrained. Garelick does not—and cannot—contend that searches of electronic devices at the border, and corresponding requests for a passcode, are non-routine. Accordingly, the CBP officers were not wrong to call their border search of Garelick "routine"—even if the routine stop in this case was initiated with a subjective investigative motivation in mind.

What is left, then, is Garelick's claim that he was coerced because the CBP officers did not tell him he was subjected to the interview because he was under criminal investigation and the FBI agents in the next room had a warrant to search his phone. That omission was not coercive. Courts in this Circuit have explained that border agents may "(1) conceal the purpose of the interview, and (2) mislead [the] defendant" without rising to the level of a coercive interrogation. *United States v. Oladokun*, No. 15 Cr. 559 (BMC), 2016 WL 4033166, at *6 (E.D.N.Y. July 27, 2016) (holding statements in response to border interview not compelled where DSS agent and CBP officer hid that defendant was being questioned about visa fraud). A valid waiver of the Fifth Amendment right "does not require that an individual be informed of all information 'useful' in making his decision or all information that 'might affec[t] his decision to confess.'" *Colorado v. Spring*, 479 U.S. 564, 576 (1987) (quoting *Moran v. Burbine*, 475 U.S. 412, 422 (1986)). Officers' failure to inform Garelick that he was under criminal investigation did not transform a non-coercive setting into a coercive one, even if Garelick would not have given up his passcode had he known he was under investigation. *Oladokun*, 2016 WL 4033166, at *5; *cf. Illinois v. Perkins*, 496 U.S. 292 (1990) ("Ploys to mislead a suspect or to lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns.").

41

The cases Garelick relies on, by contrast, are all distinguishable. In *Anderson*, the agents told a defendant that if he asked for a lawyer it would permanently preclude him from cooperating with the Government; the Circuit held that that misstatement was sufficiently misleading in being designed to force the defendant to confess that the agent's conduct overbore the defendant's free will. *United States v. Anderson*, 929 F.2d 96, 99-102 (2d Cir. 1991); *accord United States v. Duvall*, 537 F.2d 15, 24-25 (2d Cir. 1976) (AUSA's threat of unrealistic 100-year sentence to force cooperation made confession involuntary). Over-threatening a defendant into confessing can be coercion, but that is not this case. *See also United States v. Mendonca*, 88 F.4th 144, 169-70 (2d Cir. 2023) (holding no plain error in lying to defendant about polygraph results and falsely accusing defendant of molesting children, but noting concerns on de novo review).

By contrast, in *Mitchell* and in *Okwumabau*, the Second Circuit held that the agents' "deemphasis" or of a criminal investigation or failure to reveal that they were investigating the defendant criminally was not coercive. *United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992); *United States v. Okwumabua*, 828 F.2d 950, 953 (2d Cir. 1987). Garelick argues that those cases are different because here, when he asked the CBP officers why they were asking him questions, they responded by telling him that their questions and requests were "routine," thus affirmatively lying to him. As described above, the inspection *was* routine—there was no misrepresentation— and Garelick does not assert that he asked specifically whether he was under criminal investigation and received a misleading answer in response.

And in *FNU LNU*, the Second Circuit relied on the nature of the questions being asked to determine only if the interview rose to the level of a "custodial interrogation" for *Miranda* purposes, not whether the questions made the interview coercive under the Fifth Amendment. 653 F.3d at 154-55. As explained further *infra*, the *Miranda* inquiry is orthogonal to Garelick's motion

42

to suppress here—*FNU LNU*'s discussion of what is "routine" in the *Miranda* context does not translate to whether Garelick was "coerced" into giving up his passcode under a Fifth Amendment voluntariness rubric.

Garelick also cites a line of out-of-Circuit cases holding that a defendant's statement can be found involuntary when an IRS agent misrepresents a criminal tax investigation as a civil tax audit (Garelick Mem. 12-13). But those cases are entirely inapposite here. They turn on the fact that the IRS conducts substantial civil tax investigations under its audit powers, and, as those cases hold, it would be improper to use that ample civil authority as a stalking horse for a criminal investigation. *See, e.g.*, *United States v. McKee*, 192 F.3d 535, 540-45 (7th Cir. 1999) (summarizing system). There is no case in this Circuit—or anywhere—analogizing an intrusive and ongoing IRS civil tax audit to a brief CBP border search. It is obvious why—they are not remotely alike in duration, scope, or compulsion.

Finally, Garelick argues that the circumstances of the border search interview "were sufficiently intimidating as to constitute a 'custodial' interrogation triggering his *Miranda* rights." (Garelick Mem. 12). It is not clear whether Garelick is arguing that his statement was "compelled" in violation of his Fifth Amendment rights *because* he was subjected to a custodial interrogation, or whether he is separately asserting a free-standing claim that his *Miranda* rights were violated. If the former, Garelick is wrong on the law; if the latter, he cannot seek suppression of his phone even if he could make out a *Miranda* claim.

*Miranda* is a "prophylactic" on the Fifth Amendment right. *Vega v. Tekoh*, 142 S. Ct. 2095, 2101-02 (2022). But the Supreme Court has consistently held "a violation of *Miranda*" is not a *per se* "violation of the Fifth Amendment right against compelled self-incrimination" because a non-*Mirandized* statement is not necessarily a compelled statement. *See id.* at 2101-03; *see also Elstad*,

470 U.S. at 306-07 (explaining that *Miranda* "sweeps more broadly than the Fifth Amendment" and excludes even "*voluntary* statements"); *United States v. Patane*, 542 U.S. 630, 634 (2004) (analyzing "unwarned but voluntary statement"). A defendant may be "in custody" for *Miranda* purposes such that they should receive *Miranda* warnings, but that does not make their statement "compelled" and "involuntary" under the Fifth Amendment in the absence of such warnings. Accordingly, even assuming *arguendo* Garelick was "in custody" for *Miranda* purposes, which he was not, that does not show coercion under the Fifth Amendment. For the reasons described above, there was none here.

If Garelick is asserting a free-standing *Miranda* claim, however, his motion to suppress would still fail because the Supreme Court has also held that the fruit of the poisonous tree doctrine that would require suppression of physical evidence—like a cellphone—is not a proper remedy for a *Miranda* violation. *See Patane*, 542 U.S. at 642-43 ("The exclusion of unwarned statements . . . is a complete and sufficient remedy for any perceived *Miranda* violation."); *accord id.* at 645 (Kennedy, J., concurring in the judgment) ("doubtful" that excluding physical evidence due to failure to give *Miranda* warnings is warranted so long as statements are not introduced at trial). The Second Circuit and courts in this District have followed the holding of a majority of the justices in *Patane* and consistently decided that "failure to give *Miranda* warnings does not require suppression of physical evidence discovered as a consequence of unwarned statements." *United States v. McCoy*, 407 F. App'x 514, 516 (2d Cir. 2010); *accord United States v. Haygood*, 157 F. App'x 448, 449 (2d Cir. 2005); *United States v. Sharma*, No. 18 Cr. 340 (LGS), 2019 WL 3802223, at *8 (S.D.N.Y. Aug. 13, 2019); *United States v. Wilson*, 914 F. Supp. 2d 550, 562 (S.D.N.Y. 2012); *United States v. Grant*, No. 07 Cr. 1119 (CM), 2008 WL 2971781, at *6-*7 (S.D.N.Y. Aug. 1, 2008). And while the Second Circuit has not yet addressed how *Patane* applies to the specific

context of asking a defendant for his phone passcode, the Fourth Circuit has similarly held that *Patane* squarely precludes suppression of data from a phone searched using a passcode obtained from a defendant without first providing *Miranda* warnings. *See United States v. Oloyede*, 933 F.3d 302, 309-10 (4th Cir. 2019).

Garelick's cases (Mem. 13) are all inapposite because they turn on the violation of the *Edwards* rule protecting the right to counsel, not *Miranda*. In *United States v. Gilkeson*, the defendant asked for a lawyer three times; police continued to question him notwithstanding his invocation of his right to counsel in violation of not only *Miranda* but also *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), and only then did the defendant reveal the location of an incriminating device in his barn. 431 F. Supp. 2d 270, 291-294 (N.D.N.Y. 2006). It was on the same basis of a purported *Edwards* violation that led Judge Rakoff to order a suppression hearing to determine if the defendant had in fact invoked his right to counsel. *Pinto-Thomaz*, 352 F. Supp. 3d at 311 (distinguishing a mere *Miranda* violation, for which suppression would not be required, from an *Edwards* violation). *Mitchell* was also an *Edwards* violation, but there the court held that under the Military Rules of Evidence it did not need to decide if *Edwards* required suppression of a phone searched using information gained from questioning after the defendant invokes his right to counsel. *United States v. Mitchell*, 76 M.J. 413, 419-20 (C.A.A.F. 2017). Even if *Edwards* could warrant suppression, there is no *Edwards* claim here; Garelick does not contend he asked for a lawyer.

Garelick is wrong when he asserts, without legal basis, that this is not a "mere failure[] to warn" case. It is, at best, that. And it is perhaps for that reason that Garelick's motion conflates the *Miranda* and Fifth Amendment standards and does not commit to either making a *Miranda* claim

or explaining how the *Miranda* case law from this Circuit factors into the compulsion analysis—viewed squarely under either lens, he loses.

As a last-ditch effort to convince this Court to apply the fruit-of-the-poisonous tree doctrine in an entirely novel and legally unmoored setting, Garelick accuses the Government of intentionally misleading the judiciary—particularly Judge Sullivan in issuing the June 2022 warrant to search Garelick's phone again—by "hiding" the fact that "that it had coercively obtained Garelick's passcode in subsequent warrants discussing the border search" because the Government "knew its agents had acted improperly." (Garelick Mem. 15). That accusation is absurd, baseless, and wrong.

First, the Government had nothing to hide from Judge Sullivan; the agents acted appropriately in asking Garelick for his passcode in December 2021. But that fact is entirely irrelevant as to whether there was probable cause to believe that Garelick had committed a crime or that his phone or other devices continued to have evidence of that crime. There would be no reason to include in subsequent warrant applications a fact that did not add to the probable cause analysis one way or another. *See, e.g.*, Second Garelick Warrant Aff. ¶ 2 ("Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation."); *accord United States v. Awadallah*, 349 F.3d 42, 67 (2d Cir. 2003) ("[A]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation"); *see also United States v. DeFilippo*, No. 17 Cr. 585 (WHP), 2018 WL 740727, at *2 (S.D.N.Y. Jan. 31, 2018) ("As courts in this Circuit have recognized, it is not shocking that every affidavit will omit facts which, in retrospect, seem significant."). And had it been included, it would not have affected the Government's ability to obtain a second warrant for Garelick's phone, or for the other electronic

warrants referenced in Garelick's motion; it was entirely irrelevant. *Cf. United States v. Rajaratnam*, 719 F.3d 139, 154-55 (2d Cir. 2013) (courts should not infer recklessness in the *Franks* context where "the omission resulted from nothing more than negligence, or . . . the omission was the result of a considered and reasonable judgment that the information was not necessary to the [warrant] application").

Second, Garelick argues that the Second Garelick Warrant affidavit was false because it stated that Garelick's phone passcode was not currently known to law enforcement. (Garelick Mem. 15). That was not false—it had been six months since law enforcement previously searched Garelick's phone, the phone remained in his possession, and he could have easily changed the passcode at any time in the intervening six months. There was no way for the Government to know that the passcode it obtained in December 2021 was still the passcode in June 2022.

Moreover, again, that statement did not factor in to whether there was probable cause to search Garelick's phone in June 2022—whether law enforcement knew the passcode or not did not matter. That statement was made in support of the request to include a biometrics provision, i.e., to require Garelick to open the phone using his biometric identifiers such as a fingerprint or face ID. Biometrics were not used to open the phone because, as it turned out, Garelick had not changed his passcode in the intervening six months. But even if the Government should have included, in an abundance of caution, that it at one point learned the passcode six months prior, that would not have affected: (1) the legal basis to obtain a biometrics provision that it did not use; or (2) the probable cause supporting the warrant more generally. *Cf. United States v. Martin*, 426 F.3d 68, 73 (2d Cir. 2005) (a falsehood or omission is immaterial if "after putting aside erroneous information and material omissions, 'there remains a residue of independent and lawful information sufficient to support probable cause.'"). Garelick's frivolous and unsupported

misconduct allegation—a cloaked *Franks* allegation that Garelick does not even attempt to argue clears the *Franks* standard[5]—cannot overcome the fact that he voluntarily surrendered his phone passcode at JFK in December 2021 and there is no legal remedy available to him to suppress the incriminating information found on his phone as a result.

Finally, Garelick's request for an evidentiary hearing on his motion should be denied because there is no genuine dispute as to any material fact. *Caming*, 968 F.2d at 236. Here, even accepting Garelick's version of what happened at the border as true, for the reasons stated above, he is not entitled to relief. Accordingly, a hearing is not required on his motion to suppress.

Garelick also argues that a hearing is required so that "Garelick can learn the substance of any other relevant statements he made, whether they are, in the government's view, inculpatory—and therefore subject to suppression—or exculpatory—and therefore subject to *Brady*'s disclosure requirements." (Garelick Mem. 17). That is nonsensical. Garelick knows the substance of any other relevant statements he made to law enforcement—he does not need a hearing to learn them.

This is really a discovery motion which Garelick has not pressed and for which a hearing is not the proper form of relief. At the time the Government produced discovery in this case, it was not in possession of the CBP reports of the CBP officers' interactions with Garelick at JFK Airport. In connection with preparing its response to the defendant's motions, the Government requested the reports from CBP and produced them to the defense on January 10 and 12, 2024, the day after it received each of them. The remedy for Garelick's purported discovery violations—a claim for

---

[5] A *Franks* challenge to the Second Garelick Warrant would require Garelick to make a "substantial preliminary showing" that "(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding." *United States v. Nieves*, No. 19 Cr. 354 (JSR), 2021 WL 1240472, at *6 (S.D.N.Y. Apr. 1, 2021) (quoting *United States v. Salameh*, 142 F.3d 88, 113 (2d Cir. 1998) (per curiam)).

which he has not complied with Local Criminal Rule 16.1—would be for the Government to look for and, if it exists, produce the discovery Garelick contends is missing, which it has now done; it is not to hold a hearing and permit the defendant to hunt for facts during cross-examination. Evidentiary hearings are not rewards for discovery fishing expeditions. Garelick's motion should be denied without a hearing.

## VI.  The Court Should Adopt the Government's Proposed Schedule for Pretrial Disclosures

The defendants request that the Court adopt a schedule for pretrial disclosures that is contrary to practice in this district, unreasonable in light of the relatively limited complexity in this case, conspicuously lopsided in favor of the defense, and includes deadlines that the Court is not empowered to impose. The Court should deny the defendants' requested schedule and should adopt the Government's proposed schedule.

The Government's proposed schedule and its comparison to the defense proposal is set forth below:

|  | Government Proposal | Defense Proposal |
|---|---|---|
| Opening Government Expert Disclosure | February 15, 2024 | February 15, 2024 |
| Opening Defense Expert Disclosure | February 15, 2024 | March 15, 2024 |
| Defense Rule 16 Production | March 4, 2024 | None |
| Rebuttal Expert Disclosures (if any) | March 4, 2024 | None |
| Rule 404(b) Notice | March 8, 2024 | February 15, 2024 |
| Government Exhibits | April 2, 2024 | February 15, 2024 |
| Defense Exhibits | April 2, 2024 | April 8, 2024 |
| Government Witness List | April 2, 2024 | March 15, 2024 |
| Defense Witness List | April 2, 2024 | After opening statements |

The Government's proposed schedule is reasonable, in line with practice in this district, and provides the parties with more than adequate time to prepare for trial:

- Expert disclosures: As recently amended, Rule 16 sets forth analogous provisions for both Government and defense expert disclosures. *See* Fed. R. Crim P. 16(a)(1)(G), 16(b)(1)(C). There is no basis for the defense's substantive expert notice, which it intends to use in its case-in-chief, to be produced to the Government one month later than the Government's own disclosure. That provides inadequate time for the

49

Government to identify a rebuttal expert and prepare a rebuttal expert disclosure. The Government's proposal appropriately sets the same deadline for both parties' opening expert disclosures and gives the parties two and a half weeks to produce any rebuttal expert disclosures.

- Defense Discovery: The defense has not agreed to set a deadline for its own Rule 16 discovery production, of which the Government has received none. A deadline of March 4, 2024 for the defense to produce the Rule 16 materials in its possession is reasonable.

- Rule 404(b): The Government proposes making its Rule 404(b) notice on March 8, 2024, which is two weeks before motions in limine are due and more than a month before trial. Rule 404(b) requires only "reasonable notice," and the Government's proposal certainly suffices as such. This proposal is even more generous than common practice in this district. "Courts in this Circuit have routinely found that at least ten business days provides reasonable notice to a defendant under Rule 404(b)." *United States v. Filippi*, No. 12 Cr. 604 (RA), 2013 WL 208919, at *6 (S.D.N.Y. Jan. 16, 2013) (quoting *United States v. Ojeikere*, 299 F. Supp. 2d 254, 257 (S.D.N.Y. 2004)).

- Exhibits and Witness Lists: The Government proposes that the parties produce witness lists and exhibits intended to be used in the cases-in-chief approximately two weeks before trial.[6] By contrast, the defense seeks the Government's exhibits two months before trial (but is willing to disclose their own exhibits only one week before trial) and seeks the Government's witness list a month before trial (but is willing to disclose their own only after opening statements). The Court should adopt the Government's proposal, which is reasonable and consistent with common practice in this district. For example, in advance of a three-week racketeering and murder trial involving multiple defendants and a more than decade-long, complicated, conspiracy, Judge Furman ordered the disclosure of an exhibit list fourteen days before trial. *See United States v. Blondet*, No. 16 Cr. 387 (JMF), 2019 WL 5690711, at *6 (S.D.N.Y. Nov. 4, 2019); *see also United States v. Parnas*, No. 19 Cr. 725 (JPO), 2021 WL 2981567, at *5 (S.D.N.Y. July 14, 2021) ("With regard to exhibit lists, the typical practice in this circuit is to order the early disclosure of exhibits several days, or sometimes weeks, in advance of trial. . . . courts in this District typically require disclosure of witness lists several weeks before trial."); *United States v. Falkowitz*, 214 F. Supp. 2d 365, 392-93 (S.D.N.Y. 2002) (ordering disclosure of exhibit list one week before trial in complex fraud and conspiracy case). In addition, contrary to the gamesmanship inherent in the defense proposal, the Government's proposal treats the parties similarly and ensures that neither is unfairly surprised by its opponent's case-in-chief.

---

[6] Additional exhibits are commonly identified on a rolling basis following the initial disclosure of bulk exhibits. The proposal of this deadline is not intended to foreclose either parties' good faith addition of exhibits after that date.

- Section 3500 Material: The Government will produce Jencks Act material sufficiently in advance of trial, in line with the U.S. Attorney's Office's general practice. However, the Second Circuit has held that the Act "prohibits a District Court from ordering the pretrial disclosure of witness statements." *United States v. Coppa*, 267 F.3d 132, 145 (2d Cir. 2001). As a result, the Court should decline the defense request to set a deadline for the production of Section 3500 material.

For the reasons set forth above, the Court should decline to adopt the defendants' proposed schedule and should adopt the Government's proposed schedule.

## CONCLUSION

For the reasons set forth above, the defendants' motions should be denied in their entirety and without a hearing.

Dated: New York, New York
        January 12, 2024

                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney

                                By:     /s/_____
                                        Elizabeth Hanft
                                        Daniel G. Nessim
                                        Matthew R. Shahabian
                                        Assistant United States Attorneys
                                        Tel.: 212-637-2334 / -2486 / -1046