# Exhibit  BB

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3
    ---------------------------x
4                              :
    UNITED STATES OF AMERICA    :
5                              :
    v.                         :
6                              :    USAO No. 23 Cr. 307
                               :
7   SHVARTSMAN et al.,          :
                               :
8                              :
    ---------------------------X
9

10

11

12

13
                          Recorded Conversation
14

15

16

17                  Date:  March 15, 2023
                    Time:
18                  Session ID:
                    Participants:  CS
19                                 Michael Shvartsman
                                   John Iveson
20                                 Michael Park
                                   Eric Hannelius
21

22

23

24                  (U/I) - UNINTELLIGIBLE
                    (PH)  - PHONETIC SPELLING
25

```
 1   CS:            The time is 1042 hours, that's 10:42 a.m. on
 2                  Wednesday, the 15th of March 2023.
 3                  Currently in Aventura where I'm going to, to
 4                  attend a meeting with Michael Shvartsman and
 5                  I believe Michael Park.  It's at their
 6                  offices, which is 21550 Biscayne Boulevard,
 7                  Suite 400, Aventura with a post code or zip
 8                  code of 33180.  And the objective of the
 9                  meeting is to discuss -- is to execute a
10                  trust agreement that has been put in place,
11                  and discourse and strategy regarding the
12                  decanting of assets from the current
13                  situation, which I believe are held in
14                  entities in the U.S. Virgin Islands, and
15                  from my meeting with Michael Shvartsman back
16                  in December, I believe he wants to decant
17                  them and move them to Belize.  I'm going to
18                  leave the device running.  This is for the
19                  purpose of the secondary device that I've
20                  got.  The time is now 1044 hours, that's
21                  10:44 a.m., Wednesday the 15th of March.
22                  I'm just about to attend the offices of
23                  Michael Shvartsman and Mike Park, he's a
24                  U.S. Attorney, in order to execute new trust
25                  agreements and discuss the decanting of
```

```
 1                         assets held in -- entities in the U.S.

 2                         Virgin Islands.  Also in attendance at the

 3                         meeting will be John Iveson.

 4   [BACKGROUND NOISE/NON-TARGET CONVERSATION]

 5   CS:             Hi Michael.  Good to see you.  Are you well?

 6                   Good, thank you.

 7   SHVARTSMAN:     How you doing?

 8   CS:             Good, Michael.  Nice to meet you in person.

 9   SHVARTSMAN:     Can I get you guys more coffee?

10   CS:             Do you have a water?

11   SHVARTSMAN:     We have whatever you want.

12   CS:             A water would be good for me.  Thanks.  And

13                   could you steer me -- is there a bathroom?

14   SHVARTSMAN:     You want a bathroom?

15   CS:             Bathroom, yeah, please.  Cheers.

16   SHVARTSMAN:     So, the bathroom is right over there.

17   CS:             Oh.

18   SHVARTSMAN:     You can use the blue thing.

19   CS:             Okay.

20   SHVARTSMAN:     And then when you come back, just come over

21                   here.

22   CS:             Okay.  Cheers.

23   [BACKGROUND NOISE]

24   CS:             Thanks, Michael.

25   SHVARTSMAN:     You name it.
```

SDNY_04_00019951

```
 1  IVESON:       You're one of those guys.  You know

 2                everybody.

 3  SHVARTSMAN:   Well, I know some people.  Are you drinking

 4                water?

 5  CS:           Yes, please.

 6  SHVARTSMAN:   We've got different like soda waters.  Is

 7                there a flavor that you want?

 8  BEN:          I'm Ben.

 9  CS:           Good to meet you.  Steve.

10  BEN:          Steve, nice to meet you.

11  CS:           Actually, I'll have a soda water.

12  SHVARTSMAN:   Is there a flavor you want?

13  CS:           I'll go for the lemon, yeah, please.

14  SHVARTSMAN:   (U/I) lime.

15  CS:           Cheers.

16  SHVARTSMAN:   There are three (U/I) for him.

17  IVESON:       Yeah.  If you were on the canvas (U/I)

18                because I'm sure he has clients in the

19                United States.

20  SHVARTSMAN:   A few.

21  [BACKGROUND NOISE]

22  IVESON:       Oh, you are.  Okay.

23  [OVERLAPPING VOICES]

24  SHVARTSMAN:   I mean, that's why you asked.

25  IVESON:       That's very raw.  I get it now.
```

```
 1   SHVARTSMAN:    Yeah.  Maybe you're (U/I)
 2   IVESON:        No.  I'm a lawyer working in the space of we
 3                  do -- I work with international trust
 4                  companies, banks, you know, basically (U/I)
 5                  services.  You know, it's the same issue
 6                  that everybody faces here, which is trying
 7                  to get that liquidity into the, you know,
 8                  into the global monetary system.
 9   SHVARTSMAN:    Yes.
10   IVESON:        Yeah.
11   SHVARTSMAN:    All right, guys.  Let's roll.
12   BEN:           Nice to meet you.
13   SHVARTSMAN:    Nice to meet you.
14   CS:            Good to meet you, Ben.  Take care.  Cheers.
15   [BACKGROUND NOISE]
16   IVESON:        We were going to ask if you guys had a
17                  whiteboard.  I'm sorry --
18   CS:            He's rather full --
19   IVESON:        I've learned not to touch, and that's okay
20                  because I came prepared.
21   SHVARTSMAN:    All right.  You ready for this?  Makes it
22                  own whiteboard.
23   IVESON:        Okay.  Awesome.
24   CS:            Yeah.  Telescopic.
25   [BACKGROUND NOISE]
```

```
 1   SHVARTSMAN:    So, you know.  We've spoken, you know,
 2                  opening a bank account, that kind of stuff
 3                  is difficult.  Right?
 4   IVESON:        Yeah.
 5   SHVARTSMAN:    (U/I) individual things that (U/I).  Do you
 6                  have any Russian clients or any problems
 7                  with (U/I)?
 8   CS:            I've had Russian clients on and off over the
 9                  years.  And he's noticed other clients are
10                  having issues, lots of people do.  Funny
11                  enough, my phone has never stopped ringing
12                  over the last two or three weeks, and the
13                  way things are escalating, everybody's
14                  getting deeply, deeply concerned.
15   SHVARTSMAN:    Great.
16   CS:            So, I think --
17   SHVARTSMAN:    If you got problems, I got solutions.  I'm
18                  serious.
19   IVESON:        Yeah?
20   SHVARTSMAN:    So, a good friend of mine owns a bank in
21                  Dominica.  And he got the regulators in
22                  Dominica to give him a green light on
23                  banking Russian individuals.  So, you know,
24                  for Russian individuals, and even some
25                  Ukrainian individuals, even though
```

```
 1                      Ukrainians are, you know, having sanction
 2                      issues, is (U/I).  So, he can bank them,
 3                      they can transact in, you know, U.S.
 4                      Dollars, Euros, Pounds.  He issued cards to
 5                      them so they can, you know, make purchases
 6                      and that kind of stuff.
 7  CS:                 Yeah.
 8  SHVARTSMAN:         So, the regulator gave them a green light.
 9                      So, you know, if you guys are looking for
10                      that type of solution, then we can --
11  IVESON:             Yeah, absolutely.  You had mentioned --
12  CS:                 Yeah, you did mention it before, actually,
13                      Michael.  It's defendant -- that could be
14                      very interesting.
15  IVESON:             Yeah, it would be good to know.  You know,
16                      just to be honest, Mike, this isn't going to
17                      last.  I mean, I've worked in this space for
18                      20 plus, and I've seen everything.  I've
19                      seen sanctions come and go.  I've seen, you
20                      know, due to the politics, (U/I), you know,
21                      all the challenges that affect us in an
22                      offshore space.  And the problem right now
23                      is that what's going on with the Ukrainian
24                      situation, it's not getting any better in
25                      the near term.  Now, I don't expect it to
```

```
 1                          last forever.  And at some point it will

 2                          revert back to the norm.

 3    SHVARTSMAN:    Sure.

 4    IVESON:        But for now, the risk that we see for our

 5                          clients, especially Russian nationals, is

 6                          that the west is just going to continue to

 7                          ramp up the pressure on these Caribbean

 8                          jurisdictions.  They're already applying

 9                          pressure on the Eastern Caribbean Central

10                          Bank to get their member countries in line.

11                          And so, right now, we have a bit of a

12                          loophole in that jurisdictions like

13                          Dominica, while they will enforce the

14                          specially designated nationals list, they

15                          will not enforce the general prohibition on

16                          the provision of services to Russian

17                          nationals, or Russian residents.

18    SHVARTSMAN:    Yeah.

19    IVESON:        But I, the way I do my business, the way,

20                          you know, the effect that we have in our

21                          organization, we don't expect it, that

22                          loophole to last throughout the summer.  I

23                          wouldn't be surprised if the -- in the next

24                          few months, the pressure is brought to bear

25                          to close that down in some of these other
```

```
 1                    jurisdictions.  And so, what that just means
 2                    for us is it's a window.  You know, we have
 3                    an opportunity to do some planning, to try
 4                    and just get everything in place, so that
 5                    we're not reliant on these small
 6                    jurisdictions where, yeah, at the drop of a
 7                    hat, you know, they're notifying you that
 8                    funds have been blocked.  Because that's
 9                    what happens when they step in and they say
10                    okay, Dominica, you can no longer provide
11                    this service.  The funds aren't taken,
12                    they're not confiscated, they're just
13                    blocked and then you're sitting there
14                    waiting to get your money for however many
15                    years.  And a lot of people don't know when
16                    your funds get blocked, you don't get the
17                    interest on those funds.  The interest goes
18                    to the institution that holds the funds.
19                    So, your funds, you know, the banker, he
20                    stands to do quite well, actually, if they
21                    ramp up sanctions.
22  SHVARTSMAN:       Yeah, I mean only as a green light for non-
23                    sanctioned individuals, obviously.
24  IVESON:           Yeah, yeah.  Right.
25  CS:               Yeah.
```

```
 1   IVESON:        You're not on the (U/I) list.  Yeah.

 2   SHVARTSMAN:    (U/I) non-sanctioned individuals.  Listen, I

 3                  think that the positive news is my friend

 4                  owns the bank.  We do a lot of business

 5                  together.  He's a very good friend of mine.

 6                  So, if -- and he's very good friends with

 7                  the regulators there.  So, if something was

 8                  coming down the pike, we would know in

 9                  advance.

10   IVESON:        Yeah.

11   SHVARTSMAN:    And we would make sure that money was moved

12                  before that happened.

13   IVESON:        Yeah, but to answer your question, we would

14                  very much appreciate the introduction

15                  because it would offer some outlet for some

16                  clients for the time being.  But to be

17                  honest, most of our clients, especially in

18                  your net worth range, they're not reliant on

19                  that at all.  They're several steps ahead.

20                  And you know, I'm sure we'll touch on some

21                  of those things.

22   CS:            And I'm sure there's something we can

23                  definitely do there.

24   SHVARTSMAN:    Yeah.

25   CS:            And an introduction would be very welcome.
```

10

```
1   IVESON:       Yeah.  How would you like to coordinate that
2                 introduction?
3   SHVARTSMAN:   I'm the introduction.  If you need it, I can
4                 -- do you have a client, all right, reach
5                 out to me, and I'll set it up.
6   IVESON:       Okay.  Will do.
7   CS:           Perfect.
8   IVESON:       Thank you.
9   SHVARTSMAN:   So, what do you think something like this is
10                worth?  Like how much money can we make off
11                of this?
12  IVESON:       So, there's custody which right now, there
13                are plenty of practical solutions out there
14                that people have access to, including the
15                solutions that Steve provides.  So,
16                typically, you know, the fees in this range
17                are probably, you know, you're looking at 1
18                to 2 percent.  It's way more, you know, five
19                to ten times more if you're able to do a
20                little bit of the work that allows you to
21                kind of remove fingerprints, remove history,
22                you know, provide a clean record for funds.
23                That's far more valuable.
24  SHVARTSMAN:   So, a little --
25  [BACKGROUND NOISE]
```

```
 1   SHVARTSMAN:    -- Ukraine as an example.  So, I have
 2                  friends of mine in the Ukraine that have --
 3                  so Ukraine has a law where you cannot send
 4                  money in the Ukraine now.  So, there's guys
 5                  in the Ukraine sitting on a lot of cash.
 6                  Most people in the Ukraine that make a lot
 7                  of money actually don't put it in the bank
 8                  anyways.  So, there's lots of guys sitting
 9                  on lots of cash.  So, how -- so what -- they
10                  have a service in the Ukraine, and it's not
11                  just the Ukraine, other countries have a
12                  similar kind of service, wherein you give
13                  somebody their, I'm going use a million
14                  dollars as an example, you give somebody
15                  there a million dollars in cash.  They
16                  charge you 3 percent.  Somebody shows up at
17                  your door here in Miami, or New York,
18                  wherever, and they give you a million
19                  dollars in cash here.  So, it's one service
20                  that --
21   CS:            Like the old kitty banking, isn't it?
22   SHVARTSMAN:    Yeah.  Exactly.  (U/I) for the bank.  Right.
23                  Another service they have is they -- you
24                  give them a million dollars in cash there,
25                  and they get a company from the EU to wire
```

```
 1                    you money.  So, why (U/I) this.  Very simple
 2                    reason.  Right.  Because for that company in
 3                    the EU, the owner of that business, whatever
 4                    business it is, they take a million dollars
 5                    in cash in the EU, put it in their pocket,
 6                    and then they wire out a million dollars.
 7                    And for them, for that company in the EU,
 8                    it's an expense.
 9  CS:               Yep.
10  SHVARTSMAN:       They just expensed a million dollars, they
11                    pay a million dollars less in --
12  CS:               Yeah.
13  IVESON:           Yeah.
14  CS:               Yeah, yeah, yeah.  Yeah.
15  SHVARTSMAN:       They pay less.  Right.  So, that's, that
16                    service that I've got nothing to do with --
17  IVESON:           Sure.
18  SHVARTSMAN:       But it's a service that exists today.
19                    Right.  So, what I'm getting to is that if
20                    you have clients that have cash, right --
21  IVESON:           Okay.
22  SHVARTSMAN:       I can find out who these people are,
23                    introduce them, okay.  And that I think
24                    would help in terms of getting money into
25                    the account from --
```

13

```
 1  [OVERLAPPING VOICES]

 2  IVESON:        Oh, absolutely.

 3  CS:            Yeah.

 4  IVESON:        Yeah, that would be --

 5  CS:            Yeah.

 6  IVESON:        Actually, I was talking with you the other

 7                 day about a client that is in specific need

 8                 for that.

 9  CS:            Yeah.

10  IVESON:        In the Ukraine.  So, we ought to talk to

11                 him.  Do you have any sense of what those

12                 services might cost?

13  SHVARTSMAN:    Yeah.  So, they charge 3 percent.

14  IVESON:        Okay.  So, it is the 3 percent.

15  SHVARTSMAN:    Yeah.  They charge 3 percent.

16  IVESON:        And that's actually pretty cheap.

17  SHVARTSMAN:    I mean, like I said --

18  IVESON:        Relying on me putting margin in.

19  CS:            Oh, there's plenty.  I was going to say

20                 there's plenty of room for margin on us.

21  IVESON:        I mean, when you factor in -- I mean, I

22                 guess maybe the factoring of the tax

23                 benefits is an offset or, you know, an

24                 additional revenue angle.

25  CS:            Yeah.
```

14

```
 1   IVESON:      But yeah, which -- yeah, when you think

 2                about it, you know, from a hard cost

 3                perspective, it adds up to about the same

 4                amount as what you would pay to have

 5                somebody just provide an absolutely clean

 6                record from the get go.  So, yeah, that's --

 7   CS:          Yeah.

 8   IVESON:      -- that's on par.

 9   CS:          Yeah, it is.

10   IVESON:      But with the tax -- if you don't get the tax

11                deduction in the EU, then it doesn't work --

12   CS:          No.

13   IVESON:      Yeah.

14   SHVARTSMAN:  Yeah.  So, like I said, I --

15   IVESON:      No, the tax --

16   CS:          No, that's very, very interesting.

17   SHVARTSMAN:  I'll let you guys (U/I).

18   CS:          Yeah, yeah.  I'm sure we can, we can come

19                back and do something on that.

20   SHVARTSMAN:  Sure.  Yeah.  Okay.  I was talking to

21                myself.

22   CS:          Okay.  So, two binders, one each.

23   SHVARTSMAN:  I see.

24   CS:          The red one is for you to sign.  The red

25                markers, and the green, the green one is for
```

```
 1                        me, and then where the witnesses need it --
 2   SHVARTSMAN:   (U/I) your evidence.
 3   CS:           There's a yellow and a blue.  So, I will
 4                 start signing this if that's okay.
 5   IVESON:       Yeah.  Go ahead and sign on yours.  Who do
 6                 we want to --
 7   SHVARTSMAN:   What date are we using on all these?
 8                 Because I mean, you got basically blank date
 9                 of January in all --
10   IVESON:       That's right.  We did -- so --
11   SHVARTSMAN:   We formed the trust -- the trust was formed
12                 on the 18th.
13   CS:           18th.
14   IVESON:       The private trust company, yeah.  That was
15                 formed on the 18th.  I have -- the ordinance
16                 requires that a trust be registered within
17                 45 days of its establishment.  But I don't
18                 think that'll be an issue because the trust
19                 is a migrative trust.  So, I think what we
20                 find was that -- but if it becomes an issue
21                 on the trust agreement only, we might wind
22                 through the date that we make the, you know,
23                 the new trust being effective.  But I
24                 believe we'll be fine with the January 18th
25                 date.  If we need to, we'll just contact,
```

```
 1                        you know, we'll replace the page with the

 2                        date for the trust.  Do you have the changes

 3                        we made back then, which you had seen a

 4                        final version of, was that we verified with

 5                        the regulator (U/I) for the trust, and that

 6                        was the name that was available.  So, we had

 7                        gone --

 8   PARK:         I believe it's spelled incorrectly.

 9   IVESON:       Which one?

10   PARK:         Michael S-C-H-V-A-R-T-S-M-A-N.  Did you

11                 notice that, Mike?  Does it matter?

12   IVESON:       Do you spell yours with an S.

13   SHVARTSMAN: It's S-H-V.

14   IVESON:       They got a C in there.

15   SHVARTSMAN:  We can print (U/I), John.

16   IVESON:       I think the easiest thing is simply the --

17   [BACKGROUND NOISE]

18   CS:           Yeah.  Initial it.

19   IVESON:       Yeah.  Just initial it.  Right there.

20   [BACKGROUND NOISE]

21   IVESON:       You can put in January, I mean --

22   [OVERLAPPING VOICES]

23   [PHONE RINGING]

24   [SHVARTSMAN ON CALL]

25   SHVARTSMAN:  Hello.  Hello.  Hello.
```

```
 1   [BACKGROUND NOISE]

 2   IVESON:        Which pages?  You have some pages where your

 3                  signature needs to be witnessed.

 4   CS:            Yeah, yeah.

 5   IVESON:        Okay.  Mike, do you have a preference as to

 6                  who you use as witnesses?  There are just a

 7                  few referenced.  I think they're the trust

 8                  documents, probably just to make sure it's

 9                  enforced in Florida as well as in the (U/I).

10                  Who would you like to use?

11   PARK:          I'm fine being a witness.

12   IVESON:        Okay.  We can witness the signatures.

13   SHVARTSMAN:    So, here, I'm resigning, (U/I) I'm resigning

14                  as trustee.

15   IVESON:        Yeah.  You're resigning as trustee.  And

16                  that's the last step of the process.  Yeah.

17   SHVARTSMAN:    So, I'm resigning as trustee.

18   PARK:          You're becoming the protector --

19   IVESON:        Of the (U/I).

20   SHVARTSMAN:    And then what happens with like the assets?

21   IVESON:        The assets are all being assigned into the

22                  new trust.  So, the last documents are all

23                  the assignments of the various entities of

24                  your assets into the trust.

25   SHVARTSMAN:    So, does that include the sub-corps, like
```

SDNY_04_00019966

```
 1                        Rocket Holdings and --
 2  [BACKGROUND NOISE]
 3  CS:           I made a little agenda for us to discuss
 4                that.  The way I understand it, I think it -
 5                - was it you wanted them to be housed in the
 6                Belize LLC.
 7  SHVARTSMAN:   Yeah.  And we'll talk about that.
 8  CS:           Yeah.
 9  SHVARTSMAN:   But that's all -- I'm just, so I'm clear
10                here.  So, we got the trust.
11  CS:           Yep.
12  SHVARTSMAN:   The trust actually doesn't -- where's the
13                trust go?
14  IVESON:       At this point, with those assignments, the
15                trust will own three things.  It'll be the
16                three membership interest and those three
17                separate U.S. Virgin Island LLC's.
18  SHVARTSMAN:   Okay.
19  IVESON:       Which I think you're the manager of all
20                three of them.
21  SHVARTSMAN:   I am the manager.  So, the trust owns it.
22                Right?
23  IVESON:       Right.
24  SHVARTSMAN:   So, you control the trust.
25  CS:           You control it online.  No matter -- yeah.
```

```
 1   IVESON:        He's the trustee, but you have the right to

 2                  --

 3   CS:            But ultimately the way it's structured is

 4                  that you --

 5   SHVARTSMAN:    Right.  But if you make a decision without

 6                  my approval, then what happens?

 7   IVESON:        Well --

 8   CS:            But -- go on.

 9   IVESON:        So, right now --

10   [OVERLAPPING VOICES]

11   SHVARTSMAN:    I'll find you too.

12   CS:            Yeah, yeah.

13   IVESON:        So, that's a -- that's the exact correct

14                  question you should be asking, and that's

15                  why I think --

16   CS:            Yeah.

17   IVESON:        -- we will want to talk more detail here

18                  today.

19   CS:            Yeah.

20   IVESON:        About a couple issues stemming from that.

21                  The immediate observation is that you are

22                  correct.  He has the ability as the trustee

23                  to do whatever the hell he wants with any

24                  asset that he owns as the trustee.  Right

25                  now, it's just those three membership
```

```
 1                      interests.
 2   SHVARTSMAN:    Yeah, well --
 3   IVESON:        And --
 4   [BACKGROUND NOISE]
 5   IVESON:        They do.  Which -- but because you are the
 6                  manager of those three LLC's, technically,
 7                  he can't do anything unless you say hey, you
 8                  know, want can a member of an LLC do and a
 9                  manage an LLC.  They would just sit around
10                  and wait for distributions.
11   SHVARTSMAN:    Mike and Ethan?
12   IVESON:        Yeah.  And now here's the problem.  From --
13                  I'm an asset protection lawyer, so for me,
14                  when I look at a structure like that,
15                  especially when it's U.S. Virgin Islands
16                  entities, I say what the hell can you
17                  protect, because everything is in U.S.
18                  Virgin Island revenues, under your direct
19                  control.  If there's litigation, Steve's
20                  pretty much powerless to do anything for the
21                  same reason he's powerless to do anything
22                  with the assets absent litigation.
23   SHVARTSMAN:    Yeah.
24   IVESON:        So, really what we do in asset protection
25                  planning, Mike, is we drill down.  We say
```

```
 1                     okay, well, what's inside this Virgin
 2                     Islands, LLC.  You know, cash, you've
 3                     mentioned a boat, there may be some
 4                     business.  You know, bank accounts,
 5                     whatever.  Each particular asset, we may
 6                     have our own recommendations to what the
 7                     ideal solution is for that particular asset.
 8  SHVARTSMAN:    Yeah.
 9  IVESON:        And I think it would be -- you know,
10                     normally, someone in your position, you
11                     wouldn't want to be sitting on three U.S.
12                     Virgin Island LLC's for asset protection.
13  PARK:          The reason you did that, just so you
14                     understand, just for clarity, the reason we
15                     did that is because the settler of the
16                     trust, MG Family Trust, the U.S. Virgin
17                     Islands doesn't report to the U.S. -- I'm
18                     sorry, Russian citizen.
19  IVESON:        Sure.
20  PARK:          And the U.S. Virgin Islands doesn't report
21                     anything to Russia.
22  IVESON:        Yeah.  And that's --
23  PARK:          That's why it --
24  [OVERLAPPING VOICES]
25  IVESON:        That's perfectly fine.  For the other
```

SDNY_04_00019970

```
 1                         jurisdictions that we will be working with,
 2                         will not report to Russia either.  You know,
 3                         we're sensitive to those issues.  But in --
 4                         yeah, the reasons that he put together
 5                         really were not necessarily asset protection
 6                         based.  But you came to me expressing an
 7                         issue or some concern where an asset
 8                         protection was something that you wanted to
 9                         achieve.  We look at what is being
10                         accomplished here right now as a
11                         steppingstone.  It's just the first phase.
12   SHVARTSMAN:    Yeah.
13   IVESON:        We want to get this out of the United
14                         States, the immediate reach of the United
15                         States, but the second phase, which is
16                         really getting it into a Belize LLC that you
17                         and your family properly control, but
18                         doesn't have your fingerprints, you know,
19                         those are things that we will -- that we
20                         hope to talk about today with you to just
21                         start to get the conversation flowing and
22                         talk about the options --
23   SHVARTSMAN:    Sounds good.  I got a call, I'm just letting
24                         you know, I got a call in four minutes, and
25                         then I'm open till 1:30.
```

```
 1   IVESON:        Well, why don't we go ahead and --

 2   [BACKGROUND NOISE]

 3   CS:            Yeah.

 4   IVESON:        Then Mike and I can do the witnesses.  We'll

 5                  at least get --

 6   CS:            And then we can make the amendments.

 7   IVESON:        Yeah.  But you'll have time after your

 8                  meeting that we can --

 9   SHVARTSMAN:    Yep.

10   IVESON:        -- dive into those -- okay.  Great.

11   SHVARTSMAN:    You guys can start signing this stuff, and

12                  I'll --

13   IVESON:        Sure.

14   [BACKGROUND NOISE]

15   [PHONE RINGING]

16   [SHVARTSMAN ON CALL]

17   SHVARTSMAN:    Welcome to America.  Hello.

18   U.K.3:         Hello.

19   SHVARTSMAN:    Hi, how are you?

20   U.K.3:         I'm good.

21   SHVARTSMAN:    Welcome back.

22   IVESON:        In the address you can put business.

23   [SHVARTSMAN ON CALL]

24   SHVARTSMAN:    Hey, how are you?  You're welcome.  Welcome

25                  home.  So, what's your plan right now?
```

24

```
 1                        Yeah.  Yeah.  Yep.  Absolutely.  Yeah, I

 2                        mean listen, here's what I think you should

 3                        do.  So, I've run through your office, I got

 4                        --

 5   [BACKGROUND NOISE]

 6   SHVARTSMAN:    -- around 3'ish, give or take.  And then --

 7   [BACKGROUND NOISE]

 8   SHVARTSMAN:    -- down there, and we can check it out and

 9                        see if you're in good standing there because

10                        --

11   [BACKGROUND NOISE]

12   SHVARTSMAN:    How's that sound?  Yeah, you can go there.

13   [BACKGROUND NOISE]

14   SHVARTSMAN:    Yeah.  Yeah, I mean, you can (U/I) I stayed

15                        on it the whole summer in Europe.  There's

16                        nothing wrong with it.

17   [BACKGROUND NOISE]

18   SHVARTSMAN:    Mm-hm.  It's got air conditioning, it's got

19                        power, it's got water.  So, it's up to you.

20                        Do you want to go there now, I'll give you

21                        directions.

22   [BACKGROUND NOISE]

23   SHVARTSMAN:    -- ready for you.  I'd love to but I can't,

24                        I got a bunch of people in town, you know

25                        come to sign contracts right now, so.  We
```

```
 1                         got dinner (U/I).  I've got a 6:30 kind of

 2                         dinner meeting, and then after that --

 3    [BACKGROUND NOISE]

 4    SHVARTSMAN:    I don't know.  I'm going to give you a call

 5                         back.  Okay.  What?  Let me hit you back.

 6                         Okay?  Okay.

 7    [CALL ENDED]

 8    [BACKGROUND NOISE]

 9    IVESON:        Basically, this is technically, technically,

10                         it's copied, it just (U/I) that's his copy

11                         to keep.

12    [BACKGROUND NOISE]

13    SHVARTSMAN:    I'm going to excuse myself now for a few

14                         minutes.

15    IVESON:        Okay.

16    SHVARTSMAN:    I've got a call.

17    CS:            No problem.

18    SHVARTSMAN:    If you guys want, you can help yourself to -

19                         -

20    [BACKGROUND NOISE]

21    CS:            Thank you, thank you.

22    [SHVARTSMAN LEAVES THE ROOM]

23    IVESON:        Do you have an outside practice or is it

24                         just mostly in house?

25    PARK:          Just in house.
```

```
 1   IVESON:      Okay.  So, how are the hours for you?

 2   PARK:        You know, probably a little better than I'm

 3                used to when I was working in the firms.

 4   IVESON:      Yeah.

 5   PARK:        I'm still spending 50, 60 hours a week --

 6   IVESON:      Yeah.  I was (U/I) seeing all the activity

 7                here.

 8   PARK:        There's a lot going on.  I have an

 9                associate, we're looking to hire a couple

10                more.  (U/I) somewhere else, you know.

11   IVESON:      Oh, no.

12   PARK:        Yeah.

13   IVESON:      How is it, if you know, I was going to ask

14                you, what do you guys do for business?

15   PARK:        Well, a lot of it's in payments.  Michael's,

16                you know, your classic serial entrepreneur.

17                He's always giving you one thing after

18                another.

19   IVESON:      Mm-hm.

20   PARK:        His core business is payments.  He's done a

21                lot (U/I) 20 plus years.  Merchant acquiring

22                where basically you'll set a merchant up

23                with the ability to accept credit card

24                payments.  All right.

25   IVESON:      Yeah.
```

```
 1   PARK:          And link them with a bank and get them in

 2                  the system so they can -- and so when he's

 3                  (U/I) got a whole network of guys.  They

 4                  confirm people that need it.

 5   [BACKGROUND NOISE]

 6   IVESON:        Is there like a special segment of the

 7                  market or --

 8   PARK:          Well, he's really all over.  So, we have

 9                  different companies that are in different

10                  segments.  Cannabis has been a big thing in

11                  the U.S.

12   IVESON:        Yeah?

13   PARK:          So, he's, you know, he developed a solution

14                  for doing not credit card but ATM type

15                  payments from cannabis through card

16                  payments.

17   IVESON:        Oh, that's great.

18   PARK:          Which, yeah, which really, you know, is a

19                  lot easier.  There's a lot of competition in

20                  the market, but he's really got a good chunk

21                  of it locked down.

22   IVESON:        Oh, good for him.

23   PARK:          Yeah.  I mean, so anything like that where

24                  you have what they call high risk, so we

25                  aren't doing any gambling, but there's, you
```

```
 1                    know, cruise lines, you know, long term, any

 2                    type of recurring payments, all those kind

 3                    of things.  They're considered, you know,

 4                    high risk.  And then online payments because

 5                    the card is not present, that's high risk.

 6   CS:              Yeah, yeah.

 7   PARK:            So, he does a lot of that, so we have

 8                    businesses doing all those things, and then

 9                    he has a fetish for super yachts.

10   IVESON:          Mm-hm, yeah.

11   PARK:            Yeah.  He's got one in the Caribbean now.  I

12                    think, well, I think it's back here in port

13                    for right now.  He's got a second one that

14                    he just acquired that is going through a

15                    refit in Turkey.  And then he just bought a

16                    170 foot hull, but it's about -- the hull's

17                    been laid up but it hasn't been finished at

18                    all.  So, he's shipping that over to Turkey

19                    to have them basically finish this yacht.

20   CS:              Okay.

21   [OVERLAPPING VOICES]

22   PARK:            -- deal because it was the owners couldn't

23                    finish it so they put it up for auction, and

24                    he picked it up at auction.

25   IVESON:          Yeah.
```

```
1   CS:          Excellent.

2   PARK:        Yeah.  You know, and then he's got all these

3                other real estate deals and he's just got

4                people all over the world that he's friends

5                with that they get into this, they get into

6                that.  I mean, it's -- the amount of deals

7                he does, and the different types of deals is

8                just staggering.  It really is.

9   CS:          Yeah.  So, he keeps you on your toes, right?

10  PARK:        Absolutely.

11  IVESON:      What do you see as the biggest, you know,

12               challenge for you guys right now of, you

13               know, servicing the high risk payments?

14  PARK:        You know, it sounds bad because you say high

15               risk, but that's just a designation that --

16  IVESON:      Sure.

17  PARK:        -- the card brands put on it because there's

18               a higher risk because you don't have the

19               card in front of you.  Or because of the

20               type, you know, there's a high risk of a

21               chargeback.  Say someone books a cruise or

22               some big travel event.  Well, a lot of times

23               that doesn't come through.  Right?

24  IVESON:      Yeah.

25  PARK:        Something happens.  Either there's a big
```

SDNY_04_00019978

```
 1                          pandemic, or there's this, or they -- their

 2                          schedule changes and they got to cancel.

 3                          So, cancellations on --

 4   CS:        Yeah.

 5   PARK:      -- credit card payments are a big deal to

 6                          the networks.  Right.  They don't like to

 7                          give money back.

 8   IVESON:    But that's not really your issue, is it?

 9                          Because you guys don't take on any of that

10                          risk.

11   PARK:      Well, you do actually.

12   IVESON:    You do.  Oh, wow.

13   PARK:      To be in the chain and to get, you know, if

14                          you take no risk, you get like 20 percent.

15                          If you take -- no, you usually get 50

16                          percent if it's not high risk.  You know, if

17                          you take the risk of the chargebacks, then

18                          you're at 80 percent of the interchange.

19   IVESON:    So, you guys are actually paying the

20                          merchants.  You're not just --

21   PARK:      Yeah, no we --

22   IVESON:    -- processing the --

23   PARK:      -- we handle -- right.  So, the --

24   IVESON:    Wow.

25   PARK:      -- processors handle it, they kick the money
```

SDNY_04_00019979

| | | |
|---|---|---|
| 1 | | out, we take it, we document it so we're |
| 2 | | always looking at, you know, is the |
| 3 | | chargeback issue a problem here, are they |
| 4 | | running up against any of the rules.  You |
| 5 | | know, what's going on up here.  Issues of |
| 6 | | any of that, we're involved in it to help |
| 7 | | keep them compliant. |
| 8 | IVESON: | Yeah. |
| 9 | CS: | Yeah. |
| 10 | PARK: | So, they don't have those issues and they |
| 11 | | don't get kicked out of the -- of being able |
| 12 | | to process. |
| 13 | CS: | Yeah. |
| 14 | IVESON: | Yeah, I can imagine. |
| 15 | PARK: | But that's where you make the big money. |
| 16 | CS: | Oh, absolutely. |
| 17 | PARK: | We're providing the -- |
| 18 | [OVERLAPPING VOICES] | |
| 19 | PARK: | Yeah.  You're a (U/I). |
| 20 | CS: | Yeah. |
| 21 | PARK: | And so, yeah, it's huge risk and justifies |
| 22 | | significant award. |
| 23 | CS: | Yeah. |
| 24 | PARK: | It's fascinating. |
| 25 | CS: | But as well as it turns on the money, you're |

```
 1                      -- I suppose the software, hits on the
 2                      website, which is effectively a terminal --
 3                      they're running a monthly fee.  Aren't they,
 4                      Mike?
 5   IVESON:            It depends on what element you're in.
 6   CS:                Yeah.
 7   IVESON:            So, you know, typically, you know, most
 8                      merchants, yeah.  They're paying a monthly
 9                      fee for the terminal but basically, there's
10                      a charge for running the transaction.
11                      Right.  So, these are charges, you know,
12                      depends on the type of card.  There's a lot
13                      of variables.  Let's say 3 percent, Amex
14                      charges 4 percent, you know, for a credit
15                      card transaction.  That gets split up of all
16                      the people involved in the chain.
17   CS:                Yeah.
18   IVESON:            Right.  And Visa gets some of it, the bank
19                      that's sponsoring it gets some of it, we get
20                      some of it.
21   CS:                Yeah.
22   IVESON:            That's all kind of split up amongst all the
23                      parties.
24   CS:                Yeah.
25   PARK:              But probably the biggest piece of revenue is
```

```
 1                        just from providing the merchant your --

 2   IVESON:          Yeah, I mean --

 3   PARK:            -- a charge, you deposit the funds --

 4   IVESON:          -- the merchant's settlement.  You don't

 5                        really make anything more on that.  It's

 6                        part of what you have to do.  But you don't

 7                        really make anything on it.  You know,

 8                        that's why there has to be enough money in

 9                        it up front.

10   PARK:            Yeah.

11   IVESON:          From doing all those other things.  You need

12                        the money to be in it.  The good thing is

13                        most of these documents are just internal

14                        between, you know, the private trust company

15                        and the client.

16   CS:              Yeah.

17   IVESON:          But that trust is, you know, just to ensure

18                        it's enforceability, you know, we want to

19                        make sure that we initial where we change

20                        the spelling.

21   CS:              And where the date, I'll flick through and

22                        do the date, Mike, just to save you a bit of

23                        time.

24   [BACKGROUND NOISE]

25   IVESON:          -- where it hits the blank like.
```

34

```
1    PARK:          That's for a date, date and place, yeah.

2    IVESON:        Yeah.  We can just go ahead and put the 18th

3                   of January.

4    PARK:          Yeah.  Well all these, you know, you have

5                   dates on all these documents in the

6                   beginning too.

7    IVESON:        Yeah.  As long as you're fine with it, we're

8                   fine with it.  You know, I've double checked

9                   with, you know, your colleagues (U/I).

10                  They're absolutely fine.

11   CS:            Yeah.

12   PARK:          If we can our (U/I).

13   CS:            Basically, I just obviously wanted to get

14                  the signing out of the way.

15   PARK:          Okay.

16   CS:            Phase one done.  They -- that will be

17                  registered by the end of next week, Mike,

18                  probably mid next week.  And then I just

19                  wanted to run through (U/I) on Michael's

20                  visit, as well as you, Mike, and I just

21                  wanted to go through, you know, any --

22                  outline any issues that there are that

23                  Michael may want to flag up to his (U/I) in

24                  the firm, how we look to come up with

25                  solutions for part two, talk about the
```

```
 1                   assets, what they specifically are, and then
 2                   we can give some options in terms of
 3                   solutions.
 4   PARK:           When you talk about issues, are you talking
 5                   about like --
 6   CS:             The usual --
 7   PARK:           -- ones that might need asset protection?
 8   CS:             Yes, yes, basically.  I always ask the same
 9                   questions, you know, is there any
10                   litigation, you know, in terms of whatever
11                   really.  It's good to know privately any
12                   government bodies, you know, with the SEC,
13                   the Department of Justice, and all the
14                   relevant bodies.  It's just like a tick box
15                   for me, just to -- so I know for sure.
16                   Forewarned is forearmed.
17   PARK:           Yeah.  They're here, so --
18   CS:             Yeah.
19   PARK:           -- you can get it from the horse's mouth
20                   here.
21   CS:             Yeah.  Yeah.  And then obviously talk about
22                   the assets so we can just start putting
23                   something, you know, to work with on paper.
24                   We can float by Michael and Mike.
25   PARK:           Yeah.  That would be my concern is just
```

SDNY_04_00019984

```
 1                      drilling down -- well, you -- I mean,

 2                      obviously, you need to know what if any

 3                      issues are there so that you're able to, you

 4                      know, recommend solutions that --

 5  CS:                 Yeah, absolutely.  You know, if there's any

 6                      litigation coming down the pipe or from

 7                      whoever or whatever.  It's good to know.

 8                      And it's just built in braces, really.

 9  PARK:               And define term for protector there because

10                      it should (U/I) being there.

11  [BACKGROUND NOISE]

12  IVESON:             Here it is.  But it doesn't have his name, I

13                      don't think.

14  PARK:               It refers to his schedule.  Yeah, Exhibit C.

15                      Signature page and then Exhibit C where you

16                      have his name.

17  IVESON:             But the good thing is the work that has been

18                      done on the development of the private trust

19                      company and the LLC operating agreement, I

20                      think will serve Mike as a good template for

21                      what we do in Belize.  So, that'll save on,

22                      you know, some expenses there (U/I).  I've

23                      got a client who may have a superfund issue.

24                      I think I called you the other day about it.

25                      And kind of from my perspective, overruled
```

```
 1                    company's perspective, we haven't really had
 2                    any issues handling EPA, you know, once
 3                    we're outside the United States, our
 4                    experience with EPA is they don't even
 5                    bother.
 6   CS:              Yeah.
 7   IVESON:          I mean, there are certain, you call them
 8                    departments, we call them agencies.  There's
 9                    certain agencies where we are (U/I) to their
10                    ability to reach assets outside the United
11                    States.  But I can tell you my experience
12                    with the Justice Department attorneys, and
13                    the inhouse counsel at EPA offshore, they
14                    just -- they're completely out of their
15                    comfort zone.
16   CS:              Yeah.  And also, it just means, you know,
17                    maybe some assets maybe need prioritizing
18                    rather than all this, you know, if there
19                    were some issues with some, just something
20                    that may need expediting.
21   IVESON:          Yeah.  I mean, my thought is probably, I
22                    mean for this one client, I've drilled down
23                    into it.  No bankruptcy issues.  I mean,
24                    it's a superfund issue where I don't think
25                    even at a state level he is -- I don't think
```

```
 1                        the state's going to go after him.  I think
 2                        it's strictly going to be EPA and it's
 3                        probably going to be some kind of clean up
 4                        or you know, damages.  And you know,
 5                        thinking that probably a full Monaco will be
 6                        --
 7   CS:                  Yeah.
 8   IVESON:              -- just fine for --
 9   CS:                  Yeah.
10   IVESON:              You don't see an issue with that.
11   CS:                  Oh, no.  We can maybe have a look at it in-
12                        depth, maybe.
13   IVESON:              Yeah.
14   CS:                  I'm bushed today, but maybe tomorrow we can
15                        have a chat and we'll get it tucked and
16                        tailed and --
17   IVESON:              Yeah, I mean, I've been telling about, you
18                        know, doing a Singapore, but you know, as we
19                        -- as I'm working through with this (U/I)
20                        counsel, I'm thinking that Monaco is
21                        probably just enough to create the screen
22                        that nobody --
23   CS:                  Yeah.  Get like the firewall in place.
24   IVESON:              Yeah.  Yeah.
25   CS:                  That's great, Mike.
```

```
 1   IVESON:         It needs to be done, I think.

 2   CS:             So, we've agreed 18th, yeah?

 3   IVESON:         Yes.  18 January.  And it confirms with the

 4                   regular --

 5   CS:             And on the signing, so what we're going to

 6                   go with today's signing is the 18th, yeah?

 7   IVESON:         Yeah.

 8   [BACKGROUND NOISE]

 9   CS:             What's the zip code here for the place?

10   PARK:           33180.

11   CS:             33180.

12   IVESON:         My son and his mother, they're headed back

13                   to Europe this afternoon.  And he left his

14                   AirPods in the --

15   [BACKGROUND NOISE]

16   CS:             Oh, no.

17   IVESON:         In Florida.  And they're like getting ready

18                   to head over to the airport.

19   CS:             Can't go without the AirPods.

20   IVESON:         No.  No.  Especially a teenage boy.

21   PARK:           They sell them at the terminals.

22   IVESON:         I can expect to see that expense.

23   PARK:           I'm going to grab a water.  Would anyone

24                   like anything?

25   CS:             I tell you what, I wouldn't mind another one
```

```
 1                          of those.  They're quite nice.

 2   PARK:          Lemon LaCroix?

 3   CS:            Yeah, please.

 4   PARK:          The same flavor (U/I)?

 5   CS:            Yes, please.

 6   [BACKGROUND NOISE]

 7   CS:            Michael's next in line.  That I've come

 8                  across, yeah.

 9   PARK:          Mike, did you double check all the green

10                  flags he had signed?

11   IVESON:        Yeah.

12   PARK:          I just want to make sure --

13   IVESON:        Yep.

14   PARK:          Okay.

15   IVESON:        Let me ask you, Mike, just you know, when it

16                  comes to the plan that we're doing, it

17                  really helps us to know kind of what issues

18                  you may have concerns for, for your client.

19                  Just, you know, if it's, you know, like

20                  break it out, you know, by category based

21                  typically on the affidavit of solvency that

22                  we get clients to sign when they set up a

23                  new trust.  You know, we don't have that

24                  here.  This is an existing trust.  But you

25                  know, you work down a list of items --
```

```
 1   [BACKGROUND NOISE]
 2   IVESON:         -- solvency.
 3   [BACKGROUND NOISE]
 4   IVESON:         -- regulatory actions, anything like that.
 5                   And the reason I'm raising it is because I
 6                   always encourage people to tell us what
 7                   they're concerned about.
 8   PARK:           Sure.
 9   IVESON:         Only because depending on who it is, whether
10                   it's a  --
11   [BACKGROUND NOISE]
12   IVESON:         -- or even if it's a governmental agency,
13                   regulatory, anything like that.  Depending
14                   on the nature of the other party, that
15                   guides us as to okay, what are the
16                   appropriate solutions and what solutions
17                   would we not recommend.  Do you have a sense
18                   of what kind of drove Michael to think about
19                   doing this kind of planning?
20   PARK:           Yeah, I mean, you know, there was a period
21                   of time where, you know, like I said, he
22                   gets into all kinds of investments.  Okay.
23   IVESON:         Okay.
24   PARK:           The cannabis stuff, when we looked at it,
25                   right, it's been going on now, people who
```

| | | |
|---|---|---|
| 1 | | move payments in cannabis for 15 plus years, |
| 2 | | and you know, more than half of the states |
| 3 | | have some form of legal cannabis now.  So, |
| 4 | | the likelihood that they're going to do an |
| 5 | | about face on that is very low.  But the |
| 6 | | reality is -- |
| 7 | IVESON: | There's (U/I). |
| 8 | PARK: | It's still an illegal transaction.  Right. |
| 9 | | You're still involved -- |
| 10 | IVESON: | In the federal funds systems, yeah. |
| 11 | [OVERLAPPING VOICES] | |
| 12 | PARK: | You know, we've done everything we can to |
| 13 | | isolate ourselves and to keep ourselves out |
| 14 | | of it, and to do what we can.  But you know, |
| 15 | | for instance the feds decide they're coming |
| 16 | | after somebody, they're looking for the |
| 17 | | money. |
| 18 | IVESON: | Yeah, yeah, yeah.  So, yeah.  You don't want |
| 19 | | to be the last guy standing. |
| 20 | PARK: | Right. |
| 21 | [OVERLAPPING VOICES] | |
| 22 | IVESON: | -- administration, I can't imagine that -- |
| 23 | PARK: | No.  It's -- |
| 24 | [OVERLAPPING VOICES] | |
| 25 | PARK: | We all think that it's -- oh, it isn't.  It |

```
 1                      isn't an enforcement item.  Only, you know,
 2                      ever since Obama's administration, it's
 3                      really become a non-issue and none of the
 4                      Attorney Generals are looking at (U/I).  The
 5                      reality is, you know, the states that have
 6                      enacted it are making a fortune in tax
 7                      revenues and fee revenues from cannabis.
 8                      And your, you know, the Senators are not
 9                      going to, even the republican senators,
10                      where their states are making huge chunks of
11                      money, are not likely to take a position
12                      that's going to really come back and hurt
13                      their state.  Right?
14  IVESON:            Sure.  Sure.
15  PARK:              They can kiss their jobs goodbye.
16  IVESON:            Yeah, yeah, yeah.  Right.
17  PARK:              So, you know, it's becoming a lower and
18                      lower probability, but still, you know,
19                      there's still a risk out there because until
20                      they take the official action of removing it
21                      from the list of prohibited drugs in
22                      schedule one, by the FDA, which the
23                      administrator of the FDA admitted under
24                      Trump that there's a valid use for it, and
25                      it needs to be rescheduled.  Still hasn't
```

```
 1                      don't it.

 2  IVESON:            Yeah.

 3  PARK:              Right.

 4  IVESON:            Yeah.

 5  PARK:              Because in my opinion, the Senators haven't

 6                     gotten enough money out of the lobbying to

 7                     say let's move forward.

 8  IVESON:            Yeah.

 9  PARK:              And take this off the table, because they're

10                     still making good money, you know, from all

11                     the factions.  And then, you know, one of

12                     his investments he got into, I don't know if

13                     you've heard about the whole Trump, what was

14                     it called, his -- he's coming up with his

15                     own, you know, Truth Social.  And there was

16                     that whole thing to fund it.  And that

17                     company that --

18  [OVERLAPPING VOICES]

19  IVESON:            Like the Twitter alternative or was it

20                     Facebook or Twitter alternative that --

21  PARK:              Yeah.

22  IVESON:            -- he was developing.

23  PARK:              Yeah.  Truth Social.

24  IVESON:            Okay.

25  PARK:              But they're -- but originally when he was
```

```
 1                        talking about doing that, there was a Stack

 2                        out there that was raising the money and

 3                        saying, you know, it was not permitted to go

 4                        out and say this is what we're going to buy

 5                        because they had been negotiating with Trump

 6                        to provide them the funding, and if they go

 7                        public, you get the money, yada, yada.  And

 8                        if it was a Stack, we couldn't --

 9   [BACKGROUND NOISE]

10   PARK:        -- should be doing that.  Michael got

11                        introduced and provided some funding for the

12                        Stack prior to them announcing to anybody

13                        what was involved.  They -- he kind of

14                        suspected that's what it was.  Right?  Just

15                        because of all the --

16   IVESON:      Sure.

17   PARK:        -- stuff in the press and what was going on.

18                        But you know, so he and some of his

19                        partners, you know, provided the, basically,

20                        the bridge money to get the Stack to the

21                        point where they could complete the deal.

22   IVESON:      Yep.

23   PARK:        Right?  Then it all blew up, and all these

24                        regulators starting coming in and of course,

25                        subpoenas came flying in for Michael and to
```

```
 1                    the other investors.

 2   IVESON:          And welcome to politics.

 3   PARK:            Yeah.  And you know, it's been out there

 4                    long enough.  And you know, we had our

 5                    attorneys look at it and you know, they --

 6                    guys that specialize in this stuff and they

 7                    said look, you know, the process is going to

 8                    go on.  You're going to have to deal with

 9                    it.  I don't see that they've got any

10                    capability of ultimately getting to you and

11                    making an issue.  You did nothing wrong.

12                    Right.  But when it's political, and you're

13                    name's in the paper, and there's a bunch of

14                    that flying around, you just don't know, you

15                    know, so we don't think there's a big risk

16                    there, but you know, like I said, he gets

17                    involved in investments that are high net

18                    return, which brings higher risk.  So, he

19                    doesn't want there to be much opportunity

20                    for anybody to come, you know, and say, you

21                    know, I'm --

22   [BACKGROUND NOISE]

23   IVESON:          But you know, I'm sorry, but just to go back

24                    for a moment on the Trump issue.

25   PARK:            Yeah.
```

| | | |
|---|---|---|
| 1 | IVESON: | So, let's drill down into that just to make |
| 2 | | sure we're on the same page as to what risk |
| 3 | | we're trying to mitigate there, so that, you |
| 4 | | know, making sure that Steve -- |
| 5 | CS: | Yeah. |
| 6 | IVESON: | -- he's doing the right thing.  Your -- is |
| 7 | | your concern -- I mean, there's no |
| 8 | | bankruptcy proceeding affecting that. |
| 9 | PARK: | No. |
| 10 | IVESON: | Right? |
| 11 | PARK: | No. |
| 12 | IVESON: | So, was it like (U/I)? |
| 13 | PARK: | Yeah.  I mean, and I think, you know, it's |
| 14 | | really -- |
| 15 | IVESON: | That's it? |
| 16 | PARK: | -- pointing now, well at the time, who knew, |
| 17 | | right. |
| 18 | IVESON: | Yeah, well, no I mean I -- |
| 19 | [OVERLAPPING VOICES] | |
| 20 | IVESON: | -- because Steve and I, we have a track |
| 21 | | record with clients who have had FCC issues. |
| 22 | PARK: | Yeah. |
| 23 | IVESON: | And so, they're nothing to us.  We have -- |
| 24 | PARK: | Right. |
| 25 | IVESON: | Well -- |

SDNY_04_00019996

```
 1   PARK:          And you know, that's basically what it's
 2                  come down to and guy is, instead of Stack,
 3                  apparently, was doing some --
 4   [BACKGROUND NOISE]
 5   PARK:          -- and I think they kind of focused in on
 6                  him, and he's got some real troubles.
 7   IVESON:        Do you have any sense what it was he was
 8                  doing?
 9   PARK:          Oh, well, I mean, you know, was, you know
10                  doing things he wasn't supposed to do like
11                  kind of letting people know what they were
12                  going to invest in.
13   IVESON:        Okay.  So, he was giving out insider
14                  information.
15   PARK:          Yeah, basically.
16   IVESON:        Okay.
17   PARK:          And you know, he had some prior dealings
18                  that they started to look into.  So, I mean
19                  there was just a whole bunch of stuff lying
20                  around that.
21   IVESON:        Sure.
22   PARK:          But you know, I mean, you're generating all
23                  this money and it's a substantial sum of
24                  money.
25   IVESON:        Yeah.
```

SDNY_04_00019997

```
 1   PARK:          So, you really -- somebody starts coming and

 2                  looking for some reason, whether it's a

 3                  regulator or private party or whatever, you

 4                  just don't want it to be available to them,

 5                  you know, so you can basically say what --

 6   [OVERLAPPING VOICES]

 7   CS:            Definitely, yeah.

 8   IVESON:        Yeah, I mean, I would say, you know, it's

 9                  hard because the first issue you raise --

10   CS:            Sorry, one second.  I just need to do some

11                  dates in there, don't I?

12   IVESON:        Yeah.

13   CS:            I'll leave that one open.  Michael just

14                  needs to sign that one and two others.

15                  Sorry, gents.  Carry on.  I am listening.

16   [BACKGROUND NOISE]

17   IVESON:        So, two issues there.  Are there any other

18                  issues that you --

19   PARK:          No, I mean there's nothing really out there.

20                  I mean other than, like I said, I think, you

21                  know, his perspective of he's -- he invests

22                  in things that have more risk.  Right.  So,

23                  you're likely to, you know, you're more

24                  likely to be a party with somebody when

25                  you're in a higher risk endeavor.  Right.
```

| | | |
|---|---|---|
| 1 | | So, just from a general business |
| 2 | | perspective, you know, you want to remove |
| 3 | | the assets to the point where somebody can |
| 4 | | come after them if something does go |
| 5 | | sideways in one of these deals. |
| 6 | IVESON: | Yeah, no, absolutely.  And that's right up |
| 7 | | our ballpark.  I think one other issue you |
| 8 | | had raised.  I never really identified it as |
| 9 | | an issue, but it was more just when we, so |
| 10 | | (U/I) and say okay, well, you know, -- |
| 11 | SHVARTSMAN: | Sorry, guys. |
| 12 | IVESON: | You know, there's one issue there -- |
| 13 | SHVARTSMAN: | I'm running to the bathroom. |
| 14 | IVESON: | You mentioned about the attribution of |
| 15 | | ownership, you know, because when we were |
| 16 | | talking about the trust and the whole -- |
| 17 | [BACKGROUND NOISE] | |
| 18 | IVESON: | -- trust because, it's Michael's trust. |
| 19 | | (U/I).  You know.  But you pointed out some |
| 20 | | -- what from your side were valid concerns |
| 21 | | that we (U/I) attribution of ownership.  We |
| 22 | | really can't have this be Michael's |
| 23 | | property.  It has to be Maria -- Maria is |
| 24 | | her name?  It has to be Maria's property. |
| 25 | | And I mean, Mike laid out the case of, you |

```
 1                        know, not -- I thought he did it quite well.

 2                        He said look, you know, there's no law that

 3                        says that if I help my sister-in-law make a

 4                        lot of money, that I have to charge her for

 5                        it.  You know, I can do that.  You know, I

 6                        thought he summed it up quite succinctly

 7                        there.  But going forward with this

 8                        structure that's still in (U/I) we really

 9                        want that basically it's a non-Michael

10                        structure.  He can influence it.  He can't

11                        control it.

12   PARK:                Right.

13   IVESON:              Okay.  So, yeah, I would say, I'm going to

14                        write that down as a third issue, but to me,

15                        that's really a nothing.  I mean, we're able

16                        to play around that.  But that's not going

17                        to be a barrier.  And what I mean by that is

18                        I think with all the options you have for

19                        how we design the Belize LLC, that ought not

20                        to really weigh heavily on how we structure

21                        that entity.  But the first two issues, I

22                        mean --

23   CS:                  Sorry to jump in.

24   IVESON:              Sure.

25   CS:                  Michael, and just needs your signature
```

```
 1                        there.  There may be one or two that was in
 2                        the --
 3  [BACKGROUND NOISE]
 4  CS:                   -- one or two things in there, but I'm not
 5                        (U/I).
 6  IVESON:               So, DEA enforced an action liability with a
 7                        client.  To me, that's a very remote risk.
 8                        I mean, I think we would all agree, we just
 9                        don't see that happening right now.  But you
10                        know, if there were change of
11                        administration, you know, who knows.  You
12                        know, what could happen in the future yeah,
13                        things could evolve to where they take a
14                        different (U/I) on this.  I think long term,
15                        that's not going to happen.
16  PARK:                 Yeah.
17  SHVARTSMAN:           What are you guys talking about?
18  PARK:                 Just the different risks that we're looking
19                        to mitigate, you know, with the asset
20                        protection, so you know, I went through the
21                        cannabis and still federally illegal, and
22                        you know, all of that plus what happened
23                        with the (U/I) Stack.  You know, and you
24                        know, we see very limited exposure in any of
25                        those things.  It's still not something you
```

```
 1                      want to have out there.

 2   SHVARTSMAN:    Yep.

 3   PARK:          And you know, plus your standard business

 4                  model, is you invest in higher risk

 5                  investments on a regular basis, and you just

 6                  never know what's going to blow back on some

 7                  of them.

 8   SHVARTSMAN:    Yeah.

 9   PARK:          So, --

10   IVESON:        And then just close the point on the DA

11                  issue, which I think is a remote risk that

12                  normally I might not even take into account,

13                  but if we were charged with providing a

14                  solution for that particular type of risk,

15                  then the solution would be okay, look, you

16                  know, we really have to completely defuse

17                  the assets.  We have to remove the

18                  fingerprints so that the person who's

19                  holding those assets is able to substantiate

20                  to any regular -- any banking institution

21                  that there is no bad money trail here.

22                  That, you know, it's all clean money.  And

23                  so, that pushes you to the most extreme

24                  solutions.  Extreme is overstating, but you

25                  know, to more formidable solutions that we
```

```
 1                         use in that universe.  So, I just park that
 2                         out there.  Again, I don't think that's a
 3                         real risk that I would be losing sleep over.
 4   SHVARTSMAN:   We don't need that.
 5   IVESON:       Okay.  Good.  The second risk to me is more
 6                         prevalent.  It's more contemporary.  And but
 7                         that one fortunately, the solutions are a
 8                         little bit easier.  A little bit more
 9                         pragmatic because you know, we've gone head
10                         to head with the FCC in cases involving some
11                         of our clients.  And U.S. based assets, the
12                         FCC has a pretty free hand.  They can grab
13                         whatever they want, you know, within the
14                         auspices of a court order here in the United
15                         States.  Outside the United States, it's a
16                         lot harder for them to grab their assets.
17                         And we do see with the justice department
18                         attorneys who do bring these enforcement
19                         actions outside the United States, you know,
20                         working through (U/I), going through formal
21                         court proceedings in other jurisdictions,
22                         that they're really looking for easy
23                         targets.  The moment it becomes complicated,
24                         they lose their appetite.  And so, we find
25                         that a more competent solution in that space
```

```
 1                     tends to deter them.  We haven't had, you

 2                     know --

 3   SHVARTSMAN:       That's (U/I).

 4   PARK:             Hi Eric.

 5   CS:               Hi Eric.  Good to meet you.  Steve Davies.

 6   HANNELIUS:        Steve.

 7   PARK:             Hey.  John Iveson.

 8   HANNELIUS:        Nice to meet you.  Nice to meet you.

 9   IVESON:           We just, you know, we find that there are

10                     some pragmatic solutions that we implement

11                     there and make them so that they really

12                     don't want to go after.  We've never had a

13                     situation where a client did a structure

14                     where that was a specific concern, where the

15                     FCC was ever able to grab assets outside of

16                     the United States.  So, all right.  Steve,

17                     we've talked through the issues.  Mike, you

18                     said no other issues.  Okay.

19   CS:               So, we (U/I).

20   IVESON:           So, what's next on your agenda, Steve?

21   CS:               Then it's is the specific assets themselves

22                     contained in the three LLC's that are in the

23                     Virgin Islands.

24   SHVARTSMAN:       And Mike can go through those with you.

25   IVESON:           Yep.
```

```
 1   SHVARTSMAN:     There's (U/I) in the property.

 2   IVESON:         Yep.  The one of them has --

 3   SHVARTSMAN:     I mean --

 4   PARK:           -- the other boats are not under that

 5                   structure.

 6   SHVARTSMAN:     Yeah.

 7   PARK:           There's one large yacht, which is under, you

 8                   know, Rocket Management.  That's really the

 9                   only asset it holds.

10   IVESON:         Okay.

11   PARK:           The other two entities are really just

12                   investment --

13   [BACKGROUND NOISE]

14   PARK:           -- investment and various --

15   SHVARTSMAN:     Rocket Holding also owns property, two

16                   properties.

17   PARK:           Well, here in the U.S.

18   SHVARTSMAN:     Commercial property in the U.S., and it owns

19                   a condo.  Right?

20   PARK:           Yep.  Your residence.

21   SHVARTSMAN:     So, yeah, I'm living there now, but there's

22                   another property my wife and I own that we

23                   got a homestead on.

24   IVESON:         Okay.

25   SHVARTSMAN:     That we're renovating right now.
```

SDNY_04_00020005

```
 1   [BACKGROUND NOISE]

 2   IVESON:        Okay.  That's not in the structure.

 3   SHVARTSMAN:    No.

 4   IVESON:        Okay.  My wife and I, it's not in the

 5                  structure.

 6   IVESON:        Okay.

 7   SHVARTSMAN:    Under the structure is an apartment that is

 8                  here, that's owned by the trust.

 9   IVESON:        Okay.

10   SHVARTSMAN:    The commercial buildings in Miami that it

11                  also owns.

12   IVESON:        And Michael understands what -- there's only

13                  so much you can do with the U.S. asset.

14   PARK:          Yeah, or who owns it.  It's in the U.S.,

15                  it's real estate.  You're not going to, you

16                  know, you can protect --

17   IVESON:        No, but we've talked about, we do have

18                  solutions for assets that can be moved and

19                  granted, because of the cost associated with

20                  it, we normally don't recommend --

21   [BACKGROUND NOISE]

22   [OVERLAPPING VOICES]

23   SHVARTSMAN:    We're good with that.

24   IVESON:        Okay.  Good.  And then so there's the other

25                  rocket, I think it's Rocket 11 holdings.
```

```
 1   SHVARTSMAN:    Yeah.  So, that's, that's really just a
 2                  specific set of investments.  So, there's
 3                  the 11 fund, there (U/I) various
 4                  investments.  And we just created a separate
 5                  company to do all of the, anything that he
 6                  invested through the 11 fund goes to that
 7                  Rocket 11.
 8   IVESON:        Okay.
 9   SHVARTSMAN:    That's all it is.  Ownership in various --
10   [BACKGROUND NOISE]
11   IVESON:        Bank accounts.  Next to the Rocket 1 is
12                  Rocket 11.  Do you have any bank accounts in
13                  --
14   [BACKGROUND NOISE]
15   IVESON:        -- or any subsidiary --
16   SHVARTSMAN:    Only Rocket --
17   [BACKGROUND NOISE]
18   SHVARTSMAN:    -- has a bank account.  Rocket Holdings has
19                  a bank account.
20   IVESON:        Do you have a bank account?
21   SHVARTSMAN:    I don't think so.  I don't think we have one
22                  for --
23   [BACKGROUND NOISE]
24   IVESON:        Okay.  So, now that you're no longer the
25                  trustee, Steve, through the private trust
```

```
 1                       company is the trustee over the trust.  The

 2                       trust account, which bank is that with?

 3   SHVARTSMAN:   It's with a small bank here in Florida.

 4   IVESON:       Okay.  Does it hold a lot of money?

 5   SHVARTSMAN:   No.

 6   IVESON:       Okay.  Probably easiest thing is just close

 7                       that account out because technically, you no

 8                       longer have legal authority.  You're not a

 9                       trustee anymore.

10   SHVARTSMAN:   Okay.  And then what happens?  What happens

11                       to the money?

12   IVESON:       Do you need a bank account for the trust?

13                       Do you want a bank account for the trust?

14   SHVARTSMAN:   So, the reality is is that the money that's

15                       sitting in the trust right now, it's not a

16                       lot, like a million and a half dollars.

17                       That's all that's in there right now.  And

18                       the reality is --

19   [BACKGROUND NOISE]

20   SHVARTSMAN:   -- that very shortly, it's something that

21                       we're working on.  And then yeah, so the

22                       trust was Rocketship Management, which was -

23                       - which owns the boats.  Right.  So, that

24                       needs money because that pays the bills for

25                       the boat.
```

```
 1   IVESON:        Okay.

 2   SHVARTSMAN:    And also, Rocket Holdings has, I don't know

 3                  probably 40, $50 million in debt that it

 4                  owes to other entities.

 5   IVESON:        Other related entities or unrelated

 6                  entities?

 7   SHVARTSMAN:    So, Rocket Holdings holds equity in a whole

 8                  bunch of businesses.  One of the businesses

 9                  is a Puerto Rico business, which lends it --

10                  loans it money, and then Rocket Holdings

11                  uses that money to make, you know,

12                  investments and you know, do other things.

13   IVESON:        Got you.

14   SHVARTSMAN:    So, it owes 40 or 31, 51, I don't know what

15                  the --

16   IVESON:        But it owes it to its own subsidiary.

17   SHVARTSMAN:    To its -- it owes it to companies that are

18                  (U/I).

19   IVESON:        Okay.  So, yeah, that's just a paper

20                  transaction.  That's all.

21   [BACKGROUND NOISE]

22   IVESON:        But you know, one thing to touch on here is

23                  that because the legal title is changed on

24                  the trust, if those banks are required to

25                  keep, you know, the trust agreement or due
```

```
 1                        diligence on the trustee in their files,

 2                        your normal course is you would tell the

 3                        bank, hey, look, there's been a change here.

 4                        But you know, Steve, I don't want to speak

 5                        for you.  I know generally, I've never

 6                        worked with you on a U.S. bank account.  You

 7                        don't do this stuff in the United States.

 8   CS:                  Yeah.  Yeah we can (U/I) which you will have

 9                        control over anyway, Michael.  Whatever we

10                        do, whichever way we choose to do it,

11                        ultimately you choose to do it.

12   SHVARTSMAN:          Yep.

13   CS:                  You will have that control over wherever it

14                        is.

15   IVESON:              If the bank accounts or any business

16                        entities are here in the United States, then

17                        that's not an issue because --

18   CS:                  Yeah.

19   IVESON:              -- you know, you have your people as

20                        signature -- signatories on those accounts.

21                        So, it's really you have any, you know, if

22                        you need trust accounts for any of these top

23                        tier entities.  I think the larger issue is

24                        the LLC's themselves.

25   SHVARTSMAN:          Because they're (U/I).
```

```
 1   IVESON:          Yeah.  Because you know, the issues that
 2                    you're talking about, especially as the FCC,
 3                    if the FCC were to come in, as I see it
 4                    right now, everything is --
 5   PARK:            I don't think it would -- yeah, if the FCC
 6                    came in on that --
 7   [BACKGROUND NOISE]
 8   PARK:            -- to really be the target, the trust or its
 9                    holding.  Because the investment was made in
10                    a different entity that Michael owns.  Well,
11                    now Rocket Holdings owns 80 percent now.
12   SHVARTSMAN:      But it didn't before.
13   PARK:            Right.  But now, now then we look at that.
14   IVESON:          Yeah.  If they own 80 percent then, yeah,
15                    that would -- I mean, does it have material
16                    assets?
17   SHVARTSMAN:      It kind of does and kind of doesn't.  We did
18                    it for the tax stuff and we didn't end up
19                    doing that, so we didn't file anything for
20                    2020, in regards to that.  So, we can undo
21                    it right now if we wanted to.
22   CS:              Yep.
23   SHVARTSMAN:      So, we did it just to kind of mitigate
24                    taxes, we didn't intend to follow through
25                    with that, we ended up paying the taxes.
```

```
 1                      So, it doesn't have to -- we can undo it if
 2                      we wanted to.
 3  PARK:               We have to make that decision soon.  She's
 4                      filing all the extensions and I think they
 5                      listed it that way.
 6  [OVERLAPPING VOICES]
 7  SHVARTSMAN:         Okay.  Good enough.
 8  IVESON:             Maybe the better thing, Steve, I don't want
 9                      to, you know, hijack your agenda here, but
10                      maybe the better thing is just to ask where
11                      would you like to be at the end of this
12                      process?  Because I know we talked about the
13                      Belize, LLC, owned by, you know, your
14                      family.  You know, not you directly.  Or you
15                      know, somebody you trust.
16  SHVARTSMAN:         All right.  Well let's talk about it.  Let's
17                      say my dad owns the Belize, LLC.
18  IVESON:             Your dad's a -- he lives in Canada.
19  SHVARTSMAN:         Canada, yeah.  He lives in -- we'll just use
20                      that as an example.
21  IVESON:             Yeah.
22  SHVARTSMAN:         Could be somebody from the Ukraine.  I got
23                      people there.  I got people in a whole bunch
24                      of places.  I trust them (U/I).  Right.  So,
25                      let's pretend it's my dad right now.
```

SDNY_04_00020012

```
 1   IVESON:        Okay.

 2   SHVARTSMAN:    So, he owns the Belize, LLC.  And then what?

 3                  The Belize, LLC owns all these assets?

 4   IVESON:        Well, okay.  We can -- Steve and I can both

 5                  come up with our recommendations here but

 6                  from everything that I've heard, I think the

 7                  better thing for you is just to hear where

 8                  you would like to be.  I mean, what would

 9                  work best for you?

10   SHVARTSMAN:    Listen, everything -- what I'm doing right

11                  now works great for me.

12   IVESON:        Okay.

13   SHVARTSMAN:    Okay.  I don't have any issues, and

14                  everything works, everything works the way

15                  it's supposed to, the trust works the way

16                  it's supposed to.  Evidence works.  All

17                  right.  The only reason we're doing this is

18                  because 'm not even worried about the DEA,

19                  to be honest with you, at all.

20   IVESON:        Yeah, I wouldn't be worried.

21   SHVARTSMAN:    I'm not.  I'm not worried about the DEA at

22                  all.  This shit happened with Trump.  All

23                  right.  So, God willing, knock on wood, it

24                  would have happened to him too, and a bunch

25                  of other friends of ours.
```

```
 1  IVESON:          Okay.

 2  SHVARTSMAN:      That were investors in this thing.  So, God

 3                   willing, nothing happens.  But if something

 4                   happens, I want to make sure that, you know,

 5                   assets are protected.

 6  IVESON:          Okay.  Okay.  So, --

 7  SHVARTSMAN:      That nobody's taking anything from me.

 8  CS:              Shall we do the --

 9  IVESON:          Yeah.  Go ahead.

10  [OVERLAPPING VOICES]

11  CS:              Do the -- I would call it option one.

12  IVESON:          Okay.

13  CS:              And it would just be a straightforward sale.

14  IVESON:          Okay.

15  CS:              Sale and purchase.

16  IVESON:          Got you.

17  CS:              So, effectively, the U.S. Virgin Island

18                   entities will be purchased by Belize, but

19                   the Belize entity with or without any

20                   intermediary.  It'd be -- the purchase will

21                   be done using promissory notes.  What it

22                   would say we got because there's no

23                   firewall, but still, there's still a (U/I)

24                   very easily to -- from Belize to the Virgin

25                   Islands.
```

```
 1  [BACKGROUND NOISE]

 2  CS:          That's just a wholesale sale deal, no

 3               splitting up of any of the assets.

 4  IVESON:      Okay.  So, if we were to do this, thinking

 5               you have the trust here with the three U.S.

 6               Virgin Islands LLC's, in the most basic --

 7  CS:          Yep.

 8  IVESON:      -- version of this.  The trust sells it to

 9               the Belize, LLC, preliminarily takes back a

10               note, may want to with time, open up a bank

11               account for the trust so it can receive

12               actual payments.  But the idea is that

13               that's the simplest way to migrate the U.S.

14               Virgin Island LLC's over in to the Belize,

15               LLC.

16  CS:          Yeah.

17  IVESON:      But is, you know, as we discussed, you know,

18               the problem is those U.S. Virgin Island

19               LLC's are vulnerable to any SEC client.

20  CS:          Yeah.  And obviously the payments that can

21               be taken out through --

22  [OVERLAPPING VOICES]

23  IVESON:      By the way, in my experience, normally once

24               the SEC takes enforcement action, it's

25               usually followed up right away by class
```

| | | |
|---|---|---|
| 1 | | action lawsuits.  So, you're thinking in |
| 2 | | your mind right now SEC, but in my |
| 3 | | experience, the SEC ends up becoming the |
| 4 | | simpler issue. |
| 5 | SHVARTSMAN: | Class action lawsuits for what? |
| 6 | IVESON: | It, you know, it's -- |
| 7 | SHVARTSMAN: | Against us? |
| 8 | IVESON: | Yeah, yeah. |
| 9 | SHVARTSMAN: | Why? |
| 10 | IVESON: | From other market participants.  If the SEC |
| 11 | | establishes something against other |
| 12 | | investors. |
| 13 | SHVARTSMAN: | No because it's not -- no. |
| 14 | IVESON: | Okay. |
| 15 | SHVARTSMAN: | But anyways, okay, go ahead. |
| 16 | IVESON: | But that said, you know, the point here is |
| 17 | | the Virgin Islands LLC's, I would prefer |
| 18 | | that we just drill into what's in them and |
| 19 | | say okay, is it best to just pull out this |
| 20 | | individual assets, park them underneath |
| 21 | | Belize, LLC, or underneath subsidiaries that |
| 22 | | are owned by the Belize, LLC.  We can tailor |
| 23 | | that. |
| 24 | SHVARTSMAN: | I think it's better in my mind, I think it's |
| 25 | | better to set up, you know, similar LLC one, |

```
 1                    two, three under the parents and this buys

 2                    the assets from here, and then the assets

 3                    transfer over.

 4   IVESON:          Okay.

 5   CS:              Okay.  So, that would be option one.  Say if

 6                    we put another option on the table, which is

 7                    option two, where we put an intermediary in

 8                    the middle --

 9   IVESON:          Okay.

10   CS:              -- which creates a firewall.

11   IVESON:          You're thinking back to that.

12   CS:              Yeah.

13   IVESON:          Okay.  So, this is a very basic variance of

14                    the strategy.  So, here you have your

15                    intermediary.  You have a transaction here,

16                    transaction here, you have --

17   CS:              And again, it would be on the same principle

18                    with notes.

19   IVESON:          Yeah.  It's all paper.  And Steve, what's

20                    the benefit of this approach?

21   CS:              Oh, the benefit is it just takes it one step

22                    removed from the original situation in the

23                    Virgin Islands.

24   IVESON:          Yeah, well then, just this one thing then

25                    that we touched on in an earlier
```

```
 1                    conversation, that is these days -- it used
 2                    to be ten years ago if you came to me and
 3                    said hey, you know, I want to do direct sale
 4                    to the Belize, LLC, and then the Belize, LLC
 5                    can go and open up bank accounts, or let it
 6                    own subsidiaries.  So, subsidiaries could
 7                    open up bank accounts in the U.S. or
 8                    elsewhere around the world.  Not a problem.
 9                    These days, completely different world.  The
10                    banks are all saying okay, well, we need to
11                    see source of funds documentation.  You
12                    know, we've got the due diligence, the
13                    official ownership issue is well handled.
14                    The biggest obstacle these days is I can do
15                    -- Steve can do anything you guys want over
16                    here from a legal structure standpoint, but
17                    the moment you go to open up a bank account,
18                    the bank says okay, we want to see the
19                    source of funds documentation.
20  SHVARTSMAN:       There's no source of funds -- there is no
21                    source of funds.  It's just paper.  It's all
22                    IOU's.
23  IVESON:           Well, yeah, exactly.  In other words, when
24                    you go to the bank, you're showing them oh,
25                    here, we borrowed from an intermediary and
```

SDNY_04_00020018

| | | |
|---|---|---|
| 1 | | the bank says okay, well, that ends the |
| 2 | | inquiry.  If you have a good intermediary, |
| 3 | | the bank never sees this side of the |
| 4 | | equation. |
| 5 | SHVARTSMAN: | No.  The banks not -- so here's the thing. |
| 6 | | When we go open these companies, nobody's |
| 7 | | asking us anything.  Any (U/I).  So, that's |
| 8 | | easy.  All right.  So, now you got to go |
| 9 | | open a bank account for these companies. |
| 10 | IVESON: | Right. |
| 11 | SHVARTSMAN: | So, I can go to a bank in the U.S. as an |
| 12 | | example and say hey, I want to open a bank |
| 13 | | account for Belize, LLC.  I don't know, can |
| 14 | | you open a bank account for Belize, LLC in |
| 15 | | the U.S.? |
| 16 | IVESON: | Absolutely. |
| 17 | SHVARTSMAN: | Okay.  Fine.  So, I can call guys -- |
| 18 | IVESON: | I mean, it's not every bank.  There are a |
| 19 | | handful of banks here in the United States |
| 20 | | that I work with that will open up accounts |
| 21 | | -- |
| 22 | CS: | The choice is there if you want it in the |
| 23 | | U.S. |
| 24 | SHVARTSMAN: | No, what I'm saying is we've had very good |
| 25 | | relationships, I can make a phone call and |

```
 1                    we're doing it.  As an example say you want
 2                    a bank in the U.S., right.  So, we open a
 3                    bank account in the U.S., no problem.  So,
 4                    we're not going to have any questions asked,
 5                    because if we open a bank account, it's not
 6                    like we're dropping $10 million in it, it's
 7                    just a bank account.
 8   IVESON:          Well --
 9   [OVERLAPPING VOICES]
10   SHVARTSMAN:      Sometimes there are no funds.
11   IVESON:          Well, yeah.  You're assuming that there's no
12                    significant cash.  The issue is, you know,
13                    over time, you know, will there be
14                    significant cash.
15   SHVARTSMAN:      Well, what'll -- I'll tell you what's going
16                    to happen.  What will happen is that sooner
17                    or later, maybe two months, or three months,
18                    or five months, six months, or a year, or
19                    two years, there's going to be asset sales
20                    because we're investing in many different
21                    companies.  We'll have liquidity events.
22                    Right.  So, we might have a liquidity event
23                    and maybe it's going to be $30 million, as
24                    an example.
25   IVESON:          Sure.
```

| | | |
|---|---|---|
| 1 | SHVARTSMAN: | All right.  So, now, there's going to be $30 |
| 2 | | million going into this LLC, and we have a |
| 3 | | bank account for it in the U.S. as an |
| 4 | | example. |
| 5 | IVESON: | Yeah. |
| 6 | SHVARTSMAN: | Right.  So, we're going to wire $30 million |
| 7 | | and the bank at that point might say hey, |
| 8 | | where did this $30 million come from? |
| 9 | IVESON: | That's right. |
| 10 | SHVARTSMAN: | And then we're going to show them the |
| 11 | | purchase (U/I) shares, and the company we |
| 12 | | were a shareholder in.  Right.  We're going |
| 13 | | to show it to them then they go okay, that's |
| 14 | | where you got the money from.  That's it. |
| 15 | IVESON: | So, from that transaction, yes.  But if the |
| 16 | | bank -- |
| 17 | SHVARTSMAN: | Well, I'm telling you the bank doesn't know |
| 18 | | what these companies own.  It has no idea. |
| 19 | IVESON: | Yeah, no, no, no.  That's right.  And when |
| 20 | | the time comes that large sums move in, |
| 21 | | that's when the bank starts to ask those |
| 22 | | questions.  More at the time that you go to |
| 23 | | establish the account.  That's when the bank |
| 24 | | says okay, we're required to know who the |
| 25 | | beneficial owner of the structure is. |

| | | |
|---|---|---|
| 1 | SHVARTSMAN: | Of course they do. |
| 2 | IVESON: | And we need to understand the source of |
| 3 | | funds that are anticipated to come into the |
| 4 | | account.  That's where if you have the |
| 5 | | direct transaction between the trust and the |
| 6 | | Belize, LLC, the one issue you will have is |
| 7 | | that the bank will see that the assets came |
| 8 | | over from the trust.  They will eventually |
| 9 | | get that history or go get that record, |
| 10 | | which means you will have issues with |
| 11 | | beneficial ownership, and if the bank is |
| 12 | | willing to accept, okay, we get that this is |
| 13 | | a new Belize, LLC, but you know, it bought |
| 14 | | directly from its trust. |
| 15 | SHVARTSMAN: | I'll tell you, I've opened up hundreds and |
| 16 | | hundreds and hundreds of bank accounts.  Not |
| 17 | | once has anybody ever asked me what the |
| 18 | | company owns.  Not once. |
| 19 | IVESON: | No.  Not what the company owns.  What I'm |
| 20 | | talking about -- |
| 21 | SHVARTSMAN: | So, how is -- how would you -- |
| 22 | IVESON: | Right now, when you go to open any account, |
| 23 | | you're going and saying hey, Mr. Shvartsman, |
| 24 | | I own this -- |
| 25 | SHVARTSMAN: | Not if I open a trust.  Because then the |

```
 1                        trustee would come and do that.

 2   IVESON:             That's right.  And they're just getting your

 3                       information.

 4   SHVARTSMAN:         Yeah.

 5   IVESON:             Yeah.  The bank doesn't have Maria's (PH)

 6                       information.

 7   SHVARTSMAN:         Of course they did in a copy of the trust.

 8   IVESON:             They have a copy of the trust, well, I

 9                       guess, yeah.  If, you know, maybe

10                       historically the bank had it.  I mean, if

11                       you were to go in today and open up an

12                       account for the trust, the bank will say no

13                       because Maria's a Russian (U/I).  We can't

14                       even open the account right now.

15   SHVARTSMAN:         Okay.

16   IVESON:             In the United States.

17   SHVARTSMAN:         Yeah, okay.

18   IVESON:             I mean, so anyway --

19   SHVARTSMAN:         All right so

20   [OVERLAPPING VOICES]

21   CS:                 Someplace effective and just builds it up

22                       and eventually if there are any issues going

23                       forward --

24   SHVARTSMAN:         I understand, I understand what this does.

25   CS:                 Yeah.
```

```
 1  SHVARTSMAN:    But who is the beneficial owner of the
 2                 Belize corp?
 3  IVESON:        That would be your dad.
 4  SHVARTSMAN:    Okay.  Because my dad's the beneficial owner
 5                 of the Belize Corp.
 6  IVESON:        It would be -- when the bank says source of
 7                 funds, your dad is providing the
 8                 documentation that shows they acquired the
 9                 assets from this intermediary entity and
10                 that ends the inquiry.  They don't see --
11  SHVARTSMAN:    That's fine.  I mean, that works.  It's very
12                 simple.
13  IVESON:        I mean, it's up to you.  But --
14  SHVARTSMAN:    Yeah, that works.  It's very simple.
15  IVESON:        Yeah.
16  SHVARTSMAN:    So, we just sign back to back paperwork.
17                 And you know, so it gets sold twice and --
18  IVESON:        Yeah.
19  SHVARTSMAN:    -- at the same time.
20  CS:            Absolutely, yeah.
21  IVESON:        Yeah.
22  SHVARTSMAN:    That's fine.
23  CS:            So, I don't, from my understanding, it's
24                 probably not even worth discussing option
25                 three.  Option three is a back to back in
```

```
 1                        the middle with intermediaries, but if
 2                        you're comfortable with the one
 3                        intermediary.
 4   SHVARTSMAN:   I mean, in --
 5   [BACKGROUND NOISE]
 6   SHVARTSMAN:   -- what's the -- the purpose of the
 7                        intermediary is so things don't go back to
 8                        the trust --
 9   CS:          Exactly.
10   SHVARTSMAN:   -- the regular trust or --
11   CS:          So, you can have one, you can have two,
12                        whatever.  It's a paper exercise at the end
13                        of the day.
14   SHVARTSMAN:   I mean, to me this makes sense.  There's
15                        nothing wrong with it.
16   IVESON:      You know, the other advantage here is you
17                        have the ability to choose.  If you want,
18                        that there's certain investments, certain
19                        businesses that maybe you had your
20                        fingerprints on, but now you, for whatever
21                        reason, you need to be able to say, hey, I'm
22                        not associated with this company at all.
23                        I'm not an owner.  I don't have any, you
24                        know, direct control over it.  No
25                        fingerprints whatsoever.  Through this
```

```
 1                    arrangement, basically, again, what any

 2                    inquiring regulator or banker would see is

 3                    oh, it was acquired from this intermediary

 4                    entity.  And you know, the intermediary

 5                    entity would be a subset of the company that

 6                    an estate has that would, you know, they'd

 7                    be able, if they needed to, they could ping,

 8                    and Steve would be able to provide all the

 9                    verification on the -- yeah, yeah, we did in

10                    fact sell this business or this company to

11                    this Belize, LLC.  We sold it to Mike's

12                    father.

13   CS:              Yeah.  Here's all the paperwork.

14   SHVARTSMAN:      All right.  So, right now, so I get this, so

15                    let's proceed.

16   IVESON:          Okay.

17   SHVARTSMAN:      So, that's --

18   IVESON:          Easy enough.

19   SHVARTSMAN:      All right.

20   CS:              So, you're comfortable with just one

21                    intermediary, Michael.

22   SHVARTSMAN:      I mean, if you want to give me a reason why

23                    (U/I).

24   IVESON:          Nice to meet you.

25   CS:              Yeah.  Nice to meet you.
```

```
 1  SHVARTSMAN:    So, okay, why do I need two?

 2  CS:            Well, it's just a little bit more of an

 3                 extra distancing from the trust.

 4  SHVARTSMAN:    Here's the way I look at it.  Let's talk

 5                 about shaking this out.

 6  IVESON:        Yep.

 7  SHVARTSMAN:    All right.  Let's talk (U/I).  So, if --

 8  [BACKGROUND NOISE]

 9  SHVARTSMAN:    -- then, here's what's going to happen.

10                 They're going to call the bank where the

11                 trust is today.  They're going to say --

12                 they're going to subpoena all the bank

13                 records.  All right.  They're going to

14                 subpoena the bank records.  And they're

15                 going to follow the money.  All right.  And

16                 they're going to see, oh, this company

17                 invested in -- they wrote a check to this

18                 company, and this company, and this company,

19                 and this company.  Then they could call each

20                 of those companies and say hey, you received

21                 a million dollars, as an example, from

22                 Rocket Holdings.  What's it for.

23  [PHONE RINGING]

24  SHVARTSMAN:    Sorry.

25  [SHVARTSMAN ON CALL]
```

SDNY_04_00020027

```
 1   SHVARTSMAN:    Hello.  Are, no problem.  I got a client.

 2                  All right.  Bye.

 3   [CALL ENDED]

 4   SHVARTSMAN:    (U/I).

 5   [OVERLAPPING VOICES]

 6   IVESON:        So, what's your cut?

 7   SHVARTSMAN:    Don't wait for the bank then.  So, here's

 8                  what happens.  So, they call the companies,

 9                  the companies say yeah, we sold equity to

10                  the company.  They say it, okay, fine.  Then

11                  they -- so what do they do next.  They sold

12                  equity to the company.  Now, so they know,

13                  let's say they go after assets.  Oh, there's

14                  a condo in Sunny Isles.  There's a boat that

15                  it's owned by it.  So, they're going to know

16                  all that.  Right.

17   IVESON:        Yeah.

18   SHVARTSMAN:    I'm not hiding anything.

19   IVESON:        Right.

20   SHVARTSMAN:    They know, if they want.

21   IVESON:        There's substantial assets and it's hard to

22                  conceal your relationship with those assets.

23   SHVARTSMAN:    Yeah.  They know.  Right.  So, they're going

24                  to know.  If they actually do the research,

25                  they're going to figure out who 1:50:45
```

|    |            |                                           |
|----|------------|-------------------------------------------|
| 1  |            | about Michael.  They're going to know.    |
| 2  |            | Right.  It's not -- you can't hide this   |
| 3  |            | shit.  Right.  So, then they're going to go |
| 4  |            | out, let's say then, they're going to, you |
| 5  |            | know, okay, well here are the assets.     |
| 6  |            | They're not owned by Michael.  They're owned |
| 7  |            | by this trust.  Let's try to make a claim |
| 8  |            | against the trust.  So, they're going to run |
| 9  |            | into court, as an example.  Right.  And   |
| 10 |            | they're going to go hey, we want to seize |
| 11 |            | these assets.  I'm talking like --        |
| 12 | IVESON:    | Yeah, yeah.                               |
| 13 | SHVARTSMAN: | Right.  They're going to court and they're |
| 14 |            | going to say let's seize everything and   |
| 15 |            | figure out everything after.  So, that's  |
| 16 |            | what we're going to do.  Right.           |
| 17 | IVESON:    | Which is what they usually do.            |
| 18 | SHVARTSMAN: | Right.  Right.  So, they're going to run  |
| 19 |            | into court.  They're going to seize this, |
| 20 |            | seize that, you know, seize everything they |
| 21 |            | can.  But they know the shares are owned by |
| 22 |            | the trust.  They know the boat is owned by |
| 23 |            | the trust.  They know the apartment is owned |
| 24 |            | by the trust.  Right.                     |
| 25 | IVESON:    | Right.                                     |

```
1   SHVARTSMAN:    Now, we can update the apartment, so it's
2                  not owned by the trust anymore.  But they
3                  know this shit.  And we can update the
4                  ownership of the boat.  But it's not no
5                  longer owned by the trust, it's owned by
6                  this Belize company.
7   IVESON:        That's right.
8   SHVARTSMAN:    So, we can do that stuff.  But they're going
9                  to go try to get their hands on everything.
10  IVESON:        But actually, Mike, to that exact point that
11                 you raise, the observation that you bring
12                 up, it's absolutely valid when they say
13                 okay, let's look at the boat.  Okay.  Your
14                 position is going to be well, we sold it
15                 off.  You know.  It -- my dad's company
16                 bought it.  You know, or actually, you're
17                 going to say you sold it off to some company
18                 that, you know, may be a Hong Kong company,
19                 or you know, Singapore company that --
20  CS:            Yeah.
21  IVESON:        -- Steve has, that bought it.  Hey, here it
22                 is, here's the transaction documentation,
23                 Mike Park, you know, worked on the sale
24                 with, you know, Steve's attorneys.  And
25                 there it all is, all documented, and yeah, I
```

SDNY_04_00020030

```
 1                      mean, they could if they did the research,
 2                      they might be able to find out that your
 3                      dad, through his Belize, LLC, ended up
 4                      buying the boat off of Steve.  They probably
 5                      won't, at least not for things like a boat.
 6                      And for the SEC, I think a single
 7                      intermediary is probably more than enough.
 8                      I mean, if it were DEA, then you know, a
 9                      double intermediary, you know, the double --
10   CS:                Yeah, yeah.
11   IVESON:            -- the normal course.  But for SEC, a single
12                      blind is adequate.
13   CS:                No.  I always say that one braces at the end
14                      of the day, and --
15   SHVARTSMAN:        So, I mean, listen, whether it's a single or
16                      a double, it's the same paper with different
17                      company names on it.
18   IVESON:            You know, when we do double it --
19   CS:                Yeah.
20   IVESON:            -- won't reduce a double blind --
21   CS:                Yeah.
22   IVESON:            -- where normally, we're pairing off
23                      jurisdictions against each other, you know,
24                      we often use jurisdictions like Hong Kong,
25                      Singapore, because they're tax neutral.
```

| | | |
|---|---|---|
| 1 | | They're reputable jurisdictions.  Nobody is |
| 2 | | curious about a company in Hong Kong that |
| 3 | | buys a yacht.  Everybody's curious about a |
| 4 | | company in Nevis that buys a yacht.  So, |
| 5 | | when we do the double blind, we might use a |
| 6 | | jurisdiction like Hong Kong or Singapore, |
| 7 | | where it's hard for the SEC to get |
| 8 | | information but it's not impossible.  But |
| 9 | | the double blind that says okay, that Hong |
| 10 | | Kong company then laid off the contract to |
| 11 | | Belize or Nevis, or a Cook Islands company. |
| 12 | | Now, the SEC runs into a roadblock.  Unless |
| 13 | | they can provide a criminal case, they have |
| 14 | | no access to the documentation, the |
| 15 | | regulator's going to tell them can't help |
| 16 | | you there.  That ends the inquiry. |
| 17 | SHVARTSMAN: | What if there is a criminal case? |
| 18 | IVESON: | If there's a criminal case, then what we |
| 19 | | really have to show is that your father paid |
| 20 | | (U/I) value for these assets.  And our |
| 21 | | objective, whenever we work on these |
| 22 | | transactions is to try to build that record. |
| 23 | SHVARTSMAN: | Yeah, but nobody -- so my father can't write |
| 24 | | a check, and the problem is -- |
| 25 | IVESON: | That's right. |

84

```
 1   SHVARTSMAN:   -- if he wrote the check, the money would

 2                 have to go back to the trust anyways.

 3   IVESON:       That's right.

 4   SHVARTSMAN:   Right.  So, my father can't --

 5   IVESON:       I'm glad you raised that point.  So, let's

 6                 talk about that.  Okay.  Now just preparing

 7                 for the worst.

 8   SHVARTSMAN:   Yep.

 9   IVESON:       Normally, we'd recommend then this

10                 transaction, you know, if you look at this

11                 diagram, you got a promissory note going

12                 back to the trust, but eventually, you

13                 probably would want to reduce that.

14   SHVARTSMAN:   Actually, that was the only one that was

15                 missing.

16   IVESON:       We normally --

17   [BACKGROUND NOISE]

18   IVESON:       -- is to set the main account to the trust.

19                 Okay.

20   SHVARTSMAN:   For this trust --

21   IVESON:       Yeah, that's right.

22   SHVARTSMAN:   This trust or my trust?

23   IVESON:       For that trust.

24   SHVARTSMAN:   Any trust.  Yeah.  Okay.

25   IVESON:       And the idea is that okay, you use your
```

SDNY_04_00020033

```
 1                      existing cashflow so that you can document
 2                      payments that your father makes to the
 3                      intermediary.  So, if anybody asks, well,
 4                      you know, did you dad pay for this?  Yeah,
 5                      yeah, there it is.  There's the
 6                      documentation.  He actually paid the Hong
 7                      Kong company for that boat.  Okay.  Now what
 8                      they don't see is that the Hong Kong company
 9                      that writes it off into a trust bank
10                      account.  And that bank account is
11                      established in a jurisdiction where absent a
12                      judgment from a Nevis court, they're not
13                      going to give that money to any inquiring
14                      president.  You know, in that (U/I).  So,
15                      that's proven pretty effective in criminal
16                      cases as well.
17   SHVARTSMAN:        So, then what happens?  So, who can -- he
18                      can draw his trust.
19   IVESON:            He can draw his trust, but the bank account,
20                      that may be something different.  Okay.  It
21                      may be a trust account on which he's one of
22                      -- I think when you open up a bank account,
23                      you're putting a couple million dollars in
24                      it, you're going to add more than one
25                      trustee to this trust.  You're document
```

```
 1                        already provides the mechanism to have that.
 2                        So, you can have a committee of trustees.
 3                        And then we can get multiple signatories,
 4                        you might use a trustee in another
 5                        jurisdiction.  It could be another Caribbean
 6                        jurisdiction, or you may use a second
 7                        trustee, a trustee, you know, in a major
 8                        western jurisdiction, but one where, you
 9                        know, for example, it's a canvas issue.  You
10                        know, they're not able, you know, the U.S.
11                        Government is not going to be like an
12                        influence over that foreign jurisdiction.
13                        But the point here is that when we go to do
14                        things like the bank account, we're working
15                        with you so that it is set up exactly the
16                        way that you want.  If at the end of the day
17                        you say hey, look, under no circumstance am
18                        I going to trust Steve Davies, all right.
19   SHVARTSMAN:          So, I just need --
20   CS:                  It's okay.  Nothing personal, Michael.
21   IVESON:              You know this well.  You form an LLC sub
22                        underneath the trust, that someone you know
23                        and trust manages.  And that's the person
24                        who is the signatory on that LLC bank
25                        account.  So, again, you know, a
```

```
 1                       jurisdiction that's being asked, hey, the

 2                       U.S. Government is coming in.  They want to

 3                       confiscate these assets.  Show us the

 4                       relationship.  They can't show the

 5                       relationship.  Show us the judgment from the

 6                       Nevis high court.  They don't have a

 7                       judgment.  You know, in most jurisdictions

 8                       outside the United States, that's the end of

 9                       the story.  And we count our victories in

10                       that space.  You know, we have more

11                       victories in that space than anybody.  So, -

12                       -

13   SHVARTSMAN:         Okay.  I mean, doesn't the fact that you can

14                       open bank accounts like for managers who

15                       control them, okay, we're good.

16   IVESON:             Yes.

17   SHVARTSMAN:         So, let's get started on this.

18   IVESON:             Okay.

19   SHVARTSMAN:         We can do this.  That's easy.

20   IVESON:             All right.

21   SHVARTSMAN:         In the meantime, I think what we're going to

22                       do is, I mean, we can pick the day.  We can

23                       -- I can move, like I'll give an example.

24                       Let's say it's a million and a half.

25   IVESON:             Okay.
```

```
 1   SHVARTSMAN:    We can move that million and a half into the
 2                  11 as an investment.
 3   IVESON:        Okay.  Yeah.  It's a subsidiary of the
 4                  trust, so you can do that right now.  It
 5                  wouldn't be an investment, it would be a
 6                  capital contribution.
 7   SHVARTSMAN:    No.  I'm talking about -- I'm not talking
 8                  about the 11 --
 9   IVESON:        Oh, not the U.S. Virgin Islands, LLC.
10   SHVARTSMAN:    U.S. Virgin Islands, LLC, I mean, I can move
11                  it to the U.S. Virgin Islands, LLC, and U.S.
12                  Virgin Islands, LLC can move it to actually
13                  11.
14   IVESON:        Okay.  The 11, you're talking about the 11
15                  funds.
16   SHVARTSMAN:    Yeah.  The 11 fund.
17   IVESON:        Okay.  Well, the 11 fund is a subsidiary of
18                  Rocket 11, which is owned by the trust.  You
19                  can make a direct transfer from the trust to
20                  the 11 fund --
21   SHVARTSMAN:    The fund --
22   PARK:          It's a separate entity.  Yeah.
23   SHVARTSMAN:    Separate, it's not (U/I).  The 11 fund is --
24   IVESON:        You're a member of the 11 fund.  Right?
25   SHVARTSMAN:    Yeah.  That's right.
```

```
 1   IVESON:        Yeah.  So, you can do it direct.

 2   SHVARTSMAN:    What do we do about like Rocket Management,

 3                  where I need to pay -- not Rocket, the out

 4                  charters, Rocketship Management, when we

 5                  need to pay bills and stuff.  What do we do

 6                  with Rocket?

 7   IVESON:        Okay.  So, glad you asked.  So, you have a

 8                  bank account right now set up for that

 9                  purpose.

10   SHVARTSMAN:    Yep.

11   IVESON:        It's in the name of Rocket Management?

12   SHVARTSMAN:    Rocketship Management, yeah.

13   IVESON:        Okay.  So, question is what do you want to

14                  do long term with the yacht.  I mean, it

15                  would change the ownership of the yacht over

16                  to the Belize, LLC, presumably, if you do

17                  that, so let's say one of these is the yacht

18                  --

19   SHVARTSMAN:    I mean, so let me ask a question.  On the

20                  title of -- we're using the yacht as an

21                  example.

22   IVESON:        Yeah.

23   SHVARTSMAN:    On the title, the title here, the title of

24                  the yacht should change to here and then to

25                  here.
```

| | | |
|---|---|---|
| 1 | IVESON: | Yeah.  You had mentioned that the -- |
| 2 | SHVARTSMAN: | Or not. |
| 3 | IVESON: | Well, you mentioned that the yacht is owned |
| 4 | | by -- |
| 5 | SHVARTSMAN: | Marshall Island. |
| 6 | IVESON: | Marshall Island Company.  Okay. |
| 7 | SHVARTSMAN: | Yes. |
| 8 | IVESON: | Okay.  So, it's very simple. |
| 9 | SHVARTSMAN: | On, no.  Just Marshall Island Company would |
| 10 | | have to trade hands. |
| 11 | IVESON: | So, what happens is the stock in Marshall |
| 12 | | Islands Company gets transferred to the |
| 13 | | intermediary, who -- this is all back to |
| 14 | | back. |
| 15 | SHVARTSMAN: | Yeah. |
| 16 | IVESON: | Just like we're here at the table today, |
| 17 | | that paperwork then gets transferred down |
| 18 | | here so that the Marshall Islands entity |
| 19 | | becomes the subsidiary of Belize, LLC. |
| 20 | SHVARTSMAN: | That's fine. |
| 21 | IVESON: | And then the Belize, LLC can open up an |
| 22 | | account, or you can have another LLC |
| 23 | | underneath Belize, LLC that's here in the |
| 24 | | U.S. that opens up a bank account.  That |
| 25 | | won't be a problem.  I have a couple of |

```
 1                          banking relationships.  They'll be able to
 2                          get accounts open for you.  Not a problem.
 3                          So, it's all seamless.  You'll be able to
 4                          continue to do exactly what you're doing,
 5                          but you will no longer be the owner.  You'll
 6                          be able to testify under oath.
 7    SHVARTSMAN:           I'm not going, and I'm not the trustee
 8                          anymore.
 9    IVESON:               You're not the trustee anymore.  And if they
10                          were to drill down, if they ask the right
11                          questions, they might -- they probably
12                          won't, but they might find out that you're
13                          the protector of the private trust company,
14                          but as you've seen from the documentation,
15                          we've talked about it quite extensively,
16                          your powers as a protector are negative
17                          powers.  You can't force Steve to do
18                          anything.  You just -- he can't do anything
19                          without your permission.
20    SHVARTSMAN:           Well, he can.  But I'd have to kill him.
21    CS:                   That's the second time he said he's going to
22                          kill me.
23    SHVARTSMAN:           I don't fuck around.
24    IVESON:               Yeah.  Well practically speaking, what would
25                          happen if we thought there was something
```

```
 1                         seriously confronting --
 2   SHVARTSMAN:   Yeah.
 3   IVESON:       Okay.  Or your personal freedom is at
 4                         jeopardy or your concerned about a court
 5                         order that could kind of locking you up.
 6   [PHONE RINGING]
 7   SHVARTSMAN:   Sorry.
 8   IVESON:       What we would recommend is that you resign
 9                         as the protector in favor of a family member
10                         outside of the United States.
11   SHVARTSMAN:   Yeah, my dad, for example.
12   IVESON:       Your dad would be a great alternative for
13                         that.
14   SHVARTSMAN:   Right.  Yeah.  So, the next question is
15                         let's talk about -- I think I understand
16                         this.  Let's move forward with it.  I mean,
17                         we're good.  So, the next question I have is
18                         I think we're good for what I'm going to
19                         bring up to you.  Let's say, God forbid
20                         again, my wife wants a divorce tomorrow.
21   IVESON:       Okay.
22   SHVARTSMAN:   So, we want to believe this would protect
23                         from her as well, because I don't have any
24                         kids so --
25   IVESON:       Okay.  So, glad you asked that.
```

```
 1  SHVARTSMAN:    Oh, wait, there's more.

 2  IVESON:        Yeah, if you bring up somebody else it's

 3                 okay, well then.

 4  [OVERLAPPING VOICES]

 5  IVESON:        No.  The truth of the matter is I've seen it

 6                 all.

 7  SHVARTSMAN:    Yeah.

 8  IVESON:        I have seen it all.  So, I'm glad you asked

 9                 about divorce.  So, there are two aspects to

10                 divorce proceedings.  One is, you know, the

11                 pure power of possession that we have

12                 through this trust.  And the other is the

13                 actual proceedings in the State of Florida.

14                 So, bear with me on this.

15  SHVARTSMAN:    Hold on a sec.

16  IVESON:        Under these trust agreements, your wife is a

17                 beneficiary of the trust.

18  SHVARTSMAN:    Under the MG Family Trust.

19  IVESON:        That's right.

20  SHVARTSMAN:    Yeah, she is.

21  IVESON:        Okay.  It's a discretionary trust.  She's

22                 not entitled to anything.  It's only if the

23                 trustee decides to make a distribution, and

24                 even then under the terms of this trust

25                 agreement, which I think Michael Rosenblum
```

```
 1                     had designed it.

 2   SHVARTSMAN:     Yeah.

 3   IVESON:         He has put in there language that the

 4                   trustee can choose to give money to Michael,

 5                   but not to Alexandra.  You know, so there's

 6                   that.  Okay.

 7   SHVARTSMAN:     But I thought, but that's going away because

 8                   --

 9   IVESON:         Well, no.  That trust will still be there.

10   CS:            It's --

11   SHVARTSMAN:     We're moving that trust to Nevis.

12   IVESON:         Okay.  Now the Belize, LLC is completely

13                   detached from all that.

14   SHVARTSMAN:     So, okay, just so I'm clear.  So, we're

15                   taking an existing trust, we're moving it

16                   Nevis.  Right.  I'm coming off of it and

17                   he's becoming the new trustee on the trust.

18   IVESON:         Right.

19   SHVARTSMAN:     And I'm the protector of the trust company

20                   that owns the trust.

21   IVESON:         That's right.

22   SHVARTSMAN:     Is that what we're doing?

23   IVESON:         Yep.  So, but now the assets will all be in

24                   the Belize, LLC, which presumably would be

25                   owned by your dad.
```

SDNY_04_00002043

| | | |
|---|---|---|
| 1 | SHVARTSMAN: | And we haven't opened the Belize LLC's yet. |
| 2 | IVESON: | No. |
| 3 | SHVARTSMAN: | All right. |
| 4 | IVESON: | That's the next step.  The -- but now going |
| 5 | | back to the divorce question.  So, the truth |
| 6 | | of the matter is she's entitled to nothing |
| 7 | | under the terms of the trust agreement, you |
| 8 | | would be able to remove her as a |
| 9 | | beneficiary.  You'd be able to exclude her |
| 10 | | as a beneficiary.  So, if you want to knock |
| 11 | | her off of the trust, you absolutely can. |
| 12 | | And her lawyers can pound the table all they |
| 13 | | want, but the reality is in Nevis, they'll |
| 14 | | get nowhere.  Okay.  I've been there, I've |
| 15 | | been through all of this with countless |
| 16 | | clients.  Okay.  Not a single time has any |
| 17 | | divorce lawyer been able to get assets of |
| 18 | | one of these trusts outside of the United |
| 19 | | States in a divorce proceeding.  Now that |
| 20 | | said, what the Judge will do in Florida is |
| 21 | | say Michael, look, you're not fooling |
| 22 | | anybody.  You got this, you know, you have |
| 23 | | buildings, you have yachts.  You have this |
| 24 | | network.  I'm not buying for a second that |
| 25 | | your dad owns all this.  You know, it'll all |

```
 1                          be documented, and your lawyers will push
 2                          back hard and say Your Honor, you can't say
 3                          that.  You know, he did sell to his dad.
 4                          But the point is the Judge can say hey
 5                          Michael, you know what, I'm not going to
 6                          grant the divorce until you come up with a
 7                          more meaningful property settlement.  So,
 8                          you have the absolute right to tell your
 9                          wife to buzz off.  Okay.  But you may not
10                          get your divorce decree until you reach a
11                          settlement with her.  In our experience,
12                          that's what happens.  The lawyers read the
13                          writing on the wall.  They go to her, and
14                          they say Alexandra look, we tried.  And you
15                          know, and unless you have billions of
16                          dollars in cash sitting in the bank to fund
17                          years of litigation here and overseas, we're
18                          telling you right now your best shot is to
19                          take Michael's offer.
20   SHVARTSMAN:  Okay.  That's what I figured.
21   IVESON:      Okay.  Any other questions?
22   SHVARTSMAN:  No.  But you know, yeah, actually, I do have
23                          a question.  Not about this.  Earlier I
24                          asked you guys because here's the thing, I
25                          don't want, we've got a great business,
```

```
 1                        we've got great investments, I just want to
 2                        keep doing what I'm doing.  The last thing I
 3                        want to do is and need is any headaches.
 4                        Right.
 5   IVESON:              Okay.
 6   SHVARTSMAN:          So, the reason I bring this up is the phone.
 7                        Yes, I have a contact, yes, we open up bank
 8                        accounts.  Yes, if I'm going to ask my
 9                        friends to do stuff, I want to get paid for
10                        it.
11   IVESON:              Yep.
12   SHVARTSMAN:          All right.  So, but I don't want to have any
13                        headaches and problems with it because I
14                        don't need any heat.
15   IVESON:              Understood.
16   SHVARTSMAN:          Just completely transparent.  All right.
17                        So, I can -- now, for example, let's say
18                        you've got somebody in Russia, or let's say
19                        the Ukraine, fuck Russia.  You got someone
20                        in the Ukraine.  He wants a bank account.
21   IVESON:              But you're okay with Russians, right?
22   SHVARTSMAN:          Yeah, yeah, I work with Russians.
23   IVESON:              Because I mean --
24   SHVARTSMAN:          My wife's Russian.
25   IVESON:              Yeah, no, I mean I have --
```

```
 1   [OVERLAPPING VOICES]

 2   SHVARTSMAN:`   -- every night.

 3   IVESON:        Yeah.  I mean I have Russian clients who

 4                  will want this service if I -- and the price

 5                  is right.

 6   SHVARTSMAN:    Yeah.  So, here's my question.  My question

 7                  is you got a client, we'll use Russia, you

 8                  have a client in Russia.  He's got $10

 9                  million.  Okay.  In cash.

10   IVESON:        Yep.

11   SHVARTSMAN:    Because they can't wire money anyway either.

12   IVESON:`       That's right.

13   SHVARTSMAN:    Okay.  So, they got $10 million in cash.  I

14                  give you the name of somebody in Russia that

15                  he can get -- you can test it out, 100

16                  grand, 500 grand, do it slowly, whatever.

17   IVESON:        Yep, right.

18   SHVARTSMAN:    So, he'll have $10 million and worry about

19                  getting robbed.  So, he gives somebody cash.

20                  Let's call it $10 million.  And then

21                  somebody wires him money to the account in

22                  Dominica.  All right.  $10 million.  Now,

23                  what's happening, completely transparent is

24                  that guy from Europe somewhere, who's wiring

25                  this money is getting $10 million in cash,
```

| | | |
|---|---|---|
| 1 | | as you know./= |
| 2 | IVESON: | Yep. |
| 3 | SHVARTSMAN: | Okay.  And what he's doing is on his books, |
| 4 | | he's expensing that $10 million. |
| 5 | IVESON: | That's right.  That's -- |
| 6 | SHVARTSMAN: | He's creating an invoice that he sold |
| 7 | | fucking, I don't know, sell (U/I). |
| 8 | IVESON: | Yeah, yeah, yeah. |
| 9 | SHVARTSMAN: | Whatever it is. |
| 10 | IVESON: | Yeah. |
| 11 | SHVARTSMAN: | Whatever business they happen to be in. |
| 12 | | Okay.  That they bought a product and a |
| 13 | | service from this company.  Okay.  Is that |
| 14 | | money laundering? |
| 15 | IVESON: | You're asking me? |
| 16 | SHVARTSMAN: | Yeah.  You're a lawyer.  Because I don't |
| 17 | | want to be involved in, you know, anything |
| 18 | | like that. |
| 19 | IVESON: | Well, you know, money laundering, you're |
| 20 | | trying to -- |
| 21 | SHVARTSMAN: | I'm asking you. |
| 22 | IVESON: | You're trying to conceal proceeds. |
| 23 | SHVARTSMAN: | I mean, money laundering is taking dirty |
| 24 | | money and cleaning it.  That's what money |
| 25 | | laundering is. |

100

```
 1   IVESON:        Yeah, that's right.

 2   SHVARTSMAN:    So, I guess it could be money laundering if

 3                  the money was from crime that they then, you

 4                  know, get $10 million in cash because they

 5                  sold drugs.  Right.  Then it could be money

 6                  laundering.

 7   CS:            I suppose it would have to be proven what

 8                  those funds related to in the first place.

 9   IVESON:        Yeah.  Well, I mean the thing is my opinion

10                  would have no authority, you know, vis-à-vis

11                  you know, the U.S. Government.  I think --

12   SHVARTSMAN:    Not a legal opinion.

13   IVESON:        Yeah.

14   SHVARTSMAN:    We're just talking, we're just having a

15                  conversation.

16   IVESON:        You know.  I think the challenge would be

17                  okay.  So, who -- you have to have proceeds

18                  of a crime, in that you have to try and

19                  conceal the proceeds of the crime by putting

20                  them through the series of transactions.

21                  So, I would go back to, okay, who is this

22                  Russian national, and where did they get

23                  their funds from.  I mean --

24   SHVARTSMAN:    Well, here's what's going to happen --

25   IVESON:        If the problem there is the quality of due
```

101

```
 1                          diligence of Russia, as you know, I'm sure
 2                          you've done business there, I would think
 3                          you would have, but in any event --
 4    [BACKGROUND NOISE]
 5    SHVARTSMAN:    -- a criminal background check for two days
 6                          in Russia, today.
 7    IVESON:        Yeah, yeah.  And so, it's easy in some of
 8                          these jurisdictions like Russia to get an
 9                          automated report from the government.  It's
10                          hard, though, to get information outside of,
11                          you know, strict channels of communication
12                          there.
13    SHVARTSMAN:    I guess what I'm -- okay.  So, your client
14                          sets up a company.  Right.  Let's walk
15                          through the process.  Your client sets up a
16                          company in wherever the fuck.  Okay.
17    [BACKGROUND NOISE]
18    SHVARTSMAN:    -- in Nevis, wherever.  Sets up a company.
19                          You call me up.  And you're like hey,
20                          Michael, we've got a client.  He needs to
21                          send $10 million.  Let's say he already has
22                          $10 million somewhere, he needs to wire it
23                          to the bank.  The bank's going to say -- I'm
24                          going to say okay, I'm going to tell you,
25                          hey, you know what, I'm going to set up this
```

102

```
 1                    relationship.  I'm going to do the
 2                    interaction.  I want (U/I).  Okay.  Then I'm
 3                    going to send an email, make a phone call,
 4                    it'll be my signal, telegram, chat,
 5                    whatever.  I'm going to say hey, go to this
 6                    bank, show them all the information.  Just
 7                    like normal.  Your company information, the
 8                    ID, the official owner, just like any
 9                    standard application.  They're going to do
10                    that.  Okay.  The bank is going run KYC,
11                    OFAC sanctions, all that kind of stuff.
12                    Now, if the guy is clean, the next thing
13                    they're going to say is source of funds.
14                    Right.  So, the guy is going to have to
15                    prove where the source of funds came from.
16   IVESON:          That's right.
17   SHVARTSMAN:      Can your clients prove the source of funds?
18   IVESON:          They'll always provide that.
19   SHVARTSMAN:      Okay.  Fine.
20   IVESON:          All of that information is reliable.  I
21                    mean, you know, we try to vet it as best we
22                    can.
23   SHVARTSMAN:      But that's not your job.  What I mean is
24                    that's the feds job.
25   IVESON:          It's the feds job and in, you know, the
```

103

```
 1                          thing is, I don't know Russian law in this,
 2                          but my assumption is that anybody doing this
 3                          in Russia, they're at least trying to evade
 4                          a Russian legal obligation, prohibition on
 5                          transfers, but if it's strictly a commercial
 6                          issue that they can't physically wire the
 7                          money out, then to me, I don't, you know,
 8                          that's not an issue.  That's not money
 9                          laundering.
10   SHVARTSMAN:    Yeah.  Okay.  That's fine.  But what I'm --
11                          so let's walk through what I just said.  So,
12                          we've done that, they open a company, I tell
13                          them here, go to this link.  When you submit
14                          the application let me know.  Right.
15   IVESON:        Okay.
16   SHVARTSMAN:    They let me know.  I make a phone call.  I'm
17                          like hey, this is a friend, you know, you
18                          got to take care of this person.  Right.  As
19                          long as they submit all the proper
20                          documentation, I'll make a phone call, the
21                          account's going to get open.
22   IVESON:        Let's talk pragmatics here.
23   SHVARTSMAN:    That's not real life.
24   IVESON:        What's the minimum size transaction that you
25                          would be interested in?
```

104

```
 1  SHVARTSMAN:    It doesn't matter, like whatever.

 2  IVESON:        Well, I mean --

 3  SHVARTSMAN:    A million bucks.

 4  IVESON:        You know, you're -- technically, you're

 5                 taking a risk any time you do this.

 6  SHVARTSMAN:`   Yeah, of course.  Of course.

 7  IVESON:        So, I can't imagine that you're going to do

 8                 this for small amounts of money.

 9  SHVARTSMAN:    I might do it for -- yeah.  So, what --

10  IVESON:        Okay.  So, a million bucks.

11  SHVARTSMAN:    Here's the thing.  The 50 grand I don't care

12                 about.  Right.

13  IVESON:        Okay.

14  SHVARTSMAN:    The only reason I'd say a million bucks is

15                 because most people aren't going to just

16                 wire, you know, $100 million or $10 million

17                 without trying it out.

18  IVESON:        Yeah.  That's right.  Yeah, no that -- yeah.

19                 The assumption is hey, we're not going to

20                 waste your time unless somebody's committed

21                 to this program and they want to at least

22                 send a million dollars, then they test it

23                 out for 100,000, but the idea is that if

24                 that works, then they commit to sending the

25                 remaining 900,000, so that they top up to a
```

```
 1                     million.
 2   SHVARTSMAN:        No, I mean the million dollars to me, to me
 3                     that's like the minimum, meaning -- like
 4                     they can start with you guys, they can start
 5                     100 grand, but even a million bucks is not
 6                     worth anybody's, you know, it's not worth my
 7                     time.
 8   IVESON:           Is there a maximum amount that --
 9   SHVARTSMAN:        No.  There's no maximum.  For me, this is
10                     somebody that wants like, I think that if
11                     you've got a million dollar problem, you
12                     don't have a problem.
13   IVESON:           Yeah.
14   SHVARTSMAN:        Right.
15   IVESON:           Just write the check.
16   SHVARTSMAN:        No.  What I'm saying is you're doing --
17                     going through this for a million dollars,
18                     you're not doing it because a million
19                     dollars is finding cash in your pocket.
20   IVESON:           Yeah.
21   SHVARTSMAN:        And you just spend and live your life.
22   IVESON:           Right.
23   SHVARTSMAN:        Right.  So, people that are doing, that need
24                     this help, it's not because they need help
25                     for a million dollars.
```

| | | |
|---|---|---|
| 1 | IVESON: | Okay.  We say the same thing in asset |
| 2 | | protect, we say, you know, under $5 million, |
| 3 | | between you and your wife, you're going to |
| 4 | | figure out a way to spend it pretty quickly. |
| 5 | SHVARTSMAN: | Yeah.  So, it's not for -- it's not a |
| 6 | | solution for a person that has a million |
| 7 | | dollars is what I'm getting to. |
| 8 | IVESON: | I follow you. |
| 9 | SHVARTSMAN: | So, -- |
| 10 | IVESON: | Yeah.  Just I had to ask. |
| 11 | SHVARTSMAN: | Yeah. |
| 12 | IVESON: | You know, but I'm with you on that. |
| 13 | SHVARTSMAN: | So, what I'm saying to you is if you call me |
| 14 | | up and you're like hey, this guy's got a |
| 15 | | million dollars, and he wants to do it and |
| 16 | | that's all he's got.  Not interested is what |
| 17 | | I'm saying. |
| 18 | IVESON: | In the bank of Dominica, do you know who |
| 19 | | they're using as a correspondent? |
| 20 | SHVARTSMAN: | They got correspondents everywhere. |
| 21 | IVESON: | Okay. |
| 22 | SHVARTSMAN: | They got U.K., they got, you know, U.S., |
| 23 | | obviously Euro. |
| 24 | IVESON: | Yeah.  And -- |
| 25 | SHVARTSMAN: | Because their correspondents -- |

107

```
 1  IVESON:        I think it'll hold up how sterling U.S.
 2                 Dollars --
 3  SHVARTSMAN:    Euro.
 4  IVESON:        And Euros.  Okay.  Yeah, because that, you
 5                 know, for our clients, that would be the
 6                 issues.  You know, they're not going to be
 7                 keen to work with a Dominican bank, but you
 8                 know, we can tell them yeah, but this bank
 9                 has a correspondent relationship.  So, your
10                 money really won't be seen in Dominique --
11  SHVARTSMAN:    It won't be seen --
12  IVESON:        -- it will be seen with the Federal Reserve.
13  SHVARTSMAN:    Yeah, it is.  It's not sitting in Dominica,
14                 obviously.  There's no money sitting in
15                 Dominica.
16  IVESON:        Yeah.
17  SHVARTSMAN:    Right.  It's all correspondents.
18  IVESON:        Yeah.
19  SHVARTSMAN:    And the reason they -- Dominica, they're
20                 going to do whatever they want.  Right.
21                 More or less.  So, it's really the
22                 correspondent's going to ask -- be asking
23                 the questions.
24  IVESON:        Okay.
25  SHVARTSMAN:    That you have to have an answer for.
```

SDNY_04_00020056

```
 1   IVESON:        The bank in Dominica, they're used to

 2                  working with Russian clients.  I mean --

 3   [OVERLAPPING VOICES]

 4   SHVARTSMAN:    The owner's Russian.

 5   IVESON:        Okay.  So, that's a huge (U/I).  Yeah.  He

 6                  lives in Russia?

 7   SHVARTSMAN:    He lives here.

 8   IVESON:        Okay.  Okay.

 9   SHVARTSMAN:    He lives on Fisher Island.

10   IVESON:        Oh, really.  Okay.

11   SHVARTSMAN:    Yeah.  He lives here.

12   [BACKGROUND NOISE]

13   SHVARTSMAN:    And yeah, he lives here.

14   IVESON:        That's great.

15   SHVARTSMAN:    Yeah.

16   IVESON:        Good for him.  So, how long has he owned the

17                  bank?

18   SHVARTSMAN:    If I told you an answer, I'd have to (U/I).

19   [BACKGROUND NOISE]

20   IVESON:        Steve, I'm sure with all the mutual clients

21                  that you have --

22   CS:            I'll just have another look.  Here, just a

23                  minute.

24   [BACKGROUND NOISE]

25   IVESON:        -- extremely useful.
```

109

```
 1   CS:           Absolutely.  No, absolutely.

 2   IVESON:       Yeah, I think --

 3   [OVERLAPPING VOICES]

 4   IVESON:       I got some stuff there, you know, I could

 5                 send it to you, you know.

 6   [BACKGROUND NOISE]

 7   SHVARTSMAN:   And yeah, I was very --

 8   [BACKGROUND NOISE]

 9   SHVARTSMAN:   He's the kind of guy that needs to build a

10                 relationship, and (U/I) Dominica.

11   [BACKGROUND NOISE]

12   CS:           A great guy to know.

13   IVESON:       Yeah, yeah.  No, that's --

14   CS:           Yeah.

15   IVESON:       Those could be best friends.  You know, it's

16                 --

17   [BACKGROUND NOISE]

18   IVESON:       You mentioned earlier about this

19                 relationship.  And to me, you know, again,

20                 you know, my observation is always the same

21                 that most clients have, which is well, who

22                 really wants to keep the money and --

23   [BACKGROUND NOISE]

24   IVESON:       You know, I've owned banks in the Cook

25                 Islands.  And I've always told patient then,
```

SDNY_04_00020058

```
 1                        Cook Islands doesn't --
 2   [BACKGROUND NOISE]
 3   IVESON:          -- all currency.
 4   SHVARTSMAN:      Yeah.
 5   IVESON:          So, you know, Dominica is part of the
 6                    Eastern Caribbean Central Banking system.
 7                    I've worked with them quite extensively.
 8                    It's a reliable institution.  It's expensive
 9                    to transact (U/I) they have to convert, but
10                    here, you wouldn't even have that issue.
11   SHVARTSMAN:      Unless they have -- so he's going -- he can
12                    issue -- he's a --
13   [BACKGROUND NOISE]
14   SHVARTSMAN:      He can issue cards, Mastercards and --
15   [BACKGROUND NOISE]
16   SHVARTSMAN:      -- but if Dominica issues (U/I).  All right.
17                    So, (U/I) pay, you can use pretty much
18                    anywhere.  You can use them at any, pretty
19                    much any store because, you know, everybody
20                    wants them.  There might be --
21   [BACKGROUND NOISE]
22   SHVARTSMAN:      Right.
23   IVESON:          Yep.
24   SHVARTSMAN:      Or I walk in Chanel or whatever, no problem.
25                    Right.  You can use that anyway a Discover
```

```
 1                      card is taken in the U.S., for example.

 2   IVESON:           Okay.

 3   SHVARTSMAN:       And yeah, and that's it.

 4   IVESON:           No, this is amazing.  And let's talk about

 5                     clients from other jurisdictions because if

 6                     you can do this for Russians --

 7   SHVARTSMAN:       (U/I).

 8   IVESON:           Okay.  Yeah, Chinese, he doesn't have an

 9                     issue with because he's not worried about

10                     the relationship with China.

11   SHVARTSMAN:       No.

12   IVESON:           Okay.

13   SHVARTSMAN:       no.

14   IVESON:           So, he has Chinese clients.

15   SHVARTSMAN:       If they ask him, he has Chinese clients, but

16                     --

17   [OVERLAPPING VOICES]

18   IVESON:           Yeah.  I mean, I asked about China because

19                     we get a lot of Chinese clients through --

20   [BACKGROUND NOISE]

21   SHVARTSMAN:       Yeah.

22   IVESON:           Because we have that passport program, and

23                     they love that.

24   SHVARTSMAN:       See that answers -- yeah, no problem.

25   IVESON:           In western countries, you know, he doesn't
```

112

```
 1                       have an issue like let's say I have a client

 2                       in France, high tax jurisdiction.  Wants to

 3                       move his cash through there, he can do that

 4                       as well.  Okay.  Well, I think we're going

 5                       to be doing a lot of business.

 6   SHVARTSMAN:   For sure.  He is not going to --

 7   [BACKGROUND NOISE]

 8   SHVARTSMAN:   And I'm not going to get --

 9   [BACKGROUND NOISE]

10   IVESON:       Yeah.

11   SHVARTSMAN:   All we're doing is, I make sure (U/I) he's

12                       got a bank, it's, you know, we got hundreds,

13                       and hundreds, and hundreds --

14   [BACKGROUND NOISE]

15   SHVARTSMAN:   -- for his clients.  And he's going to go to

16                       KYC.  He's going to go through sanctions.

17                       He's --

18   IVESON:       Sure.

19   [OVERLAPPING VOICES]

20   IVESON:       Yeah.  He's got to do his job.

21   SHVARTSMAN:   He's going to do his job.  His (U/I) do his

22                       job.  They can ask the source of funds.

23                       Whoever's going to -- you have to show the

24                       source of funds.  Maybe they sold a company,

25                       maybe they got a loan from somebody.  Maybe
```

113

```
 1                         they got whatever.  They're going to have to
 2                         show their source of funds.
 3   [BACKGROUND NOISE]
 4   SHVARTSMAN:   -- look at it.  If it makes sense --
 5   [BACKGROUND NOISE]
 6   CS:           Goodness.
 7   IVESON:       Sure.  Now, we missed the chance there.
 8   CS:           There was (U/I) mix in there.
 9   SHVARTSMAN:   So, what I'm getting to is as long as
10                         there's somebody in France wants to not pay
11                         taxes in France, that's not his problem.
12                         He's not doing anything illegal (U/I) is
13                         what I'm saying.
14   IVESON:       No, no.  Yeah, I mean, really, you know, --
15   [OVERLAPPING VOICES]
16   CS:           -- for you then.
17   IVESON:       Okay.
18   SHVARTSMAN:   He doesn't really know for sure.
19   CS:           There's a signature there for you, Mike.
20   [BACKGROUND NOISE]
21   SHVARTSMAN:   He doesn't know what they're doing or how
22                         they're doing it, but you know.
23   IVESON:       No that makes perfect sense.  So, and you
24                         know, look, the way that I do business, the
25                         way Steve does business, if you start doing
```

```
 1                     this, then everything that we do in this

 2                     regard goes through you.  Okay.  We don't

 3                     ever --

 4   SHVARTSMAN:   Try to --

 5   IVESON:       -- try to go around you, anything like that.

 6                     There's too much money to be made in the

 7                     things that we do.  You don't need to be --

 8   SHVARTSMAN:   Like I know (U/I).

 9   IVESON:       So, yeah.  He's going to be looking at the -

10                     -

11   [BACKGROUND NOISE]

12   IVESON:       But and anyone else that we introduce that

13                     may -- well, let me ask you.  You know, I

14                     have people in Russia who are always,

15                     they're --

16   [BACKGROUND NOISE]

17   IVESON:       -- they used to work with the Swiss banks a

18                     lot, now they've been shut out of it.  So, I

19                     think they would eat this up whole hog.

20                     Would you rather that they go through -- I

21                     don't need to be paid.  Okay.  But would you

22                     rather they go through me for your own

23                     protection, or --

24   [BACKGROUND NOISE]

25   IVESON:       Okay.  That's fine.  Say no more.
```

```
 1   SHVARTSMAN:    Yeah.  I think basically you just tell me

 2                  hey, Bob Smith, because you guys all know

 3                  Bob Smith, right.  Hey, Bob Smith, he wants

 4                  that (U/I) account, I got everything ready

 5                  to go.

 6   [BACKGROUND NOISE]

 7   SHVARTSMAN:    Go to the website, and there's all kinds of

 8                  fees on the website.

 9   [BACKGROUND NOISE]

10   SHVARTSMAN:    It doesn't get into that.  What is in there

11                  doesn't matter.

12   IVESON:        Understood.

13   SHVARTSMAN:    So, what we'll do, actually, what we'll do

14                  is we'll do a special addendum, I'll make

15                  one out when we next meet.

16   IVESON:        Okay.

17   SHVARTSMAN:    So, they know exactly whatever it's going to

18                  cost them.

19   IVESON:        Okay.

20   SHVARTSMAN:    Okay.

21   IVESON:        Understood.

22   SHVARTSMAN:    You have a document, I'll literally have it

23                  for you next week.  You'll have the

24                  document, and you can say here's what the

25                  costs are.
```

```
 1  [BACKGROUND NOISE]

 2  IVESON:        Yeah.  I'm going to check but I think we

 3                 have this one client, Steve, I had you do

 4                 some small work for the client, but I know

 5                 he's been trying to get, I think it's about

 6                 17 million out of Russia.

 7  SHVARTSMAN:    Out of Russia or the Ukraine?

 8  IVESON:        Out of Russia.

 9  SHVARTSMAN:    It's so fucking funny to say that.  You want

10                 me to tell you why?

11  IVESON:        Why?

12  SHVARTSMAN:    Because a friend of mine is moving 17

13                 million out of Ukraine right now.

14  IVESON:        Oh, okay.

15  CS:            Spooky.

16  [OVERLAPPING VOICES]

17  IVESON:        So, I didn't mean to spook you there.

18  SHVARTSMAN:    No, not at all.

19  IVESON:        Yeah, no but --

20  SHVARTSMAN:    That's so funny.

21  IVESON:        I know he's going to want to see an offer.

22  SHVARTSMAN:    So, let me give you an example what just

23                 happened --

24  IVESON:        Okay.

25  SHVARTSMAN:    -- perfect timing.  Right.  So, my friends
```

```
 1                    in the Ukraine said hey, you know, we want
 2                    to start --
 3   [BACKGROUND NOISE]
 4   SHVARTSMAN:    -- on there.  They can't send money out of
 5                    the country.
 6   IVESON:        Sure.
 7   [BACKGROUND NOISE]
 8   SHVARTSMAN:    -- real estate --
 9   [BACKGROUND NOISE]
10   SHVARTSMAN:    -- the bank, the money in the bank is less,
11                    you know, they're getting robbed and --
12   [BACKGROUND NOISE]
13   SHVARTSMAN:    -- in the Ukraine.  So, we said it's no
14                    problem.  So, we open a U.S. bank account
15                    for them.  Haven't opened Dominica yet.  So,
16                    a U.S. bank account, and ready to accept the
17                    wire.
18   IVESON:        Did you have trouble opening up the U.S.
19                    bank account?
20   SHVARTSMAN:    No.
21   IVESON:        That's great.
22   [BACKGROUND NOISE]
23   SHVARTSMAN:    So, anyways, we open up the bank account,
24                    and again, we provide identification, the
25                    bank gets KYC and OFAC.  It's --
```

```
 1   IVESON:          It's your bank account.

 2   SHVARTSMAN:      There's nothing wrong with opening a bank

 3                    account.  Now, if you walk into Chase and

 4                    you say hey I'm a Ukrainian national and I

 5                    want to open a bank account here, and I'm

 6                    not here, you're talking about 0 for 40.

 7   IVESON:          Yeah.

 8   SHVARTSMAN:      And you tell him you want to wire $10

 9                    million, they're going to fucking have a

10                    heart attack and not take your money, and

11                    you have all kinds of --

12   [BACKGROUND NOISE]

13   SHVARTSMAN:      We solved all that.

14   IVESON:          Okay.

15   SHVARTSMAN:      None of that happened.

16   IVESON:          Okay.

17   SHVARTSMAN:      So, the thing is, so yesterday, last night,

18                    he actually has a good friend, who's also my

19                    good friend, lives in my building.  So, last

20                    night, he calls me and he's like hey, I want

21                    to talk to you a minute.  He says I know the

22                    account's set up, but the problem is these

23                    guys in Europe that wired the funds from,

24                    they don't want to wire to an individual.

25   IVESON:          Because they can't take the individual
```

119

```
 1                        deduction for tax purposes.
 2  [BACKGROUND NOISE]
 3  SHVARTSMAN:    And they don't want to wire individuals.
 4  IVESON:        Okay.
 5  SHVARTSMAN:    So, now it's like -- now they have to set up
 6                 a fund --
 7  [BACKGROUND NOISE]
 8  SHVARTSMAN:    Right here, and then they (U/I) I got to
 9                 figure out some other way to help.
10  IVESON:        Right.
11  SHVARTSMAN:    So, yeah.  So, it has to be --
12  [BACKGROUND NOISE]
13  IVESON:        Yeah, yeah.  Well, yeah.  It sounds like
14                 probably what you ought to do is just use a
15                 company that's an intermediary.
16  [BACKGROUND NOISE]
17  IVESON:        -- to the individual.  Some company that you
18                 come up with that satisfies the foreign tax
19                 authorities.
20  [BACKGROUND NOISE]
21  SHVARTSMAN:    -- the companies here.  Right.  It's a
22                 problem because if somebody wired $10
23                 million, that's --
24  [BACKGROUND NOISE]
25  IVESON:        Yeah.
```

120

```
1   SHVARTSMAN:    The company, now you got incoming.

2   IVESON:        It depends if it's --

3   [BACKGROUND NOISE]

4   IVESON:        You don't have that problem if it's

5                  overseas.

6   SHVARTSMAN:    Yeah, it's -- yeah, for sure.

7   [BACKGROUND NOISE]

8   SHVARTSMAN:    -- wire $10 million here, and then give it

9                  to an individual.

10  IVESON:        Yeah.  Because that's one of the things that

11                 Steve, you and I have touched on, and I

12                 think we may have even discussed it in

13                 relation to Belize, LLC, that you know, it's

14                 way easier to open accounts here in the

15                 United States.  Especially if your dad's a

16                 Canadian national.  It's sometimes easier

17                 than opening --

18  CS:            And you're --

19  IVESON:        -- for Americans here.

20  CS:            I know.

21  IVESON:        But it would be very easy to open up some of

22                 these, you know, like for example, we got,

23                 you know, the Marshall Islands Company, have

24                 an affiliated company that opens an account

25                 here in (U/I) or something.
```

121

```
 1   SHVARTSMAN:      Let me ask you a question.

 2   IVESON:          Sure.

 3   SHVARTSMAN:      So, you got a -- here, use those -- one of

 4                    those U.S. Virgin Island companies as an

 5                    example.

 6   IVESON:          Okay.

 7   SHVARTSMAN:      U.S. Virgin Island company is owned by the

 8                    trust.  Let's say (U/I).  It's owned by the

 9                    trust.

10   [BACKGROUND NOISE]

11   SHVARTSMAN:      My friend in the Ukraine wires $10 million

12                    to Rocket Holdings.

13   [BACKGROUND NOISE]

14   SHVARTSMAN:      Right.

15   IVESON:          Mm-hm.

16   SHVARTSMAN:      So, Rocket Holdings doesn't pay taxes in the

17                    U.S.  Doesn't pay capital gains.  But it

18                    pays income tax for operating entities.

19   IVESON:          That's right.

20   SHVARTSMAN:      So, $10 million comes in, Rocket Holdings

21                    wires $10 million to this person that just

22                    opened a bank account.  Tax ramifications?

23   IVESON:          Well, so you're subject to --

24   [BACKGROUND NOISE]

25   IVESON:          -- in the U.S. Virgin Islands, and they have
```

```
 1                         a parallel tax system to the U.S.  And I
 2                         assume that's the way you're recording it
 3                         right now.  You're filing local tax returns
 4                         here in the U.S. Virgin Islands.  So,
 5                         really, it's a matter of would the USVI
 6                         authorities question the income and the
 7                         offsetting expense --
 8   SHVARTSMAN:  So, I'll tell you something.  We haven't had
 9                         any income.  Meaning the --
10   IVESON:      Right.
11   [BACKGROUND NOISE]
12   SHVARTSMAN:  So, we have the MG that we trust, had a
13                         certain amount of money that it's in receipt
14                         for the liquidity event, and he comes in,
15                         that's the end.
16   IVESON:      Okay.
17   SHVARTSMAN:  This company here, you know, owns the U.S.
18                         Virgin Island subs, and this company made a
19                         bunch of different investments.
20   IVESON:      Yep.
21   SHVARTSMAN:  Okay.  Then one of the subs, Rocket
22                         Holdings, borrows money from a company in
23                         Puerto Rico.
24   IVESON:      Yep.
25   SHVARTSMAN:  They borrow --
```

123

```
 1  [OVERLAPPING VOICES]

 2  IVESON:         Yes.

 3  SHVARTSMAN:     All right.  They borrow his money.

 4  IVESON:         That's right.

 5  SHVARTSMAN:     And then this company makes investments and

 6                  does whatever it does.

 7  IVESON:         Yeah, it's borrowing from its own -- I mean

 8                  --

 9  SHVARTSMAN:     Yeah.

10  IVESON:         -- it's the same chain of ownership.

11  SHVARTSMAN:     Yeah.

12  IVESON:         Yeah.

13  SHVARTSMAN:     But it's borrowing the money.  Right.  So,

14                  it's not income.  So, --

15  IVESON:         Right.

16  SHVARTSMAN:     -- what I'm saying is, I'm just asking, so

17                  if this $10 million comes in from offshore

18                  somewhere --

19  IVESON:         Yeah.  The question is, is it a loan or is

20                  it something else?

21  SHVARTSMAN:     Right.  So, if somebody (U/I) it's a loan,

22                  then it's a loan.

23  IVESON:         Yeah, usually the bank is the first to ask.

24  SHVARTSMAN:     Yeah.

25  IVESON:         What is this $10 million.
```

124

```
1   SHVARTSMAN:    Yeah.

2   IVESON:        And you're showing them where you have an

3                  invoice, or you're showing them where you

4                  have a promissory note.

5   SHVARTSMAN:    Yeah.

6   IVESON:        One or the other.  I mean, that's what I

7                  would expect the bank to do.

8   SHVARTSMAN:    Yeah, it's true.

9   IVESON:        And that really does touch on what Steve and

10                 his team, what they do so well, which is

11                 they help build up that documentation so

12                 that when the bank looks --

13  CS:            It's stands up.

14  IVESON:        -- they're not asking any questions.

15  SHVARTSMAN:    All right.  So, let's walk through this

16                 scenario that --

17  [BACKGROUND NOISE]

18  IVESON:        I'm going to follow you, though.

19  CS:            Cheers.

20  [BACKGROUND NOISE]

21  CS:            I'm heading outside.  I can, I'm coming back

22                 in a couple weeks.

23  SHVARTSMAN:    Yeah.

24  CS:            Yeah, put some (U/I) out.  The weather's

25                 good.  Far better than in the --
```

```
 1   SHVARTSMAN:     The U.K.?

 2   CS:             Yeah.

 3   [BACKGROUND NOISE]

 4   IVESON:         Steve, you're going to be on time for the

 5                   airport?

 6   CS:             I'm not flying out today.

 7   [BACKGROUND NOISE]

 8   CS:             How long will it take us from here?

 9   IVESON:         From here, not long at all.  Probably 20

10                   minutes.

11   CS:             Perfect.

12   [BACKGROUND NOISE]

13   IVESON:         Yeah.  With that $17 million transaction,

14                   that would be amazing.

15   CS:             Yeah.

16   IVESON:         To run that through his facility.

17   CS:             Absolutely.

18   [BACKGROUND NOISE]

19   SHVARTSMAN:     Here you go.

20   CS:             Cheers.

21   [BACKGROUND NOISE]

22   CS:             No problem.

23   SHVARTSMAN:     All right.  So, all right.  Okay.  That's

24                   it.

25   IVESON:         I mean, basically, I would like to get a fee
```

126

```
 1                    proposal from you on a $17 million

 2                    transaction.

 3   SHVARTSMAN:     Yeah, I'll have --

 4   IVESON:         Yeah.

 5   SHVARTSMAN:     That'll be for the (U/I), it'll be the same.

 6   IVESON:         Okay.  I appreciate that.

 7   [BACKGROUND NOISE]

 8   IVESON:         Okay.

 9   SHVARTSMAN:     Yeah.  Anything else?  Can I get a copy of

10                    the --

11   IVESON:         If you want a hard copy - yeah.  I don't

12                    carry business cards --

13   [OVERLAPPING VOICES]

14   IVESON:         -- in the United States.  But --

15   PARK:           Can I give you my number?

16   IVESON:         Yeah.  Give me your phone number and I'll

17                    send you my contact card right now.

18   PARK:           Okay.

19   SHVARTSMAN:     (U/I) United States.

20   IVESON:         No.

21   PARK:           We don't carry business cards either.

22   IVESON:         No, it's -- the purpose is I can't accept

23                    trust business here in the United States.

24                    We're not licensed as trust --

25   [BACKGROUND NOISE]
```

127

```
 1   SHVARTSMAN:    Oh, okay.

 2   [BACKGROUND NOISE]

 3   SHVARTSMAN:    All right.  Just so I know, what's the next

 4                  steps?

 5   CS:            This will be registered probably Wednesday,

 6                  I'll say the end of next week.

 7   SHVARTSMAN:    Yeah.

 8   CS:            And then we will get together and come up

 9                  with a proposal for the option two we agreed

10                  on, wasn't it?  So, --

11   SHVARTSMAN:    All right.

12   CS:            So, yeah.

13   PARK:          (818) ███- --

14   IVESON:        You're in the valley.

15   PARK:          Yeah.  (818) ███████.

16   CS:            We'll get on that straight away, Michael.

17   SHVARTSMAN:    And I'll introduce you guys.  When this is

18                  all set up, I'll introduce you to a bunch of

19                  other people.

20   CS:            Okay.  Appreciate it.

21   [BACKGROUND NOISE]

22   IVESON:        And again, thank you very much.

23   CS:            Yeah.  Very much appreciate it.

24   [OVERLAPPING VOICES]

25   IVESON:        -- person after all this time.
```

```
 1   SHVARTSMAN:     Thank you.

 2   IVESON:         You know.

 3   SHVARTSMAN:     Thank you for the patience.

 4   IVESON:         No absolutely.

 5   CS:             No problem.

 6   IVESON:         It was a -- you know, I think here, we'll be

 7                   able to get this all done within a couple of

 8                   weeks.  It doesn't take long.

 9   SHVARTSMAN:     No problem.

10   IVESON:         You know, as I said before, we really set

11                   the template with all the work that we did

12                   on the private trust --

13   [BACKGROUND NOISE]

14   SHVARTSMAN:     Thank you so much.

15   [BACKGROUND NOISE]

16   IVESON:         I did, in case, in case --

17   [OVERLAPPING VOICES]

18   IVESON:         We're going to be at my -- I was deployed

19                   and when I saw rats ---

20   [BACKGROUND NOISE]

21   CS:             -- looks like the board on My Beautiful

22                   Mind.

23   IVESON:         You know my 13-year-old does this, so yeah.

24                   Whatever you're feeding him, it's working.

25   [BACKGROUND NOISE]
```

129

```
 1   CS:           Good to meet you.

 2   HANNELIUS:    Nice to meet you.

 3   CS:           Okay, Michael.  We'll speak soon.  See you

 4                 soon.  I'm back in a couple of weeks

 5                 anyways.  So, --

 6   SHVARTSMAN:   Yeah, we'll see you when you get back.

 7   CS:           Yeah.  Will do.  Great to meet you, Mike.

 8   SHVARTSMAN:   Great to meet you.  Thanks.

 9   CS:           Always good to put a face to it.  And we'll

10                 see each other pretty soon.

11   SHVARTSMAN:   I'm sure.

12   CS:           I think once Monty gets talking, he just --

13   [BACKGROUND NOISE]

14   IVESON:       You and I can take a look at the numbers and

15                 see how they work.

16   CS:           Absolutely.

17   IVESON:       If it's going to work for the client, you

18                 know.

19   CS:           As I said to Michael --

20   IVESON:       If it is what he says, it's going to

21                 absolutely work for -- the client's going to

22                 love it.

23   CS:           Yeah.  Yeah.  It's great, a great situation.

24   IVESON:       It is.

25   CS:           So, we --
```

SDNY_04_00020078

130

```
 1  [BACKGROUND NOISE]

 2  IVESON:        So, go to ground, and then we'll go to the

 3                 parking garage, and I'm parked on the

 4                 seventh floor.

 5  CS:            Okay.  Oh.  Do we need to get out at the

 6                 seventh floor?

 7  [NON-TARGET CONVERSATION]

 8  IVESON:        I thought the two issues that you mentioned,

 9                 the DEA and the SEC issue, to me, the DEA

10                 issue is not an issue.

11  CS:            No.

12  IVESON:        You know, I mean, I get -- Mike is doing his

13                 job to look out for Michael and make sure

14                 there is no liability there, but really it's

15                 --

16  CS:            It's my complex situation, isn't it because

17                 of the way I understand it is he's on a

18                 (U/I) basis.  And then you've got the --

19  IVESON:        Same level as, well, federal level it's

20                 illegal.

21  CS:            Yeah.

22  [BACKGROUND NOISE/NON-TARGET CONVERSATION]

23  IVESON:        So, what did you think of the meeting?

24  CS:            I thought it went very well.

25  IVESON:        I'm really impressed with Michael.
```

```
 1  CS:          Yes.

 2  IVESON:      I think he's going to achieve so much

 3               success that you know --

 4  CS:          It was interesting to hear what he's got

 5               going on.  Very interesting.

 6  IVESON:      Well, you know, what I'll do is I'll, you

 7               know, I think the right way to go about is

 8               you are now the trustee --

 9  [BACKGROUND NOISE]

10  IVESON:      Well, I'll talk to him, but it may be that

11               because his father is the one that

12               technically would be setting up the company

13               --

14  CS:          Yeah.

15  IVESON:      I think it's to have his father, you know, I

16               can basically do an engagement to get the

17               LLC established.

18  CS:          Yeah.

19  IVESON:      But then I think --

20  CS:          (U/I) is there one, two, three?  I'm just

21               checking for -- sorry to interrupt.

22  IVESON:      No worries, no worries.  But I think then

23               what next makes sense is once that Belize,

24               LLC is established, the sale transaction,

25               that's really between you and the Belize,
```

1                     LLC.  And I think what makes the most sense

2                     --

3   [END OF RECORDING]

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25