```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__3/20/2024__
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                       :

UNITED STATES OF AMERICA,          :

                                         :

           -v-                       :       23-cr-307 (LJL)

                                         :

MICHAEL SHVARTSMAN, GERALD     :      OPINION AND ORDER
SHVARTSMAN, and BRUCE GARELICK,  :

                                         :

                  Defendants.      :

-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Defendant Michael Shvartsman ("M. Shvartsman") moves to dismiss the Indictment, to

suppress evidence, and for a bill of particulars. Dkt. No. 55. Defendant Bruce Garelick also

moves to suppress evidence and for a bill of particulars. Dkt. No. 51. Defendant Gerald

Shvartsman ("G. Shvartsman" and, together with M. Shvartsman and Garelick, "Defendants")

joins in his co-Defendants' motions to the extent applicable. Dkt. No. 46.[1] For the following

reasons, Defendants' motions are denied.

## BACKGROUND

      The following factual allegations are taken from the Superseding Indictment, Dkt. No.

81, and are accepted as true for purposes of M. Shvartsman's motion to dismiss, *see United*

*States v. Rosado*, 2021 WL 2292856, at *1 (S.D.N.Y. June 4, 2021).

      In the summer of 2021, the chief executive officer (the "CEO") of Benessere Capital

Acquisition Corporation ("Benessere") sought investors for a new venture the CEO managed and

---

[1] G. Shvartsman and Garelick also moved for a pretrial disclosure schedule and an order
imposing a deadline for the Government to provide Jencks Act material. Dkt. Nos. 50 at 2, 52 at
23. The Court addressed those motions by a separate order on February 8, 2024. Dkt. No. 85.

planned to take public: Digital World Acquisition Corporation ("DWAC").  Dkt. No. 81 ¶ 7.

Both Benessere and DWAC are special purpose acquisition corporations ("SPACs").  *Id.* ¶ 5.

SPACs are companies that have no operating business of their own when they become publicly

traded.  *Id.*  After a SPAC goes public, it merges with a private company, thereby making the

private company publicly traded.  *Id.* ("After the deal is complete the shares of the SPAC

become the shares of the operating company, which then can be bought and sold by the public on

a stock exchange.").  A SPAC's share price often increases after the announcement of a

combination with a private company, based on market demand for shares of the target company.

*Id.*

The CEO met with the M. Shvartsman at the offices of Rocket One Capital LLC

("Rocket One")—a venture capital firm owned by M. Shvartsman—to discuss a potential

investment in Benessere and DWAC.  *Id.* ¶ 7.  G. Shvartsman, M. Shvartsman's brother, also

attended the meeting; as did Garelick, who served as Rocket One's chief investment officer.  *Id.*

Before any substantive discussion about the SPACs occurred, the CEO required each of

the Defendants to enter into confidentiality agreements with Benessere and DWAC.  *Id.* ¶ 8.

Those agreements provided that the Defendants could use information provided by the SPACs

only to consider whether to purchase either "locked up" founder shares or units issued in their

initial public offerings ("IPOs").  *Id.*  Additionally, the agreements forbid Defendants from

disclosing any material non-public information ("MNPI") they learned from Benessere or

DWAC or using that MNPI to trade in securities in the open market.  *Id.*

After Defendants signed the confidentiality agreements, the CEO informed Defendants

that Benessere and DWAC were pursuing a business combination with the Trump Media and

Technology Group ("Trump Media"), a media company founded by former President Donald J.

Trump. *Id.* ¶¶ 2, 8.  Specifically, the CEO told Defendants that Benessere had a executed a letter of intent with Trump Media.  *Id.* ¶ 8.  Following the meeting at Rocket One, Defendants had several telephone calls with the CEO, in which the CEO stated that Trump Media was a likely target for DWAC.  *Id.*

Defendants invested hundreds of thousands of dollars in founder shares and IPO units of DWAC.  *Id.*  As a condition of that substantial investment, Garelick was named as a director of DWAC and thereby became subject to a code of ethics that prohibited the misuse of confidential information for insider trading.  *Id.* ¶ 9.  Through his position on the board, Garelick learned additional details about DWAC's negotiations with Trump Media—including the timing of a letter of intent and a merger agreement between the companies, as well as deal terms and an anticipated closing date.  *Id.* ¶ 10.

Despite their confidentiality agreements with Benessere and DWAC and Garelick's duties to DWAC as a director, Defendants used MNPI about the company's likely merger with Trump Media to make well-timed purchases of DWAC securities on the open market.  *Id.* ¶ 11. Garelick purchased DWAC units on the open market throughout September 2021.  *Id.* ¶ 12(a). After Trump Media entered into a letter of intent with DWAC, Garelick conveyed MNPI to M. Shvartsman over the course of several conversations in which Garelick discussed the likely merger with Trump Media and urged M. Shvartsman to buy DWAC securities.  *Id.* ¶ 12(b).  M. Shvartsman took that advice by purchasing two million DWAC units in early October 2021.  *Id.* Shortly thereafter, G. Shvartsman purchased four hundred thousand DWAC units.  *Id.* ¶ 12(c).

Defendants also provided MNPI to their friends and employees.  *Id.* ¶ 13.  On September 30 and October 1, 2021, M. Shvartsman told his neighbor to invest in DWAC stock, stating simply that it was a good bet.  *Id.* ¶ 13(a).  M. Shvartsman and Garelick shared MNPI regarding

DWAC's planned combination with Trump Media with a business associate, who purchased DWAC warrants in early October 2021. *Id.* ¶ 13(b). While on a trip to Las Vegas with M. Shvartsman and Garelick, a friend of M. Shvartsman purchased DWAC warrants the day after Garelick participated in a virtual DWAC board meeting regarding the finalization of the Trump Media merger. *Id.* ¶ 13(c). In mid-October 2021, G. Shvartsman told two employees of his business, Source Outdoor Furniture, to purchase DWAC warrants because DWAC was going to announce a merger with Trump Media in the next weeks. *Id.* ¶ 13(d)–(e). The employees purchased DWAC warrants and relayed G. Shvartsman's tip to friends and family, who also invested in DWAC. *Id.*

On October 20, 2021, a spokesperson for former President Trump announced the planned merger of DWAC and Trump Media via Twitter. *Id.* ¶ 14. DWAC's share and warrant prices increased substantially after the announcement. *Id.* Defendants then sold the DWAC securities they had purchased on the open market. *Id.* Each earned a profit: M. Shvartsman made approximately $18.2 million; Garelick made approximately $49,702; and G. Shvartsman made approximately $4.6 million. *Id.*

## PROCEDURAL HISTORY

On June 26, 2023, a grand jury returned a ten-count Indictment against the Defendants. *Id.* Count One charged Defendants with conspiracy to commit securities fraud in violation of Title 18 of the U.S. Code, Section 371. *Id.* ¶¶ 15–18. Counts Two through Nine charged Defendants with securities fraud in violation of Title 15 of the U.S. Code, Sections 78j(b) and 78ff, and Title 17 of the Code of Federal Regulations, Section 240.1b-5. *Id.* ¶¶ 19–20. Finally, Count Ten charged Defendants with securities fraud in violation of Title 18 of the U.S. Code, Section 1348. *Id.* ¶¶ 21–22. The Indictment also sought forfeiture of any proceeds of the charged offenses or substitute assets for such proceeds. *Id.* ¶¶ 23–24.

At their July 20, 2023 arraignment, Defendants pleaded not guilty on all counts of the Indictment.  *See* Minute Entry of July 20, 2023.

On December 22, 2023, G. Shvartsman filed a motion joining the pretrial motions of his co-Defendants to the extent applicable.  Dkt. No. 46.  He also filed a memorandum of law, in which he urged the Court to require a bill of particulars and to set a pretrial disclosure schedule that would ensure "defendants receive an exhibit list, marked exhibits and the Jencks Act materials before they are required to make their motions *in limine*."  Dkt. No. 50 at 1.

Garelick moved for the suppression of evidence allegedly obtained in violation of his Fifth Amendment right against self-incrimination and for a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f).  Dkt. No. 51.  In his accompanying memorandum of law, Garelick requested an evidentiary hearing on his suppression motion, and proposed a schedule for pretrial disclosures.  Dkt. No. 52 at 16, 23.  In further support of his motion, Garelick submitted a declaration, Dkt. No. 54, as well as a declaration of his attorney, Alexandra A.E. Shapiro, Dkt. No. 53.

M. Shvartsman filed a motion: to dismiss the Indictment pursuant to Article I and the Due Process Clause of the Constitution, to suppress the fruits of information obtained by a confidential informant ("CI") in alleged violation of the Sixth Amendment and professional ethics rules, to hold an evidentiary hearing on the CI's actions, to either dismiss the Indictment or inspect the grand jury materials due to the Government's purported presentation of misleading evidence to the grand jury, and for a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f).  Dkt. No. 55.  M. Shvartsman also filed a corresponding memorandum of law and declaration of his attorney, Tai H. Park.  Dkt. Nos. 56–57.

The Government submitted an omnibus memorandum of law opposing Defendants' motions, Dkt. No. 66, and a declaration of Matthew R. Shahabian, Dkt. No. 67, on January 12, 2024.  Defendants filed reply briefs on January 18, 2024.  Dkt. Nos. 68–70; *see also* Dkt. No. 71 (declaration of Tai H. Park in further support of M. Shvartsman's motion).

On January 25, 2024, the Court granted Garelick's request for an evidentiary hearing on his motion to suppress and M. Shvartsman's request for the Court to conduct an *in camera* review of the grand jury materials relevant to his motion to dismiss the Indictment.  Dkt. No. 73.

The Government filed two letters on January 26, 2024.  In the first, the Government provided a sur-reply to certain arguments raised for the first time in Garelick's reply brief.  Dkt. No. 74.  In the second, the Government explained that it had provided the grand jury materials to the Court for *in camera* inspection but stated that "the Government intends to seek a superseding indictment in this case" before a new grand jury.  Dkt. No. 75.

On February 6, 2024, a new grand jury returned a Superseding Indictment.  Dkt. No. 81. In addition to the original charges, the Superseding Indictment added two counts against M. Shvartsman: Count Eleven for money laundering in violation of Title 18 of the U.S. Code, Section 1956(a)(1)(B)(i), *id.* ¶¶ 25–26; and Count Twelve for engaging in a monetary transaction of property derived from specified unlawful activity in violation of Title 18 of the U.S. Code, Sections 1957 and 2, *id.* ¶¶ 27–28.  M. Shvartsman pleaded not guilty on those counts.  *See* Minute Entry of Feb. 8, 2024.

On February 8, 2024, the Court heard oral argument on the instant motions.  *See id.*  The Court also held an evidentiary hearing on Garelick's motion to suppress.  *Id.*  The following day, the Court issued an order establishing the deadlines for pretrial disclosures.  Dkt. No. 85.  The

Government and Garelick then submitted supplemental letter briefs on the testimony elicited at the evidentiary hearing.  *See* Dkt. Nos. 86, 88–89.

## DISCUSSION

### I.      M. Shvartsman's Motion to Dismiss Pursuant to Article I of the Constitution

M. Shvartsman's first argument is his most ambitious.  He asserts that criminal prohibitions on insider trading constitute "criminal law made by judges" in violation of Article I of the United States Constitution and the non-delegation doctrine.  Dkt. No. 56 at 16.  Thus, M. Shvartsman asks the Court to invalidate *all* criminal insider trading jurisprudence as contrary to the separation of powers.  The Government retorts that M. Shvartsman's argument "flies in the face of statutory and case law and is meritless."  Dkt. No. 66 at 3.

Section 1 of Article I of the Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States."  U.S. Const. art. I, § 1.  "Accompanying that assignment of power to Congress is a bar on its further delegation.  Congress, this Court explained early on, may not transfer to another branch powers which are strictly and exclusively legislative."  *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (plurality) (internal quotation marks omitted); *see also Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 472 (2001).  To ensure Congress does not "unconstitutionally divest[] itself of its legislative responsibilities," courts developed the non-delegation doctrine.  *Gundy*, 139 S. Ct. at 2135 (Gorsuch, J., dissenting).  But courts fashioned that doctrine when resolving challenges to congressional delegations to executive agencies, not the judiciary.  In those non-delegation cases, courts "repeatedly have said that when Congress confers decisionmaking authority upon agencies Congress must 'lay down by legislative act an intelligible principle to which the person

or body authorized to [act] is directed to conform.'"[2] *Whitman*, 531 U.S. at 472 (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)) (emphasis omitted). "[T]he Supreme Court has found an improper delegation only twice – in *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935), and in *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)." *CFPB v. L. Offs. of Crystal Moroney, P.C.*, 63 F.4th 174, 184 n.1 (2d Cir. 2023). And "since 1935, the Court has uniformly rejected nondelegation arguments and has upheld provisions that authorized agencies to adopt important rules pursuant to extraordinarily capacious standards." *Gundy*, 139 S. Ct. at 2130–31 (Alito, J., concurring).

M. Shvartsman's non-delegation challenge, however, opposes a purported *judicial* exercise of legislative power. Although not entirely unknown,[3] non-delegation challenges to the judiciary's activities have largely remained a subject of academic debate,[4] rather than judicial precedent. Yet the judiciary is not immune from the separation of powers concerns that animate the non-delegation doctrine. Montesquieu recognized that "there is no liberty, if the judiciary power be not separated from the legislative and executive. Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would be then the legislator." 1 Baron de Montesquieu, *The Spirit of Laws*, bk. XI, ch. 6, at 173 (Thomas Nugent trans., Batoche Books 2001); *accord* 1 William Blackstone, Commentaries *259 ("Were [the judicial power] joined with the legislative, the life, liberty, and property, of the subject

---

[2] Interestingly, M. Shvartsman does not argue that the Court should apply the intelligible principle test here.

[3] *See United States v. Buntyn*, 2020 WL 7342688, at *4 (D.N.M. Dec. 14, 2020) (rejecting such a challenge); *United States v. Hudson*, 414 F.3d 931, 936 (8th Cir. 2005) (same); *Ugland v. United States*, 596 F. Supp. 156, 158–59 (D.N.J. 1984) (same).

[4] *See, e.g.*, Alexander Volokh, *Judicial Non-Delegation, the Inherent-Powers Corollary, and Federal Common Law*, 66 Emory L.J. 1391 (2017); Margaret H. Lemos, *The Other Delegate: Judicially Administered Statutes and the Nondelegation Doctrine*, 81 S. Cal. L. Rev. 405 (2008).

would be in the hands of arbitrary judges, whose decisions would be then regulated only by their own opinions, and not by any fundamental principles of law.").  Chief Justice Marshall likewise warned that courts cannot exercise legislative power:  "It will not be contended that Congress can delegate to the Courts, or to any other tribunals, powers which are strictly and exclusively legislative."  *Wayman v. Southard*, 23 U.S. 1, 42 (1825) (Marshall, C.J.).

Only Congress can enact federal crimes.  *See United States v. Hudson*, 11 U.S. 32, 34 (1812) ("The legislative authority of the Union must first make an act a crime, affix a punishment to it, and declare the Court that shall have jurisdiction of the offence."); *see also United States v. Lanier*, 520 U.S. 259, 267 n.6 (1997).  Because "the power of punishment is vested in the legislative, not in the judicial department[, i]t is the legislature, not the Court, which is to define a crime, and ordain its punishment."  *United States v. Wiltberger*, 18 U.S. 76, 95 (1820) (Marshall, C.J.); *see also Whalen v. United States*, 445 U.S. 684, 689 (1980) ("[T]he power to define criminal offenses and to prescribe the punishments to be imposed upon those found guilty of them, resides wholly with the Congress.").

According to M. Shvartsman, criminal prohibitions on insider trading transgress this fundamental division of authority between the legislative and judicial branches.  Dkt. No. 56 at 6.  But courts did not create insider trading doctrine *ex nihilo*.  To the contrary, they have developed that doctrine as an interpretation of the anti-fraud provisions of duly enacted statutes. 18 U.S.C. § 1348 (stating that it is a crime to "to defraud any person" in connection with certain securities or "to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property" in connection with the purchase or sale of certain securities); 15 U.S.C. §§ 78j(b) (forbidding the use of "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe" in connection

with the purchase or sale of securities), 78ff(a) (criminalizing willful violations of Section 78j); *see* 17 C.F.R. § 240.10b-5 (prohibiting any person from "employ[ing] any device, scheme, or artifice to defraud . . . in connection with the purchase or sale of any security"); *see also Salman v. United States*, 580 U.S. 39, 41 (2016) ("Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b–5 prohibit undisclosed trading on inside corporate information by individuals who are under a duty of trust and confidence that prohibits them from secretly using such information for their personal advantage."); *United States v. Blaszczak*, 56 F.4th 230, 248 & n.20 (2d Cir. 2022) (Walker, J., concurring).

M. Shvartsman objects that insider trading prohibitions do not appear on the face of these statutory provisions. *See* Dkt. No. 56 at 6. While neither 18 U.S.C. § 1348 nor 15 U.S.C. § 78j "expressly mentions insider trading," it does not follow that insider trading therefore falls beyond their "broad[] prohibit[ions] on] schemes or artifices to defraud in connection with the securities market." *Blaszczak*, 56 F.4th at 248 (Walker, J., concurring). "Broadly worded constitutional and statutory provisions necessarily have been given concrete meaning and application by a process of case-by-case judicial decision in the common-law tradition." *Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 95 (1981). Indeed, "[i]n almost any statutory scheme, there may be a need for judicial interpretation of ambiguous or incomplete provisions. But the authority to construe a statute is fundamentally different from the authority to fashion a new rule or to provide a new remedy which Congress has decided not to adopt." *Id.* at 97; *see also Mistretta v. United States*, 488 U.S. 361, 417 (1989) (Scalia, J., dissenting) ("The whole theory of *lawful* congressional 'delegation' is not that Congress is sometimes too busy or too divided and can therefore assign its responsibility of making law to someone else; but rather that a certain degree of discretion, and thus of lawmaking, *inheres* in most executive or judicial

action, and it is up to Congress, by the relative specificity or generality of its statutory commands, to determine—up to a point—how small or how large that degree shall be.").

The judiciary has performed its constitutional duty to interpret broadly worded criminal statutes since the Founding.  Congress's first criminal enactment—the Crimes Act of 1790—penalized a variety of offenses on the high seas and in federal enclaves.  *See* 1 Stat. 112 (1790).  "The offenses, however, were merely identified and not defined by the statutory text."  Dan M. Kahan, *Lenity and Federal Common Law Crimes*, 1994 Sup. Ct. Rev. 345, 371.  As a result, federal courts struggled to elucidate those offenses and even expressed concerns that "it seemed to us too much like legislating to give a definition of our own."  *United States v. Kelly*, 26 F. Cas. 700, 701 (C.C.E.D. Pa. 1825).  Yet the Supreme Court roundly rejected the notion that the Crimes Act's lack of specificity required the judiciary to exceed its constitutional role:  "This Court is of opinion, that although the act of Congress does not define this offence, it is, nevertheless, competent to the Court to give a judicial definition of it."  *United States v. Kelly*, 24 U.S. 417, 418 (1826).

Similar challenges to the judiciary's authority to interpret broad statutes arose nearly a century later, following the enactment of the "Magna Carta of free enterprise": the Sherman Antitrust Act.  *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972).  The Act's laconic prohibition on "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade," 15 U.S.C. § 1, led critics of the statute to contend that it unconstitutionally delegated legislative power to the judiciary.  For example, Standard Oil argued that the Act was "not susceptible of being enforced by the courts because it cannot be carried out without a judicial exertion of legislative power."  *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 69 (1911).  But the Supreme Court held that argument was "clearly unsound."  *Id.*  Although the

Court acknowledged that the Sherman Act "generically enumerates the character of acts which it prohibits," the Court rejected the proposition that "it never can be left to the judiciary to decide whether, in a given case, particular acts come within a generic statutory provision," as that legal principle would "deny the existence of essential legislative authority, and challenge the right of the judiciary to perform duties which that department of the government has exerted from the beginning." *Id.* at 69–70.  In reciting "obvious examples" of judicial applications of generic provisions, the Court stated:  "Take questions of fraud."  *Id.* at 70.  Two years later, the Supreme Court upheld a criminal conviction under the Sherman Act, despite the defendant's similar objection "that the crime thus defined by the statute contains in its definition an element of degree as to which estimates may differ."  *Nash v. United States*, 229 U.S. 373, 376 (1913).  Writing for the Court, Justice Holmes emphasized that the Sherman Act built on "the common law as to the restraint of trade," and that the criminal law "is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree."  *Id.* at 377.

Like the Crimes Act and the Sherman Act, the securities laws include broad proscriptions that cannot be mechanically applied in a given case.  Consequently, when faced with a securities fraud case, the court must engage in the quintessential judicial act of interpretation.  *See Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.  Those who apply the rule to particular cases, must of necessity expound and interpret that rule."); *see also Anspec Co. v. Johnson Controls, Inc.*, 922 F.2d 1240, 1245 (6th Cir. 1991) ("The authority to construe a statute lies at the very heart of judicial power.").  In applying the anti-fraud provisions of the securities laws to insider trading, courts have hewed closely to their traditional role by construing fraud—one of the most ancient and venerable doctrines of our legal tradition—in light of other common-law concepts.  *See, e.g.,*

*Chiarella v. United States*, 445 U.S. 222, 227–28 (1980) (fiduciary duties); *Dirks v. SEC*, 463

U.S. 646, 661 n.20 (1983) (restitution and agency); *United States v. O'Hagan*, 521 U.S. 642, 654

(1997) (embezzlement).

The judiciary's resort to longstanding doctrines in expounding the meaning of securities

fraud undermines the notion that insider trading doctrine has crossed the boundary from legal

interpretation to outright legislation.  Indeed, the division of authority between Congress and the

courts in contemporary insider trading jurisprudence reflects fraud's inherently open-textured

nature.  It is impossible to anticipate in advance the precise manner in which one person might

seek to defraud another.  *See* 1 J. Story, *Equity Jurisprudence* § 189 163–64 (1839) ("Fraud,

then, being so various in its nature, and so extensive in its application to human concerns, it

would be difficult to enumerate all the instances in which courts . . . will grant relief under this

head.").  Consequently, any attempt to exhaustively list and detail every possible fraudulent

scheme by legislation would not only be futile but also enable a creative criminal to engage in

wrongdoing the legislature sought to prohibit by designing a scheme that fell just outside the

letter of the law.  *See McAleer v. Horsey*, 35 Md. 439, 452 (1872) ("[F]or as it is the very nature

and essence of fraud to elude all laws in fact, without appearing to break them in form, a

technical definition of fraud, making everything come within the scope of its words before the

law could deal with it as such, would be in effect telling to the crafty precisely how to avoid the

grasp of the law.").  Thus, it is little surprise that our constitutional order has long permitted the

Congress to legislate in broad strokes leaving room for interpretation by the courts in applying

Congress's language to specific concrete cases.  *See Standard Oil Co.*, 221 U.S. at 70; *see also*

*McNally v. United States*, 483 U.S. 350, 372–73 (1987) (Stevens, J., dissenting).  M. Shvartsman

may disagree with the Supreme Court's interpretation of the securities laws as forbidding insider

13

trading.  But "[w]hatever the merits of that interpretation, it is undoubtedly an *interpretation* of the [securities] fraud statute[s]: an attempt to 'giv[e] effect to the will of the Legislature.'" *United States v. Holden*, 908 F.3d 395, 401 (9th Cir. 2018) (quoting *Osborn v. Bank of U.S.*, 22 U.S. (9 Wheat.) 738, 866 (1824) (Marshall, C.J.)).

M. Shvartsman's restrictive view of the separation of powers proves too much.  If consistently applied, it would invalidate a wide array of other criminal laws.  The federal securities laws are not the only laws that prohibit fraud and leave it to the courts to determine the metes and bounds of that crime.  Congress has enacted numerous statutes that proscribe schemes or artifices to defraud.  *See* 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 1344(1) (bank fraud), 1347(a)(1) (healthcare fraud), 2314 (transportation of stolen property).  Beyond the context of fraud, Congress has used broad language in other laws, requiring courts to give meaning to its language through interpretation and case-by-case adjudication.  For example, the Racketeer Influenced and Corrupt Organizations Act ("RICO") forbids "conduct[ing] or participat[ing], directly or indirectly, in the conduct of [any] enterprise's affairs through a pattern of racketeering activity."  *Id.* § 1962(c).  RICO's definition of "enterprise" is capacious and general; it extends to "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  *Id.* § 1961(4).  Likewise, RICO defines a "pattern of racketeering activity" as "at least two acts of racketeering activity."  *Id.* § 1961(5).  Congress did not give further meaning to "enterprise", nor did it further elaborate what was meant by a "pattern."  The Supreme Court has recognized that "RICO is to be read broadly.  This is the lesson not only of Congress' self-consciously expansive language and overall approach, but also of its express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes.'"  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479,

497–98 (1985) (citation omitted) (quoting Pub. L. 91–452, § 904(a), 84 Stat. 947).  Much like the

federal fraud statutes, RICO requires interpretation to effectuate the prohibition on racketeering

because any attempt to list the features of organized criminal enterprises would render that

prohibition easy to evade.  *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 248 (1989)

("Congress realized that the stereotypical view of organized crime as consisting in a

circumscribed set of illegal activities . . . was no longer satisfactory because criminal activity had

expanded into legitimate enterprises. . . .  Congress [therefore] drafted RICO broadly enough to

encompass a wide range of criminal activity, taking many different forms.").  If the securities

laws are unconstitutional delegations of legislative authority to the courts, then so too are many

of the federal government's essential tools for combatting crime.

To avoid this conclusion, M. Shvartsman suggests that insider trading law is uniquely

improper because Congress has "attempt[ed] three times to try to pass a law of insider trading,"

yet those efforts "failed to yield any law."  Dkt. No. 56 at 9–10 (citing H.R. 2655, 117th Cong.

(2021); H.R. 2534, 116th Cong. (2019); and H.R. 1625, 114th Cong. (2015)).  In urging passage

of the most recent of these bills, Representative James Himes of Connecticut—who sponsored all

three—voiced his view that the "vast body of court-made law around insider trading" is "an

abrogation of the legislative responsibilities of the United States Congress" because "it is, in fact,

the elected legislators of this country and not the judges, as important as their role may be, who

should determine what we consider wrong in statute and what we punish people for doing."  167

Cong. Rec. H2461 (daily ed. May 18, 2021) (statement of Rep. Himes).

The Government retorts that "the Congressional Record that Shvartsman asks this Court

to consider is replete with the opposite acknowledgement—that prohibitions on insider

trading . . . already exist."  Dkt. No. 66 at 7.  For example, in discussing Representative Himes's

proposed legislation, Representative J. French Hill of Arkansas remarked that "this legislation's intent is to codify, and neither expand nor contract insider trading law as it is currently understood and interpreted by the Federal courts."  167 Cong. Rec. H2461 (daily ed. May 18, 2021) (statement of Rep. French).  He added: "there should not be a single cause of action available under this law that would not otherwise be available to Federal prosecutors or [U.S. Securities and Exchange Commission ("SEC")] enforcement attorneys under the already existing securities laws."  *Id.*; *see also* 166 Cong. Rec. H2972 (daily ed. Dec. 5, 2019) (statement of Rep. Waters) (noting the bill "reflect[s] existing insider trading case law"); *id.* (statement of Rep. Huizenga) ("Current law prohibits trading on material insider information in breach of a fiduciary duty under the antifraud provisions of the Federal securities laws.").

Thus, the parties draw conflicting inferences from Congress's failure to enact Representative Himes's insider trading bills.  M. Shvartsman contends that "Congress simply failed to reach agreement on a prohibition [on insider trading] despite repeated efforts to do so. This, then, is an instance of the legislature trying in good faith, but failing to pass a law; not a delegation or abrogation of its obligations."  Dkt. No. 56 at 12.  But the Government counters that these bills demonstrate that "Congress, for its part, aware of the long line of case law prohibiting insider trading under existing statutes, has not chosen to enact more specific legislation."  Dkt. No. 66 at 7.  The parties' competing inferences illustrate why "failed legislative proposals are 'a particularly dangerous ground on which to rest an interpretation of a prior statute.'"  *United States v. Craft*, 535 U.S. 274, 287 (2002) (quoting *Pension Benefit Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 650 (1990)).  When Congress does not pass a bill, "several equally tenable inferences may be drawn from such inaction, including the inference that the

existing legislation already incorporated the offered change." *Id.* (quoting *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994)).

In *Central Bank of Denver*, for example, the parties disputed whether private liability under § 10(b) of the Securities Exchange Act of 1934 reaches those who aid and abet a violation. 511 U.S. at 167. "[T]o support their differing interpretations of § 10(b)," the parties "advance[d] competing arguments based on . . . post–1934 legislative developments." *Id.* at 185. On the one hand, the petitioner stressed that "bills were introduced that would have amended the securities laws" to explicitly establish aiding and abetting liability and argued that "these proposals reveal that those Congresses interpreted § 10(b) not to cover aiding and abetting." *Id.* at 186–87. But the Court rejected the petitioner's argument, noting that congressional inaction is inherently equivocal. *Id.* at 187. On the other hand, the respondents asserted that Congress's refusal to amend the Securities Exchange Act showed "acquies[ence] in the judicial interpretation of § 10(b)." *Id.* at 186. Again, the Court disagreed: "It is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of the [courts'] statutory interpretation." *Id.* (alteration in original) (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 175, n. 1 (1989)). *See generally Helvering v. Hallock*, 309 U.S. 106, 121 (1940) (Frankfurter, J.) ("[W]e walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle.").

In addition to these functional concerns with discerning meaning from congressional inaction, relying on unsuccessful bills subverts the formal requirements of Article I. Outside "narrowly and precisely defined" areas in which "either House of Congress [can] act alone," legislative action is "subject to the standards prescribed in Article I[: t]he bicameral requirement, the Presentment Clauses, the President's veto, and Congress's power to override a veto." *INS v.*

*Chadha*, 462 U.S. 919, 955, 957 (1983); *see also Gundy*, 139 S. Ct. at 2134 (Gorsuch, J.,

dissenting).  Because a failed bill does not satisfy these strictures, "[c]ongressional inaction

cannot amend a duly enacted statute."  *Patterson*, 491 U.S. at 175 n.1.

Accordingly, the three bills on which M. Shvartsman relies "lack[] 'persuasive

significance.'"  *Pension Benefit Guar. Corp.*, 496 U.S. at 650 (quoting *United States v. Wise*, 370

U.S. 405, 411 (1962)).  While they do not confirm that Congress has acquiesced in the Supreme

Court's insider trading jurisprudence, they do not demonstrate that insider trading falls outside

the ambit of existing securities laws either.  Nor is Representative Himes's characterization of

insider trading jurisprudence as "court-made law" dispositive, 167 Cong. Rec. H2461 (daily ed.

May 18, 2021) (statement of Rep. Himes), as "the interpretation given by one Congress (or a

committee or Member thereof) to an earlier statute is of little assistance in discerning the

meaning of that statute," *Cent. Bank of Denver*, 511 U.S. at 185 (quoting *Pub. Emps. Ret. Sys. of

Ohio v. Betts*, 492 U.S. 158, 168 (1989)).

In sum, the Court concludes that criminal prohibitions on insider trading are

interpretations of broadly worded statutory proscriptions on securities fraud.  Construing

statutes—even those that require "the judiciary to decide whether, in a given case, particular acts

come within a generic statutory provision," *Standard Oil Co.*, 221 U.S. at 69—is a

characteristically judicial task that fundamentally differs from legislating, *Nw. Airlines, Inc.*, 451

U.S. at 97.  Although M. Shvartsman avers that three unenacted bills demonstrate that insider

trading doctrine violates the precept that "[i]t is the legislature, not the Court, which is to define a

crime, and ordain its punishment," *Wiltberger*, 18 U.S. at 95, those failed amendments are too

equivocal to prove that the securities laws do not forbid insider trading.  Because courts have

developed insider trading prohibitions by interpreting validly enacted statutes, insider trading doctrine comports with Article I of the Constitution and the separation of powers.

## II.     M. Shvartsman's Motion to Dismiss Pursuant to the Due Process Clause

Next, M. Shvartsman argues that "as applied to any conduct viewed as trading on material nonpublic information, the statutes at issue (and Rule 10b-5) are void for vagueness, [so] the Indictment should be dismissed."  Dkt. No. 56 at 18.  In response, the Government contends that an as-applied challenge is premature before trial and that "[s]uch a challenge would clearly fail, in any event."  Dkt. No. 66 at 18.

"The void-for-vagueness doctrine derives from the constitutional guarantee of due process, which requires that a penal statute define a criminal offense '[1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.'"  *Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir. 2010) (alteration in original) (quoting *Skilling v. United States*, 561 U.S. 358, 402 (2010)); *see also Reynolds v. Quiros*, 25 F.4th 72, 96 (2d Cir. 2022).  "The 'touchstone' of the notice prong 'is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.'"  *Mannix*, 619 F.3d at 197 (quoting *Lanier*, 520 U.S. at 267).  To satisfy the "arbitrary enforcement prong," a statute must "give 'minimal guidelines to law enforcement authorities, so as not to 'permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections.'"  *Id.* (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).  "Statutes carrying criminal penalties or implicating the exercise of constitutional rights are subject to a more stringent vagueness standard than are civil or economic regulations.  However, the statute need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth."  *United States v. Dawkins*, 999 F.3d 767, 787 (2d Cir. 2021) (cleaned up).

19

"A law or regulation may be challenged as void-for-vagueness either on its face or as applied." *Union Square Supply Inc. v. De Blasio*, 572 F. Supp. 3d 15, 21 (S.D.N.Y. 2021). "The claim in a facial challenge is that a statute is so fatally indefinite that it cannot constitutionally be applied to anyone." *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018). "[A] facial vagueness challenge carries a significant burden: 'the challenger must establish that no set of circumstances exists under which the Act would be valid.'" *United States v. Requena*, 980 F.3d 30, 39 (2d Cir. 2020) (quoting *Copeland*, 893 F.3d at 110). By contrast, in an as-applied challenge, a party "professes that the law in question 'cannot constitutionally be applied to the challenger's individual circumstances.'" *Id.* (quoting *Copeland*, 893 F.3d at 110). When a "statute is judged on an as applied basis, one whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness." *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir. 1993). However, "all vagueness challenges—whether facial or as-applied—require us to answer two separate questions: whether the statute gives adequate notice, and whether it creates a threat of arbitrary enforcement." *Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2006) (Sotomayor, J.).

As an initial matter, M. Shvartsman explicitly disclaims any facial challenge to the anti-fraud provisions of the securities laws: "Mr. Shvartsman's constitutional challenge is to be distinguished from a general claim that Section 10(b) of the Exchange Act or 18 U.S.C. Section 1348 are unconstitutional on their face or void for vagueness as a *general* matter." Dkt. No. 70 at 6 (emphasis in original). Indeed, courts generally do not permit facial vagueness challenges outside the First Amendment context. *See United States v. Holcombe*, 883 F.3d 12, 17 (2d Cir. 2018) ("Where, as here, First Amendment rights are not implicated, we evaluate such a challenge 'in light of the specific facts of the case at hand' and not with regard to the facial validity of the

criminal statute or regulation at issue." (quoting *Nadi*, 996 F.2d at 550)). *But see Requena*, 980 F.3d at 40 n.5 ("Certain of our decisions' unequivocal language notwithstanding, we have declined to endorse wholesale the proposition that facial challenges are entirely foreclosed outside the First Amendment context." (citations omitted)).

Yet M. Shvartsman also states that his challenge is not an ordinary as-applied challenge. Dkt. No. 70 at 6 ("While the defense motion used the phrase 'as applied,' . . . the motion was using the words for a different purpose."). Had M. Shvartsman brought such a challenge, the Court would have "denied [it] as premature." *United States v. Avenatti*, 432 F. Supp. 3d 354, 366 (S.D.N.Y. 2020). "An implicit requirement of [the vagueness] test is that it must be clear what the defendant did." *United States v. Raniere*, 384 F. Supp. 3d 282, 320 (E.D.N.Y. 2019) (citation omitted). Consequently, "the Court requires full factual development at trial before it can determine whether the [relevant] statutes failed to provide Defendant fair warning that his conduct was prohibited by law, as required by the Due Process Clause." *United States v. Phillips*, 2023 WL 5671227, at *13 (S.D.N.Y. Sept. 1, 2023); *see also Avenatti*, 432 F. Supp. 3d at 366; *United States v. Hoskins*, 73 F. Supp. 3d 154, 166–67 (D. Conn. 2014); *United States v. Milani*, 739 F. Supp. 216, 217 (S.D.N.Y. 1990) ("In the absence of a plenary trial record this Court is unable to rule on whether the statute is impermissibly vague as applied to defendant.").

According to M. Shvartsman, his vagueness argument defies the distinction between facial and as-applied challenges, because he "submits that the constitutional statute becomes void for vagueness when it is applied to criminalize insider trading." Dkt. No. 70 at 6. But a party cannot "disclaim a full-fledged facial challenge" and instead "use the term 'as applied' in an idiosyncratic way" in order to "avoid the rule that a statute is not vague on its face unless it is vague in all applications." *Copeland*, 893 F.3d at 113. Faced with a purportedly as-applied

challenge that did not assert "that the statute cannot lawfully be applied to [the challengers']
personal facts and circumstances," but rather averred "that the statute cannot lawfully be applied
to a broad class of [conduct] that could be [performed] by anyone," the Second Circuit
disregarded the argument's form in favor of its substance:  "The sweeping relief sought and the
method of proof advanced persuade us that this is a facial challenge."  *Id.*  The same is true here.
M. Shvartsman urges the Court to invalidate *all* criminal prohibitions on insider trading, Dkt. No.
56 at 12–13, and eschews any reference to the factual circumstances of *his* alleged violations, *see
id.* at 13–18.  Thus, despite M. Shvartsman's characterization of his argument as concerning the
application of the securities laws, the substance of his motion confirms that he brings a facial
challenge.

But even if the Court were to entertain a facial challenge outside the First Amendment
context and to confine that facial challenge to insider trading, M. Shvartsman's void-for-
vagueness argument would still fail, as he cannot show that there is no set of circumstances
under which the proscription on insider trading would satisfy due process.[5]

First, the securities laws' anti-fraud provisions provide "fair notice" of the prohibition on
insider trading.  *United States v. Halloran*, 821 F.3d 321, 337 (2d Cir. 2016) (quoting *United
States v. Rosen*, 716 F.3d 691, 699 (2d Cir. 2013)).  M. Shvartsman asserts that notice must
derive from statutory text, rather than case law.  Dkt. No. 70 at 8 ("Caselaw is simply no
substitute for legislation.").  In essence, he claims that Congress must have prohibited insider
trading *in haec verba.*  But binding authority dictates otherwise.  "[C]larity at the requisite level

---

[5] Although "[t]he Supreme Court has recognized three circumstances in which a statute that is
not necessarily vague in all applications may nonetheless be void for vagueness on its face,"
*Requena*, 980 F.3d at 39, M. Shvartsman does not—and cannot—argue that any of those
exceptional circumstances are present here.

may be supplied by judicial gloss on an otherwise uncertain statute." *Lanier*, 520 U.S. at 266; *see United States v. Smith*, 985 F. Supp. 2d 547, 588 (S.D.N.Y. 2014) ("Importantly, it is not only the language of a statute that can provide the requisite fair notice; judicial decisions interpreting that statute can do so as well."), *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016); *see also United States v. Benjamin*, __ F.4th ___, 2024 WL 995569, at *10 (2d Cir. 2024) ("[T]he applicable statute, as well as [two Supreme Court decisions], provided sufficient notice that the alleged exchange in this case was prohibited.").  After all, the guiding inquiry is "whether the statute, either standing alone *or as construed*, made it reasonably clear at the relevant time that the defendant's conduct was criminal."  *United States v. Napout*, 963 F.3d 163, 181 (2d Cir. 2020) (emphasis added) (quoting *Halloran*, 821 F.3d at 338).  And precedent is clear that certain acts of insider trading constitute securities fraud—for example, trading in securities on the basis of MNPI in violation of a duty of confidentiality imposed by a nondisclosure agreement, *see United States v. Chow*, 993 F.3d 125, 138–39 (2d Cir. 2021), and trading in securities on the basis of MNPI received as a tip when the tippee knows that the tipper breached a fiduciary duty by disclosing that information, *see Salman*, 580 U.S. at 51 (rejecting a tippee's as-applied void-for-vagueness challenge).[6]  Furthermore, to violate 15 U.S.C. § 78ff(a), a defendant must "willfully" violate the securities laws by "breach[ing] a recognized duty." *O'Hagan*, 521 U.S. at 665–66; *see also* 15 U.S.C. § 78ff(a) ("[N]o person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation.").  "[T]he presence of this scienter requirement

---

[6] M. Shvartsman urges the Court to disregard *Salman* "because the case was decided before Congress tried, and failed, three times to pass an insider trading law, sponsored by a congressman who insisted that Congress fulfill its Article I obligations."  Dkt. No. 70 at 6.  But for the reasons discussed *supra*, those unenacted bills did not abrogate *Salman*.

undercuts any due process void for vagueness challenge." *United States v. Little*, 2017 WL
1743837, at *7 (S.D.N.Y. May 3, 2017); *see United States v. McGee*, 892 F. Supp. 2d 726, 734–
35 (E.D. Pa. 2012), *aff'd*, 763 F.3d 304 (3d Cir. 2014).

Second, the securities laws' criminal prohibitions on insider trading do not invite
"arbitrary and discriminatory prosecutions." *Napout*, 963 F.3d at 181 (quoting *Halloran*, 821
F.3d at 338). The elements of securities fraud under both Title 15, *see Nicholson v. United
States*, 2014 WL 4693615, at *7 (S.D.N.Y. Sept. 22, 2014) (Sullivan, J.), *aff'd*, 638 F. App'x 40
(2d Cir. 2016), and Title 18, *see United States v. Mahaffy*, 693 F.3d 113, 125 (2d Cir. 2012), are
well established. Because the Government must prove each of those elements to prevail in an
insider trading prosecution, they ensure that the Government does not have "'virtually unlimited'
or 'unfettered' discretion" to penalize insider trading. *Smith*, 985 F. Supp. 2d at 589 (quoting
*United States v. Lahey*, 967 F. Supp. 2d 731, 743 (S.D.N.Y. 2013)); *see United States v. Motz*,
652 F. Supp. 2d 284, 295 (E.D.N.Y. 2009) ("[T]he requisite elements of the statute are
straightforward. . . . The Court finds that this standard is sufficiently clear to prevent the
arbitrary or discriminatory application of 18 U.S.C. 1348."); *United States v. Melvin*, 143 F.
Supp. 3d 1354, 1371–72 (N.D. Ga. 2015) (same), *aff'd*, 918 F.3d 1296 (11th Cir. 2017).
Defendant correctly observes that in insider trading cases "within the Second Circuit in the past
ten years . . . thoughtful judges [have] disagreed on what conduct is prohibited." Dkt. No. 56 at
15; *see id.* at 15–17 (surveying recent case law). However, "divergence in panel or circuit views
of a statute, criminal or otherwise, is inherent—and common—in our [judicial] system [and]
does not establish vagueness." *United States v. Rybicki*, 354 F.3d 124, 143 (2d Cir. 2003) (en
banc); *see also United States v. Morrison*, 686 F.3d 94, 104 (2d Cir. 2012) ("[I]t is manifest that
conflicts between courts over the interpretation of a criminal statute do not in and of themselves

render that statute unconstitutionally vague."); *Small v. Bud-K Worldwide, Inc.*, 895 F. Supp. 2d 438, 448 (E.D.N.Y. 2012) (Bianco, J.) (collecting cases), *aff'd sub nom. Small v. Rice*, 546 F. App'x 41 (2d Cir. 2013). Judicial disagreements demonstrate that applying anti-fraud provisions to concrete insider trading cases can "be difficult," but "[t]hat alone cannot render 'shapeless' a federal criminal prohibition, for even clear rules 'produce close cases.'" *Salman*, 580 U.S. at 51 (quoting *Johnson v. United States*, 576 U.S. 591, 601–02 (2015)); *see also Mannix*, 619 F.3d at 197. Because the anti-fraud provisions of the securities laws impose clear barriers to arbitrary prosecutions, insider trading law does not "permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender*, 461 U.S. at 358.

Thus, even if M. Shvartsman's idiosyncratic challenge to criminal prohibitions on insider trading were permissible, he has not shown that those prohibitions are void for vagueness under the Due Process clause.

## III.  M. Shvartsman's Motion to Dismiss Due to Misconduct Before the Grand Jury

M. Shvartsman further contends that the Court must dismiss the Indictment because the Government misled the grand jury as to a significant fact. Dkt. No. 56 at 27. He notes that the Indictment quoted an apparently incriminating text that Garelick sent him—"GARELICK texted MICHAEL SHVARTSMAN that he had 'intelligence to share with you,'" Dkt. No. 1 ¶ 12(b)— but that "[t]he government has since admitted the text had nothing to do with DWAC," Dkt. No. 56 at 27. In the alternative, M. Shvartsman urged the Court to conduct an *in camera* review of the grand jury materials, *id.* at 31, and assess "how such information was presented to the Grand Jury," *id.* at 30.

On January 25, 2024, the Court granted M. Shvartsman's request "for the Court to conduct an *in camera* inspection of the grand jury materials" and directed the Government "to provide the Court with a transcript of all testimony given to the grand jury pertinent to

paragraphs 8, 10, 12, and 13 of the Indictment—as well as copies of any exhibits presented to the grand jury in connection with that testimony."  Dkt. No. 73.  The Government complied the following day, but notified both the Court and Defendants that it intended "to seek a superseding indictment . . . [and] present the superseding indictment to a different grand jury than the grand jury that returned the original Indictment, without the error complained of by the defendants."  Dkt. No. 75.  On February 6, 2024, the second grand jury returned the Superseding Indictment, which omitted the challenged text message from Garelick to M. Shvartsman.  Dkt. No. 81 ¶ 12(b).

When assessing a non-constitutional grand jury error like the Government's presentation of the misleading text message here, "dismissal of the indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations."  *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (quoting *United States v. Mechanik*, 475 U.S. 66, 78 (1986)); *see also United States v. Murphy*, 2023 WL 3098490, at *4 (S.D.N.Y. Apr. 26, 2023) (Sullivan, J., sitting by designation).  M. Shvartsman cannot establish prejudice, however, because the Government obtained the Superseding Indictment from "a new *unbiased* and *independent* grand jury" that was not exposed to the misleading text.  *United States v. Acquest Dev., LLC*, 932 F. Supp. 2d 453, 462 (W.D.N.Y. 2013) (emphasis in original) (citation omitted).  As a result, the Superseding Indictment cured any defect in the original grand jury proceedings.  *See United States v. Bok*, 1997 WL 148815, at *3 (S.D.N.Y. Mar. 27, 1997) ("[E]ven if the original Indictment was in some way defective, the returning of a Superseding Indictment by a different grand jury cures any prejudice to the defendant that may have been caused by an improper original Indictment."); *see also United*

*States v. Marrero*, 643 F. App'x 233, 237 (3d Cir. 2016); *United States v. Collins*, 300 F. App'x 663, 666 (11th Cir. 2008).

Moreover, the Court has reviewed the minutes and exhibits from the Government's presentation to the original grand jury and "finds that the alleged inaccuracies did not 'substantially influence' the grand jur['s] decision to indict." *United States v. Torres*, 1994 WL 48820, at *4 (S.D.N.Y. Feb. 16, 1994) (quoting *Bank of Nova Scotia*, 487 U.S. at 256), *aff'd*, 48 F.3d 1214 (2d Cir. 1994). Those materials demonstrate that the misleading text message was not "material to the grand jury's decision to indict," *United States v. McGrady*, 2021 WL 4846221, at *3 (W.D.N.Y. Oct. 18, 2021); *United States v. Rodriguez*, 2022 WL 2805536, at *5 (S.D.N.Y. July 18, 2022), so the Government's presentation of that message to the original grand jury was "not prejudicial," *Bank of Nova Scotia*, 487 U.S. at 255. Accordingly, even if the Government had not obtained the Superseding Indictment, dismissal of the Indictment for misconduct before the grand jury would be improper.

## IV.   M. Shvartsman's Motion to Suppress and Hold an Evidentiary Hearing Due to Pre- and Post-Indictment Contacts

M. Shvartsman also moves to suppress statements he made to a confidential informant ("CI") both before and after the grand jury returned the Indictment, as well as the fruits of those statements. Dkt. No. 56 at 19. He contends: "As to conduct post-indictment, Mr. Shvartsman's Sixth Amendment rights were violated and any and all statements and fruits thereof must be suppressed. As to pre-indictment conduct, the Court should hold an evidentiary hearing to determine whether the conduct qualifies as 'egregious misconduct' and, if so, determine the appropriate remedy." *Id.* The Government responds that because the CI contacted M. Shvartsman as part of what was then a separate investigation into suspected money laundering,

his communications with the CI did not implicate the Sixth Amendment.  Dkt. No. 66 at 27–28.[7]
Additionally, the Government asserts that the CI's pre-Indictment contacts with M. Shvartsman
were authorized by law and therefore consistent with ethical rules.  *Id.* at 28.

### A.   Factual Background

In December 2022, Homeland Security Investigations ("HSI") within the Department of
Homeland Security launched an investigation "to determine if [M.] SHVARTSMAN, and/or
associates, conducted illicit financial transactions in relation to the proceeds from insider trading
or any other criminal activity."  Dkt. No. 60-1 at 1.  An HSI Report of Investigation indicates
that M. Shvartsman contacted the CI regarding "establishing and/or managing a trust and other
financial activities."  *Id.* at 2.  The CI then arranged a meeting with M. Shvartsman "to discuss
[the CI's] potential role in managing a trust for alleged illicit funds and possible other money
laundering activities."  *Id.*  They met on December 14, 2022 in a hotel at Miami International
Airport.  Dkt. No. 60-2 at 2.  The CI wore a hidden recording device.  *Id.*  During their meeting,
they discussed M. Shvartsman's interest in offshoring certain assets to Belize and Switzerland.
*Id.*

The CI secretly recorded another meeting with M. Shvartsman at Rocket One's office in
Aventura, Florida, on March 15, 2023.  Dkt. No. 60-4 at 2.  Michael Park, Rocket One's general
counsel, was also present for that meeting.  *Id.*  The CI, M. Shvartsman, and Park discussed how
transferring assets to an LLC in Belize could conceal and protect those assets from "actions that
could be taken by the SEC" and others.  *Id.* at 3.  At one point, M. Shvartsman "left the room for
a short duration."  *Id.* at 2.  With M. Shvartsman absent, the CI and Park spoke about the SEC's

---

[7] At the time of the contact and at the time of the Government's brief, the investigation was
separate.  But as noted above, the Government has since filed a Superseding Indictment based on
the fruits of the money-laundering investigation.

investigation into potential insider trading in DWAC securities, *id.* at 3, and Park expressed his belief that the investigation was politically motivated, Dkt. No. 57-6 at 46:12–18.

On March 22, 2023, the U.S. Attorney's Office for the Southern District of Florida served a subpoena on a Florida entity, seeking documents regarding a wire transfer from Rocket X Capital LLC in connection with an HSI investigation. Dkt. No. 57-7. On April 13, 2023, an attorney representing M. Shvartsman and Rocket X Capital LLC contacted an Assistant U.S. Attorney of the Southern District of Florida, informed him that the attorney represented both M. Shvartsman and Rocket X Capital LLC, and inquired about the grand jury subpoena.[8] Dkt. No. 57 ¶ 11.

The CI met with M. Shvartsman and Park again on April 28, 2023, over lunch at a restaurant in Miami. *Id.* ¶ 12; Dkt. No. 57-8. They continued to discuss moving assets abroad. Dkt. No. 57-8 at 1:4–6. When the CI asked M. Shvartsman about the SEC's investigation into insider trading, he responded that there was "nothing . . . to be concerned about during the course of the decanting of the assets." *Id.* at 2:21–23.

Two months later, on June 26, 2023, the grand jury returned the sealed Indictment. Dkt. No. 1. Defendants were arrested in Miami on June 29, 2023, Dkt. No. 60-5 at 2, and the Indictment was unsealed, Dkt. No. 2. However, the CI continued to communicate with M. Shvartsman and Park. They had a phone call on July 27, 2023 that the CI recorded. Dkt. No. 57-10. During that call, the CI recommended transferring M. Shvartsman's assets across multiple jurisdictions before providing them to the LLC in Belize. *Id.* at 2:13–23; *see id.* at 5:4–8 ("[Hong Kong] is the big washing machine, if you like, where they go into a deep wash. When

---

[8] Although the Government asserts that the Assistant U.S. Attorney "does not recall" Rocket X Capital's attorney stating that he also "represented Shvartsman," Dkt. No. 66 at 24, the Government does not offer any evidence in support of that assertion.

they come out, they go to the UK and to their, to their end – to the end of the journey in Belize where you want them.").  When the CI asked whether there was "anything linked to the SEC that we need to be aware [of,]" M. Shvartsman replied that "all of these assets have nothing to do with that matter."  *Id.* at 16:23–17:1.  The CI had additional contacts with M. Shvartsman and Park throughout the following month, with phone calls on August 1 and 9, 2023, Dkt. No. 57-11, and a meeting in Bal Harbour, Florida on August 23, 2023, Dkt. No. 57-12.

### B.     Sixth Amendment

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  "[T]he Sixth Amendment imposes on the government an affirmative obligation not to solicit incriminating statements from the defendant in the absence of his counsel."  *United States v. Siri-Reynoso*, 807 F. App'x 103, 106 (2d Cir. 2020) (summary order) (quoting *United States v. Rosa*, 11 F.3d 315, 329 (2d Cir. 1993)).  The government breaches that obligation by "tak[ing] some action that was designed deliberately to elicit incriminating remarks."  *Id.* (quoting *Rosa*, 11 F.3d at 329).  Additionally, "government interference in the relationship between attorney and defendant may violate the latter's right to effective assistance of counsel."  *United States v. Simels*, 654 F.3d 161, 166 (2d Cir. 2011) (quoting *United States v. Ginsberg*, 758 F.2d 823, 833 (2d Cir. 1985)).  "[T]o prove a Sixth Amendment violation where an informant attended defense strategy sessions, a defendant must 'establish that privileged information had been passed to the government or that the government had intentionally invaded the attorney client relationship, and resulting prejudice.'"  *United States v. Chandler*, 56 F.4th 27, 37 (2d Cir. 2022) (quoting *United States v. Dien*, 609 F.2d 1038, 1043 (2d Cir. 1979)).

"But in order to show a violation of the Sixth Amendment, [a defendant] must establish that his Sixth Amendment right had 'attached' at the time of its claimed violation."  *United*

*States v. Gumaer*, 765 F. App'x 608, 613 (2d Cir. 2019) (summary order).  "[I]t is 'firmly

established that a person's Sixth . . . Amendment right to counsel attaches only at or after the

time that adversary judicial proceedings have been initiated against him.'"  *United States v.*

*Stern*, 313 F. Supp. 2d 155, 165 (S.D.N.Y. 2003) (Lynch, J.) (quoting *Kirby v. Illinois*, 406 U.S.

682, 688 (1972)); *see also Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191, 198 (2008) ("The

Sixth Amendment right of the 'accused' to assistance of counsel in 'all criminal prosecutions' is

limited by its terms: 'it does not attach until a prosecution is commenced.'" (quoting *McNeil v.*

*Wisconsin*, 501 U.S. 171, 175 (1991))).  Thus, "[a]ttachment of the Sixth Amendment right to

counsel occurs 'only when formal judicial proceedings are initiated against an individual by way

of indictment, information, arraignment, or preliminary hearing.'"  *Gumaer*, 765 F. App'x at 613

(quoting *United States v. Gouveia*, 467 U.S. 180, 185 (1984)).

Another fundamental limitation on the Sixth Amendment right to counsel is that it "'is

offense specific,' meaning that even when the right to counsel attaches for one offense, that does

not mean that the defendant has a right to counsel for all ongoing criminal investigations."

*United States v. Moore*, 670 F.3d 222, 235 (2d Cir. 2012) (quoting *Texas v. Cobb*, 532 U.S. 162,

164 (2001)).  However, "the definition of an 'offense' is not necessarily limited to the four

corners of a charging instrument."  *Cobb*, 532 U.S. at 173.  Rather, to determine whether two

crimes constitute a single offense for purposes of the Sixth Amendment, a court must apply the

*Blockburger* test developed in double jeopardy jurisprudence: "where the same act or transaction

constitutes a violation of two distinct statutory provisions, the test to be applied to determine

whether there are two offenses or only one, is whether each provision requires proof of a fact

which the other does not."  *Id.* (quoting *Blockburger v. United States,* 284 U.S. 299, 304 (1932));

*see Moore*, 670 F.3d at 235.

M. Shvartsman's Sixth Amendment right to counsel did not attach until the original grand jury returned the Indictment, and even then it attached only as to the charges in that Indictment. *See United States v. Bing Yi Chen*, 433 F. App'x 14, 15 (2d Cir. 2011) (summary order) ("The Sixth Amendment right to counsel attaches upon indictment."). The mere fact that M. Shvartsman received a subpoena and retained counsel prior to the Indictment was insufficient to trigger that right. *See United States v. Mapp*, 1996 WL 506933, at *8 (E.D.N.Y. Sept. 3, 1996) ("[E]ven if an individual is the target of a grand jury and has retained counsel, . . . the Sixth Amendment right to counsel has not yet attached."); *see also In re Grand Jury Subpoena Served Upon Doe*, 781 F.2d 238, 244 (2d Cir. 1986) (en banc) ("At the pre-indictment stage, appellant's Sixth Amendment rights have not attached."). Consequently, the CI's pre-Indictment contacts with M. Shvartsman did not violate the Sixth Amendment.[9] *See Piercy v. Fed. Rsrv. Bank of N.Y.*, 144 F. App'x 897, 900 (2d Cir. 2005) (summary order); *United States v. Corcino*, 2021 WL 4991326, at *4 (S.D.N.Y. Oct. 27, 2021).

As for the CI's post-Indictment contacts with M. Shvartsman—both with and without Park present—the Government contends that its "investigation into money laundering related to a distinct crime" from the offenses charged in the original Indictment. Dkt. No. 66 at 27–28. Accordingly, the Government argues that the CI's contacts fell outside M. Shvartsman's "offense-specific" right to counsel that attached due to the Indictment. *Id.* at 27. In response, M.

---

[9] On March 15, 2024, M. Shvartsman filed a letter stating that the Government had also used a second CI who "presented himself as a lawyer who could provide trust advisory services" as part of its money-laundering investigation. Dkt. No. 97 at 1. M. Shvartsman avers that the second CI began surveilling M. Shvartsman "as early as November of 2022" and was present for the "meeting at Mr. Shvartsman's office on March 15, 2023." *Id.* at 1. But M. Shvartsman's Sixth Amendment right had not attached at either time. And notwithstanding M. Shvartsman's assertion that the second CI met with him "before *and after* his indictment," *id.* (emphasis added), M. Shvartsman has not identified any post-Indictment communication with the second CI—let alone one that amounts to a knowing circumvention of the right to counsel.

Shvartsman avers that "money laundering cannot be separated from the underlying offense; they are inextricably intertwined."  Dkt. No. 70 at 22.  He states that "[m]oney laundering cannot be proven without knowledge of the underlying specified activity that generated the proceeds and purposeful action to hide such criminal proceeds[, so] the *mens rea* element of knowledge and willfulness for insider trading and for money laundering overlap."  *Id.* at 22–23 (citations omitted).

But money laundering is a separate offense from securities fraud or conspiracy to commit securities fraud under the under the *Blockburger* test, because each includes an element that the others do not.  Money laundering "requires proof of some concealing or disguising financial transaction," which is not an element of securities fraud or conspiracy to commit securities fraud. *United States v. El-Difrawi*, 898 F. Supp. 3, 10 (D.D.C. 1995), *aff'd sub nom. United States v. Moheyeldein*, 1995 WL 686255 (D.C. Cir. Oct. 5, 1995).  By contrast, the securities fraud "statutes, of course, require the government to show that the defendant engaged in the fraud itself," *id.*, and "[c]onspiracy to commit securities fraud requires proof of an agreement to commit securities fraud," *United States v. Booth*, 583 F. Supp. 3d 545, 549 (S.D.N.Y. 2022), neither of which is necessary in a money laundering prosecution, *see United States v. Silver*, 948 F.3d 538, 576 (2d Cir. 2020) ("Significantly, an individual need not have been convicted of the underlying criminal offense in order to be convicted of laundering the proceeds thereof." (emphasis omitted)); *United States v. Kozeny*, 493 F. Supp. 2d 693, 706 (S.D.N.Y. 2007) ("The elements of a money laundering offense do not include, or even implicate, the capacity to commit the underlying unlawful activity."), *aff'd*, 541 F.3d 166 (2d Cir. 2008).  As numerous courts have recognized, money laundering is a separate offense from the underlying unlawful activity under the *Blockburger* test.  *See United States v. Rude*, 88 F.3d 1538, 1546 (9th Cir.

1996) ("It is well established, however, that money laundering and wire fraud are separate offenses."); *United States v. Smith*, 46 F.3d 1223, 1234 (1st Cir. 1995) ("Bank fraud and money laundering do not constitute a single offense within the meaning of the test of *Blockburger*."); *El-Difrawi*, 898 F. Supp. at 10; *see also United States v. Mescall*, 624 F. App'x 103, 104 (4th Cir. 2015).  Although securities fraud and "money laundering will often occur together," *United States v. Iacaboni*, 363 F.3d 1, 6 n.8 (1st Cir. 2004), "[t]he test 'emphasizes the elements of the two crimes' not the conduct that will be proved to sustain a conviction—so long as each offense 'requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes,'" *United States v. Hernandez*, 2009 WL 3169226, at *5 (S.D.N.Y. Oct. 1, 2009) (quoting *Brown v. Ohio*, 432 U.S. 161, 166 (1977)); *see United States v. Garavito-Garcia*, 827 F.3d 242, 250 n.52 (2d Cir. 2016).  The elements of money laundering diverge from those of securities fraud and conspiracy to commit securities fraud, so money laundering is a distinct offense from those crimes.

Consequently, the CI's communications with M. Shvartsman in connection with the HSI investigation into potential money laundering did not violate the Sixth Amendment, even after the grand jury returned the Indictment.  The Supreme Court has explained:

> The police have an interest in investigating new or additional crimes after an individual is formally charged with one crime.  To exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities.

*McNeil*, 501 U.S. at 175–76 (cleaned up); *see also United States v. Kavoukian*, 180 F. Supp. 2d 402, 406 (N.D.N.Y. 2002) ("[L]aw enforcement agents have an interest in investigating new or additional crimes, even if the investigations require surveillance of individuals already under indictment.").  Because the CI's contacts with M. Shvartsman and Park concerned money

laundering—a distinct offense from those in the Indictment—those contacts did not violate M. Shvartsman's offense-specific right to counsel. *See United States v. Taveras*, 2006 WL 626248, at *6 (E.D.N.Y. Feb. 22, 2006); *see also United States v. Blackman*, 2023 WL 3346822, at *7–8 (N.D. Ill. May 10, 2023).

Nor did the Government "knowingly circumvent[]" M. Shvartsman's right to counsel for the charges in the Indictment by using the CI to investigate money laundering.[10]   *United States v. Jacques*, 684 F.3d 324, 331 n.4 (2d Cir. 2012) (quoting *Maine v. Moulton*, 474 U.S. 159, 180 (1985)); *see also Massiah v. United States*, 377 U.S. 201, 206 (1964).  M. Shvartsman has only identified a single exchange—a July 27, 2023 phone call—during which he and the CI discussed the alleged DWAC insider trading after the Indictment.[11]  Dkt. Nos. 56 at 21, 70 at 15–16. According to a transcript of the CI's recording of that call, the entirety of that discussion was as follows:

> [CI:] Just before you go, I'm just trying to think if I've got any other questions while I've got you Michael, and Mike.  Yeah.  Once we, once we get going with this – once you give us the relevant details of the beneficiaries – the controlling beneficiaries, if we need to know, is there any specific details of an asset that you may – we may need to separate out?  You don't have to answer that now.  Maybe that's – anything linked to the SEC that we need to be aware –
>
> Shvartsman: In all, in all honesty, all of these assets have nothing to do with that matter.
>
> [CI:] Good.
>
> Shvartsman: I'm actually not –
>
> [CI:] Good.
>
> Shvartsman: I'm actually not at all worried about the SEC and going after any of these assets because, you know, the purported, the purported crime, the funds from

---

[10] M. Shvartsman does not allege that the CI has contacted him about money laundering since the second grand jury returned the Superseding Indictment.

[11] After reviewing M. Shvartsman's factual submissions, the Court agrees that this was the sole post-Indictment discussion pertinent to the insider trading allegations against him.

that didn't buy any of these assets or invested in any assets. I'm actually not worried about that at all.

Dkt. No. 57-10 at 16:14–17:11.

First, although the CI's question mentioned the SEC's investigation into alleged insider trading, that question was limited to whether the assets M. Shvartsman intended to offshore were proceeds of his DWAC trades. Notably, the CI's question did not inquire into the legality of the underlying trades. The CI therefore did not "actively elicit[] statements that are incriminating with respect to the '*charged crimes*'" of the Indictment. *United States v. Espinal*, 96 F. Supp. 3d 53, 63–64 (S.D.N.Y. 2015) (Chin, J.) (emphasis added) (quoting *Jacques*, 684 F.3d at 332); *see also United States v. DeVillio*, 983 F.2d 1185, 1191 (2d Cir. 1993); *Kavoukian*, 180 F. Supp. 2d at 405. Undoubtedly, the CI's question reflects that the suspected money laundering was "factually related" to the charges in the Indictment, but such an overlap is insufficient to render the CI's conduct impermissible. *United States v. Basciano*, 763 F. Supp. 2d 303, 329 (E.D.N.Y. 2011), *aff'd*, 634 F. App'x 832 (2d Cir. 2015); *see also United States v. Garey*, 813 F. Supp. 1069, 1072 (D. Vt. 1993), *aff'd*, 19 F.3d 8 (2d Cir. 1994).

Second, M. Shvartsman's contacts with the CI did not violate his Sixth Amendment right to counsel because he "did not say anything incriminating" in answering the CI's question regarding insider trading. *Espinal*, 96 F. Supp. 3d at 65; *see also Moulton*, 474 U.S. at 176 ("[T]he Sixth Amendment is violated when the State obtains *incriminating statements* by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." (emphasis added)). To the contrary, as M. Shvartsman emphasizes, his answer insisted "that the Informant's trust services would have nothing to do with assets involved in the SEC investigation." Dkt. No. 70 at 15. That statement did not

inculpate him in any of the crimes charged in the Indictment.  Thus, the CI's contacts with M. Shvartsman did not violate his Sixth Amendment right to counsel.

### C.      "No Contact" Ethics Rule

In his challenge under the "no contact" ethics rule, M. Shvartsman urges the Court to "hold a hearing to determine the facts necessary to examine whether the *pre-indictment* contact with a represented party constitutes 'egregious' governmental misconduct, requiring suppression or some other sanction."  Dkt. No. 56 at 23–24 (emphasis in original).  The Government responds that a hearing is unnecessary because the CI's "contacts with Shvartsman were . . . consistent with applicable ethics rules" as a matter of law.  Dkt. No. 66 at 28.

By statute, "[a]n attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State."  28 U.S.C. § 530B; *see United States v. Walker*, 2019 WL 1876873, at *3 (E.D.N.Y. Apr. 26, 2019).  New York Rule of Professional Conduct 4.2(a)[12] states:  "In representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the other lawyer or is authorized to do so by law."  N.Y. R.P.C. 4.2(a); *see Rekor Sys., Inc. v. Loughlin*, 2021 WL 2186439, at *2 (S.D.N.Y. May 28, 2021).

In *United States v. Hammad*, 858 F.3d 834 (2d Cir. 1988), the Second Circuit addressed a defendant's challenge to the government's use of an informant under the predecessor to Rule 4.2.  The prosecutor in *Hammad* had instructed an informant to arrange and record a meeting with the

---

[12] Defendant brings his ethical challenge to the CI's actions under New York Rule of Professional Conduct 4.2.  Dkt. No. 56 at 24.  The Court therefore analyzes his challenge under that Rule, rather than its Floridian analogue.

defendant.  *Id.* at 835.  At that meeting, the informant falsely stated that he had been subpoenaed to appear before a grand jury investigating the defendant.  *Id.* at 836.  Five days later, the informant met with and secretly recorded the defendant once more.  *Id.*  The informant showed the defendant "a sham subpoena supplied by the prosecutor," which the defendant evidently believed was genuine, as he suggested "strategies for [the informant] to avoid compliance."  *Id.*  The defendant subsequently moved to suppress that evidence as violating New York's no contact ethics rule, and the district court granted that motion.  *Id.* at 837.

The Second Circuit reasoned that the no contact ethics rule applied "to the investigatory stages of a criminal prosecution," *id.* at 838, even before the attachment of the Sixth Amendment right to counsel, *see id.* at 839 ("[T]he Constitution prescribes a floor below which protections may not fall, rather than a ceiling beyond which they may not rise.").  And the Circuit determined that the prosecutor had "oversteppe[ed] the already broad powers of his office, and in doing so, violate[d] the ethical precepts" of the no-contact rule by "issu[ing] a subpoena for the informant, not to secure his attendance before the grand jury, but to create a pretense that might help the informant elicit admissions from a represented subject."  *Id.*  Yet the Circuit declined to establish "a bright-line rule" of when investigative conduct violates no-contact obligations, and instead stated that "[t]his delineation is best accomplished by case-by-case adjudication."  *Id.*  Although the Circuit observed that "suppression may be ordered in the district court's discretion" to remedy no-contact violations, *id.* at 840, it noted that "the law was previously unsettled in this area" and therefore concluded "an exclusionary remedy is inappropriate in this case," *id.* at 842.

Throughout *Hammad*, the Second Circuit emphasized that pre-indictment contacts with a represented defendant do not invariably violate New York's no contact rule.  The Circuit "urge[d] restraint in applying the rule to criminal investigations to avoid handcuffing law

enforcement officers in their efforts to develop evidence." *Id.* at 838. And the Circuit underscored that it did "not interpret the disciplinary rule as precluding undercover investigations" entirely. *Id.* at 839. Rather, the Circuit recognized that "the use of informants by government prosecutors in a preindictment, non-custodial situation, *absent the type of misconduct that occurred in this case*, will generally fall within the 'authorized by law' exception to [the no-contact rule] and therefore will not be subject to sanctions." *Id.* at 840 (emphasis added).

In the ensuing decades, courts have interpreted *Hammad* narrowly. Writing for the Second Circuit, Judge Cardamone—a member of the unanimous *Hammad* panel—explained that by its own terms the opinion had "limited [its] holding to the circumstances of that case." *United States v. Schwimmer*, 882 F.2d 22, 29 (2d Cir. 1989). Indeed, "[s]ince *Hammad*, the Second Circuit has urged 'restraint in applying [Rule 4.2(a)] in the pre-indictment context so as not to unduly hamper legitimate law enforcement investigations,' and the district courts within the circuit have heeded that admonition." *United States v. Binday*, 908 F. Supp. 2d 485, 496–97 (S.D.N.Y. 2012) (quoting *Grievance Comm. for the S. Dist. of N.Y. v. Simels,* 48 F.3d 640, 649 (2d Cir. 1995)).

Accordingly, district courts have held that "the pre-indictment, surreptitious recording by a [cooperating informant] of a target known by the Government to be represented by counsel is 'authorized by law' as long as the Government does not engage in 'egregious misconduct.'" *United States v. Nouri*, 611 F. Supp. 2d 380, 385 (S.D.N.Y. 2009) (Chin, J.). In defining "egregious misconduct," courts have confined themselves to the type of deception in *Hammad* by concluding that prosecutors are "authorized by law" to use "an informant to record statements made by a represented target," but cannot "create[] a fake subpoena for the informant to use in

sparking conversation about the subject matter of the investigation." *Binday*, 908 F. Supp. 2d 485, 496; *see Basciano*, 763 F. Supp. 2d at 330 ("The *Hammad* court based its finding of an ethical violation principally on the use of the bogus subpoena."); *United States v. Santopietro*, 809 F. Supp. 1008, 1013 (D. Conn. 1992) ("[T]he record is simply lacking any evidence that over the course of its investigation, the government employed as unfairly deceptive a device as the sham subpoena used in *Hammad*."); *United States v. Harloff*, 807 F. Supp. 270, 276 (W.D.N.Y. 1992) ("[T]he critical element in *Hammad* was the abuse of the grand jury subpoena process by a prosecutor who authorized the issuance of a 'counterfeit grand jury subpoena.'").

The CI's pre-Indictment contacts with M. Shvartsman complied with Rule 4.2(a). Although an attorney notified the Government on April 13, 2023 that he was representing M. Shvartsman in connection with HSI's investigation, the CI's sole meeting with M. Shvartsman and Park after that notice, but prior to the Indictment, occurred in the eminently "non-custodial" setting of a lunch at a Miami restaurant. *Hammad*, 858 F.2d at 840. And, critically, the Government and CI did not engage in any egregious misconduct comparable to the prosecutor's fabrication of a subpoena in *Hammad*. *See United States v. Chestman*, 704 F. Supp. 451, 454 (S.D.N.Y. 1989) (Walker, J.) ("In this case, the recordings were pre-indictment, non-custodial, and occurred in the absence of any 'egregious misconduct'—such as the prosecutor's use in *Hammad* of a sham Grand Jury subpoena—that might support their suppression."). M. Shvartsman avers that the CI's actions exceeded those of a typical informant because the CI posed "as a trustee (presumably bound by fiduciary duties)." Dkt. No. 56 at 26. However, in *United States v. Santopietro*, during a pre-indictment investigation into potential corruption by the mayor of Waterbury, Connecticut, the government directed Waterbury's corporation counsel, an attorney, to serve as an informant and secretly record the mayor. 809 F. Supp. at 1010. In a

subsequent challenge to that tactic, the district court assumed "that an attorney-client relationship existed over the relevant period between the former Mayor and his Corporation Counsel"—such that the corporation counsel owed the mayor fiduciary duties—yet the court held that "the government's investigatory tactics here [do not] constitute the type of misconduct contemplated in *Hammad*, that is, conduct that can be said to fall outside the Rule's 'authorized by law' exception." *Id.* at 1014. Thus, the Government's "use of the CI [here] was a legitimate investigative technique authorized by law under Rule 4.2, and [M. Shvartsman] has not alleged any facts that persuade the Court otherwise."[13] *United States v. Taylor*, 17 F. Supp. 3d 162, 174 (E.D.N.Y. 2014), *aff'd*, 802 F. App'x 604 (2d Cir. 2020).

Because the undisputed facts establish that the CI's pre-Indictment contacts with M. Shvartsman were permissible under Rule 4.2(a), the Court denies his request for an evidentiary hearing on that issue. *See United States v. Fernandez*, 2000 WL 991667, at *2 (S.D.N.Y. July 19, 2000) ("It is unnecessary to hold a hearing on a motion to suppress where the defendant's papers do not 'state sufficient facts which, if proven, would . . . require[] the granting of the relief requested.'" (quoting *United States v. Culotta*, 413 F.2d 1343, 1345 (2d Cir. 1969))); *United States v. Tracy*, 1995 WL 522807, at *6 n.8 (W.D.N.Y. Aug. 24, 1995).

## V.    Garelick's Motion to Suppress

Garelick contends that the Government violated his Fifth Amendment right against self-incrimination by "coerc[ing him] into disclosing the password to his cellphone" when he entered into the United States at John F. Kennedy International Airport ("JFK") on the night of

---

[13] These considerations apply *mutatis mutandis* to the second CI that M. Shvartsman describes in his March 15, 2024 letter, Dkt. No. 97: M. Shvartsman has not identified any contacts he had with the second CI after April 13, 2023; and the fact that the second CI presented himself as an attorney who could provide trust advisory services does not constitute egregious misconduct for purposes of *Hammad*.

December 31, 2021.  Dkt. No. 52 at 1.  Garelick also asserts that the Government violated *Miranda* by failing to warn him of his rights during that interrogation.  He therefore argues that his compelled statement, and the fruits of thereof, must be suppressed.  *Id.*  The Government responds that Garelick's disclosure of his passcode was not an incriminating testimonial statement under the Fifth Amendment, Dkt. No. 66 at 37, and "[e]ven if he could show that he made an incriminating testimonial statement, his motion . . . fails because none of his statements were compelled," *id.* at 39.  Additionally, the Government denies that suppression is warranted under *Miranda*.  *Id.* at 44.

### A.    Relevant Testimony

The Court held an evidentiary hearing on Garelick's motion to suppress on February 8, 2024.  Dkt. No. 73.  Two witnesses testified: U.S. Customs Officer Justo Gonzalez and FBI Examiner Christian Isolda.

Officer Gonzalez described the secondary inspection of Garelick on December 31, 2021, *see* Feb. 8, 2024 Hearing Transcript ("Hearing Tr.") 23:1, shortly after Garelick arrived at Terminal 5 of JFK on a flight from Cancún, Mexico, *id.* at 24:7–13.  Approximately an hour before Garelick's flight landed, Task Force Officer Anthony Apath—Customs and Border Protection's liaison with the FBI—told Officer Gonzalez to conduct a "normal routine inspection [of Garelick] and obtain his electronic device."  *Id.* at 23:8–9, 23:20–22, 25:5–6.  Gonzalez was informed that the FBI was onsite because of an insider trading investigation, but he was not told anything further about why the FBI wanted his cellphone or the nature of that investigation.  *Id.* at 23:10–19, 55:7–56:5.[14]  At the time, Gonzalez was wearing his Customs and Border Protection uniform, with his handgun holstered but visible.  *Id.* at 25:11–26:5, 79:22–23.

---

[14] On his own initiative, Officer Gonzalez reviewed information in Customs and Border Protection's system and learned that the investigation involved DWAC, and he looked up public

Officer Gonzalez first encountered Garelick as Garelick entered the secondary inspection area, *id.* at 26:7–8, which is a 10- to 45-second walk from the primary inspection point, *id.* at 27:1–7, 58:21–59:17, where all passengers arriving in the United States provide their passports to Customs officers, *id.* at 22:13–30.  The secondary inspection area is a fifteen-by-twenty foot room with a door open to the remainder of the terminal.  *Id.* at 26:20–25.  When Garelick arrived, there were other passengers in the secondary inspection room, as well as three other Customs and Border Protection agents and Task Force Officer Apath.  *Id.* at 27:8–18.  The room had bottled water and restrooms available for passengers.  *Id.* at 29:11–15.

Garelick entered the secondary inspection area by himself.  *Id.* at 27:21–22.  He was neither handcuffed nor restrained, and the door was not closed behind him.  *Id.* at 28:18–24.  Although it was "presumed" that he would not be able to leave until the inspection was complete, he was never told that.  *Id.* at 28:25–29:7, 79:19–21.

After he entered the room, Garelick was told to have a seat and wait until he was processed.  *Id.* at 29:16–18.  He took a seat in the front pew and waited until his name was called.  *Id.* at 29:19–25.  Once Officer Gonzalez finished processing the other passengers to whom he was assigned, he called Garelick by name.  *Id.* at 30:1–11.  Garelick approached the station where Officer Gonzalez was working and Officer Gonzalez asked him the standard "five Ws," questions which Officer Gonzalez asks every passenger subject to secondary inspection: why the passenger traveled, where the passenger stayed, whom the passenger travelled and met with, when the passenger bought the ticket, and what the passenger does for a living.  *Id.* at 30:10–21, 61:13–14.  In that respect, Officer Gonzalez did not treat Garelick differently than any other passenger subject to a secondary inspection.  *Id.* at 46:18–23.  Garelick responded with his

---

information on Garelick and his employment.  Hearing Tr. 57:10–20, 68:3–5.

email address, phone numbers, and address, as well as where he met his girlfriend and the names of the hotels in which he had stayed in Mexico.  *Id.* at 31:3–9.  He also stated that he was a venture capitalist.  *Id.* at 31:11.  At some point during the questioning—before he was asked for his cellphone—Garelick inquired why he was being inspected.  *Id.* at 62:16–19, 62:25–63:2, 63:6–9.  Officer Gonzalez responded that it was a routine inspection, which was untrue.  *Id.* at 62:20–24, 74:13–18.  Officer Gonzalez agreed that that was "a false cover story."  *Id.* at 63:6–9.

Officer Gonzalez then asked Garelick to step into another room, just off the secondary inspection room, where the officer could collect an EMR tear sheet and obtain Garelick's electronic device.  *Id.* at 31:17–32:20, 60:12–13.  That room was approximately eight-by-ten feet and was connected to three other rooms—an interview room, a pat-down room, and a cell.  *Id.* at 32:7–9.  Without any resistance, Garelick stepped into the room through a door propped open with a chair.  *Id.* at 32:4–5, 32:21–33:2.  He was not handcuffed or restrained, and the door remained open while he was in the room.  *Id.* at 33:3–8.  Garelick sat in the chair that propped the door open.  *Id.* at 33:8–9.  Task Force Officer Apath stood nearby, a foot or two from the doorway.  *Id.* at 78:21–79:6.  Once Garelick took a seat, Officer Gonzalez told Garelick that he was going to conduct a second part of the inspection while they waited for his bags to arrive from the airline.  *Id.* at 33:11–13.  At that point, approximately twenty minutes had elapsed since Garelick had been diverted to the secondary inspection area.  *Id.* at 51:22–52:1.  Officer Gonzalez asked Garelick to take out his cellphone and to open it.  *Id.* at 33:13–16.  Garelick complied and unlocked his phone.  *Id.* at 33:15–18.  Officer Gonzalez then asked Garelick the passcode for the phone.  *Id.* at 33:20.  Garelick provided the code and either Garelick or Officer Gonzalez wrote it down.  *Id.* at 33:22–23.  After Garelick gave Officer Gonzalez the passcode, Garelick asked why Officer Gonazalez wanted his cellphone.  *Id.* at 34:2–3.  Officer Gonzalez

replied that he was looking for "child pornography" or evidence of "transnational crimes." *Id.* at 34:4–5; *see also id.* at 80:25–81:8.  Officer Gonzalez then locked the phone and handed it and the written passcode to Task Force Officer Apath, who took both to a separate room where FBI agents had set up a laptop to retrieve the phone's data.  *Id.* at 34:16–35:5.  Meanwhile, Officer Gonalez told Garelick to take a seat in the secondary inspection and Garelick did so, resuming his place at the seat in the front pew.  *Id.* at 36:3–6.

At that point, Officer Gonzalez made "small talk" with Garelick.  *Id.* at 37:2–4.  Garelick waited patiently and read a book.  *Id.* at 37:6.  Garelick eventually asked for his girlfriend, with whom he was travelling, and she was permitted to enter the room and sit next to him.  *Id.* at 37:10–11, 41:9–25.  After about 25 to 30 minutes, Officer Gonzalez retrieved Garelick's luggage and brought it to the smaller room where Garelick had turned over his cellphone.  *Id.* at 37:22–23.  While inspecting Garelick's luggage, Officer Gonzalez asked Garelick about his work, including the largest deal he had worked on.  *Id.* at 38:13–23.  Garelick said he was recently on the DWAC deal and the two discussed that deal.  *Id.* at 39:1–7.  As Officer Gonzalez searched Garelick's luggage, Garelick again asked what the inspection was about and Officer Gonzalez responded that he was conducting a normal inspection and that Garelick had been chosen randomly for the inspection.  *Id.* at 40:15–22.  That was untrue.  *Id.* at 40:23–24.

Garelick then returned to his seat and drank a bottle of water.  *Id.* at 41:4–8.  A few minutes later, Officer Gonzalez and a Customs and Border Protection Supervisor walked Garelick out to the baggage carousel with his luggage.  *Id.* at 42:7–8.  The supervisor gave Garelick his cellphone back, as well as a comment card for Garelick to provide feedback on the inspection.  *Id.* at 42:10–16.  Garelick left the inspection area and never filled out the comment card or complained about the inspection.  *Id.* at 42:10–11, 42:17–19.

Customs and Border Protection agents did not restrain Garelick, threaten him, or tell him he was under arrest. *Id.* at 44:2–8. To the contrary, Officer Gonzalez testified that his interactions with Garelick were cordial. *Id.* at 44:9–10. And, while Garelick was initially confused as to why he had been diverted for secondary inspection, Garelick was cogent, compliant, and cooperative throughout the process. *Id.* at 44:11–17, 62:14–15.

### B.      Right Against Self-Incrimination

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." *Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cnty.*, 542 U.S. 177, 189 (2004); *see United States v. Greer*, 631 F.3d 608, 612 (2d Cir. 2011).

A communication is testimonial if it requires a suspect "to disclose the contents of his own mind." *Doe v. United States*, 487 U.S. 201, 211 (1988) (quoting *Curcio v. United States*, 354 U.S. 118, 128 (1957)). Consistent with the right against self-incrimination's purpose—"to prevent 'a recurrence of the Inquisition and the Star Chamber, even if not in their stark brutality,'" *Pennsylvania v. Muniz*, 496 U.S. 582, 596 (1990) (quoting *Ullmann v. United States*, 350 U.S. 422, 428 (1956))—the Supreme Court has held: "Whenever a suspect is asked for a response requiring him to communicate an express or implied assertion of fact or belief, the suspect confronts the 'trilemma' of truth, falsity, or silence, and hence the response (whether based on truth or falsity) contains a testimonial component." *Id.* at 597. To be incriminating, a communication need not be "directly incriminating," as the right against self-incrimination also extends to communications "that, while not themselves inculpatory, 'would furnish a link in the chain of evidence needed to prosecute the claimant.'" *United States v. Greenfield*, 831 F.3d 106, 114 (2d Cir. 2016) (quoting *Ohio v. Reiner*, 532 U.S. 17, 20 (2001) (per curiam)).

Like a verbal statement, "the act of producing documents can [also] be both incriminating and testimonial." *In re Grand Jury Subpoena Issued June 18, 2009*, 593 F.3d 155, 157 (2d Cir. 2010) (per curiam). But the Supreme Court has recognized an exception to the privilege against self-incriminating acts of production when "[t]he existence and location of the papers are a foregone conclusion and the [suspect] adds little or nothing to the sum total of the Government's information by conceding that he in fact has the papers." *Fisher v. United States*, 425 U.S. 391, 411 (1976). "[F]or the foregone conclusion exception to apply, the Government must establish 'with reasonable particularity' its knowledge as to '(1) existence of the documents, (2) the [suspect's] possession or control of the documents and (3) the authenticity of the documents.'" *United States v. Fridman*, 974 F.3d 163, 174 (2d Cir. 2020) (quoting *Greenfield*, 831 F.3d at 115)). Compelling a suspect to produce documents under those circumstances does not offend the Fifth Amendment because "[t]he question is not of testimony but of surrender."[15] *Fisher*, 425 U.S. at 411 (quoting *In re Harris*, 221 U.S. 274, 279 (1911) (Holmes, J.)).

Finally, as the Fifth Amendment proscribes only "*compelled*" self-incrimination, U.S. Const. amend. V (emphasis added), the Supreme Court has remarked that it is "axiomatic that the Amendment does not automatically preclude self-incrimination, whether spontaneous or in response to questions put by government officials. . . . Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning

---

[15] Courts are divided on the rationale of the foregone conclusion doctrine and specifically on whether the foregone conclusion doctrine establishes that the act of production was not testimonial or instead that it was not incriminating. *Compare Moog Inc. v. Skyryse, Inc.*, 2022 WL 16852666, at *3 (W.D.N.Y. Oct. 4, 2022) (not testimonial), *In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011*, 670 F.3d 1335, 1345 (11th Cir. 2012) (same), *and In re Grand Jury Subpoena, Dated Apr. 18, 2003*, 383 F.3d 905, 908 (9th Cir. 2004) (same), *with United States v. Paccione*, 992 F. Supp. 335, 338 (S.D.N.Y. 1998) (not incriminating), *United States v. Clark*, 847 F.2d 1467, 1473 (10th Cir. 1988) (same), *and United States v. Ali*, 2014 WL 5790996, at *6 (D. Md. Nov. 5, 2014) (same).

admissions." *United States v. Washington*, 431 U.S. 181, 186–87 (1977); *see Greer*, 631 F.3d at

612. "The test is whether, considering the totality of the circumstances, the free will of the

[suspect] was overborne." *Washington*, 431 U.S. at 188; *accord* Dkt. No. 52 at 9.

This motion to suppress requires the Court to apply these well-established principles to a

factual context that has divided state and federal courts alike over the past decade: a suspect's

disclosure of the passcode for her cellphone to government agents. Drawing on act-of-

production precedents, several courts have applied the foregone conclusion doctrine and held

that the government may compel a suspect to disclose the passcode to his cellphone without

transgressing the Fifth Amendment. *See United States v. Smith*, 2023 WL 8611259, at *3

(S.D.N.Y. Dec. 13, 2023); *United States v. Cheng*, 2022 WL 112025, at *9 (S.D. Tex. Jan. 12,

2022); *State v. Andrews*, 234 A.3d 1254, 1274 (N.J. 2020); *Commonwealth v. Jones*, 117 N.E.3d

702, 718 (Mass. 2019); *State v. Stahl*, 206 So. 3d 124, 137 (Fla. Dist. Ct. App. 2016); *see also*

*People v. Sneed*, __ N.E.3d ___, 2023 IL 127968, ¶ 102 (Ill. 2023). In the view of those courts,

the suspect's verbal act of telling an agent the passcode for a cellphone is indistinguishable from

her physical act of unlocking the cellphone. However, other courts have concluded that the Fifth

Amendment forbids the government from forcing a suspect to utter the code to her phone. *See*

*United States v. Spencer*, 2018 WL 1964588, at *2 (N.D. Cal. Apr. 26, 2018); *United States v.*

*Sanchez*, 334 F. Supp. 3d 1284, 1298–99 (N.D. Ga. 2018); *Matter of Search Warrant*

*Application for [Redacted Text]*, 279 F. Supp. 3d 800, 806 (N.D. Ill. 2017); *SEC v. Huang*, 2015

WL 5611644, at *3 (E.D. Pa. Sept. 23, 2015); *State v. Valdez*, __ P.3d ___, 2023 UT 26, ¶ 73

(Utah 2023).

### a.    Incriminating Testimony

Under fundamental Fifth Amendment principles, Garelick's disclosure of his passcode to

Officer Gonzalez was both testimonial and incriminating. When Officer Gonzalez "asked

[Garelick] for the passcode for the phone," Hearing Tr. 33:20, Garelick faced the "cruel trilemma" of "truth, falsity, or silence," *Muniz*, 496 U.S. at 597. Garelick's verbal response required him to "express the contents of his mind," *Doe*, 487 U.S. at 210 n.9, by making an "assertion[] of fact or belief," *United States v. Zemlyansky*, 908 F.3d 1, 15–16 (2d Cir. 2018) (citation omitted); *see also United States v. Jimenez*, 419 F. Supp. 3d 232, 233 (D. Mass. 2020). Had he been confronted with the question before the grand jury, a false statement could have exposed him to a charge of perjury and a refusal to answer could have subjected him to a charge of contempt. As a result, Garelick's articulation of the phone passcode—like the "vast majority of verbal statements"—was "testimonial."[16] *Doe*, 487 U.S. at 213; *see also id.* ("There are very few instances in which a verbal statement, either oral or written, will not convey information or assert facts."). Indeed, the Government does not argue otherwise. Dkt. No. 66 at 37.

Garelick's disclosure of his passcode was also incriminating. Although the passcode was not "*directly* or *inherently* self-incriminating," the Fifth Amendment applies with equal force to testimonial statements that "may lead to incriminating evidence." *Greenfield*, 831 F.3d at 127 (emphasis in original) (citation omitted). Because the passcode enabled the Government to unlock Garelick's phone at will and access incriminating evidence on the phone, Garelick's

---

[16] The fact that Garelick *told* Officer Gonzalez his passcode distinguishes this case from those in which a suspect unlocks her phone by entering a passcode or using biometric data. *See United States v. Oloyede*, 933 F.3d 302, 309 (4th Cir. 2019) (contrasting a suspect stating a passcode and "simply us[ing] the unexpressed contents of her mind to type in the passcode herself"); *United States v. Eldarir*, 2023 WL 4373551, at *5 (E.D.N.Y. July 6, 2023) ("[T]he compelled use of a defendant's biometric features to unlock a phone does not amount to a testimonial communication, and therefore does not run afoul of the Fifth Amendment."); *In re Search Warrant No. 5165*, 470 F. Supp. 3d 715, 732 (E.D. Ky. 2020) ("This Court does not dispute that passcodes are afforded Fifth Amendment protections. Yet, biometrics are not passcodes."). Accordingly, the Government's reliance on *United States v. Apple MacPro Computer*, 851 F.3d 238 (3d Cir. 2017), in which the defendant appealed an order that "required him to produce several seized devices in a fully unencrypted state," *id.* at 241–42, is misplaced. *See* Dkt. No. 66 at 35.

disclosure of his passcode "furnish[ed] a link in the chain of evidence." *Hoffman v. United States*, 341 U.S. 479, 486 (1951); *see United States v. Connolly*, 2019 WL 2120523, at *17 (S.D.N.Y. May 2, 2019).

The closer question is whether Garelick's disclosure is subject to the foregone conclusion doctrine. While the Government emphasizes persuasive authority applying that doctrine to verbal disclosures of passwords, Dkt. No. 66 at 35, Garelick contends that "the foregone conclusion rule is a limited exception to the act of production doctrine [that] does not apply where the government has compelled a testimonial *verbal statement*," Dkt. No. 69 at 2 (emphasis in original). When the Supreme Court first recognized the foregone conclusion doctrine in *Fisher*—a case concerning a subpoena for accounting records—the Court emphasized that the case did not involve "compel[led] oral testimony." 425 U.S. at 409. And since *Fisher*, "the Supreme Court has never applied the exception outside of the context of assessing the testimoniality of a nonverbal act of producing documents." *Valdez*, 2023 UT 26, ¶ 64 (cleaned up); *see also United States v. Danaher*, 2020 WL 7264454, at *4 n.3 (C.D. Cal. Dec. 9, 2020); *Andrews*, 234 A.3d at 1269. Nor has the Second Circuit. *See, e.g.*, *Fridman*, 974 F.3d at 174; *In re Grand Jury Subpoena Duces Tecum Dated Oct. 29, 1992*, 1 F.3d 87, 93 (2d Cir. 1993).

Moreover, the Supreme Court has indicated that there is a meaningful difference between the verbal act of being compelled to tell law enforcement a code and the physical act of producing an otherwise-inaccessible document. In *Doe*, the Government sought to compel a suspect to sign forms consenting to the disclosure of bank account records. 487 U.S. at 203. Justice Stevens authored a dissent that concluded the compelled signature would violate the right against self-incrimination and explained a suspect "may in some cases be forced to surrender a key to a strongbox containing incriminating documents, but I do not believe he can be compelled

to reveal the combination to his wall safe." *Id.* at 219 (Stevens, J., dissenting).  The *Doe* majority endorsed Justice Stevens's distinction:

> We do not disagree with the dissent that "[t]he expression of the contents of an individual's mind" is testimonial communication for purposes of the Fifth Amendment.  We simply disagree with the dissent's conclusion that the execution of the consent directive at issue here forced petitioner to express the contents of his mind.  In our view, such compulsion is more like "be[ing] forced to surrender a key to a strongbox containing incriminating documents" than it is like "be[ing] compelled to reveal the combination to [petitioner's] wall safe."

*Id.* at 210 n.9 (citations omitted) (alterations in original).  More than a decade later, Justice Stevens reiterated that distinction in a majority opinion that held the foregone conclusion did not apply to an act of production when "[t]he assembly of those documents was like telling an inquisitor the combination to a wall safe, not like being forced to surrender the key to a strongbox."  *United States v. Hubbell*, 530 U.S. 27, 43 (2000).  The implications of the Supreme Court's analogy for the case at hand are plain:  Garelick's verbal disclosure of his passcode, like the revelation of a safe combination, cannot be equated with merely unlocking his phone and allowing the Government to examine its contents.[17]  *See United States v. Kirschner*, 823 F. Supp. 2d 665, 669 (E.D. Mich. 2010); Wayne R. LaFave et al., 3 Criminal Procedure § 8.13(a) (4th ed. 2017).

Despite this guidance, some courts have extended the foregone conclusion doctrine to verbal disclosures of phone passcodes, reasoning that the government's real interest is in the files on the phone so the statement of the passcode is tantamount to an act of production.  *See Cheng*, 2022 WL 112025, at *6 ("[Defendant] essentially 'produced' unencrypted devices by providing

---

[17] Tellingly, in ruling that disclosure of a phone's passcode was subject to the foregone conclusion doctrine, the Florida District Court of Appeals in *Stahl* did not attempt to reconcile its holding with the Supreme Court's guidance in *Hubbell* and instead rejected the Court's distinction outright:  "We question whether identifying the key which will open the strongbox—such that the key is surrendered—is, in fact, distinct from telling an officer the combination." 206 So. 3d at 135.

both the devices and the passwords to the agents."). On this view, "the [only] testimonial

significance of . . . providing the password is the implied statement: 'I am the person who knows

the password for this phone.'" *Smith*, 2023 WL 8611259, at *3; *see Jones*, 117 N.E.3d at 710

("In the context of compelled decryption, the only fact conveyed by compelling a defendant to

enter the password to an encrypted electronic device is that the defendant knows the password,

and can therefore access the device."); *Andrews*, 234 A.3d at 1274; *accord* Dkt. No. 66 at 37.

The disclosure of a passcode could amount to more than a mere act of production in the (highly

improbable) case in which a passcode is independently incriminating, "such as the hypothetical

password, 'ISELLDRUGS.'" Orin S. Kerr, *Compelled Decryption and the Privilege Against

Self-Incrimination*, 97 Tex. L. Rev. 767, 779 (2019). Otherwise, as long as "the Government can

independently show the phone belonged to the defendant and that the defendant knew the

password, the foregone conclusion doctrine applies, and the Fifth Amendment is not violated."

*Smith*, 2023 WL 8611259, at *3;[18] *see* Dkt. No. 66 at 37 (urging the Court to apply the foregone

conclusion doctrine here, consistent with *Smith*); *see also Sneed*, 2023 IL 127968, ¶ 113.

     But this line of reasoning rests on flawed premises. First, the fact that the government is

not ultimately interested in the specific alphanumeric combination of a suspect's passcode for its

own evidentiary value does not afford it carte blanche under the Fifth Amendment. *See Muniz*,

---

[18] In *Smith*, a court in this District determined that the foregone conclusion doctrine applied when
federal agents at Newark International Airport "demanded that [the defendant] turn over his
cellphone and the password to unlock it." 2023 WL 8611259, at *1. The *Smith* court relied on
Professor Kerr's article, *Compelled Decryption and the Privilege Against Self-Incrimination*, and
Judge Breyer's opinion in *United States v. Spencer* to support that result. *Id.* at *3. Yet both
suggest that the foregone conclusion doctrine is inapplicable to the verbal disclosure of a phone
passcode. *See* Kerr, *supra*, at 799 n.5 (citing Orin S. Kerr & Bruce Schneier, *Encryption
Workarounds*, 106 Geo. L.J. 989, 1001–04 (2018)); *Spencer*, 2018 WL 1964588, at *2 ("[T]he
government could not compel Spencer to state the password itself, whether orally or in
writing.").

496 U.S. at 599 n.13 (concluding police violated a DUI suspect's right against self-incrimination by asking him the date of his sixth birthday even though the police "had no investigatory interest in the actual date of Muniz's sixth birthday").  After all, the ultimate aim of *Hubbell*'s inquisitor was the evidence in the wall safe, not its combination.  530 U.S. at 43.  Despite that indifference, the Supreme Court admonished that the inquisitor could not compel the safe's owner to divulge the combination.  *Id.*  Second, extending the foregone conclusion doctrine to a passcode simply because a court believes that statement is not testimonial or incriminating enough, *see Andrews*, 234 A.3d at 1274 ("[P]asscodes are a series of characters . . . of 'minimal testimonial value.'" (citation omitted)), contravenes the intentionally broad tests for whether a communication is testimonial or incriminating, *see Maness v. Meyers*, 419 U.S. 449, 461 (1975) ("This Court has always broadly construed [the Fifth Amendment] to assure that an individual is not compelled to produce evidence which later may be used against him as an accused in a criminal action."); *Est. of Fisher v. Comm'r*, 905 F.2d 645, 648 (2d Cir. 1990).  The prohibition on compelling self-incriminating verbal testimony is categorical.  *See In re Horowitz*, 482 F.2d 72, 86 (2d Cir. 1973) (Friendly, J.) ("The essence of the self-incrimination clause remains what it has always been— the prohibition of the exercise of compulsion upon the person whose communications, oral or written, may tend to incriminate him."); *Valdez*, 2023 UT 26, ¶ 43; *see also Hubbell*, 530 U.S. at 34–35 ("[T]here is a significant difference between the use of compulsion to extort communications from a defendant and compelling a person to engage in conduct that may be incriminating.").  The inquisitor cannot force a suspect to answer questions on the basis that the answers only incriminate her indirectly or on the basis that the compelled information, while incriminating, was not needed because it already was known.  *See Reiner*, 532 U.S. at 20; *Fisher*, 425 U.S. at 429 (Brennan, J., concurring in the judgment); *see also Commonwealth v. Davis*, 220

A.3d 534, 549 (Pa. 2019) ("[T]o apply the foregone conclusion rationale in these circumstances would allow the exception to swallow the constitutional privilege.").  Third, it is simply untrue that a phone's passcode is an arbitrary string of characters whose disclosure merely shows that the suspect uses the phone.  Even if a passcode is not as brazen as "ISELLDRUGS," passcodes are inherently personalized and reveal how users think.  *See Davis*, 220 A.3d at 548 ("As a passcode is necessarily memorized, one cannot reveal a passcode without revealing the contents of one's mind.  Indeed, a password . . . is, by its nature, intentionally personalized and so unique as to accomplish its intended purpose—keeping information contained therein confidential and insulated from discovery.").  Additionally, individuals often reuse their passcodes for multiple devices and accounts,[19] so when a suspect is compelled to divulge her phone passcode "she likely is *also* disclosing her password to other, innocent devices, as well as to many of her online accounts including social media, bank, and email accounts."  Laurent Sacharoff, *Unlocking the Fifth Amendment: Passwords and Encrypted Devices*, 87 Fordham L. Rev. 203, 224 (2018) (emphasis in original).  Consequently, "[t]he *content* of the password thus provides law enforcement agents with information they can use to access these other portions of the suspect's life."  *Id.* (emphasis in original).

Restricting the foregone conclusion doctrine to non-verbal acts of productions also comports with that exception's rationale.  When the Supreme Court first adopted that doctrine, Justice Brennan observed that it represented a departure from ordinary self-incrimination jurisprudence:  "I know of no [other] Fifth Amendment principle which makes the testimonial nature of evidence, and therefore, one's protection against incriminating himself, turn on the

---

[19] *See* Rick Walsh & Emilee Rader. *Prioritizing Security over Usability: Strategies for How People Choose Passwords*, J. Cybersecurity 1, 15 (2021) ("Users do seem to reuse passwords, as many others have noted.").

strength of the Government's case against him." *Fisher*, 425 U.S. at 429 (Brennan, J., concurring in the judgment).  The *Fisher* majority eschewed the "categorical" rules that govern verbal self-incrimination in favor of an approach that looks to "the facts and circumstances of particular cases," *id.* at 410 (majority op.), only after concluding that "the Fifth Amendment does not independently proscribe the compelled production of every sort of incriminating evidence," *id.* at 408.  Entitling a suspect to resist a document subpoena on the basis that production would incriminate him, when the Government already knows everything the act of production would reveal, would resurrect in a different guise the very rule that a person may not be forced to produce his "private papers" that the *Fisher* Court rejected.  *Id.* at 409.  Indeed, without the foregone conclusion doctrine, a suspect could "just gather all of his records and keep them in his possession" to preclude the government from accessing incriminating, yet non-testimonial, documentary evidence.  Kerr, *supra*, at 778.  But that interest-balancing accommodation is unnecessary when the Government seeks a passcode to obtain access to files on a suspect's cellphone.  The Government need not compel the suspect to reveal the contents of his mind by divulging a passcode or cross the line drawn in *Doe* and *Hubbell*.  Consistent with those cases, the Government can instead "ask or seek to compel the suspect to turn over an unlocked phone— whether through biometric means (for example, fingerprint or facial identification) or through entering the passcode themselves without providing the passcode to police."  *Valdez*, 2023 UT 26, ¶ 41.

Thus, precedential, practical, and purposive considerations alike demonstrate that the Government cannot justify Garelick's disclosure of his phone passcode as a foregone conclusion.  *See Danaher*, 2020 WL 7264454, at *4; *Spencer*, 2018 WL 1964588, at *1–2; *Valdez*, 2023 UT 26, ¶ 9; *Davis*, 220 A.3d at 550.  Perhaps to some, the requirement that the Government find

other means to access a suspect's cellphone will appear inefficiently "based on form rather than substance." *Andrews*, 234 A.3d at 1274. But the form protects a principle that is both profound and enduring: "our respect the inviolability of the human personality and of the right of each individual to a private enclave where he may lead a private life." *Doe*, 487 U.S. at 212 (quoting *Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52, 55 (1964)). The inviolability of the human personality and the private enclave inheres in each individual's right to the privacy of his own mind. It does not protect against every Government request with respect to the movement of his body. *See Muniz*, 496 U.S. at 591 (recognizing the "distinction between 'testimonial' and 'real or physical evidence' for purposes of the privilege against self-incrimination").

>   **b.**   **Compulsion**

Yet the Court's determination that the foregone conclusion doctrine is inapplicable here does not end the Fifth Amendment inquiry, as the Court still must address the "most fundamental element of a violation of [the] right against compelled self-incrimination: compulsion." *United States v. Maxwell*, 545 F. Supp. 3d 72, 79 (S.D.N.Y. 2021) (Nathan, J.). Garelick emphasizes that Officer Gonzalez "misled Garelick, and did so in response to Garelick's specific request for information about the nature of the inspection," and contends that, "[c]ombined with the coercive environment of the border, this resulted in compulsion that violated Garelick's Fifth Amendment rights." Dkt. No. 88 at 4; *see also* Dkt. No. 52 at 9. The Government retorts that "Garelick voluntarily provided the passcode," Dkt. No. 86 at 2, as "Officer Gonzalez's statement to Garelick that the inspection was 'routine' did not transform a polite interaction of approximately twenty minutes, during which Garelick was not restrained in any way, into anything like the circumstances in which courts have concluded a defendant acted involuntarily." Dkt. No. 89 at 1.

The Second Circuit has explained that "trickery and deception" by government agents can render an incriminating statement involuntary under the Fifth Amendment.[20] *United States v. Kourani*, 6 F.4th 345, 351 (2d Cir. 2021) (quoting *United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992)).  A defendant can establish deception by "produc[ing] clear and convincing evidence that the agents affirmatively misled him as to the true nature of the investigation." *Okwumabua*, 828 F.2d at 953; *see also Mitchell*, 966 F.2d at 100.  But deception alone is insufficient to show an incriminating statement was involuntary.  *See United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018); *United States v. Ash*, 464 F. Supp. 3d 621, 629 (S.D.N.Y. 2020), *aff'd*, 2022 WL 16955057 (2d Cir. Nov. 16, 2022).  Rather, the Court must examine the "totality of the circumstances"—including "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials"—to determine whether "the defendant's will was overborne." *Kourani*, 6 F.4th at 351–52 (citations omitted); *see also United States v. Zerbo*, 1999 WL 804129, at *8 (S.D.N.Y. Oct. 8, 1999) ("These factors are not to be balanced in a mathematical fashion.").

Garelick's "'characteristics' favor a finding that [he] . . . voluntarily" disclosed his phone's passcode. *Kourani*, 6 F.4th at 352.  He is an intelligent, middle-aged man with an established career in venture capital.  Hearing Tr. 31:11; *see Diaz v. Senkowski*, 76 F.3d 61, 65 (2d Cir. 1996); *see also United States v. Maney*, 2006 WL 3780813, at *9 (W.D.N.Y. Dec. 21,

---

[20] The Supreme Court has "never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Colorado v. Spring*, 479 U.S. 564, 576–77 (1987) (quoting *Moran v. Burbine*, 475 U.S. 412, 422 (1986)); *see United States v. Sawinski*, 2000 WL 1357491, at *6 (S.D.N.Y. Sept. 20, 2000).  As a result, "[s]imple failure to inform defendant that he was the subject of the investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit unless defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead." *United States v. Okwumabua*, 828 F.2d 950, 953 (2d Cir. 1987) (quoting *United States v. Serlin,* 707 F.2d 953, 956 (7th Cir. 1983)).

2006).  Garelick also "exhibit[ed] attention to and understanding of what [was] being said during the interview."  *Haak*, 884 F.3d at 414.  Although he was initially "a bit confused" as to why he had been selected for secondary inspection, he was "cognitive," "answered everything" Officer Gonzalez asked, and "sp[oke] English well."  Hearing Tr. 44:11–16; *see United States v. Gavino*, 2024 WL 85072, at *9 (E.D.N.Y. Jan. 7, 2024) (concluding "defendant's proffer of his cell phone passcode was voluntary" when "defendant appeared to understand his questions, spoke English well, and seemed to understand what was going on").  And his demeanor was "calm, cool, [and] collected."  Hearing Tr. 83:10.  Garelick emphasizes that he lacked experience with secondary border inspections and the criminal justice system.  Dkt. No. 88 at 3.  But, considered as a whole, Garelick's background and behavior suggest that he was not "prone to coercion."  *Haak*, 884 F.3d at 414 (citation omitted).

The conditions of the questioning similarly support the conclusion that Garelick acted voluntarily.  *See United States v. Juv. Male*, 968 F. Supp. 2d 490, 504 (E.D.N.Y. 2013) (Bianco, J.) (explaining courts should consider "the place where an interrogation is held, and the length of detention" (quoting *Green v. Scully*, 850 F.2d 894, 902 (2d Cir. 1988))); *Saunders v. Lavalley*, 2014 WL 2624763, at *15 (S.D.N.Y. June 10, 2014).  Garelick had access to bottled water and restrooms in the secondary inspection area.  Hearing Tr. 29:11–15; *see Diaz*, 76 F.3d at 65 ("[T]here was no evidence that Diaz was denied food, access to the bathroom, or sleep during his interrogation."); *Maney*, 2006 WL 3780813, at *9; *United States v. Egipciaco*, 389 F. Supp. 2d 520, 525 (S.D.N.Y. 2005) ("He asked for water and was given a bottle of water.").  Other passengers were present there too.  Hearing Tr. 27:8–18; *see Gavino*, 2024 WL 85072, at *1 ("Multiple civilians can be in the secondary inspection area at any given time, including other passengers.").  The secondary inspection room was a mere ten- to forty-five-second walk from

the main inspection area that all passengers walk through when entering the United States, Hearing Tr. 27:1–7, and a fifteen-second walk to the baggage claim area, *id.* at 28:3–13. Additionally, the secondary inspection area's door was open to the rest of the terminal. *Id.* at 26:20–25. When Officer Gonzalez asked Garelick for his cellphone passcode, they were in a smaller room adjoining the secondary inspection area. *Id.* at 31:20–23. But that room's door was open to the remainder of the secondary inspection area, *id.* at 32:2–5, and Garelick sat in the threshold on a chair propping the door open, *id.* at 33:7–9. Approximately twenty minutes had elapsed since Garelick was diverted from primary inspection in the main terminal. *Id.* at 51:22–52:1. That relatively short period "was not unduly lengthy." *Haak*, 884 F.3d at 415. Indeed, courts have deemed statements made during far lengthier interviews to be voluntary. *See Okwumabua,* 828 F.2d at 953 (one hour); *United States v. Guarno*, 819 F.2d 28, 31 (2d Cir. 1987) (two and one-half hours); *Maney*, 2006 WL 3780813, at *9 (one and one-half hours). Consequently, the conditions in which Officer Gonzalez asked Garelick for his cellphone passcode do not indicate "an overbearing of [Garelick's] will." *Green*, 850 F.2d at 902.

"The final and most critical circumstance, however, is the law enforcement officers' conduct." *Quartararo v. Mantello*, 715 F. Supp. 449, 459 (E.D.N.Y.) (internal quotation marks omitted), *aff'd*, 888 F.2d 126 (2d Cir. 1989). Several aspects of their conduct here suggest that Garelick provided his phone passcode voluntarily. Garelick was not restrained or handcuffed during the secondary inspection. Hearing Tr. 33:1–6, 44:2–4. Nor was he threatened. *Id.* at 44:2–4; *see Diaz*, 76 F.3d at 65 ("Diaz was not beaten, otherwise abused, or even handcuffed."). Although Officer Gonzalez wore his Customs and Border Protection uniform and carried a firearm, Hearing Tr. 25:11–26:5, 79:22–23, he did not unholster or display his weapon, *see Kourani*, 6 F.4th at 352 (emphasizing that the FBI agents who questioned the defendant "did not

display firearms"). Officer Gonzalez also treated Garelick courteously, Hearing Tr. 44:9–10, and made "small talk" with him, *id.* at 37:4. The questioning was therefore "conducted in a conversational and polite manner." *Haak*, 884 F.3d at 415; *see also Maney*, 2006 WL 3780813, at *9 ("[T]he overall tone of the interview, fully supported by the record, was friendly and cooperative."). When questioned by law enforcement, many individuals—law respecting or not—will feel that they cannot decline to answer without repercussions. But the Fifth Amendment is not violated whenever a person feels "pressure" to speak; rather, to amount to compulsion, that pressure must overcome the "resistance" of the suspect such that his "will [is] overborne." *Dickerson v. United States*, 530 U.S. 428, 434 (2000); *see also United States v. Hamilton*, 487 F. Supp. 3d 140, 150 (E.D.N.Y. 2020). ("[A] statement may be deemed voluntary if the defendant agreed to speak despite official pressure.").

The crux of Garelick's argument is that Officer Gonzalez compelled him to reveal his passcode through deception. Dkt. No. 52 at 10. Specifically, Garelick underscores that when Officer Gonzalez asked Garelick "the five Ws" in the secondary inspection area, Garelick inquired why he had been selected for secondary inspection. Hearing Tr. 62:16–19; *see* Dkt. No. 88 at 2. Officer Gonzalez replied: "it's a routine inspection." Hearing Tr. 62:22. That was false. *Id.* at 62:24. In fact, Garelick's diversion to secondary inspection was a ruse to allow FBI agents to search his cellphone for purposes of their insider trading investigation. *See id.* at 36:7–21. Officer Gonzalez's answer was clearly deceptive, as he "affirmatively misled [Garelick] as to the true nature of the investigation." *Kourani*, 6 F.4th at 351 (citation omitted). But "duplicitous conduct" is not dispositive. *Ash*, 464 F. Supp. 3d at 629. The relevant question is not whether Garelick was deceived but whether his will was overborne. And the nature of Officer Gonzalez's deception indicates that it did not overbear Garelick's will. A government agent's

acts result in compulsion only if they "overbear a [suspect's] will to resist and bring about [a statement] not freely self-determined." *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir. 1993) (quoting *Guarno*, 819 F.2d at 30). The suspect must succumb to "official pressure to comply," *Hamilton*, 487 F. Supp. 3d at 149, such that he is "deprived of his free choice to admit, to deny, or to refuse to answer," *Garrity v. State of New Jersey*, 385 U.S. 493, 496 (1967). Conversely, acts that simply "put [a suspect] at ease," *Restrepo-Duque v. May*, 2022 WL 4548645, at *11 (D. Del. Sept. 29, 2022), are insufficient as they do not "critically impair[]" a suspect's "capacity for self-determination," *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). These general principles apply with equal force to acts of deception. To exert sufficient pressure to overbear a suspect's will, a deception typically "must be linked up to the constitutional standard of threat or promise." *United States v. Kontny*, 238 F.3d 815, 819 (7th Cir. 2001) (Posner, J.); *see Okwumabua*, 828 F.2d at 953 ("The circumstances in this case do not disclose any overbearing conduct on the part of government agents. There is no evidence that any promises were made to [defendant] or that he was subjected to any threats."); *McCray v. Capra*, 2017 WL 3836054, at *8 (N.D.N.Y. Aug. 31, 2017) ("[T]rickery, deceit, even impersonation do not render a confession inadmissible . . . unless government agents make threats or promises." (quoting *United States v. Crawford*, 372 F.3d 1048, 1060–61 (9th Cir. 2004) (en banc))); *see also United States v. Heatley*, 994 F. Supp. 477, 482–83 (S.D.N.Y. 1998) (Sotomayor, J.). Deceits untethered to either—that do not intimidate or entice—are far more likely to be the kind of "false reassurance[s]," Dkt. No. 86 at 4, that merely "lull [a suspect] into a false sense of security," *Illinois v. Perkins*, 496 U.S. 292, 297 (1990), without coercing her to speak. This case is illustrative: Officer Gonzalez gave Garelick a "cover story rather than the truth," Hearing Tr. 62:20–21, to trick him into remaining calm and unaware of the federal investigation into DWAC. As a result, when Garelick disclosed

his phone passcode, he acted as he otherwise would have during a secondary inspection at the airport.  Simply put, his behavior was normal, not coerced.  *See Alejandre v. Montgomery*, 2019 WL 7666541, at *15 (C.D. Cal. Oct. 7, 2019) (rejecting the proposition that "by purposefully creating a false sense of security, the state is in a sense causing or compelling the accused to speak when he would not otherwise do so" (citation omitted)), *report and recommendation adopted*, 2020 WL 374882 (C.D. Cal. Jan. 19, 2020).  Officer Gonzalez's misrepresentation that Garelick had been chosen for a routine search therefore lends minimal support to the conclusion that Garelick's disclosure of his passcode was involuntary.

Although Garelick argues that two of Officer Gonzalez's other actions also demonstrate compulsion, Dkt. No. 88 at 1–2, neither was relevant to Garelick's incriminating statement.  First, Garelick notes that Officer Gonzalez handed him a tear sheet explaining it is "mandatory" for travelers to provide Customs and Border Protection personnel with the information necessary to access electronic devices.  *Id.* at 1 (quoting Gov. Ex. 2 at 2)).  Second, Garelick observes that Officer Gonzalez misled him a second time when Garelick asked why Officer Gonzalez wanted his phone and Officer Gonzalez responded that he was looking for evidence of "child pornography [or] transnational crimes."  Hearing Tr. 34:3–10; *see* Dkt. No. 88 at 2.  Yet both acts occurred *after* Garelick provided Officer Gonzalez his passcode.  Hearing Tr. 33:23–24 ("[H]e provided me the code.  I then gave him the tear sheet."); *id.* at 34:2–10 ("Q. What happened after you gave him the tear sheet?  A. He had asked me why are we doing this . . .  I told him that we were looking for child pornography and child international crimes, transnational crimes.").[21]  Thus, they could not have coerced Garelick into disclosing the passcode.  *See Mitchell*, 966 F.2d at 100.

_____

[21] Garelick filed a declaration that avers he asked why Customs and Border Protection wanted

In sum, the "totality of the circumstances" demonstrate that Garelick voluntarily disclosed his passcode to Officer Gonzalez. *Kourani*, 6 F.4th at 352 (quoting *Haak*, 884 F.3d at 409). Although Officer Gonzalez employed "a ruse" to lull Garelick into a false sense of security and disclose his phone passcode, *United States v. Mitchell*, 2013 WL 6175849, at *8 (W.D.N.Y. Nov. 22, 2013), Garelick's "will was [not] overborne" by that deception, *Dickerson*, 530 U.S. at 434 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). The Fifth Amendment right against self-incrimination "only protects 'compelled' statements," *Rivera v. Samilo*, 2018 WL 1701935, at *12 (E.D.N.Y. Mar. 30, 2018), so the Government did not violate that right here.[22]

### C.  *Miranda* Rights

Garelick also briefly asserts that the Government violated *Miranda* by failing to warn him of his rights during the secondary inspection. Dkt. Nos. 52 at 11–12, 69 at 14. But, as the Government notes, that inspection was not custodial. Dkt. No. 66 at 44. "The Second Circuit has explained that '[a] suspect is entitled to *Miranda* warnings only if he or she is interrogated while in custody.'" *United States v. Thomas*, 519 F. Supp. 2d 283, 288 (D. Conn. 2007) (alteration in original) (quoting *Tankleff v. Senkowski*, 135 F.3d 235, 242 (2d Cir. 1998)); *United States v. Chandler*, 164 F. Supp. 3d 368, 385 (E.D.N.Y. 2016). In *United States v. FNU LNU*, 653 F.3d 144 (2d Cir. 2011), the Circuit clarified when a Customs and Border Protection agent at

---

his cellphone *before* he provided his passcode. Dkt. No. 54 ¶¶ 9–10. However, "[t]he self-serving affidavit of the moving defendant is usually disregarded if [he] declines to testify at the [suppression] hearing." *United States v. Clark*, 600 F. Supp. 3d 251, 264–65 (W.D.N.Y. 2022) (quoting *United States v. Polanco*, 37 F. Supp. 2d 262, 264 n.4 (S.D.N.Y. 1999)); *see also United States v. Deleston*, 2015 WL 4745252, at *5 (S.D.N.Y. July 24, 2015).

[22] As the Court concludes that the Government did not violate Garelick's right against self-incrimination, the Court does not address the parties' arguments regarding what remedy would be appropriate if the Government had violated that right.

an airport must provide *Miranda* warnings to a traveler entering the United States.[23]  "[T]he overarching 'custody' question is whether 'a reasonable [person] in the suspect's position would have understood' herself to be 'subjected to restraints comparable to those associated with a formal arrest.'"  *Id.* at 153 (quoting *Georgison v. Donelli*, 588 F.3d 145, 155 (2d Cir. 2009)).  To answer that question, a court must "consider[] the circumstances surrounding the encounter with authorities," including: the "duration" and "location" of the questioning, the use of "restraints," the presence of "weapons . . . especially [if] they were drawn," a statement to the suspect that "he was free to leave or under suspicion," and "the nature of the questions asked."  *Id.*  The Circuit explained that the questions a Customs and Border Protection agent asks is a particularly important consideration, *id.* at 154; *see also id.* at 156 (Dennis, J., concurring in the judgment), since "the fact that the questions asked fall within the range of inquiries one expects will, by itself, be enough to assure a reasonable person that he or she is not under arrest," *id.* at 154 (majority op.).

Applying *FNU LNU* here, the Court "determines that the secondary screening . . . was not custodial, so the agents need not have read [Garelick] a *Miranda* warning."  *Booth*, 583 F. Supp. 3d at 552.  Although Garelick states that "[h]e was taken out of the ordinary flow of travelers for two hours," Dkt. No. 52 at 12, Officer Gonzalez only questioned Garelick for a brief portion of that time—the rest of which Garelick spent "waiting patiently" and "reading a book" in the secondary inspection area, Hearing Tr. 37:6, 41:6; *see United States v. Yilmaz*, 508 F. App'x 49, 52 (2d Cir. 2013) (summary order) ("Although the secondary inspection lasted for approximately

---

[23] In his brief, Garelick "recognizes . . . this Court is bound" by *FNU LNU*, but "reserves the right to challenge that case as inconsistent" with Supreme Court precedent.  Dkt. No. 52 at 11. Indeed, "a published decision by the Second Circuit binds future panels and district courts within the Circuit unless the decision is overruled by the *en banc* Second Circuit or by the Supreme Court."  *United States v. Fayton*, 2023 WL 8275924, at *3 (S.D.N.Y. Nov. 30, 2023).

ninety minutes . . . , during that time Yilmaz remained unrestrained in an area of the Port of Entry described as a 'waiting room.'"); *cf. FNU LNU*, 653 F.3d at 155 (concluding a ninety-minute interrogation was non-custodial).  Officer Gonzalez questioned Garelick in both the main secondary inspection area and the smaller adjoining room.  The former was a sizable room, with a door open to the rest of the terminal, and it contained other passengers, several pews, bottled water, and restrooms.  *See United States v. Kamaldoss*, 2022 WL 1200776, at *7 (E.D.N.Y. Apr. 22, 2022) (concluding a defendant who was questioned in an airport's "secondary inspection room" that "contain[ed] twenty to fifty chairs," as well as "a water fountain [and] bathroom," was not in custody); *Gavino*, 2024 WL 85072, at *8.  The latter's door was also left open to the main secondary inspection area, and Garelick sat in the threshold.  *See United States v. Wilson*, 100 F. Supp. 3d 268, 279 (E.D.N.Y. 2015) (ruling defendant was not in custody in a "private screening room" when "the door in the room remained open" and "only two CBP officers were in the room with him"); *see also FNU LNU*, 653 F.3d at 155 (observing the interrogation took place "in a closed room, out of public view").  Garelick was never restrained.  Hearing Tr. 44:2–4; *see FNU LNU*, 653 F.3d at 155; *Yilmaz*, 508 F. App'x at 52; *Wilson*, 100 F. Supp. 3d at 280.  Nor did Officer Gonzalez draw the firearm he carried in his holster.  Hearing Tr. 25:25–26:1; *FNU LNU*, 653 F.3d at 155; *Kamaldoss*, 2022 WL 1200776, at *8.  Additionally, far from informing Garelick he was under suspicion, Officer Gonzalez repeatedly assured Garelick that the inspection was "routine."  Hearing Tr. 62:22; *see also id.* at 40:19–22 ("I said . . you've been chosen randomly for this inspection . . . .  [W]e just want to check that everything is squared away with you.").  Garelick was also "never told" that he was not free to leave the secondary inspection, though Officer Gonzalez testified that fact was "understood."  *Id.* at 29:5–7.  "But a reasonable person in [Garelick's] position would not understand these restrains as comparable to

those associated with formal arrest.  Rather, such a person would suppose that the restraints were attendant to the immigration screening process—a process to which all international travelers entering the United States must submit to one degree or another." *United States v. Tavares*, 2012 WL 194974, at *2 (E.D.N.Y. Jan. 23, 2012); *see also United States v. Rijo-Carrion*, 2012 WL 6617388, at *3 (E.D.N.Y. Dec. 19, 2012) ("While defendant was asked by a uniformed officer to step out of line into the secondary screening area and was certainly not free to leave, the restraints to which he was subjected were those attendant to the routine screening of *all* incoming international travelers.").

Garelick contends that "the questioning here strayed far from immigration concerns" because "agents asked Garelick pointed questions about his boss and his business and sought access to his phone even though there was no indication Garelick used it for border-related offenses." Dkt. No. 52 at 11–12.  Yet the "five W" questions Officer Gonzalez asked Garelick— why he traveled, where he stayed, whom he travelled and met with, when he bought the ticket, and what he does for a living—all "fall within the range of inquiries one expects" when entering the United States.  *FNU LNU*, 653 F.3d at 154; *see also Booth*, 583 F. Supp. 3d at 552 (questioning defendant on "where he worked before his retirement, details about his income streams, and whether he controlled any domestic or foreign companies . . . was not unreasonable for a secondary screening interview").  Were the law otherwise, Customs and Border Protection agents would need to provide *Miranda* warnings to virtually every traveler subject to secondary inspection.  Officer Gonzalez also questioned Garelick about his baggage before inspecting it. Hearing Tr. 38:4–11 ("I asked him:  Are these bags yours?  Did you pack them yourself?  Is there anything in the bags that I should know about? . . .  I asked him if he has any food, alcohol, tobacco, money that he's traveling with, and . . . I asked him about prescription medication.").

Those too were routine inquiries that a reasonable person would expect when entering the country. *See FNU LNU*, 653 F.3d at 153–54 ("[A] reasonable traveler will expect . . . questions and follow-up about his . . . baggage."); *see also Rijo-Carrion*, 2012 WL 6617388, at *3.

By contrast, when Officer Gonzalez asked Garelick for his cellphone and passcode, Officer Gonzalez strayed from the routine questioning a reasonable traveler would expect at the border. *But see Hassan*, 2019 WL 5684367, at *3 (determining that taking defendant's "cell phone" was a "routine restraint[] at a border crossing"). Nevertheless, the overall focus of Officer Gonzalez's questioning during the secondary inspection remained on matters relevant to admissibility. And "the nature of the questions asked" is but one "relevant factor" among many for determining whether an interrogation was custodial. *FNU LNU*, 653 F.3d at 154. Thus, while Officer Gonzalez's requests for Garelick's phone and passcode lend some support to the conclusion that Garelick was in custody, the greater context of the secondary inspection establishes that those two questions did not render Garelick in custody for purposes of *Miranda*. *See Kamaldoss*, 2022 WL 1200776, at *8 ("Mr. Kamaldoss was asked for his laptop, iPhone, and their passcodes in secondary inspection . . . . But I decline to find that this single factor transformed an otherwise non-custodial environment into a custodial one."); *Gavino*, 2024 WL 85072, at *2 (concluding a defendant was not in custody although a Customs and Border Protection Officer "asked the defendant for his cell phone . . . [and] asked him to open the phone." (internal quotation marks omitted)).

Finally, Officer Gonzalez asked Garelick about his "divorce" and "venture capital work," but Officer Gonzalez testified that when they discussed those topics they were simply making "small talk." Hearing Tr. 37:2, 38:18. That kind of "conversational" chat, *United States v. Aguilar*, 2022 WL 3139100, at *6 (E.D.N.Y. Aug. 5, 2022), would not lead "a reasonable person

[to] feel restrained in a way similar to a formal arrest," *FNU LNU*, 653 F.3d at 154.  Officer

Gonzalez acknowledged that he had an ulterior motive for asking Garelick about his work.

Officer Gonzalez secretly hoped Garelick would discuss "the DWAC deal."  Hearing Tr. 39:21.

But the Court must look to the objective conditions of Garelick's questioning, not Officer

Gonzalez's subjective motivations.  *See United States v. Ardines*, 293 F.R.D. 117, 124 (E.D.N.Y.

2013) ("[Custody] is defined by the perceptions of the defendant—not the subjective intent of the

police.").  Consequently, though Officer Gonzalez's questions about Garelick's venture capital

work were "clearly motivated by the pending criminal investigation, not immigration concerns,"

the Court concludes Officer Gonzalez's "subjective motives are not relevant to determining

whether [Garelick's] interrogation was custodial."  *Booth*, 583 F. Supp. 3d at 552.

Despite Officer Gonzalez's request for Garelick's phone and passcode, Garelick was not

subject to restraints comparable to a formal arrest during his secondary inspection.  As a result,

Garelick "was not 'in custody' at this time, [so] there was no *Miranda* violation."  *United States*

*v. Medina*, 19 F. Supp. 3d 518, 538 (S.D.N.Y. 2014).  Garelick's motion to suppress based on the

Government's failure to provide a *Miranda* warning is therefore unavailing.  As neither of

Garelick's asserted bases for suppression is meritorious, the Court denies his motion to suppress.

## VI.   Defendants' Motion for a Bill of Particulars

Each of the Defendants moves for a bill of particulars.  M. Shvartsman asks for further

particulars regarding the material nonpublic information that the defendants are alleged to have

shared or traded on, Dkt. No. 56 at 33, and the identification of unindicted co-conspirators and

tippees, *id.* at 35.  Garelick seeks the same information, Dkt. No. 52 at 18–21, as well as

particulars regarding the "universe of trades the government plans to prove were illegal," *id.* at

21–22.  G. Shvartsman seeks identical particulars.  Dkt. No. 47.  The Government responds that

its fifteen-page speaking Indictment, as well as the discovery it has provided to the defense and

the additional disclosures it has made, gives the defense notice of the charges against the Defendants. Dkt. No. 66 at 18. It emphasizes that the Indictment describes the identity of the unnamed co-conspirators, *id.*, and the MNPI the Defendants traded upon or shared and the particular trades and trading periods, *id.* at 19.

The motions for a bill of particulars are without merit. Rule 7(f) of the Federal Rules of Criminal Procedure authorizes the Court to "direct the government to file a bill of particulars." Fed. R. Cr. P. 7(f). The purpose of a bill of particulars is to permit a defendant "to identify with sufficient particularity the nature of the charges pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam); *see also United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988) (same). However, "[a] bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." *United States v. D'Amico*, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) (quoting *United States v. Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001)). A district court has broad discretion in determining whether to grant a motion for a bill of particulars. "Courts are only required to grant a bill of particulars 'where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" *Raniere*, 384 F. Supp. 3d at 322 (quoting *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004)); *United States v. Wey*, 2017 WL 237651, at *17 (Nathan, J.) (S.D.N.Y. Jan. 18, 2017) ("[T]he question in determining whether to grant one 'is not whether the information would be *useful* to the defense' but rather whether it is '*necessary* for the preparation of the defense.'" (emphasis in original) (quoting *United States v. Chalmers*, 410 F. Supp. 2d 278, 286–87 (S.D.N.Y. 2006))).

Defendants have not established their entitlement to further particulars.  The Indictment identifies the MNPI at issue and the Government has confirmed it both in its memorandum in opposition to the defendants' motions and at oral argument: it is information "about DWAC's plans to merge with Trump Media."  Dkt. No. 66 at 18; *see* Dkt. No. 81 ¶¶ 8, 10, 11; *see also United States v. Buyer*, 2023 WL 1381970, at *3 (S.D.N.Y. Jan. 31, 2023) ("The Indictment clearly describes the nature of the material nonpublic information at issue, and at what time and in what capacity Defendant . . . acquired this inside information before trading.").  The Superseding Indictment also identifies the alleged co-conspirators and tippees.  In addition to the Defendants themselves, they include a neighbor of M. Shvartsman (whom M. Shvartsman allegedly tipped on or about September 30 and October 1, 2021), Dkt. No. 81 ¶ 13a, a business associate of M. Shvartsman, who was tipped in September and October 2021, *id.* ¶ 13b, a friend of M. Shvartsman who was tipped on or about October 19, 2021, *id.* ¶ 13c, an employee of G. Shvartsman's outdoor furniture business who was tipped on or about October 18 or October 19, 2021, *id.* ¶ 13d, and a second employee of that business who was tipped on or about October 19. 2021, *id.* ¶ 13e; *see United States v. Ballesteros Gutierrez*, 181 F. Supp. 2d 350, 356 (S.D.N.Y. 2002) ("Given the limited nature and duration of the alleged conspiracy, [defendant] is not entitled to identification of coconspirators.").  Finally, the Superseding Indictment identifies the trades alleged to be unlawful—the purchase of DWAC shares on the open market from on or about September 3, 2021, to the public announcement of the planned merger of DWAC and Trump Media after market close on or about October 20, 2021.  *See Wey*, 2017 WL 237651, at *19 ("To require the disclosure of further detail, including trade-level detail, would be to require the Government to advise [defendant] of the specific 'manner in which it will attempt to prove the charges.'" (quoting *United States v. Rittweger*, 259 F. Supp. 2d 275, 291 (S.D.N.Y. 2003)));

*United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 302 (S.D.N.Y. 2018).  This information, as well as that provided in discovery, provides ample notice of the conduct with which the defendants are charged sufficient for them to defend themselves as well as to interpose a claim of jeopardy.  *See Bortnovsky*, 820 F.2d at 574 ("[I]f the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required."); *United States v. Lemay*, 2022 WL 1498961, at *5 (S.D.N.Y. May 12, 2022); *United States v. Conley*, 2002 WL 252766, at *4 (S.D.N.Y. Feb. 21, 2002).

The cases cited by Defendants do not require a conclusion to the contrary.  Defendants rely primarily on *United States v. Rajaratnam*, 2010 WL 2788168, at *2 (S.D.N.Y. July 13, 2010).  But in that case, as the court described it, the charges at issue "spann[ed] six years and involve[ed] dozens of stocks, dozens of co-conspirators, and a total of seven conspiracies as charged in the indictment."  *Id.*; *see also Pinto-Thomaz*, 352 F. Supp. 3d at 302 ("[I]n *Rajaratnam*, the case upon which defendants primarily rely, the court's decision to grant in part defendants' motion for a bill of particulars turned on the fact that the case was 'far larger' than any others cited, involving 31 stocks and 'dozens of co-conspirators, charged and uncharged.'" (citations omitted)).  Even then, for the most part, the court ordered the Government to provide particulars with respect to the reporting periods at issue and "the substance of the information provided for any period" and the dates on which the information was conveyed—information similar to that which is already conveyed by the Indictment here.  *Rajaratnam*, 2010 WL 2788168, at *5–6.[24]

---

[24] There is insufficient information in the other opinions to know whether they are on point or not.  In *United States v. Russo*, 647 F. Supp. 153, 188 (E.D.N.Y. 1986), *rev'd on other grounds Davidoff*, 845 F.2d 1151, the court ordered the Government to provide particulars on the nature of the inside information upon which the defendants were alleged to have traded when the indictment charged that one defendant provided to his codefendants confidential, MNPI

## CONCLUSION

For the foregoing reasons, Defendants' motions are DENIED.  The Clerk of Court is

respectfully directed to close Dkt. Nos. 46, 51, and 55.


      SO ORDERED.


Dated: March 20, 2024
     New York, New York

                               LEWIS J. LIMAN
                     United States District Judge

---

regarding a merger.  In this case, the Indictment provides notice regarding the nature of the information.  Additionally, *Russo*'s holding appears to have not been followed by any court since 1986.  Likewise, in *United States v. Falbo*, the court ordered particulars to be provided regarding the MNPI the Government would contend that the defendants learned, but the order does not indicate what information was already in the indictment.  1993 WL 147441 (S.D.N.Y. Apr. 6, 1993).