REDACTED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| - v. - | : | 23 CR 307 (LJL) |
| | : | |
| MICHAEL SHVARTSMAN, et al., | : | |
| | : | |
| Defendants. | : | |

---

**SENTENCING SUBMISSION ON BEHALF
OF MICHAEL SHVARTSMAN**

Alan S. Futerfas
The Law Offices of Alan S. Futerfas
565 Fifth Avenue, 7th Floor
New York, New York 10017
*Attorney for Michael Shvartsman*


Dennis C. Vacco
Lippes Mathias, LLP
50 Fountain Plaza
Suite 1700
Buffalo, New York 14202
*Attorney for Michael Shvartsman*

PRELIMINARY STATEMENT                                                                          1

STATEMENT OF FACTS                                                                              3

1.       The Plea Agreement                                                                     3

II.      The Offense Conduct                                                                    4

III.     The Non-Guidelines Sentencing Factors (18 U.S.C. § 3553(a))                            7

IV.      Mr. Shvartsman's Character and History                                                 8

         A.      Personal History                                                               8

         B.      Family Circumstances                                                          17

         C.      Commitment to the Community and Giving Back                                    22

V.       The Need to Avoid Unwarranted Sentencing Disparities Suggests a Substantially
         Below Guidelines Sentence in this Case                                                26

VI.      The PSR Justification for Recommendation is flawed and the Final
         Recommendation Inconsistent with Precedent and Penalizes Mr. Shvartsman
         for Exercising a Constitutional Right                                                 31

VII.     Deterrence                                                                            34

VIII.    Disparate Treatment of Noncitizens Affects Sentencing Considerations                  35

IX.      Objections to the Final PSR                                                           37

CONCLUSION                                                                                     38

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| - v. - | : | 23 CR 307 (LJL) |
| | : | |
| MICHAEL SHVARTSMAN, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

## SENTENCING SUBMISSION ON BEHALF
## OF MICHAEL SHVARTSMAN

### PRELIMINARY STATEMENT

Defendant Michael Shvartsman, through his counsel, respectfully submits this memorandum in support of a sentence that is sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing. 18 USC 3553(a). This memorandum provides information that will aid the Court in seeing Michael Shvartsman for more than the conduct of which he is convicted.  This memorandum thus provides insight into Mr. Shvartsman, the businessman, father and longtime supporter of many community and charitable efforts.  The information about his life and character is outlined below, providing details that fully show the level of commitment and support Mr. Shvartsman has received from family, friends and business colleagues.

We also address the impact of Mr. Shvartsman's conviction on his family, businesses and the broader community. Michael Shvartsman has accepted responsibility for his offense by entering a timely plea before this Court.  He is remorseful not only for the circumstances that have brought him here, but also for the impact his conduct has had on his family, friends and his employees.  Having had a difficult childhood, his sole motivation in life was stability, success

and the ability to provide for his family. He sought a life different than he had known as a child and different from the difficulties his parents experienced, particularly his mother. The way in which he has conducted his life, as discussed herein and in the letters received from his community, counsels strongly in favor of a sentence sufficient but not greater than necessary to achieve the purposes of sentencing.

Mr. Shvartsman recognizes his conduct was unlawful and is doing his best to atone for his offense. Has begun to and will spend the rest of his life making amends for the extremely poor judgment he exercised when he profited from his crime. As a starting point, in a timely fashion he has accepted responsibility for his crime; has paid back 100% of the forfeiture judgment; and has complied with all of the conditions of his pretrial release.

While we recognize that we are asking for a lower sentence than the advisory guidelines suggest, and that Probation recommends, we seek this sentence as we believe that it will meet the goals of sentencing under 18 U.S.C. §3553(a)(2). While every case presents different facts and circumstances, given the fact that this is Mr. Shvartsman's first offense, his history and characteristics, remorse and acceptance of responsibility, his compliance with his conditions of supervised release, and the severe collateral consequences of his conviction, we ask for a sentence below the guidelines.

His status as a noncitizen presents with certainty disproportionately harsher prison conditions, and a much longer actual prison sentence, than a similarly situated US citizen given an identical sentence. In addition, there is the very real risk of deportation of him and his family upon any sentence completion. These are serious 18 U.S.C. § 3353(a) sentencing factors suggesting a sentence significantly below the applicable guideline range of 46 to 57 months' imprisonment.

## STATEMENT OF FACTS

Mr. Shvartsman, now 53 years old, was arrested on June 29, 2023 and charged in a ten-count indictment, with two codefendants – his brother Gerald Shvartsman and Bruce Garelick -- in connection with a scheme to trade in the securities of a special purpose acquisition corporation ("SPAC") named Digital World Acquisition Corporation ("DWAC") based on insider information that the SPAC was going to take public a Trump related media company called Trump Media Group ("TMG"). The Indictment charged the defendants with using confidential information they possessed regarding DWAC's target, its plans, and its negotiations in order to make a profit by trading on material nonpublic information ("MNPI"). The charges included conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 (Count One), securities fraud in violation 15 U.S.C. § 78j(b) and 78ff, 7 C.F.R. § 240.l0b-5; and 18 U.S.C. § 2 (Counts Two to Nine) and securities fraud in violation of 18 U.S.C. § § 1348 and 2 (Count Ten). The indictment was superseded on February 6, 2024 (ECF 81).

### 1.    The Plea Agreement

On April 3, 2024, Mr. Shvartsman pled guilty before this Court pursuant to a plea agreement to the securities fraud charged in Count Three of the superseding indictment. Pursuant to the parties' plea agreement, dated April 1, 2024, applying the November 1, 2023 edition of the applicable Guideline manual, the parties stipulated to the applicable guidelines as follows:

Base Offense Level:
　　　　18 U.S.C.  § 1343 (U.S.S.G. § 2B1.1(a))　　　　　　　　　　8

Specific Offense Characteristics
　　　　Loss greater than $9,500,000 but not more than $25,000,000
　　　　(U.S.S.G. § 2B1.1(b)(1)(K))　　　　　　　　　　　　　　20

Acceptance of Responsibility

| | |
|---|---|
| U.S.S.G. § 3E1.1(a) and (b) | -3 |
| Adjustment for Zero Point Offenders (U.S.S.G. § 4C1.1(a) | - 2 |
| TOTAL OFFENSE LEVEL | 23 |

Based upon these calculations, and with no prior criminal history, the sentencing range is 46-57 months' imprisonment.  There is no restitution in this case. (*See* PSR at ¶43) The parties agree further that the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At guidelines level 23, the applicable fine range is $20,000 to $5,000,000.  Pursuant to an agreed-upon consent Preliminary Order of Forfeiture/Money Judgment executed and filed April 3, 2024, Mr. Shvartsman agreed to forfeit, prior to sentence, $18,200,000 in United States currency, representing the amount of proceeds traceable to the commission of the offense. Under the terms of that agreement, the payment of that sum will render the Money Judgment "fully satisfied" and the government will not seek to forfeit the Specific Property, defined as the vessel "Provocateur" and three jet skis. The government had previously seized $11,321,086.59 from a company that will be attributable to Mr. Shvartsman and will likely be deemed to be income to him. As of Monday, October 7, 2024, with the transfer of an additional $6,878,913.41 to the government, the $18,200,000 million Money Judgment has been paid. (*See* PSR at ¶131 noting that forfeiture would be paid prior to sentence)

II.    **The Offense Conduct**

At the time of his plea, Mr. Shvartsman allocuted as follows:

Between October 1st and October 5, 2021, I possessed material information about DWAC's pursuit of TMG that was not publicly available to the general public. During this time, I had a duty to DWAC to keep this information confidential and not act upon it. I purchased 2 million DWAC warrants on October 1st, 4th, and 5th, 2021, and information I had was a factor in my decision to purchase the warrants. After the DWAC-TMG merger was executed and became public on or about October 20, 2021, I sold those warrants at a profit.

4

(Plea Minutes, April 3, 2024, T. 23-24)

As the plea agreement acknowledges, as does Probation (*see* PSR at ¶ 42), there is no role adjustment. The DWAC SPAC was created by Patrick Orlando and, on or about June 8, 2021, Orlando was envisioning DWAC merging with TMG, and he communicated that to various investors. *See* SEC Settlement Order, In the Matter of DWAC, file no. 3-21534 dated July 20, 2023, ¶¶ 23-26. Some days later, Marc Wachter, who knew Orlando and was familiar with Orlando's plans for DWAC, set up a meeting with Mr. Shvartsman, his brother, Gerald, and others for potential investment. Through June and into July 2021, Orlando made presentations to various investors including the potential DWAC merger target of TMG.

On or about July 18, 2021, Mr. Shvartsman invested $125,000 into DWAC and received Founders' Shares. As part of that investment, Mr. Shvartsman was permitted a board seat and Mr. Garelick was placed on the DWAC board. On or about September 3, 2021, Mr. Shvartsman purchased IPO shares. Neither the Founders' Shares investment nor the IPO shares purchase are charged in this case. Over the next several months, the plans for the DWAC acquisition pressed forward. Mr. Shvartsman did not control the information that came out of the boardroom meetings. And he did not handle the negotiations between DWAC and TMG. It was Patrick Orlando, not Mr. Shvartsman, who controlled DWAC and made all decisions for the company.

Mr. Shvartsman fully acknowledges, however, that he understood the DWAC plans and purchased the DWAC warrants on or about October 1, 2021.[1] These circumstances are reflected

---

[1] Paragraph 43 of the PSR states that, "Restitution is not an issue in this case as there are no identifiable victims in this offense." Some background to the warrant trades may be helpful. The DWAC warrants ("DWACW") were not a widely available security because of a complex Unit structure. The DWAC Warrants were only issued as part of the initial security, which was a Unit. The Unit was made up of common stock and a fractional warrant. There had to be specific steps taken to free up the warrants if an investor wanted to sell them. The Press Release from DWAC makes this clear. (*See* Press Release: "MIAMI, FL / ACCESSWIRE / September 27,

in Mr. Shvartsman's plea. Mr. Shvartsman pled to a misappropriation theory, i.e., that Mr.

Shvartsman misappropriated confidential DWAC information and traded on it to his benefit.

(*See* Plea Minutes, April 3, 2024, T. 11-12)("I had a duty to DWAC to keep this information

confidential and not act upon it.")

Mr. Shvartsman's offense, for which he takes full responsibility, was to use the

information that he and other insider investors possessed about the plan for DWAC to acquire

TMG, and purchase warrants prior to that information being publicly announced. He also told

others, including friends and acquaintances, that he thought that the TMG acquisition would be

viewed favorably by the market when that information became public. Mr. Shvartsman shared

his view, based on this inside information, with his neighbor whom he ran into in the elevator

and a few friends, some of whom traded on this information as well.

---

2021 / Digital World Acquisition Corp. (NASDAQ:DWACU) (the "Company") announced that, commencing on or about September 30, 2021, holders of the units sold in the Company's initial public offering may elect to separately trade shares of the Company's Class A common stock and warrants included in the units. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. The shares of Class A common stock and warrants that are separated will trade on the Nasdaq Global Market under the symbols "DWAC" and "DWACW," respectively. Those units not separated will continue to trade on the Nasdaq Global Market under the symbol "DWACU." **Holders of units will need to have their brokers contact Continental Stock Transfer & Trust Company, the Company's transfer agent, in order to separate the units into shares of Class A common stock and warrants.")** (Emphasis added)

Accordingly, we understand that the only public float of the warrants consisted of Founders and or IPO participants, which were largely financial institutions. Only when those original investors took the steps to break the warrants out of the Unit and sell them into the market, was there a public float available to the marketplace. The institutional investors had the option of keeping the shares and just selling the warrants or selling both. That decision would have been made prior to the breaking apart of the Unit. Given the evidence, and their insider status, we believe that the initial investors knew of the TMG acquisition plans when they separated the warrants and sold them. Based upon these circumstances, it appears that Mr. Shvartsman, and others who purchased warrants on or about October 1, 2021, purchased them from institutional investors who had made the decision, post IPO, to sell their warrants and harvest gains.

Mr. Shvartsman fully accepts responsibility for this conduct. He and his brother pled guilty and saved the government the costs and efforts of their trial. Mr. Shvartsman's plea clearly and fully acknowledges his conduct, and he will do so again at sentence.

### III.    The Non-Guidelines Sentencing Factors (18 U.S.C. § 3553(a))

The United States Sentencing Guidelines are only the "starting point and initial benchmark" at sentencing. *Kimbrough v. United States*, 552 U.S. 85, 108-9, 128 S.Ct. 558, 574 (2007)*, citing Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 596 (2007). The Court may not simply presume that the guideline range is reasonable. *Gall,* 128 S.Ct. at 597. While the guidelines are only advisory at sentencing, it is incumbent upon the Court to fairly appraise the rationale behind a particular guideline calculation to determine whether it reasonably assesses culpability for an offense in the typical case. *Kimbrough*, 128 S.Ct. at 574 ("it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives"), *citing Rita v. United States,* 551 U.S. 338, 349, 127 S.Ct. 2456, 2464-65 (2007). The sentencing court's analysis is guided by "[r]easonableness" and an "*individualized* application of the statutory sentencing factors." *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (citing *Gall*, 552 U.S. at 46–47, 128 S.Ct. 586) (emphasis added).

As *Kimbrough* instructs, after the Court considers the applicable guidelines calculation, it must make an individualized assessment of the case-specific factors to determine whether, "in a particular case, a within-Guidelines sentence is 'greater than necessary' to accomplish the goals of sentencing." *Kimbrough*, 128 S.Ct. at 570, *citing* 18 U.S.C. § 3553(a). The "greater than necessary" language of the federal sentencing statute incorporates the need for the sentence to "reflect the seriousness of the offense," "promote respect for the law," and "provide just punishment for the offense.*"* 18 U.S.C. § 3553(a).

The factors weighing into this calculus of a reasonable sentence include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed-
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for--
>> (A) the applicable category offense committed by the applicable category of defendant as set forth in the guidelines...
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

18 U.S.C. § 3553(a).

Here, it is respectfully submitted that a substantially less than guideline sentence is supported by all of these factors. We also ask the Court to take into consideration the harsher conditions of confinement, the unavailability of programs due to Mr. Shvartsman's status as a noncitizen of the United States, and the likelihood of his ultimate deportation.

**IV.    Mr. Shvartsman's Character and History**

**A.    Personal History**

Michael Shvartsman and his brother Gerald Shvartsman were born to Mark Semenovych Shvartsman and Klara Shvartsman *nee* Monivna. Michael Shvartsman was born in January 1971 while his family was residing in Odessa, Ukraine. He was raised in Odessa for the first three years of his life living with his grandparents in a 350 square foot home.

At the time of his birth, Ukraine was a republic of the Soviet Union. Under Leonid Brezhnev, antisemitism in the Soviet Union was at its peak. The oppression of the Jewish people in the Soviet Union caused international outrage which opened the doors for 400,000 Jews to be permitted to emigrate. Mr. Shvartsman's family stayed in Soviet Union (which later became Ukraine) after the first wave of immigrants left. Life was difficult with a continued government push to rid the Soviet Union of those of Jewish decent. To experience serious poverty as a child leaves a lasting imprint. Although only three at the time, Mr. Shvartsman understood that the family could not live in the Soviet Union and freely practice their faith or be proud of who they were.

Mr. Shvartsman's mother wanted a better life for her family. Life in Soviet Union entailed long hours with little pay, waiting in lines for food, and viral antisemitism. Due to his mother's perseverance, in 1974 the family was allowed to leave through the Hebrew Immigrant Aid Society (HIAS). The family first relocated to Italy and then, one year later, emigrated to Toronto, Canada. In Toronto, as well, Mr. Shvartsman experienced serious antisemitism, an issue which affects him to this day and motivates his support for various causes.

Later in life, his mother, father and grandparents often talked about the discrimination they suffered solely because they were Jews with many of their friends being Holocaust survivors. From these experiences, Mr. Shvartsman has maintained close and supportive relationships with the Jewish Community through Chabad House in Miami Beach and has supported the Jewish community in Ukraine after the invasion by Russia.

Rabbi Katz, the Rabbi of Chabad House in Miami Beach, writes of Mr. Shvartsman's support of the Jewish community and his compassion.

We do many events that help the less fortunate year round. As we come upon Rosh

Hashanah our goal is to ensure that every Jewish person is not alone. If they won't or can't come to me I go to them. We do everything that we can to ensure that those that wish to practice Judaism are supported and cared for and Michael is one of the supporters that makes that happen. His generosity has allowed us to reach many we might not otherwise. This Rosh Hashanah dinners will be brought in the Synagogue, and we will bring meals to those who cannot travel. Michael has a deep love for those less fortunate and is kind, caring and compassionate. I am grateful to him. Michael is an amazing person and has never said no to helping in any way. I met he and his brother approximately 25 years ago and they have both been with the Synagogue since the beginning. He and his brother were looking to connect and continue to be inspired by religion. Michael, since the beginning, his family has sought out advice and spiritual guidance. Michael is rough around the edges but has a heart of gold. After he married and had children, his spirituality was focused on appreciating the everyday blessings.

After his arrest in this case, he sought counsel, and it is my belief that he is remorseful for his actions and the impact those actions have had on his family. He has always sought to be a model in the community and to his children. I still hold Michael in the highest regard as a dear and close friend. We are all grateful for his generosity and recognize that humans err. His mistakes do not define him as a person. He continues to actively participate in synagogue life and continues to make a meaningful difference.

Not only has Michael been a supporter of the synagogue but he has been a supporter of my family as well. I found out in Dec of 2023 that my 17 year old son was diagnosed with cancer. I didn't know what to do or how to feel. I went to see Michael and I cried and he gave me a hug. became visibly upset and started to cry with me. He asked me how he could help and what he could do. I told him that I needed to spend time at the hospital with our sick child but I wasn't able to and Michael without hesitation made sure that I didn't have to worry about my family and my livelihood during that very difficult time.

(Letter of Rabbi Zev Katz)

From a very young age, Mr. Shvartsman has been a hard worker. His parents led by example. His father and mother worked long hard hours, his father delivering pizzas, his mother working in a factory. And Mr. Shvartsman knew too much responsibility from an early age. Almost from Gerald's birth, Mr. Shvartsman was essentially designated to be the primary caretaker for his younger brother. Only a child himself, this was hard work and a great deal of responsibility. Mr. Shvartsman took Gerald everywhere he went; picked him up from school; fed

him and tucked him in every night. He acted as Gerald's parent.  Gerald Shvartsman looked up
to his older brother and Michael Shvartsman wanted to be a good role model. He still does. Unlike
Michael, Gerald was not as independent.  At the age of 5, Mr. Shvartsman was feeding himself
and taking the public transportation bus to kindergarten alone.  The letter of support from his
father, Mark Shvartsman, describes how very independent Michael Shvartsman was out of
necessity and how his father now regrets failing to be a greater part of his sons' lives.

Mark Shvartsman, Michael's Shvartsman's estranged father, writes of his son's difficult
upbringing that foisted responsibility and resilience on him from a very young age.

> Mike, since he was a child [was] very serious but sociable, independent and had a
> very smart mind. My ex-wife and I were working many hours when Mike was born
> and for many years after that we lived at home with my parents and we needed help
> from them when Mike was a baby. When Mike was 5... the decision was made to
> start sending Mike alone on the publick (sic) bus to take himself to kindergarten. .
> . .I have a great deal of regret when it comes to Mike, I feel I put to much (sic)
> pressure on him to be a man, to be successful...
>
> In 1993, when Mike was 22 years old, I went back to Ukraine. My idea was to make
> a business and send money back home but I never did… I never supported my
> family, my business was not successful… my not being present hurt [my children]
> both deeply. Mike had to be the father, the had (sic) of the house and the way to a
> better life.  Her was smarter in business than me!... I realize there are many things
> I could have done differently with my sons.  A few visits were no substitution for
> my being present every day in their lives…  My biggest fear is that history will
> repeat itself and Mike will not be there for my grandchildren.

(Letter of Mark Shvartsman)

Mr. Shvartsman missed many of the normal childhood experiences of his friends in order
to support and care for his family. From an early age, he knew he did not wish the suffering of
his family to be passed onto the next generation. There was never a time Mr. Shvartsman did not
work. He began a life of hard work from the time he was 11 years old in Canadian flea markets
with his mother, Klara Shvartsman, selling jewelry.  Klara acquired knowledge of jewelry from

11

the factory where she worked and put that knowledge to use in creating a new business. Mr.

Shvartsman's father was never as driven as his mother, but he also worked hard to support the

family when his children were young. That work ethic, and the desire to support his family, drives

Mr. Shvartsman to this day. His mother writes about both her sons, Michael and Gerald:

> My sons care for me, they bring me groceries and medicine and completely
> oversee my medical care. I rely on them. My sons are good to their mother
> because that is how I raised them. They were raised to know that their first
> obligation is family. It's what made them the wonderful fathers and providers
> for their wives and my grandchildren. . .
>
> Michael is much softer [than his brother], quieter but I can see his pain. Michael
> cared for Gerald and kept him on his own from the time he was a small child.
> Gerald looked up to him and Michael wanted to be a good role model. The only
> time we had together was weekends, when my children as early as 7 and 13
> would work in the flea market together with me selling jewelry. My children
> never asked me for a penny no matter how many hours they had to work.

(Letter of Klara Shvartsman)

One of Mr. Shvartsman's childhood friends recalls the experience of working with

Michael in the family's jewelry business and the importance of their friendship at that time,

> We met early on in life as we lived just down the street from one another. Once
> friends we were inseparable. . . When I was 14, his parents gave me my first job,
> selling jewelry for their downtown store. My home life was difficult, and it was a
> good escape. A week before my 16th birthday I was having dinner with Michael,
> Gerald and his family when I was asked to come home as my parents needed to
> talk to me. I went home immediately only to find out that my parents had decided
> to get a divorce. This was a traumatic experience for me as it would be for most. I
> immediately ran back to Michael's where I was consoled and asked to stay as long
> as needed. I don't know what I would have done without his friendship at that
> time.

(Letter of Ron Basch)

In or about 1989, Michael and Gerald's father, Mark Shvartsman, returned to Ukraine

after the collapse of the Soviet Union, leaving his family alone. Mark Shvartsman had dreams

of business success, hoping that by returning to Ukraine as a Canadian citizen/businessman, he

would be afforded a measure of influence he had not had prior to the fall of the Soviet Union. Ultimately, his dreams were more important to him than his family was. Before his father returned to Ukraine, Mr. Shvartsman knew his father was unhappy.  His father treated Mr. Shvartsman, then a teenager, like a grown man, sharing with him the family's financial problems and, much to Mr. Shvartsman's chagrin, his father's indiscretions.  His father spoke to him like a man, and never permitting him to have a normal childhood. Mr. Shvartsman was more mature, not by choice, but by necessity, and Mr. Shvartsman shielded Gerald from everything.

Years passed before Gerald and Michael next saw their father. When they did, he was not the man that they had known.  He now had a new wife 30 years younger than him, and two small children. From that marriage, Mr. Shvartsman has a half-brother, Shawn Shvartsman, now age 21, and a half-sister, Sabrina Shvartsman, age 19.  All of this came as a shock to Mr. Shvartsman and permanently changed his relationship with his father. While he has little respect for his father's choices, Mr. Shvartsman has continued a relationship with his father.

While his father was gone, Mr. Shvartsman picked up where his father left off, working as many hours as he could and trying to bring in money for the family.  He began selling t-shirts out of the trunk of his car, and that humble start grew into a lucrative business.  By the age of 17, he had several friends working under him selling t-shirts to the tourists in Toronto.  That business led to selling Mexican ponchos. At 17, Mr. Shvartsman flew to Pueblo Mexico and convinced the manufacturer to let Mr. Shvartsman be the only importer of Mexican ponchos into Canada. A single retailer, Coconut Joe's, generated significant sales. Eventually, Coconut Joe's went out of business and left Mr. Shvartsman having to start again.

In 1988, after losing the poncho business, Mr. Shvartsman began looking for his next business venture. Mr. Shvartsman was known in his community as a hard worker and his work ethic brought him opportunities.  Teddy Lipfeld, a Toronto billionaire who made his fortune in real estate, was the father of Mr. Shvartsman's schoolmate.  His son and Mr. Shvartsman became friends.  Mr. Lipfeld was a holocaust survivor and knew what it took to survive in business. Mr. Lipfeld gave Mr. Shvartsman opportunities in the home construction business doing roofing and contracting.

Mr. Shvartsman went to the library and studied how to put a roof on a house and other construction matters, spending long hours in the library and taking books with him to the site.  His work with Mr. Lipfeld taught Mr. Shvartsman about scaling businesses.  From there, Mr. Shvartsman developed a keen sense of how to identify potential success in small specialty markets.  Over the years, Mr. Shvartsman has taken many small specialty businesses and scaled them to success. Often, he has taken the opportunities he received from Teddy Lipfeld and returned that back to the community.

In short form, Mr. Shvartsman has been an entrepreneur since he was 17 years old. Mr. Shvartsman's core business is venture capital ("VC"). His first VC deal was in 2009. Since then, he has invested in dozens if not hundreds of start-ups, some of which survived, and many did not. His investments focus on non-public businesses especially in the tech, ad tech, and fintech sectors. Mr. Shvartsman has rarely invested in publicly traded securities. He also runs a small VC fund started in 2013. While his investments are almost entirely in non-public start-ups, a few successful companies have gone public. Interestingly, his investment in DWAC was far outside the norm and is his only investment in a SPAC.

A founder of one of these businesses, Marylin Schaffer, describes Mr. Shvartsman's acumen and generous spirit:

> As the founders and I struggled to find ways to scale the company, Michael came in and changed the game through his astute strategic counsel and relationships. We were adding one driver at a time to our daily pay for Uber-driver's solution. Michael's guidance helped us to take the company beyond the success of the founders. Within a short time, Payfare had a half-billion market cap…….
>
> ……The most significant thing about Michael's support is that he has done this without any prospect of personal gain. I am not part of his peer group, I am not a friend in that I do not know his family or children though he talks about them glowingly, and I am completely out of his league financially. Despite this, he has been kind and mentored me for which I am forever appreciative. Without him I am confident that I would not have the measure of success that I have now.

(Letter of Marylin Schaffer)

Other letters tell of these same traits.

Regina Jewett writes:

> I am writing this letter to offer my personal perspective on Michael Shvartsman, whom I have had the privilege of knowing for many years. We have been friends since we were teenagers, and over the years, Michael has become more like a big brother to me. I can honestly say that he is one of the most loyal, dependable, and compassionate individuals I have ever known.
>
> Michael has always been a constant and steady presence in my life, and that of many others. Our families share a deep history, going back to our grandparents, who were also acquainted with one another. Throughout all these years, Michael has shown unwavering kindness and commitment to those he cares about, never hesitating to offer support when it is needed the most.
>
> When I went through my divorce, it was Michael who stepped forward to help me navigate the difficult process of adjusting to life as a single parent with small children. In what was an emotionally challenging time for me, Michael was a source of stability and generosity. He even extended a hand to my ex-husband by offering him work, demonstrating his belief in second chances and his willingness to help those in difficult circumstances. Additionally, Michael showed the same level of support for my oldest son, offering to help him find work when he came of age.
>
> Michael has also been a vital part of my life during joyful moments. He was the first one at the hospital when each of my children was born, sharing in those life-

changing milestones with me and my family. His support during both the highs and lows of life has meant the world to me.

(Letter of Regina Jewett)

John Gavigan writes:

For the past decade, I have dedicated myself to serving the Western New York Community by leading Entrepreneur Support Organizations and managing startup companies. These organizations support innovators who build businesses that create jobs and open new opportunities for people across our community. Given my work, which is deeply rooted in purpose and lifting others, I'm naturally drawn to those who share similar values. I first met Michael at a conference in Europe. As a successful, self-made entrepreneur, he had gained a reputation for supporting other entrepreneurs with sound advice, investment capital, business connections, and his time. Finding all these qualities in one person is rare, and I was eager to meet him. During our first conversation, Michael said something that truly reflected his values. When I asked why he continued to take on the stress of supporting numerous projects and companies—especially when he had already achieved financial security and had a young family—he replied, "It's not for the money. I just want to help build companies that do something special for the world." Working on various ventures in the years since, I've seen Michael consistently live up to this statement. He has proven himself to be a selfless mentor, an unobtrusive investor, and an invaluable connector to his network. In my experience, people like Michael are vital to fostering a healthy entrepreneurial and business ecosystem. He thinks big, is dedicated to paying it forward, and consistently supports others in meaningful ways. The companies, employees and individuals who benefit from his generosity create positive ripple effects within their communities and Mike's actions will continue to inspire others to use their own time, resources, and talents to do the same.

(Letter of John Gavigan)

Vicki and Michael Zemelman, friends of Mr. Shvartsman for the past 30 years, state:

During these many years of close and consistent contact, we have come to know Michael and his family very well, forging a deep and meaningful friendship that has endured through the years.

Michael Shvartsman is a dedicated, responsible, and compassionate individual. We were witnesses to him being a loving and devoted son and brother, stepping into the role of a father figure after his parents' divorce. Since his father left the household, Michael has not only taken on the responsibility of caring for his mother but also for his younger brother, ensuring that they both had the support they needed during a challenging time. He has maintained his duties to his mother and brother

consistently to this day. His selflessness and dedication to his family speak volumes about his character. Michael's commitment to family extends into his own household, where he is a remarkable husband and father.

We have seen firsthand his devotion to his wife and children. and his tireless efforts to ensure their happiness and well-being. He is patient and kind and we sincerely enjoy spending time with them as we get to witness their happiness. His deep sense of responsibility to his family is one of his most defining traits.

Throughout the years, we have also called upon Michael for his business advice, which has always been sound and helpful. He has a keen sense of responsibility and wisdom in his professional dealings, and his guidance has been invaluable to us. During a particularly difficult time in our lives, Michael's support went beyond words-he even helped us financially, with no strings attached, demonstrating his generosity and willingness to help others in need. Moreover, Michael has also been a loyal and compassionate friend. During our own family's tribulations, he has been a constant source of support, offering not only his friendship but his empathy and understanding during difficult times. His unwavering loyalty and kindness are qualities we have
always admired.

We know him to be a man who supports his community. Michael has been deeply involved in the Jewish community, contributing to his local synagogue and Jewish causes. He is always willing to give back and lend a helping hand. His generosity and dedication to these causes reflect his commitment to making a positive impact on those around him.

(Letter of Vicki and Michael Zemelman)

**B.**    **Family Circumstances**

In 2013, Mr. Shvartsman moved to the United States.  He was 42 years old and still single with no children.  In the United States, Mr. Shvartsman met Alexandra Melnikova, now 33, at a friend's home in Miami Beach.  They were married and shortly thereafter had three children, ███████ Shvartsman, age eight; ██████ Shvartsman, age four; and ██████ Shvartsman, age one.

As Mrs. Shvartsman writes:

We have been married for over 9 years, the best years of my life. Michael is my best friend and the most wonderful father I could have dreamt of for my children. We have 3 children together: ████ 8 years old, █████ 4 years old and

baby ███████ 1.5 years old. Michael always makes our family his first priority. Even with his busy schedules he has never missed our son's soccer games, parent teacher conferences and all the performances our kids have. He loves to help me with bathing them and putting them asleep. He is the best in doing math homework and also he is the man who would wake up in the middle of the night and make a bottle of milk for the baby. He is the biggest supporter and example for our children.

(Letter of Alexandra Shvartsman)

There are a number of letters of support from friends who have known Mr. Shvartsman through good and bad times. They all describe an individual of kindness, empathy and loyalty.

A friend of forty years, Jack Ponte, writes:

Throughout these decades, I've had the privilege of knowing Mike as a person of unwavering integrity, kindness, and deep loyalty to the people around him. He is more than just a friend to me—he's been like a brother. . .

Growing up, I wasn't as fortunate as the others in our circle, but Mike made sure I never felt left out. Whether it was lending me clothes or covering my share of a bill when I was short, he always looked out for me. My parents could never afford to buy me the things my friends had, especially a bike. When Mike received his BMX, a legendary PK Ripper, for his Bar Mitzvah, it was the dream bike every boy in those days. Mike never let anyone ride it—except me. One day, when everyone else was denied a ride, Mike handed me the handlebars and said, "Take it for a spin." That gesture wasn't just about the bike, it was about who Mike was. He always put me first, treating me like the brother I never had.

Mike's nurturing and caring nature didn't just extend to me but to his younger brother Gerald, too. Gerald was often with us because Mike always made sure he was safe and included in all our adventures. Their parents, Klara and Mark, worked very long hours, but Mike stepped up and took on a protective, older brother role without hesitation. The Shvartsman home became like a second home to me. I witnessed firsthand the kindness and respect Mike showed his parents, and I tried to model my own behavior after his.

Even when there was a period of time when we lost regular contact, after Mike and his family moved to Edmonton, we would always reconnect on special occasions like birthdays and holidays, just like family. When they returned to Toronto briefly in 1999, before moving to Florida, they were going through tough times. I remember lending Mike money on my credit card to help them restart life in Miami. I went down for a visit shortly after they moved there. We all slept on air mattresses and reused plastic plates as they settled into a new place, making sure to stretch

every dollar. Despite the hardships, Mike made sure to repay the money and even gave me extra as a token of appreciation for the help. . . .

Before starting his own family with Sasha, Mike would visit often to spend time with my children, always eager to have kids of his own. Now, as a father, his love for his children shines through in every conversation we have. Despite the demands of his busy professional life, Michael takes time to connect with me almost every day. Whether it's early morning calls with his kids laughing in the background or thoughtful check-ins when I need advice, Michael always shows up. He's one of the most generous and compassionate people I know—someone whose heart is full of love and whose actions have consistently demonstrated care for those around
him.

(Letter of Jack Ponte)

And Ms. Onufriichuk writes:

In the 4 years that I lived with Michael and Alexandra I did not see Michael ever raise his voice at Alexandra and ▆▆▆▆ or anyone else for that matter. Michael always left early to work in the AM and no matter how late he got home from work he made time to be with his son. He hugged, kissed and told ▆▆▆ he loved him all day every day. ▆▆▆ has always been closest to his father.

The children and Alexandra are the love of Michael's life, and I was and am envious of the way that he treats his wife and children. He is a model example of how a father and husband should treat his wife and family. I saw many people come visit their home and ask for assistance and their door was always open to everyone. All of the high holidays their home is filled with family friends and often strangers that had nowhere to go and everyone was always treated the same.

Two years after I stopped working for Michael and Alexandra the Ukraine war started and I was deadly afraid what was going to happen to my adult children. I had to get them out of Ukraine so I could make sure their lives would be spared. The first person I called that I knew would help me was Michael and Alexandra. Michael immediately said that he would do his best to try to get them out of the country and to America. He did it. He saved my children. Many of their friends have died because of the war and I can't thank Michael and Alexandra enough for saving my children's lives. He did all this without ever asking for anything. I know he has done the same for many other people.

(Letter of Antonia Onufriichuk)

Mr. Shvartsman is an extremely dedicated father and is very close to his children. He has created a loving and calm environment within his home and attends and supports his children in all of their myriad sports events, school performances and activities. ███████

███████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

███████████████████████████████

█████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████

████████████████████████████████████
████████████████████████████████████
███████████████████████

████████████████████████████████████

No discussion of Mr. Shvartsman's family circumstances is adequate without a realistic discussion of the impact that deportation will have on this family. As noted in the PSR (PSR at ¶41), absent a waiver, Mr. Shvartsman is subject to removal proceedings for the offense to which he pled guilty. This collateral consequence, not shared by a citizen defendant, is severe and a huge disparity between Mr. Shvartsman and any citizen defendant. Mrs. Shvartsman has been in the United States for 13 years, after being recruited by Florida Atlantic University to play basketball. Neither Mrs. Shvartsman, nor her three children, have ever spent time in Canada and are they not Canadian citizens. The children were born and raised in the Miami community.

The relocation of a family in these circumstances is traumatic and an enormous collateral consequence not endured by citizen defendants. The penalty in this case should be commensurate with that of a United States citizen and take into consideration the significant collateral impact on this family.

C.    **Commitment to the Community and Giving Back**

Mr. Shvartsman recognizes the wrongfulness of what he has done and wants the Court to know that, while he cannot undo his actions, he has learned a difficult lesson and hopes to take significant steps towards rehabilitation and atonement. The first step, of course, was by admitting and acknowledging his criminal activity. He also intends to make amends through acts of charity and to pass on the lessons he has learned to whoever he can. Michael has been and can continue to be a mentor to others.

As the son of refugees, and a refugee himself, Mr. Shvartsman has sought the opportunity to help other refugees. One example is Joblio. Joblio is a recruitment company that Mr. Shvartsman co-founded. It focuses on bringing talented individuals to corporate partners. When the war in Ukraine broke out, Mr. Shvartsman, a now former board member of Joblio, and his team, decided to assist Ukrainian refuges through the United States program Uniting 4 Ukraine by sponsoring families into the United States.Uniting 4 Ukraine allows Ukrainian refugees with sponsors to come into the United States. Joblio worked directly with a number of resettlement agencies such Jewish Family Services, Catholic Charities, and the Shapiro Foundation, among others, to provide housing, transportation, employment and direct assistance to families until they can be self-sufficient. Mr. Shvartsman and his wife personally sponsored 100 families to come to the United States through Uniting 4 Ukraine. The process is rigorous, and Homeland Security must approve all applications. To date, 21 people have been brought into the United States based on Mr. Shvartsman's efforts. Through these efforts, these people are now safe from the war and are productive members of the community.

A letter from Segery, Tetiana and Dasha Koltsov states:

> We would like to express our deepest gratitude to Michael and Alexandra Shvartsman, who graciously sponsored us when we fled Ukraine under the U4U

Humanitarian Parole Status.  Though they had no obligation to do so, they chose to open their hearts and help us, expecting nothing in return.  Their kindness and generosity in sponsoring us out of the goodness of their hearts has changed our lives forever.  We are forever grateful to Michael and Alexandra Shvartsman for the incredible act of compassion, which has allowed us to rebuild and hope for a better future.

(Letter from Segery, Tetiana and Dasha Koltsov)

Mr. Shvartsman's friend of 13 years, Brian Bogosian, writes:

Michael, like me, came from very humble beginnings. He himself was an immigrant to both Canada and then the USA. Michael is a person of great heart and compassion, both for friends with whom he has an unshakable loyalty, to family including his brother and parents for whom he is really the Patriarch of the family, and especially to his Mother Klara who l have met on many occasions where he has taken her happiness, her security and her wellbeing as being his personal responsibility. I have seen Michael through his marriage to Sasha, one of the kindest human beings I have ever met. and his lovely children, for whom he is a present, very involved and loving father Michael is also an observant Jew, devoted to his religion and who follows scriptures in his day to day to life. He is generous in his personal philanthropy, again with an open heart and a giving nature. The Shvartsman table is always open to guests. both well-known and successful to simple people without status or wealth. Michael is incredibly intelligent and funny and is often the center of the conversation in groups. both small and large. He knows right and wrong and is quick in his advice to others, including me. to always guide us to doing the right thing and that doing the right thing and doing good is always rewarded in the grand scheme of life.
I need to pause to reflect on my own journey and the very difficult and heart wrenching past two years I have been through which are as a result of a divorce and the alienation of my two daughters… The depths of despair I was feeling were very profound and despite everything Michael has going through these past two years. he put aside his issues for me and always made time for a comforting word and very often tangible ideas on ways to reunite with them.
There were days I wasn't certain I would get through and his genuine and caring manner along with the grounded and very sound advice helped me and I'm not sure where I'd be today without that support. This was not a call or meeting; it was hours and hours of deep and personal discussions Michael has likewise supported countless people as mentor, advisor and devoted friend, I believe strongly and with all my heart that Michael's positive impact on society and all those he touches are best served with his continued mission to assist his fellow man and that his inner goodness and good deeds far outweigh any mistakes he has made in matters before this court. When the word Michael comes up I cannot help but think of the Yiddish word "Mensch" as he personifies it in all ways.

(Letter of Brian Bogosian)

Igor Matrosov writes:

From the beginning of our friendship in 2006, I cannot say enough about the respect I have for him as a friend, a mentor and a genuinely caring individual. I have been there for the birth of all his children and watched him build a beautiful family, I have watched him take care of his ailing mother over the years and I have witnessed numerous acts of generosity and caring towards individuals in his circle of friends and those in need of help around him in the community.

My true testimony of Michael's character is based in my own experiences with him throughout the years. He has always provided honest opinions and helped guide me in becoming a successful family man myself and provided invaluable knowledge and mentorship in my career and business in the technology field.

I would like to share with you a true example of his generosity and will to help others in the example of my wife's business. In 2010 My wife was looking to establish a business in the Medical Skin Care Business, She was knowledgeable in the field but lacked the business acumen and background to start the new venture. We both approached Michael for help in guidance, not only did he mentor her over the years, but he also provided her with free office space when she was just starting and couldn't afford to pay rent. Most importantly he provided the generosity of his time and effort to care in helping her succeed.

We can both adamantly state that we have never know Michael to conduct himself in a unscrupulous or unethical manner. I have always known Michael to be the first one to guide those around him to be righteous and honest, its evident in the respect and love that so many of his friends and associates have for him and its evident in the beautiful family he has and the way they conduct themselves.

Our family is close to Michael's family, and we have witnessed the impact this case has had on his young children. █████████████████████████████

(Letter of Igor Matrosov)

And Tom Greenberg, who met Mr. Shvartsman in 2009, has praise for Mr. Shvartsman's

skill in the business world and kindness as a friend and mentor.

In my professional life, I am the founder and CEO of Score Promotions. I have been in this business/industry since 1998. We create custom branded merchandise for of the world's largest brands such as Deloitte, Salesforce, Budweiser, TD Bank, L'Oreal and many more. I can say with the utmost confidence that a big part of my success is attributable to Michael. From the moment we became friends, I looked

up to him as mentor and would always call him when I would need career and business advice. Not only would he answer any questions I had at any given time, but he truly took an interest in my success and career path. Over the years as my business would grow and my needs and challenges became greater, he was always there as a sounding board for me. During some of my more difficult times in business, he helped guide me in the right direction. Any chance Mike would have to introduce me to a potential client, whether it be a friend of his or a business associate, he did it out of the kindness of his heart without ever expecting anything in return. He was just happy to see my business grow and never cared to benefit from it. I respect him.

On a personal level, Michael has been my rock. In 2015 I was at a crossroads in my life and dealing with a very difficult divorce. Mike was there for me at all hours of the day or night. I can say with all my heart that thanks to him, I got through it and was very fortunate to have a friend like him during this trying time. In 2017, before my first daughter was born, my fiancée and I decided to move to Florida so I could continue to expand my business in the USA. We had no family members in Florida and moving away from our hometown Toronto was that much easier having a friend like Mike. He insisted (and still insists) that on every Thanksgiving, Rosh Hashanah, Passover, or any other holiday we were together with his family. Over the years we both started to have more children. Our wives became incredibly close and our kids our are growing up together. Watching our families grow together gives me immense joy and gratitude for our friendship…

I can say with all confidence that Mike has without a doubt had the biggest positive impact on my life. I love him like a brother and can truly say that he is salt of the earth.

(Letter of Tom Greenberg)

Finally, Mark Reiman, a former Senior Special Agent with nearly thirty years at Homeland Security Investigations (HSI), writes about his work with Mr. Shvartsman at Joblio:

…over the course of my career, I gained a unique perspective into people's true character through the most challenging of circumstances. Now retired, *I* have taken on a role in the private sector, an experience that has afforded me the opportunity to work closely with Michael al Joblio, a company that helps immigrants and refugees find meaningful employment while supporting them through various wrap-around services.

Upon joining Joblio, I quickly came to know Michael as a leader who not only possesses impressive business acumen, but also exemplifies the qualities of an

outstanding mentor. His dedication to guiding others, accessibility, and genuine willingness to share knowledge have profoundly impacted my growth in the private sector. Michael's mentorship helped me transition into a leadership role, instilling in me the confidence needed to make sound decisions for the company and our employees. Under his direction, Joblio has flourished from a startup to an international brand benefiting countless individuals in need of opportunity and support.

Beyond our professional collaboration, I have come to know Michael on a personal level. He is deeply dedicated to his family, as evident through his loving and involved relationship with his three young children. Observing his compassion as a father, I am reminded of my own journey raising three children, and I admire the way Michael nurtures and guides his family. It is a testament to the kind of person he is, someone who leads not just with his mind but with his heart.

Michael's generosity extends beyond his family to his friends, colleagues, and even acquaintances. He bas an unwavering willingness to help others, whether by offering support, making connections, or simply being there during difficult times. This generosity is not transactional; it comes without expectation of anything in return. His actions speak volumes about his character, consistently putting others before himself and seeking to uplift others around him.

(Letter of Mark Reiman)

Mr. Shvartsman's generosity to strangers and friends alike is demonstrated in the letters from friends and supporters, excerpted herein, and attached collectively as Exhibit A.

## V.    The Need to Avoid Unwarranted Sentencing Disparities Suggests a Substantially Below Guidelines Sentence in this Case

A critical sentencing consideration is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a).  Individuals convicted of insider trading in the Second Circuit have often received significantly below-guidelines sentences.

The PSR sets forth Judiciary Sentencing Information (JSIN) in an Appendix, but it is limited to just 5 cases where the Guidelines were level 23 and the Criminal History was 1. That makes for a very limited data set. Still, the average sentence in those 5 cases was 27-28 months

– essentially a sentence to level 17 or 18, not 23. Below is a compendium of recent cases, mostly in this district, where defendants uniformly received sentences substantially below the agreed-upon Guidelines range. The point is that, in this district, first-time white-collar defendants are often sentenced far below the plea agreement.

In *United States v. Andrew Stiles*, 23 Cr. 098 (RA) (S.D.N.Y.), the defendant pled guilty to insider trading with respect to Kodak stock prior to a public announcement that the federal government was considering a loan to Kodak of millions of dollars to increase pharmaceutical manufacturing in the United States. The defendant engaged in trading on MNPI misappropriated from his employer concerning the impending Kodak government contract announcement. (Gov't Sentencing Letter, July 17, 2024, at 2)(Dkt. No. 23 cr. 098, ECF 56) The parties agreed to a stipulated guidelines range of 21 to 27 months' incarceration. Mr. Stiles' plea agreement (non-cooperation) was a level 17 with a Guidelines range of 24-30 months. The government recommended a sentence within this stipulated range.  (*Id.* at 12) At sentence on July 24, 2024, the Hon. Ronnie Abrams sentenced Mr. Stiles to 3 months incarceration, 9 months home detention, and 2 years supervised release.

In *United States v. Stewart,* No. 15 cr. 287 (JSR)(S.D.N.Y.), the defendant, a vice president at a healthcare investment bank, was convicted after trial of tipping his father on five separate deals. (Gov't Sentencing Submission, November 26, 2019, at 3-4) (Dkt. No. 15 cr. 287, ECF 363) The father and his colleague reaped $1.1 million in insider trading profits. The advisory guidelines sentencing range for Stewart's criminal conduct was 63 to 78 months of imprisonment. Describing Stewart's criminal insider trading conduct as "brazen, as were his many acts of deception to avoid being held responsible for his crimes," including Stewart's

"commit[ting] perjury" during trial, the government recommended 36 months' imprisonment. (Id.) On December 3, 2019, the district court imposed a sentenced of 24 months.

In *United States v. Bill Tsai,* No. 19 cr. 675 (VM)(S.D.N.Y.), defendant abused his position as an analyst at an investment bank to obtain MNPI with which he made profitable securities trades in his personal brokerage account, receiving profits of nearly $99,000. (Gov't Sentencing Submission, January 10, 2020, at 2, 5) (Dkt. No. 19 cr. 675, ECF 23) The defendant pled guilty to a stipulated guidelines range of 18 to 24 months' imprisonment. (*Id.*) The district court imposed a sentence of five years' probation.

In *United States v. Jason Peltz,* 21 cr. 154 (NGG) (E.D.N.Y.), defendant pled guilty to securities fraud and tax evasion in connection with obtaining and trading on MNPI acquired from a corporate insider concerning a potential takeover bid. (Gov't Sentencing Letter, October 21, 2022, at 1-2) (Dkt.  No. 21 cr. 154, ECF 59) Defendant profitably traded in stock and options of the target company using brokerage accounts of two co-conspirators and also tipped off other individuals, each of whom profited by trading on the MNPI.  Further, the defendant gave the MNPI to a reporter of a financial publication, hoping to gin up the stock price with a published story on the takeover bid. Defendant was responsible for more than one million in profits from his insider trading activities. (*Id.* at 2) The plea agreement called for a guideline sentencing range of 37 to 46 months' incarceration. The government recommended 36 months - slightly below the applicable sentencing guidelines. On November 17, 2022, the district court sentenced Mr. Peltz to five years' probation.

In *United States v Joseph Lewis,* 23 cr. 370 (JGLC)(S.D.N.Y.), defendant, a billionaire investor with access to MNPI, "committed grave, serial breaches of the duties he owed publicly traded companies to keep information confidential."  (Gov't Sentencing Submission at 2) (Dkt.

No. 23 cr. 370, ECF 66) In a "troubling pattern of misconduct over the course of several years," Lewis "tipped his girlfriend, personal pilots, employees, and friends with closely guarded, valuable information entrusted to him." (*Id.*)  The government recognized that the seriousness of the offense was counterbalanced by "the unique mitigating age and health factors at issue for Lewis." (*Id.* at 2)

The government recognized that Lewis' status as a noncitizen was also a mitigating factor:

> At this time, the Government understands that the Bureau of Prisons does not strictly forbid the designation of a non-citizen to a minimum security prison camp, and the Court may make such a recommendation. That said, the Bureau of Prisons does not ordinarily designate non-citizens to such facilities, and any designation decision, were the defendant to be sentenced to a term of incarceration, would be left to the discretion of the Bureau of Prisons.

(*Id.* at 16)(Emphasis added)  The government suggested that a sentence below the applicable guidelines range of 18 to 24 months' incarceration would be sufficient, but no greater than necessary, to reflect the seriousness of the offense and the mitigating factors. (*Id.* at 20) The district court imposed a sentence of 3 years' probation and a fine of $5 million. (Dkt No. 2303670(ECF 69)

In *United States v. Christopher Collins*, 18 cr. 567 (VSB)(S.D.N.Y.), defendant, a U.S. Congressman, pled guilty to insider trading and making a false statement to the FBI, in connection with giving his son MNPI about a pharmaceutical company's failed drug trial. The applicable guidelines range was 46 to 57 months' imprisonment. (Gov't Sentencing Letter, January 13, 2020, at 1)(Dkt. No. 18 cr. 567, ECF 155) The government requested a sentence at the top of the guidelines range to reflect the seriousness of the congressman's conduct. (Id. at 6-11) On January 16, 2020, the district court imposed a sentence of 26 months.

In *United States v. David Stone*, No. 22 cr. 510 (MKV)(S.D.N.Y.), defendant, an information technology professional at an investment-advice company, gained unauthorized access to the computer system to view confidential information about the company's pre-publication stock recommendations, traded on that on that information, and distributed that information to a friend. (Gov't Sentencing Letter, February 8, 2023, at 1-2)(Dkt. No. 22 cr. 510, ECF 32) Stone and his friend placed dozens of securities trades based on the stolen information and made millions in illicit profits. (*Id.*) Through his own brokerage account and those of his wife and father, Stone realized a profit of $4,836,518. The applicable guidelines range was 46 to 57 months.  The district court sentenced Stone to 28 months' incarceration.

In *United States v. Bhardwaj*, No. 22 cr. 398 (GHW)(S.D.N.Y.), defendant, an executive at a technology company, pled guilty to his role in orchestrating an insider trading ring involving two different acquisition targets, including efforts to obstruct the F.B.I.'s investigation.  (Gov't Sentencing Letter, December 3, 2023, at 1-2)(Dkt. No. 22 cr. 398, ECF 14) Bhardwaj personally profited over $500,000 from his own trading based on his inside information, and the overall insider trading ring's profits were in the millions of dollars. (*Id.* at 2) The applicable sentencing range was 57 to 71 months' incarceration. (*Id.* at 5) Bhardwaj was sentenced to 24 months' imprisonment.

In *United States v. Brandon Wong*, 22 cr. 395 (ER)(S.D.N.Y.), defendant plead guilty to an insider trading scheme spanning several weeks during which he purchased thousands of shares of a company's stock using confidential information stolen by his codefendant from his girlfriend who was a law firm associate working on the company's acquisition. Wong personally encouraged trading by his brother and numerous friends -- a total of eight other people. He

made more than $1 million after the company acquisition was publicly announced. In describing the seriousness of the offense, the government stated that Wong

> jumped at the opportunity to use the stolen information, traded on it repeatedly, tipped others, and sought out more information after making a profit. Wong is different from traders who simply receive a tip and trade on it, and then later argue it was a momentary lapse in judgment. His reaction to receiving the information, the successive trades, the tipping, and the desire to do it again are all aggravating factors that make the defendant's crime more serious, and weigh in favor of a lengthier sentence.

(Wong Gov't MOL at 11)(Dkt. No. 22 cr. 395, ECF 137). Wong's guideline range was 30 to 37 months' incarceration. On January 26, 2024, Wong was sentenced to 5 months' incarceration.

In *United States v. Dikshit,* No. 21 cr. 760 (CM)(S.D.N.Y.), defendant, a partner at McKinsey & Company advising an investment bank on a two-billion dollar acquisition, obtained sensitive and confidential information that he used to trade on out-of-the-money call options. Defendant's insider trading resulted in illegal profits of $450,000. The applicable guideline range was 30 to 37 months' incarceration.  Defendant was sentenced to 24 months' imprisonment.

In this regard, we adopt and join the arguments made in Gerald Shvartsman's sentencing Memorandum filed October 2, 2024 (ECF 208) (Point 1), with respect to how the guidelines use financial amounts to overstate an appropriate sentence.

## VI.    The PSR Justification for Recommendation is flawed and the Final Recommendation Inconsistent with Precedent and Penalizes Mr. Shvartsman for Exercising a Constitutional Right

The PSR states that there are factors that may warrant a departure from the applicable guideline range. Specifically, the PSR states that Mr. Shvartsman is a first-time offender; that he has a stable residence and stable employment; has a solid family; is married with three young children; the sole earner for his family; and has the support of his wife and mother. (PSR at

para's 134-135) Paradoxically, Probation recommends the bottom of the plea agreement – 46 months. The justification for this appears to be centered on Mr. Shvartsman's decision, based on counsels' advice, not to submit a financial statement on the basis of his Fifth Amendment rights under the US Constitution. We respectfully submit that that is inappropriate and penalizes Mr. Shvartsman's assertion of his constitutional rights.

The PSR suggests four reasons for its recommendation. First, it states that Mr. Shvartsman made the most money of the defendants in this case – $18.2M. That is true, but it is also already taken into account by the offense level which, as we all know, is guided by 2B1.1. (*See* U.S.S.G. § 2B1.1(b)(1)(K)) In every one of the cited cases above, including those 5 notes in the JSIN, the guideline was determined from the amount of money at issue. And in every case, there was a below guideline sentence.

The PSR suggests, as a justification, the need for deterrence. But that is true for every defendant in the JSIN (all level 23), and in the collected cases above.

The PSR also suggests that Mr. Shvartsman was the "driving force" and the planner in the case. But that theory is belied by the plea agreement itself, which has no role adjustment, and the facts. As noted above, Mr. Shvartsman, and others, fully understood the plan for DWAC to purchase TMG, and he purchased the DWAC securities based on this information. Further, Mr. Garelick on multiple occasions purchased DWAC shares in the open market during the month of September 2021, well before Mr. Shvartsman's warrant purchases on October 1, 2021. So, it is just not fair to say that Mr. Shvartsman had any greater role than anyone else in this case.  Yes, Mr. Shvartsman did tell friends and others about his view of DWAC, but that did not justify a role adjustment to the government, and it is certainly consistent with every tipper/tippee case cited above, including the *Stiles*, *Stewart*, *Peltz*, *Joseph Lewis*, *Collins*, *Stone* and *Bhardwaj* cases.  In every one of these cases, the defendants were tippers to others and thus

could be considered the driving force in the case. They all received significant below guidelines sentences.

Finally, Probation recommended a year and a day for Mr. Shvartsman's brother, Gerald. Gerald's guideline level is 21, which is 36-47 months. Mr. Shvartsman's guideline is 23 – just two levels higher – yet Probation is suggesting a sentence four (4) times greater than that for his brother, Gerald Shvartsman.

It thus appears that the reason for Probation's displeasure is Mr. Shvartsman's decision not to submit a Personal Financial Statement (PFS).[1] That circumstance is noted multiple times in the PSR. (*See* para's 111 and 117) The purpose of the PFS is well known. As the PSR itself acknowledges, the purpose of the PFS is for Probation to be able "to determine the defendant's ability to remit a fine." (PSR at para. 117) Probation acknowledges that, by letter dated September 17, 2024, defense counsel notified that:

> The PSR should note that, on the advice of counsel and pursuant to his rights under the Fifth Amendment, Mr. Shvartsman is not filing a financial statement. On the other hand, please note that Mr. Shvartsman will be paying the forfeiture prior to sentence and does have the means to pay a fine.

Accordingly, there is no dispute that Mr. Shvartsman has the ability to pay a fine. Further, as of Monday, October 7, 2024, the $18.2 million forfeiture judgment is paid.

---

[1] Probation suggests that Mr. Shvartsman did not submit full credit reports, but he did so, sending full Equifax and Transunion reports to probation on August 26, 2024. These reports were apparently satisfactory for Gerald Shvartsman. Mr. Shvartsman also provided a release for Probation to obtain all of his tax return information from the IRS. Additionally, Probation asks for special conditions (PSR at page 40) that allow him to "monitor" Mr. Shvartsman's financial transactions suggesting his dissatisfaction with the failure to provide financials. The request includes limiting his business actions and requiring permission to incur lines of credit. All of which is unnecessary with full knowledge that Mr. Shvartsman has paid the forfeiture judgment and intends to pay a fine in full.

We respectfully submit that under the circumstances here, where the defense acknowledges Mr. Shvartsman's ability to pay a fine and, on counsels' advice, Mr. Shvartsman declines to provide a PFS pursuant to his constitutional rights, where the overwhelming majority of cases, including the JSIN, shows significant below guidelines sentences, and where Probation's recommendation for Gerald Shvartsman is a year and a day, Probation's recommendation of 46 months penalizes Mr. Shvartsman for his  assertion of his constitutional rights. For these reasons, we ask that the Court reject the recommendation.

## VII.    **Deterrence**

Another key consideration for a sentencing court is whether the imposed sentence provides sufficient general and specific deterrence. Another factor listed in 18 U.S.C. § 3553(a)(2) to "afford adequate deterrence from criminal conduct" and "to protect the public from further crimes of the defendant." §§ 3553(a)(2)(B) & (C). The first factor contemplates generally deterring the public from committing crimes similar in nature to those in which the defendant has engaged. The second focuses on deterring the defendant himself from committing future crimes. Mr. Shvartsman submits that both general and specific deterrence have been met in this case.

For a sentence to accomplish general deterrence, it must work as a message to the entire community of potential violators. There is, however, "considerable evidence that even relatively short sentences can have a strong deterrent effect of prospective 'white collar" offenders." *United States v. Adelson,* 441 F. Supp.2d, 506, 514 (S.D.N.Y. 2006) (internal citation omitted); *see also United States v. Yeaman,* 248 F.3d 223, 238 (3d Cir. 2001) (Nygaard, J., dissenting) ("It is widely recognized that the duration of incarceration provides little or no general deterrence for white collar crimes.")

In analyzing whether Mr. Shvartsman is specifically deterred, many circumstances demonstrate that there is little to no risk that he will recidivate:

- Mr. Shvartsman has entered a guilty plea and agreed to a substantial forfeiture of the proceeds of his insider trading. A criminal felony conviction for securities fraud, combined with a forfeiture order, and a short period of incarceration will send a message to the general public.

- Mr. Shvartsman accepted responsibility for his offenses, is deeply remorseful for and ashamed by his misconduct and recognized the harm resulting from his offenses. See *United States v. Broxmeyer*, 699 F.3d 265, 295 (2d Cir.  2012) (indicating that a defendant who shows "remorse for, [and] appreciation of, the seriousness of the totality of his conduct" poses a low risk recidivism); *United States v. Ortega*, No. 09CR-742-01, 2010 WL 2541364, at *2 (E.D.N.Y. June 1 7, 2010) ("It is unlikely that he will engage in further criminal activity considering his supportive family, his sincere remorse, and overall good character.");

- Mr. Shvartsman is 53 years old and has no other criminal history. See *United States v. Jenkins,* 854 F.3d 181, 192 (2d Cir. 2017) (discussing how recidivism substantially decreases with age).  He has been under Pretrial Supervision for over two years and has no violations or issues.

## VIII.  Disparate Treatment of Noncitizens Affects Sentencing Considerations

The Court should, most respectfully, consider that Mr. Shvartsman will be prevented from accessing a number of prison reduction programs only available to citizens and, moreover, will be ineligible for camp status. Thus, his conditions of confinement will be significantly harsher and longer than a similarly situated defendant who happens to be a citizen of the United States. He will not be eligible for a federal prison camp where similarly sentenced defendants are housed, despite being a non-violent first-time offender. Further, he will not be eligible for time credits to reduce his sentence because he is ineligible as a noncitizen. The First Step Act of 2018 (FSA) establishes a system to encourage inmates to participate in "evidence-based recidivism reduction" programs and "productive activities." 18 U.S.C. § 3632(d). Inmates who complete these programs accrue time credits, which "shall be applied toward time in prerelease

custody [i.e., transfer to home confinement or placement at a residential reentry center] or supervised release." Id. § 3632(d)(4)(C).

Earned-time credits are applied when the inmate's credits are "equal to the remainder of the prisoner's imposed term of imprisonment." Id. § 3624(g)(1)(A). However, certain inmates are statutorily ineligible to apply earned time credits toward time in prerelease custody or supervised release. Id. § 3632(d)(4)(E).  Specifically, the FSA states that "[a] prisoner may not earn time credits" "if that prisoner is an inadmissible or deportable alien under the immigration laws…." *Id. See generally Cheng v. United States*, 2024 WL 1309016 (S.D.N.Y. 2024). In order to account for the disparate treatment foreign nationals receive in our prison system, courts have imposed reduced sentences.  For example, a district court in the Northern District of Illinois recently sentenced a defendant with foreign citizenship to time served and 3 years in community confinement (i.e., a BOP half-way house), despite the government's demand for a 10-year sentence, describing the BOP's policy with respect to the imprisonment of foreign nationals as "ridiculous". *See* Judgment in a Criminal Case at 1, *United States v. Agarwal*, No. 19-cr-864 (N.D. Ill. July 1, 2024) (ECF No. 807).

And Judge McMahon in this district recognized the impact of the BOP's policy on non-citizens. In *United States v. Black*, No. 16-cr-370 (S.D.N.Y. Oct. 24, 2019) (ECF No. 451), the defendant was charged and convicted at trial of conspiracy to commit wire fraud and bank fraud and substantive wire fraud. Judge McMahon calculated a Guidelines sentence of 57 to 71months' imprisonment. Judge McMahon addressed the impact of BOP's policy for non-citizens on the defendant. As the court explained: "If I could sentence Mr. Black to a term of incarceration—a brief term of incarceration—knowing that he would go to a facility appropriate to his criminal conduct, I would do it. But I know that I can't. I know that simply because he is a

36

non-citizen—and I use that term advisedly. He is not an illegal alien. But because he is a non-citizen, he will not be eligible to serve his sentence in the same way that any American citizen who stood convicted of this crime would serve. And that's not right."

Judge McMahon imposed a non-custodial sentence of time served, with 9 months' home confinement and 3 years of supervision.

Lastly, we join the arguments submitted by counsel for Gerald Shvartsman concerning the impact of a sentence on a non-citizen generally, and a sentence exceeding a year and a day on ICE removal determinations. See Gerald Shvartsman Sentence MOL dated October 2, 2024 at pages 30-33 (ECF 208).

## IX.    **Objections to the Final PSR**

On August 19, 2024, we received a draft PSR. We responded to that document by letter with our objections dated September 17, 2024. On October 1, 2024, we received the Final PSR. Our objections to the Final PSR are as follows:

**Para's 37-38:** As we first noted in our objection letter dated September 17, 2024, the PSR at para's 37-38, recites the Indictment's allegations regarding a charged money laundering scheme. Mr. Shvartsman did not plead guilty to those charges, and they are being dismissed upon sentence. As such, they should be removed from the PSR.

**Para. 69**: "According to ICE, since the defendant has been convicted of a felony, he may be **amenable** to removal proceedings for violations of the Immigration and Nationality Act." (Emphasis added) To the extent that the word "amenable" is misconstrued to suggest that Mr. Shvartsman is agreeable to deportation, that is certainly not the case. The PSR should reflect that definitional clarification.

**Para. 70, 71:** the PSR should note that Mr. Shvartsman met his wife, Alexandra, on February 27, 2014, not 2013.

**Para. 72**: "However, since late September 2024, the defendant and his family have been in process of moving back to 15901 Collins Avenue, Unit 2701, Sunny Isles Beach, FL, which was under renovation since early 2023." The PSR should note that since 2020, Mr. Shvartsman and his family have resided at 18555 Collins Avenue, Unit 4603. Late last month, the family moved to another apartment in the same building, apartment 2701.

**Para. 73**: the PSR should note that Mr. Shvartsman never owned this unit, and they have not moved back and have no intention of moving back.

**Para. 88:** the PSR should note that Transact First is owned by Rocket Holdings, LLC and the Hannelius Knight Family Trust.

**Para. 94**: the PSR should note that Rocket One Capital, LLC is owned 80% by Rocket Holdings, LLC and 20% by Mr. Shvartsman individually.

**Para. 96:**  Please note that Conquest Financial Services, LLC, had revenue of $60,000 in 2023, not income to Mr. Shvartsman, individually.

**Para. 97:** Mr. Shvartsman acknowledges that he is a Trustee of a Revocable Trust of which he is also a beneficiary.

**Para. 112:** The PSR should note that the following accounts are Closed:

Goldman Sachs & Co.  Acct.
E*Trade Securities
RBC Capital Markets Acct.

The PSR should further note that Mr. Shvartsman does not own Pepper Pay, LLC.

**Para. 113 and 114:** "Shvartsman stated that he and his spouse receive benefits from multiple trusts, which they have established. The defendant has not furnished, to date, the names of those trusts or any details related to those trusts."  The PSR should reflect that Mr. Shvartsman and his wife are beneficiaries of a single trust, not multiple trusts.

**Para. 115:** "Shvartsman was directed, on at least two separate occasions, to sign a waiver form allowing the probation office to generate a credit report from the Equifax credit company, but he has declined to submit this form." The PSR should reflect that by email dated August 26, 2024, Mr. Shvartsman provided current Equifax and TransUnion credit reports to Probation. Accordingly, this assertion should be deleted.

**PSR at the Box/Table on page 23:** Mr. Shvartsman has no recollection of being affiliated with M2 Enterprises, L.L.C., and Next Level Concepts, LLC.


## <u>CONCLUSION</u>

Mr. Shvartsman has paid a steep price for his insider trading. He has lost his reputation

and suffered humiliation both personally and professionally.  He has lost significant amounts of

business through the loss of banking, credit cards, customers and vendors.   His wife and

children have suffered and there will continue to be huge collateral consequence of his actions, which is a significant punishment in and of itself.

There is no question that Mr. Shvartsman has always shared his success with others and helped those in need. He has been a contributing supporter of immigrants and those in difficult circumstances. This Court should weigh the many friends, colleagues, businesses and family whom Mr. Shvartsman has helped, as described in the letters attached, as well as the deep remorse that Mr. Shvartsman has for his conduct.  For all the foregoing reasons, we respectfully request that the Court exercise its discretion to impose a sentence not greater than necessary under section 3553 upon Michael Shvartsman.

Dated: New York, New York
      October 7, 2024

Respectfully submitted,

/s/

_____

Alan S. Futerfas
The Law Offices of Alan S. Futerfas
565 Fifth Avenue, 7th Floor
New York, New York 10017
*Attorney for Michael Shvartsman*

Dennis C. Vacco
Lippes Mathias, LLP
50 Fountain Plaza
Suite 1700
Buffalo, New York 14202
*Attorney for Michael Shvartsman*