

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 10, 2024

**BY ECF**

The Honorable Lewis J. Liman
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

      **Re:**    *United States v. Michael Shvartsman*, **S1 23 Cr. 307 (LJL)**

Dear Judge Liman:

      The Government respectfully submits this memorandum in advance of the October 17, 2024 sentencing for defendant Michael Shvartsman.

      The defendant was entrusted with valuable, confidential information about a potential merger between a blank-check SPAC (DWAC) and Trump Media. He ensured that his employee would be appointed to DWAC's Board of Directors. He then misappropriated the inside information he obtained from DWAC to make more than $18 million illegally trading in DWAC warrants. His co-conspirators made millions more. And he moved portions of the proceeds of his crimes through a series of corporate payment processing accounts he controlled and used the rest to purchase a luxury yacht layered through shell companies and straw owners. The defendant's criminal conduct was flagrant, manipulative, and motivated by sheer greed.

      For the reasons set forth below, the Government respectfully submits that a sentence within the Guidelines Range of 46 to 57 months' imprisonment would be sufficient but not greater than necessary in light of the defendant's criminal conduct.

**I.    Background**

    **A.**    **The Offense Conduct**

      The defendant and his co-conspirators, including his brother, Gerald Shvartsman, made tens of millions of dollars in illegal profits by trading in the open-market securities of Digital World Acquisition Corporation ("DWAC").

      In or about June 2021, the defendant operated a number of companies involved in credit card payment processing and financial services. He also ran his own private investment firm, Rocket One Capital.

At that time, DWAC's CEO, Patrick Orlando, approached the defendant to pitch him on investing in DWAC, Orlando's new special purpose acquisition corporation, or "SPAC." Orlando came to Michael Shvartsman's offices in South Florida to present to Shvartsman and his brother in person.

Unlike most blank-check SPACs, whose investors are generally clueless as to merger targets, this pitch included the possibility of a desirable target. Orlando explained that he had an existing business relationship with former President Donald J. Trump through another SPAC Orlando had established, Benessere. Orlando told the Shvartsmans that, rather than Benessere, DWAC might be the company to profit from this relationship and could potentially merge with Trump's company, Trump Media and Technology Group, which owned the Truth Social social-media company.

Before receiving this highly confidential, highly valuable information, Shvartsman signed confidentiality agreements with both DWAC and Benessere. Those confidentiality agreements stated, in sum and substance, that the defendant could use the information provided by Orlando only to decide whether to invest directly in the SPAC, that Shvartsman could not disclose material non-public information he learned from Benessere or DWAC to others, and that he could not use it to engage in securities trading on the open market on the basis of material non-public information.

Following the pitch meeting, Michael Shvartsman offered to assemble a consortium of investors in the SPAC. Michael Shvartsman enlisted his employee, Rocket One's Chief Strategy Officer and Investment Officer Bruce Garelick, to help gather this group of investors. Together, the group Shvartsman helped bring together invested millions in legitimate pre-IPO investments in DWAC. In exchange, Michael Shvartsman arranged for Garelick to be named as a director-nominee of DWAC board of directors. Shvartsman intended that, as a director, Garelick would tend to the brothers' investments and ensure that they would profit by focusing on the potential DWAC-Trump Media merger and informing Shvartsman of the negotiations' progress.

After DWAC went public in September 2021, Garelick, as a DWAC director, learned additional material non-public information about DWAC's negotiations with Trump Media. For example, Garelick learned confidential information about the status of merger negotiations between DWAC and Trump Media, the timing of a letter of intent and merger agreement, deal terms, and a likely closing date. After learning this material non-public information through his role on DWAC's board, Garelick provided updates to Michael Shvartsman about the status of the DWAC-Trump Media merger negotiations and the timing of a public merger announcement. Garelick encouraged Michael Shvartsman and another insider, Eric Hannelius, to purchase additional warrants in DWAC. Michael Shvartsman, in turn, passed Garelick's information on to Gerald Shvartsman.

Shvartsman, armed with the inside information he had already learned from Orlando, supplemented by the tips passed on from Garelick, then made several well-timed, massive purchases of publicly trading DWAC securities, all in violation of the nondisclosure agreements he had entered.

Specifically, both before and after DWAC executed a letter of intent with Trump Media on or around September 23, 2021, Garelick conveyed material non-public information to Michael Shvartsman and encouraged him to buy DWAC securities. On October 1, 2021, once DWAC warrants began trading on the Nasdaq exchange, Michael Shvartsman placed an order to purchase 2 million DWAC warrants. These warrants were purchased on the market over the course of three days.

On or about October 6, shortly after Michael Shvartsman finished purchasing his warrants, he tipped Gerald Shvartsman. Gerald Shvartsman contacted his broker that same day and placed an order for 300,000 DWAC warrants, which he purchased over the next two days. Just two days before the merger was announced publicly, on October 18, 2021, Michael Shvartsman passed additional DWAC tips to Gerald Shvartsman concerning the timing of the merger announcement. As a result, Gerald purchased another 100,000 warrants.

But as Shvartsman stockpiled these DWAC warrants, the public was entirely ignorant of DWAC's merger target. To the market, DWAC was just like many blank-check SPACs with unknown merger prospects.

Shvartsman also violated his confidentiality obligations by telling others about inside DWAC information with the intent that they trade on it. Shvartsman and Garelick told Shvartsman's business partner, Eric Hannelius about the approaching merger, which caused Hannelius to purchase DWAC units and warrants. Shvartsman also tipped his neighbor and a friend of his, with whom he was socializing in Las Vegas on the eve of the merger announcement. This neighbor and friend also traded in DWAC securities based on those tips.

On October 20, 2021, after the close of trading, a spokesperson for former President Trump posted a press release to Twitter announcing the planned merger of DWAC and Trump Media. After the public announcement of the DWAC-Trump Media merger agreement, the share and warrant prices of DWAC skyrocketed. DWAC warrants went from trading for less than a dollar prior to the merger announcement to a daily high of $14.49 on October 21 and a daily high of $79.22 on October 22. This was a more than 18,000% increase in a two-day span.

The day after the prospective merger was announced, as the market opened, Michael Shvartsman and his conspirators sold their stores of illegally purchased securities. Michael Shvartsman and Bruce Garelick sold the Rocket One DWAC warrants for approximately $18.2 million in illegal profits. Gerald Shvartsman sold the DWAC securities he purchased on the open market for a profit of approximately $4.6 million. Bruce Garelick sold the DWAC securities he had purchased directly on the open market for profits of approximately $49,702. Shvartsman's friend and co-investor, Anton Postolnikov, sold his open market DWAC securities for a profit of approximately $14.5 million. Michael Shvartsman's business partner Hannelius, Michael Shvartsman's friend, and Michael Shvartsman's neighbor sold their securities for total illegal profits of approximately $1.5 million. Gerald Shvartsman's direct tippees sold their securities for profits of approximately $420,000, and their tippees, in turn, made approximately $1.6 million in profit trading in DWAC securities.

In total, the tipping chain from Michael Shvartsman and his co-defendants netted nearly $40 million in illegal profits—a gargantuan sum. *Cf. United States v. Rajaratnam*, 09 Cr. 1184

(RJH) (attributing approximately $66 million in gains to Raj Rajartanam's insider trading scheme).[1]

Shvartsman took advantage of his tremendous windfall of criminal profits. He transferred approximately $8.4 million of the proceeds of the sale of DWAC securities through a series of bank accounts controlled by Shvartsman or his associate Hannelius that were used primarily in connection with their payment processing businesses—one account in the chain handled billions of dollars in transactions. Shvartsman also transferred approximately $12 million of the DWAC proceeds toward purchasing a $14.7 million 160-foot yacht, then named the Ipanema. The defendant renamed the yacht the Provocateur.

### B. The Defendant's Plea, Guidelines Range, and Forfeiture

On February 6, 2024, the defendant was charged in the S1 superseding indictment (the "Indictment") in nine counts: one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 (Count One), five counts of Title 15 securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 (Counts Three, Four, Five, Six, and Seven), one count of Title 18 securities fraud, in violation of 18 U.S.C. § 1348 (Count Ten), one count of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Count Eleven), and one count of engaging in transactions in excess of $10,000 with criminally derived property (Count Twelve). On April 3, 2024, approximately four weeks before trial, the defendant pled guilty, pursuant to a plea agreement, to securities fraud, as charged in Count Three of the Indictment. (PSR ¶¶ 1-9.)

As agreed to by the parties, and as calculated by the Probation Office, the Stipulated Guidelines Range is 46 to 57 months' imprisonment. (PSR ¶¶ 9, 120.) Probation recommends the defendant be sentenced to a Guidelines sentence of 46 months' imprisonment. (PSR at 36.) As set forth in the Plea Agreement, and pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the Government seeks forfeiture in the amount of $18.2 million (PSR ¶¶ 130-31), and the Court has entered a Preliminary Consent Order of Forfeiture and Money Judgment.

---

[1] The loss amount in the parties' Stipulated Guidelines Range of approximately $24.5 million (PSR ¶ 9(c) & n.4; ¶ 40), reflects the profits attributable to the defendant personally, Gerald Shvartsman, Hannelius, the defendant's neighbor, and the defendant's friend, as the fair approximation of "reasonably foreseeable pecuniary" loss attributable to the defendant. See U.S.S.G. § 2B1.1, application note 3(A)(iv).

## II. The Sentencing Guidelines and Section 3553(a) Factors

The Sentencing Guidelines promote the "basic aim" of "ensuring similar sentences for those who have committed similar crimes in similar ways," *United States v. Booker*, 543 U.S. 220, 252 (2005), and so "to secure nationwide consistency, the [Sentencing] Guidelines should be the starting point and the initial benchmark," *Gall v. United States*, 552 U.S. 38, 49 (2007). Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

## III. The Court Should Impose a Guidelines Sentence

A sentence of imprisonment within the Stipulated Guidelines Range of 46 to 57 months' imprisonment would be sufficient but not greater than necessary under the relevant Section 3553(a) factors.

### A. A Guidelines Sentence Is Necessary in Light of the Nature and Seriousness of the Offense, the Need to Promote Respect for the Law, and the Need to Provide Just Punishment

A sentence within the Guidelines Range is necessary in light of the nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(1) & 3553(a)(2)(A).

The defendant, due to his wealth, status, and connections, was afforded an exclusive opportunity not available to ordinary investors. He was given the opportunity to make a pre-IPO

investment in a SPAC with an inside track to merge with former President Trump's social medial company. But that legal, exclusive opportunity was not enough to satisfy the defendant's greed. Shvartsman, his brother, Garelick, and their confederates used the explosive, confidential information they obtained in connection with that investment opportunity to illegally add to their profits by purchasing cheap, unrestricted open market warrants that skyrocketed in value when the rest of the world learned what the conspirators already knew was coming.

The defendant misappropriated the confidential, valuable information that DWAC had entrusted to him. And he ensured that Garelick would be installed as a DWAC director so as to guarantee the defendant's continued access to material non-public information concerning the potential Trump Media merger.

The defendant is a wealthy, successful businessman. He operates numerous companies, including his own investment firm, which appears to manage substantial assets. He is sophisticated, having formed or otherwise been affiliated with more than a dozen different entities. (*See* PSR ¶¶ 87-100.) He owns at least $11.7 million in assets, and likely has substantially more. He lives in expensive real estate and maintains a luxurious lifestyle.

There was no motivation for this crime other than pure greed. The defendant's personal investment firm made in excess of $18 million in illegal profits as a result of the warrants the defendant purchased. He used these funds, among other things, to buy a large yacht. This yacht, the Provocateur, has room for twelve guests and is to be staffed by eleven crewmembers. Although still subject to forfeiture, the yacht is currently listed for lease at rates of approximately $333,500 per week. *See* https://www.yachtcharterfleet.com/luxury-charter-yacht-49945/provocateur.htm.

The defendant's crime did not stop at lining his own pockets. He also shared material non-public information with others, allowing for his friends, family members, and associates to profit due to their relationship with Shvartsman. The defendant knew what he was doing was wrong, and knew he was violating the promises he had made to keep the information confidential and not use it.

This corruption—wealthy individuals further illegally enriching themselves when they have already been presented with opportunities beyond the reach of ordinary investors—is within the heartland of the kind of serious securities fraud that warrants a substantial sentence. Insider trading of this form "creates [the] perception in the public including, among investors and would be investors, that the market is somehow rigged or, at the very least, that certain individuals who have more access to information have the upper hand in terms of making investment decisions both whether to buy or to sell." *United States v. Collins*, No. 18 Cr. 567 (VSB) (Jan. 17, 2020), Sent. Tr. at 87-88. Insider trading also "appropriate[s] some part of the returns … at the expense of other shareholders" and "tends to discourage corporate investment and reduce the economic efficiency of corporate behavior." Michael Manove, *The Harm From Insider Trading and Informed Speculation*, The Quarterly Journal of Economics (Nov. 1989). Because of the economic harm caused by insider trading, and because "[o]ur markets are … such an important part of the fabric of our economic life," it is important to "punish those who would hurt the integrity of that system." *United States v. Wong*, No. 22 Cr. 395 (ER) (Jan. 26, 2024), Sent. Tr. at 24. Moreover, in addition to harming investors and the stock market generally, Shvartsman's misappropriation of confidential information from DWAC harmed the company itself, which, as Judge Rakoff has

described, is "the functional equivalent of stabbing [the victim company] in the back." *United States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012). In short, the serious nature of the harm of insider trading demands punishment.

In light of the seriousness of the offense and the harm it caused, a punishment that is just and commensurate with the defendant's conduct is required. As "insider trading is not only a sophisticated form of cheating but also a fundamental breach of trust and confidence … meaningful punishment is … necessary to reaffirm society's deep-seated need to see justice triumphant," and "[n]o sentence of probation, or anything close to it, could serve this purpose." *Gupta*, 904 F. Supp. 2d at 355. Justice requires that Shvartsman be punished with an incarceratory sentence within the Guidelines Range.

### B. Deterrence Warrants an Incarceratory Sentence

Both general and specific deterrence support the imposition of a Guidelines sentence.

The Court's sentence must specifically deter Shvartsman from committing additional criminal activity. Shvartsman engaged in this flagrant insider trading scheme, in which he acquired millions of DWAC warrants and realized in excess of $18 million in illegal profits. This conduct and his post-sentencing conduct indicate that Shvartsman is a person who believes that the laws and obligations of society do not apply to him.

As Probation notes, the defendant has failed to provide financial statements and has not given the Court a clear picture of his true financial condition. Although the defendant owns and operates several businesses and lives a luxurious lifestyle, both his 2020 and 2022 tax returns claim he had taxable income of $0. This lack of cooperation in common requests from Probation and the ambiguity concerning the defendant's employment and finances indicates that the defendant does not want inquiry into his life and does not care to subject his finances to the Court's examination.

In addition, the Government is further troubled by the defendant's conduct with respect to the yacht, the Provocateur. At the time of his plea, the defendant consented to the forfeiture of the Provocateur, which the Court endorsed in the Preliminary Consent Order of Forfeiture.[2] For most of the last year, the Provocateur has been docked in Turkey, where, as the defendant knows, the Government has transmitted a judicially authorized warrant to seize the yacht, and has held the execution of that warrant in abeyance pending the resolution of the defendant's forfeiture obligations. After the defendant pled guilty and agreed to forfeit the yacht, the Government learned in the summer of 2024 that, without consulting the Government (or apparently his criminal defense attorneys), the defendant had leased the Provocateur for summer charters on the Mediterranean. The Government informed defense counsel that the yacht should not be chartered, that it remained subject to forfeiture pursuant to the consent order, and that the yacht should not leave Turkey.

---

[2] Although the Government agreed to treat his forfeiture obligation as satisfied if the defendant made a payment of $18.2 million in advance of sentencing, the yacht is and remains subject to forfeiture until the Government confirms it has finally forfeited all of the necessary funds.

In September 2024, the Government learned that the yacht had been moved to Italy's Ligurian coast, pending shipment to Fort Lauderdale, Florida, in contravention of the consent forfeiture order and again without notice to or the consent of the Government. When the Government raised this issue with Shvartsman's attorneys, it became clear that they were also ignorant of the yacht's movement. Again, it appears that Shvartsman felt he could do whatever he wanted with the yacht, without regard to the Court's forfeiture order, the Government's seizure warrant, and his obligations.

Altogether, Shvartsman exhibits a troubling pattern of acting as though he were above the law. The sentence and term of supervised release imposed upon Shvartsman must deter him from committing future crimes.

General deterrence is also important here. *See* 18 U.S.C. § 3553(a)(2)(B). The Second Circuit and courts in this district have noted the appropriateness of significant sentences in the context of financial crimes, including specifically insider trading, committed by defendants who make the calculation that white collar crime is "a game worth playing." *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (quoting district court and affirming sentence of 66 months' imprisonment for insider trading offense); *Gupta*, 904 F. Supp. 2d at 355 ("As this Court has repeatedly noted in other cases, insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail."). Indeed, research shows that enforcement actions and punishment for insider trading is effective for achieving deterrence. *See, e.g.*, Fernan Restrepo, *The Impact of Insider Trading Doctrine on the Incidence of Insider Trading: An Analysis of the Effect of the Misappropriation Theory* (Nov. 8, 2023), https://ssrn.com/abstract=4627327 (finding that the adoption of the misappropriation theory of insider trading had a meaningful deterrent effect); Robert Davidson and Christo Pirinsky, *The Deterrent Effect of Insider Trading Enforcement Actions*, Accounting Review (May 2021) (concluding that insider trading convictions have a statistically significant effect on deterrence of future insider trading). And, as the Eleventh Circuit has noted, in passing the Sentencing Reform Act, "Congress was especially concerned that prior to the Sentencing Guidelines, [m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006); *see also id.* ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.").

For those reasons, it is important here to impose a sentence that will deter future insider trading. While a "relatively modest prison term" may be sufficient in some cases, non-incarceratory sentences "totally fail to send this message." *Gupta*, 904 F. Supp. 2d at 355. The potential messages that could be inferred from this case, depending on the sentence, illustrate the point. If, on the one hand, Shvartsman is sentenced to a term of incarceration, and one commensurate with the defendant's conduct, it will send a message to other individuals with access to confidential information that insider trading will result in prison time. But, on the other hand, a noncustodial or brief sentence may result in the wrong message: that insider trading is not serious or, even worse, that individuals with privileged access to confidential information are able to use their advantages to escape meaningful consequences. The fact that this case has resulted in press

coverage does not alone serve a deterrent purpose. *United States v. Cutler*, 520 F.3d 136, 171 (2d Cir. 2008). Instead, "because the case had attracted an unusually large amount of publicity," it "could have a powerful general deterrent effect." *United States v. Ulbricht*, 858 F.3d 71, 94 (2d Cir. 2017).

In sum, deterrence is important in this case. Without a significant sentence attached to insider trading, the relative simplicity of committing the crime and the challenge of detecting it would incentivize those similarly situated to the defendant to engage in similar conduct. Shvartsman's sentence must also therefore reflect an emphasis on general deterrence that is commensurate with the difficulty of detecting and proving illegal insider trading. As Judge Rakoff cautioned in *Gupta*, defendants situated similarly to the defendant must be made aware that "when you get caught, you will go to jail." 904 F. Supp. 2d at 355. Only a serious sentence, one that sends the message that insider trading will result in prison time, would adequately ensure that those who would be tempted by a similar path understand the true consequences of such conduct.

### C. A Sentence Within the Guidelines Range Is Necessary to Avoid Unwarranted Sentencing Disparities

Relative culpability and the defendant's personal characteristics also warrant a substantial sentence within the Guidelines Range. "In imposing a sentence, the district court is required to consider, among other things, 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008) (quoting 18 U.S.C. § 3553(a)(6)). As the Second Circuit has repeatedly observed, however, sentencing disparities are not "unwarranted" where defendants are not "similarly situated." *United States v. Wills*, 476 F.3d 103, 109-10 (2d Cir. 2007).

Here, when comparing the defendant's case to other insider trading defendants *nationwide*, or at least across this district, the need to avoid unwarranted sentencing disparities requires the imposition of an incarceratory sentence within the Guidelines Range.

Most insider trading defendants are sentenced to prison. Indeed, the defendant made millions more than many other defendants in this District who have been sentenced to substantial jail time. *See, e.g.*, *United States v. Viggiano*, No. 23 Cr. 497 (VEC) (defendant who received approximately $35,000 in kickbacks for illegal tips sentenced to 28 months' imprisonment following guilty plea); *United States v. Forlano*, No. 23 Cr. 497 (VEC) (defendant who realized approximately $100,000 in profits from insider trading scheme sentenced to 13 months' imprisonment following guilty plea); *United States v. Stone*, No. 22 Cr. 510 (MKV) (defendant who realized insider trading profits of approximately $4.8 million for himself and his family sentenced to 28 months' imprisonment following early guilty plea);*United States v. Markin*, No. 22 Cr. 395 (ER) (tipper in insider trading scheme who realized profits of approximately $80,000 sentenced to 15 months' imprisonment following guilty plea); *United States v. Bhardwaj*, No. 22 Cr. 398 (GHW) (defendant sentenced to 24 months' imprisonment following guilty plea); *United States v. Kakkera*, No. 22 Cr. 398 (GHW) (18 month sentence after guilty plea); *United States v. Dikshit*, No. 21 Cr. 760 (CM) (defendant sentenced to 24 months' imprisonment following early guilty plea); *United States v. Polevikov*, No. 21 Cr. 774 (LJL) (defendant in front running scheme realizing profits of approximately $8.56 million sentenced to 33 months' imprisonment following

pre-indictment guilty plea); *United States v. Malnik*, No. 19 Cr. 714 (VM) (defendant sentenced to 30 months' imprisonment following guilty plea); *United States v. Collins*, No. 18 Cr. 567 (VSB) (defendant sentenced to 26 months' imprisonment following guilty plea); *United States v. Buyer*, No. 22 Cr. 397 (RMB) (defendant who realized approximately $476,000 in profits in insider trading scheme sentenced to 22 months' imprisonment following trial).[3]

The profits realized by Shvartsman here, and his role as someone who misappropriated inside information, traded on that information, and tipped others, sets him apart from many other insider trading defendants. Indeed, since the case of *United States v. Rajaratnam*, it is difficult to find a defendant within this district who has profited as much from insider trading as Shvartsman. Rajaratnam was sentenced to eleven years' imprisonment, far higher than the Guidelines Range applicable to Michael Shvartsman.

Shvartsman's conduct is highly culpable even when compared to that of his co-defendants. Michael Shvartsman is certainly more culpable than his brother, Gerald Shvartsman. Michael was the experienced financial professional who ran his own investment firm and brought his brother in on the initial DWAC investment opportunity. Michael nominated his employee, Garelick, to be his eyes and ears on the DWAC Board and to obtain additional material nonpublic information ensuring that the DWAC-Trump Media merger was on track. Michael executed his two million warrant purchase before passing on additional inside information to his brother. And Michael used his web of corporate entities to try to hide his millions of dollars of illegal proceeds. And, although Garelick's conduct is subject to serious aggravating factors not present in Michael Shvartsman's case, including Garelick's violation of his duties as a director of DWAC, the Government cannot ignore that Shvartsman is the one who ensured that Garelick, his employee, joined the DWAC board. Shvartsman, moreover, is the defendant who directly benefited from the millions of dollars in Rocket One trading profits.

Although the defendant notes that he is likely to be subject to deportation, such a collateral consequence does not alter the Government's view that a Guidelines Sentence is appropriate for the reasons described above. The defendant understood the wrongfulness of his actions as he engaged in this insider trading scheme. He chose to commit these crimes knowing that he lacked citizenship status in the United States and could be deported as a result. While this collateral consequence is unfortunate, it was entirely predictable to the defendant once he chose to engage in this course of conduct.

---

[3] The cases cited by the defense do not involve similarly situated defendants. (Def. Mem. 27-31.) Some of these cases are discussed above. Others do not provide helpful comparators. *See, e.g.*, *United States v. Stiles*, No. 23 Cr. 98 (RA) (personal gains of approximately $500,000); *United States v. Stewart*, No. 15 Cr. 287 (JSR) (sentencing of tipper with total scheme gains of approximately $1.5 million); *United States v. Tsai*, No. 19 Cr. 675 (VM) (profit of approximately $98,750).

## IV. Conclusion

For the reasons set forth above, the Government respectfully submits that a sentence within the Guidelines Range of 46 to 57 months' imprisonment would be sufficient but not greater than necessary to comply with the purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: /s/_____
Daniel G. Nessim/Matthew R. Shahabian
Assistant United States Attorneys
(212) 637-2486/-1046